IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

-------------------------------------------------------X

JAMES THOMAS and DAVID HIXSON, for
themselves and those similarly situated,

                Plaintiffs,

    v.

BILL HASLAM, Governor of Tennessee, in
his official capacity; DAVID W. PURKEY,
Commissioner for the Department of Safety
and Homeland Security, in his official
capacity; and HERBERT SLATERY III,
Attorney General and Reporter, in his official
capacity,

                Defendants.
-------------------------------------------------------X

**COMPLAINT – CLASS ACTION**

**PRELIMINARY STATEMENT**

1. Whenever people are convicted of crimes in the state and local courts of Tennessee—and sometimes even when they are not convicted—they are assessed certain litigation taxes, court costs, and fines ("Court Debt"). If they cannot pay their Court Debt within one year, their driver's licenses are revoked by the State of Tennessee, without notice and without any inquiry into whether they are able to pay the Court Debt.

2. These revocations, mandated by Tennessee law, dramatically impair the ability of impoverished Tennessee residents to meet the basic necessities of life. Without their driver's licenses, Plaintiffs and class members have difficulty grocery shopping, going to the doctor, attending church, caring for and spending time with family members, taking their children to school, and participating in other fundamental aspects of daily life. The revocations also deprive

1

indigent people of a key tool for finding and keeping a job. Without work, people cannot earn enough money to pay the Court Debt. The statutory scheme traps only the poorest court debtors in a cycle of debt, poverty, and alienation from their community.

3. The Tennessee law at issue, Tenn. Code Ann. § 40-24-105(b) ("the Statute"), requires that people pay their Court Debt within one year of imposition or lose their driver's licenses—even if they are indigent and unable to pay through no fault of their own. Because of their financial circumstances, Plaintiffs and class members could not or will not be able to pay their Court Debt, and thus their licenses have been or will be automatically revoked without consideration of their ability to pay.

4. Once their licenses are revoked, Plaintiffs and class members incur additional costs in the form of substantial reinstatement fees that Defendants require them to pay in order to regain their right to drive. Plaintiffs and class members cannot afford to pay the reinstatement fees and thus are unable to regain licenses.

5. Since 2012, when the Statute went into effect, the Tennessee Department of Safety has automatically revoked more than 146,000 driver's licenses for failure to pay Court Debt.

6. The Statute violates the Due Process and Equal Protection Clauses because it is fundamentally unfair to deprive a person of the right to drive for failure to pay a Court Debt: (1) without requiring that the State first determine whether the person has the ability to pay the Court Debt; and (2) without providing a notice and an opportunity to be heard in connection with the revocation.

7. The Statute violates the Equal Protection Clause in another way: it subjects people owing Court Debts to unduly harsh and discriminatory treatment as compared to other debtors, as prohibited by the U.S. Supreme Court in *James v. Strange*, 407 U.S. 128 (1972).

8. Accordingly, Plaintiffs and class members seek a declaratory judgment that the Statute is unconstitutional. They also seek an injunction preventing Defendants from enforcing the statute and directing Defendants to reinstate all driver's licenses automatically revoked pursuant to the Statute.

## JURISDICTION AND VENUE

9. This is a civil rights action arising under 42 U.S.C. § 1983, 28 U.S.C. §§ 2201-2202, and the Fourteenth Amendment to the United States Constitution. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343.

10. Venue in this district is proper under 28 U.S.C. § 1391(b) because one or more Plaintiffs reside in this district, Defendants reside in this district, and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

11. Plaintiff James Thomas resides in Nashville, Tennessee.

12. Plaintiff David Hixson resides in Nashville, Tennessee.

13. Defendant Bill Haslam is the Governor of the State of Tennessee. He is sued in his official capacity.

14. Defendant David W. Purkey is the Commissioner for the Tennessee Department of Safety and Homeland Security. He is sued in his official capacity.

15. Defendant Herbert Slatery III is the Attorney General and Reporter for the State of Tennessee. He is sued in his official capacity.

## FACTS COMMON TO THE CLASS

*Assessment of Court Debt*

16. In Tennessee, a person who is convicted of a crime is ordered to pay Court Debt.

17. Fines are considered part of the criminal penalty and are not assessed in every case.

18. Litigation taxes and court costs, however, are not part of the penalty and are assessed after every misdemeanor and felony conviction.

19. Some people incur Court Debt without even being convicted of a crime. This occurs when they are charged with a crime, but the prosecutor, as a matter of discretion, offers to dismiss the case "on costs."

20. Examples of court costs routinely imposed include: filing fees, arrest fees, court security fees, fees for issuing subpoenas, fees for continuances, indigent defense fees, jail fees, witness fees, travel fees, and diagnostic fees. Some counties also include probation fees.

21. Depending on factors such as the length of pretrial detention and the complexity of the case, litigation taxes and court costs range from a few hundred dollars to more than ten thousand dollars. Fines likewise can range from a few hundred dollars to thousands of dollars.

22. According to the Tennessee Administrative Office of the Courts, approximately 75% of criminal defendants in Tennessee have been found indigent.

*Revocation of Driver's Licenses under the Statute*

23. Prior to 2011, Tennessee collected Court Debt in the same manner as all other civil judgments. Court debtors had the same protections and exemptions as all other civil judgment debtors. No person could be imprisoned for failure to pay litigation taxes and court costs; no person could be imprisoned for failure to pay fines unless the court first found that the

4

person actually had the ability to pay those fines; and no one lost his or her driver's license for failure to pay Court Debt. *See generally* Attorney General Opinion No. 06-135, *available at* https://www.tn.gov/assets/entities/attorneygeneral/opinions/op06-135.pdf.

24. In 2011, however, the Tennessee legislature enacted the Statute, which provides that:

> A license issued under title 55 for any operator or chauffeur shall be revoked by the commissioner of safety if the licensee has not paid all litigation taxes, court costs, and fines assessed as a result of disposition of any offense under the criminal laws of this state within one (1) year of the date of disposition of the offense. The license shall remain revoked until such time as the person whose license has been revoked provides proof to the commissioner of safety that all litigation taxes, court costs, and fines have been paid.

Tenn. Code Ann. § 40-24-105(b)(1).

25. Felony cases are adjudicated in each county's circuit criminal court and misdemeanors in each county's general sessions criminal court.

26. The clerk of the criminal court having jurisdiction over the offense ("Court Clerk") is responsible for tracking and collecting Court Debt.

27. Under the Statute, the Court Clerk "shall" notify the State Commissioner of Safety when a person has any Court Debt that remains unpaid after one year from the date of disposition of the offense. Tenn. Code Ann. § 40-24-105(b)(2).

28. Upon receiving notification from the Court Clerk that a person has outstanding Court Debt, the Commissioner of Safety "shall" revoke that person's license. Tenn. Code Ann § 40-24-105(b)(1).

29. The license "shall" remain revoked until such time as the person provides proof to the Commissioner of Safety that he or she has paid all outstanding Court Debt. *Id.*

5

30. The Commissioner also "revokes" licenses before people even have them. If such a person later applies for a license, the Commissioner may not issue a license until that person has paid all outstanding Court Debt and a reinstatement fee. Tenn. Code Ann. § 55-50-303(a)(2).

31. The Statute does not require the Court Clerk or the Commissioner of Safety to send pre-revocation notices to the people whose licenses will be revoked for failure to pay their Court Debt. As a result, they receive no notice stating that their license will be revoked, the basis for the revocation, the date of the revocation, and how to challenge the revocation, including by raising the license holder's inability to pay by reason of poverty.

32. The Statute does not provide for a hearing at which a person may challenge the revocations on the basis that he or she is unable to pay the Court Debt.

33. The Statute requires automatic and mandatory revocation without consideration of debtors' ability to pay Court Debt and does not permit the Commissioner of Safety to consider whether people subject to license revocation have the ability to pay their Court Debt before revoking their driver's licenses.

### *Hardship Provisions*

34. The Statute contains very limited "hardship" provisions that do not prevent revocation for people who cannot afford to pay their Court debt. And the Statute does not require Defendants to provide notice of the limited hardship provisions prior to or even after the license is revoked.

35. The statute allows people to avoid revocation of their driver's licenses by entering into and maintaining payment plans with the court. Tenn. Code Ann. § 40-24-105(b)(4).

36. However, the statute does not require that Court Clerks offer payment plans that are affordable to indigent court debtors.

6

37. The Statute contains no guidelines to ensure proper notice or any kind of hearing. As a result, practices prevail across the state, including Clerks requiring minimum payments to qualify for setting up a payment plan or never informing people of a payment plan option.

38. In addition, if someone is too poor to make any payment at all, he or she cannot enter into a payment plan.

39. For people who cannot pay, the statute provides for the right to apply to the court for a one-time, six-month stay of revocation based on "extreme hardship." Tenn. Code Ann. § 40-25-104(b)(3).

40. In order to grant this six-month stay, the court must find that no other transportation is reasonably available to the person. Further, "[g]rounds for finding of extreme hardship are limited to travel necessary for: (i) employment; or (2) serious illness of the person or an immediate family member." *Id.*

41. The stay cannot be extended past six months, and it therefore does not provide relief to people who cannot work because of a disability, because of childcare responsibilities, or because they face long-term unemployment or underemployment for reasons outside of their control.

42. The statute does not specify any means for notifying people that the payment plans and hardship stays are available.

### *Reinstatement of Driver's Licenses*

43. In Tennessee, once a driver's license is revoked, it must be reinstated in order for the license-holder to regain legal driving privileges.

44. Reinstatement requires paying a fee, which can amount to hundreds of dollars or more.

7

45. The Tennessee Department of Safety offers payment plans for people who owe more than $200 in reinstatement fees. However, the payment plans are themselves out of reach for indigent Tennesseans. The payment plans require a down payment of $200 and a processing fee of $25. Payments must be made in the amount of at least $300 every quarter, and the entire amount must be paid within two years. If a debtor defaults on a payment plan for any reason—including unexpected financial hardship—she loses her license and can never enter into another payment plan again. *See generally* Tenn. Comp. R. & Regs. 1340-2-5.

46. Only after a person pays the reinstatement fee may he or she apply for a new driver's license, which requires paying a separate application fee.

47. For indigent Tennesseans, reinstatement fees are yet another barrier to regaining legal driving privileges.

## *Devastating Consequences of the Statute*

48. From July 1, 2012, to June 1, 2016, the Tennessee Department of Safety revoked 146,211 driver's licenses from people who did not pay their Court Debt.

49. Only 10,750 people (7%) whose licenses were revoked for non-payment of Court Debt pursuant to the Statute have been able to get their licenses reinstated. In other words, 93% of people whose licenses were revoked since June 1, 2012, have not been able to get their licenses back.

50. People incarcerated for more than one year almost certainly cannot pay Court Debt within one year because they cannot enter into and maintain payment plans while they are imprisoned. The Statute does not provide a stay for the period of incarceration.

51. When former prisoners return to society from incarceration, the inability to drive creates a significant barrier to regaining employment, reestablishing connections to family and

8

Case 3:17-cv-00005   Document 1   Filed 01/04/17   Page 8 of 19 PageID #: 8

friends, and being able to live a normal social life. It also hinders their ability to pay various additional fees imposed by the State of Tennessee as a condition of their release, such as significant parole fees, thereby threatening them with return to prison.

52. In Fiscal Year 2015-2016, the State of Tennessee released 13,987 people from jail or prison. Among these people the average time served was 4.57 years. Thousands of these people would have had their driver's licenses automatically revoked under the Statute prior to their release.

53. Approximately 75% of criminal defendants in Tennessee qualify for appointed counsel because of their indigence.

54. People with criminal records are disproportionately poor. Sixty percent of formerly incarcerated men are unemployed one year after their release.

55. Formerly incarcerated men earn approximately 11% less in hourly wages, 40% less per year, and are unemployed nine weeks longer than those who have not served time. Even people with minor criminal records who have never been incarcerated face major barriers to employment.

56. African Americans have been particularly hard hit by driver's license revocations. Although they make up only 16% of Tennessee's population, African Americans comprise 36% of people with revoked licenses.

57. Without a driver's license, it is extraordinarily difficult to find employment. A driver's license is required for many professions, even those that are not directly related to driving.

58. For example, the following professions often require a driver's license as a condition of employment: automotive technician, cable installation technician, caregiver,

9

construction worker, delivery driver, housecleaner, HVAC technician, landscaping crew member, maintenance worker, plumber and plumber's helper, pressure washer, truck driver, truck washer, unarmed security officer, valet parking attendant, and warehouse worker.

59. Even for jobs that do not require a valid drivers' license, it is a reality of everyday life, especially in many areas across Tennessee without significant public transportation, that getting to and from a work requires driving a car. Public transportation is unreliable or lacking entirely in many parts of Tennessee and people often have no way to get to work without driving.

60. The law thus creates a vicious cycle: people do not have a driver's license because they cannot pay their Court Debt; they cannot pay their Court Debt because they do not have a job; and they cannot get a job because they do not have a driver's license.

61. Even in areas with public transportation services, those services do not meaningfully reach significant portions of the impoverished population. According to a Brookings Institution analysis, in Memphis, Nashville, and Knoxville, approximately 75% of jobs are not reasonably accessible by public transportation. And in Nashville, Knoxville and Chattanooga, more than two thirds of working-age residents lack access to public transportation.

62. Many indigent people whose licenses have been revoked still need to drive in order to get to work, school, or medical appointments.

63. Driving on a revoked license is a crime that can result in imprisonment. For the first offense, driving on a suspended or revoked license is a Class B Misdemeanor, punishable by up to six months in jail and a fine of up to $500, or both. Tenn. Code §§ 40-35-111(e)(2); 55-50-504(a)(1). For second and subsequent offenses, driving on a suspended or revoked license is a Class A Misdemeanor, punishable by up to 11 months and 29 days in jail, a fine of up to $2,500, or both. Tenn. Code §§ 40-35-111(e)(2); 55-50-504(a)(2).

10

Case 3:17-cv-00005   Document 1   Filed 01/04/17   Page 10 of 19 PageID #: 10

64. The subsequent charges generate their own fines and fees, making it less likely that these individuals will ever be able to reinstate their driver's licenses. People even serve jail time for driving on revoked licenses to which they never would have been subject had the State considered their ability to pay Court Debt prior to revoking their driver's licenses. This happens thousands of times every year in Tennessee.

65. The Statute therefore presents impoverished people with an impossible choice of driving illegally or failing to meet the basic necessities of life for themselves and their families. For many, it removes for them almost entirely the ability to live a healthy, flourishing life.

66. Local courthouses throughout the State of Tennessee have entire dockets devoted to processing people arrested and charged with driving on suspended or revoked licenses. For example, in Shelby County, many of the daily dockets in General Sessions courts are comprised of driving cases, including a large number related to driving on suspended or revoked licenses. Many of these cases involve people who are too poor to pay the Court Debt owed.

67. Dozens of counties in Tennessee contract with for-profit "user funded" private probation companies. Others run their own "user funded" probation systems. As the system typically functions, people who can pay their Court Debt are placed on unsupervised probation. Those who cannot pay immediately, however, are placed on supervised probation until their Court Debt is paid. People on supervised probation must pay additional fees of up to $45 per month, plus $20 fees any time the for-profit probation officer decides to require a drug test. The for-profit probation officers, as a matter of policy and state law, *take their own fees first* out of any money that court debtors are able to pay. As a consequence, the amount of Court Debt that people must pay to avoid revocation increases above the amount initially set.

11

68. Thus, a Court Debtor can be placed and kept on probation because of her inability to pay $300 in Court Debt. At the end of a year, she could have paid $500 toward her Court Debt, but still owe more than the original $300 because all of the money paid would have gone to "user funded" probation fees. For thousands of Tennessee's poorest people, this represents an endless cycle of poverty, debt, and jailing that makes it impossible to regain a driver's license because the Statute does not ensure any forum to consider any of the barriers to payment that are beyond their control.

69. Non-indigent people with criminal convictions do not suffer revocation of their driver's licenses under the Statute because they have the financial ability to pay Court Debt.

70. Civil judgment debtors are not subject to the revocation of their driver's licenses if they are too poor to pay. Private civil judgment debtors may not have their driver's licenses revoked at all for non-payment. Neither may people who owe other kinds of civil debt to the state, such as income taxes or welfare overpayments. People can lose their licenses for failure to pay court-ordered child support, but only after a court has determined that the person does in fact have the ability to pay and that the non-payment is willful, and only after the state has provided pre-revocation notice and an opportunity to be heard. It is only in the context of the Court Debt collection scheme enshrined in the Statute that all of the basic procedural and substantive protections applied in every other area of law have been removed.

## INDIVIDUAL PLAINTIFF FACTS

### *James Thomas*

71. Plaintiff James Thomas is a 48-year-old Veteran of the U.S. armed forces. He resides in Nashville, Tennessee. He has multiple serious disabilities and relies on Supplemental

Security Income (SSI) and Supplemental Nutrition Assistance Program (SNAP) for his only income.

72. In October 2016, Mr. Thomas visited the Tennessee Department of Motor Vehicles to apply for a driver's license. The DMV refused to issue him a license because Defendants had already revoked it for failure to pay Court Debt.

73. Mr. Thomas needs a driver's license to get to his many medical appointments. Because of the severity of his medical conditions, Mr. Thomas needs to see his doctors regularly.

74. Mr. Thomas has been taking the bus to his medical appointments, but the bus ride back and forth can take hours and is often painful because of his disabilities.

75. Mr. Thomas's Court Debt results from a 2013 conviction in Davidson County. At the time, Mr. Thomas was homeless and had no income other than SNAP benefits, which can be used only to purchase food. On a rainy night in September, he was taking shelter under a bridge when he was arrested for criminal trespass.

76. On October 14, 2013, Mr. Thomas appeared in court, represented himself *pro se*, and was found guilty. He was given a thirty-day suspended sentence and assessed court costs. He was not assessed a fine.

77. That same day, Mr. Thomas went to the Clerk's office and advised the Clerk that he could not pay because he was homeless and had no money.

78. Mr. Thomas never heard anything further about his outstanding Court Debt until October 2016, when he was denied a Tennessee driver's license.

79. Neither the County Court Clerk nor the Tennessee Department of Safety provided Mr. Thomas with written notice of the revocation of his driver's license.

13

80. Because the revocation process is automatic, neither the Court Clerk nor the Tennessee Department of Safety considered Mr. Thomas's ability to pay the Court Debt before revoking his license.

81. Mr. Thomas currently gets by on very limited, subsistence income for people who are totally and permanently disabled. He cannot afford to pay the $289.70 in Court Debt, the $65 reinstatement fee, and the additional application fee necessary to regain his driving privileges. He also is not eligible for the hardship stay.

### *David Hixson*

82. Plaintiff David Hixson is 50 years old and resides in a homeless shelter in Nashville, Tennessee.

83. In 2014, Defendants revoked Mr. Hixson's license for failure to pay Court Debt resulting from a criminal conviction in Washington County. At the time of the revocation, Mr. Hixson was incarcerated and unable to pay.

84. Mr. Hixson is struggling financially to meet the basic necessities of life. He works on average 35-hours a week as a vehicle emissions inspector, but he barely makes enough to scrape by and does not have any extra money to pay his Court Debt.

85. The lack of a driver's license is preventing Mr. Hixson from accessing medical care. He needs hernia surgery, but he has not scheduled the surgery because he does not know how he is going to be able to get himself home from the hospital, and to take care of basic necessities of life during his recovery, if he cannot drive.

86. If Mr. Hixson had a valid driver's license, he could increase his income significantly by seeking work as a motorcycle mechanic. Motorcycle mechanics earn more than emissions inspectors. However, a valid driver's license is a mandatory requirement for that job.

14

87. If Mr. Hixson had a valid driver's license, he would have a better chance of moving out of the homeless shelter where he currently resides. He could broaden his housing search to areas with cheaper rents that are not well-served by public transportation. Mr. Hixson owns a car, which is fully paid for, and which he could drive if he had a license.

88. Neither the County Court Clerk nor the Tennessee Department of Safety provided Mr. Hixson with written notice of the revocation of his driver's license.

89. Because the revocation process is automatic, neither the Court Clerk nor the Tennessee Department of Safety considered Mr. Hixson's ability to pay the Court Debt before revoking his license.

90. Mr. Hixson currently owes $2,583.80 in Court Debt plus a reinstatement fee of $140 and the cost of applying for a new license. According to the Washington County Clerk, Mr. Hixson needs to pay the entire $2,583.80 before he will be eligible for reinstatement of his license.

91. Mr. Hixson cannot afford to pay $2,583.80, or any amount. He also is not eligible for the hardship stay.

92. Mr. Hixson is trapped in a vicious cycle. His license has been automatically revoked for failure to pay Court Debt while he was incarcerated. He cannot pay his Court Debt because he does not earn enough money. And he cannot obtain a better job because he does not have a driver's license.

## CLASS ACTION ALLEGATIONS

93. Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) on behalf of a class defined as: All persons whose Tennessee driver's licenses have been or will be revoked pursuant to the Statute and who, at the time of the revocation, cannot or could not pay Court Debt due to their financial circumstances.

15

Case 3:17-cv-00005   Document 1   Filed 01/04/17   Page 15 of 19 PageID #: 15

94. This class is so numerous that joinder of all members is impracticable. More than 140,000 people have had their driver's licenses revoked pursuant to the Statute, most of whom were too poor to pay their Court Debt. Class members are geographically disbursed throughout the State of Tennessee.

95. There are numerous questions of fact and law common to the class, including:

   a. Whether the Statute is fundamentally unfair because it deprives Plaintiffs of the right to drive solely because of their poverty.

   b. Whether the Statute violates the Due Process Clause because it does not afford Plaintiffs and class members notice and an opportunity to be heard in connection with the revocation of their driver's licenses.

   c. Whether the Statute violates the Due Process and Equal Protection Clauses because it mandates the automatic revocation of driver's licenses from Plaintiffs and class members without considering whether they have the ability to pay.

   d. Whether the Statute violates the Equal Protection Clause because it treats people who have unpaid Court Debt unduly harshly by mandating the revocation of their driver's licenses without consideration of their ability to pay—a consequence not possible for other debtors.

96. The individual plaintiffs' claims are typical of the claims of the class in that all of the named plaintiffs have had their driver's licenses revoked for failure to pay Court Debt, and all the named plaintiffs could not pay their Court Debt because of their indigence.

97. Declaratory and injunctive relief is appropriate with respect to the class as a whole because defendants have acted on grounds applicable to the class.

98. The named plaintiffs and the proposed class are represented by Baker Donelson, the National Center for Law and Economic Justice, Civil Rights Corps, and Just City. Plaintiffs' attorneys are experienced in class action litigation and will adequately represent the class.

99. Defendants have acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## FIRST CAUSE OF ACTION
*Violation of Due Process and Equal Protection – Fundamental Fairness*

100. The Statute's mandatory revocation of people's driver's licenses because they are too poor to pay Court Debt without any inquiry into their ability to pay violates the right to fundamental fairness guaranteed by the Fourteenth Amendment to the United States Constitution.

## SECOND CAUSE OF ACTION
*Violation of Due Process – Notice and Opportunity to be Heard*

101. The Statute's mandatory revocation of people's driver's licenses without providing them notice and an opportunity to show that they are unable to pay the Court Debt violates the right to procedural fairness guaranteed by the Fourteenth Amendment to the United States Constitution.

## THIRD CAUSE OF ACTION
*Violation of Equal Protection Clause*

102. The mandatory revocation of driver's licenses from indigent Court Debtors, but not from other debtors, violates the right to equal protection under law guaranteed by the Fourteenth Amendment to the United States Constitution.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs and class members request that the Court enter a judgment in favor of plaintiffs and the class they represent as follows:

  a. Certify this case as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2);

  b. Declare that the Statute violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution;

  c. Enjoin Defendants from revoking driver's licenses pursuant to the Statute and enjoin Defendants to (i) reinstate all driver's licenses that have been revoked pursuant to the Statute; (ii) waive all reinstatement fees for people whose driver's licenses were revoked pursuant to the Statute; (iii) notify all persons

whose licenses were revoked of their reinstatement; (iv) and provide an accounting of all reinstatements made;

d. Award litigation costs and reasonable attorney's fees, as provided by 42 U.S.C. § 1988; and,

e. Order such other and further relief as the Court deems just and proper.

Dated: January 4, 2017
Nashville, TN

Respectfully submitted,

/s/ Matthew G. White

_____
Lori H. Patterson (TN #19848)
Matthew G. White (TN #30857)
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
First Tennessee Bank Building
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
901-577-8182
lpatterson@bakerdonelson.com
mwhite@bakerdonelson.com

/s/ Claudia Wilner

_____
Claudia Wilner (NY #4264156)*
Petra T. Tasheff (NY #2593325)*
Francisca D. Fajana (MA #564301)*
NATIONAL CENTER FOR LAW AND ECONOMIC JUSTICE
275 Seventh Avenue, Suite 1506
New York, NY 10001
212-633-6967
wilner@nclej.org
tasheff@nclej.org
fajana@nclej.org

/s/ Charles Gerstein

_____
Charles Gerstein (DC #1033346)*
CIVIL RIGHTS CORPS
910 17th Street NW, Suite 500

Washington, DC 20002
202-670-4809
charlie@civilrightscorps.org

/s/ Josh Spickler
_____

Josh Spickler TN (TN #21019)*
JUST CITY
902 South Cooper Street
Memphis, TN 38104
901-206-2226
josh@justcity.org


* Pro Hac Vice Motion Forthcoming