**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

-----------------------------------------------------X

JAMES THOMAS and DAVID HIXSON, on
behalf of themselves and all others similarly
situated,

Plaintiffs,

v.

No. 3:17-cv-00005

DAVID W. PURKEY, Commissioner of the
Tennessee Department of Safety and Home-
land Security,

Defendant.

-----------------------------------------------------X

**PLANTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS**

Lori H. Patterson (TN #19848)
Matthew G. White (TN #30857)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
First Tennessee Bank Building
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
901-577-8182
lpatterson@bakerdonelson.com
mwhite@bakerdonelson.com

Claudia Wilner (NY #4264156)
Petra T. Tasheff (NY #2593325)
Edward P. Krugman (NY # 1665892)*
NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
275 Seventh Avenue, Suite 1506
New York, NY 10001
212-633-6967
wilner@nclej.org
tasheff@nclej.org
krugman@nclej.org

Premal Dharia (DC #484091)*
CIVIL RIGHTS CORPS
910 17th Street NW, Suite 500
Washington, DC 20006
202-670-4809
premal@civilrightscorps.org

Josh Spickler TN (TN #21019)
JUST CITY
902 South Cooper Street
Memphis, TN 38104
901-206-2226
josh@justcity.org

\*   Pro Hac Vice Application
     Filed or Forthcoming

# TABLE OF CONTENTS

Table of Authorities ......................................................................... iii

Preliminary Statement .................................................................... 1

Statement of Facts ......................................................................... 5

    Operation of the Statute ............................................................. 5

    The 2017 Amendment ................................................................ 7

    The Named Plaintiffs ................................................................. 8

ARGUMENT

I.    THE STATUTE AS ORIGINALLY ENACTED VIOLATES THE
    DUE PROCESS AND EQUAL PROTECTION CLAUSES OF THE
    FOURTEENTH AMENDMENT ...................................................... 10

    A.    The Statute Deprives Plaintiffs of Substantive Due
        Process and Violates Equal Protection by Revoking
        Their Driver's Licenses Without Considering Whether
        They Have the Ability to Pay Court Debt .......................... 11

        1.    The *Bearden* Standard ........................................... 11

        2.    Application of the *Bearden* Test ............................. 14

            a.    The Nature of the Individual Interest
                Affected Is Significant, As Is the Extent to
                Which It Is Affected .................................... 14

            b.    The Purported Connection Between
                Legislative Means and Purpose Lacks
                Rationality ................................................... 15

            c.    The State Has Ample Means for
                Effectuating Its Purpose .............................. 16

    B.    The Statute Violates Equal Protection Because the
        State Grants Itself Debt Collection Practices It Forbids
        to Private Creditors .......................................................... 17

    C.    The Statute Violates Procedural Due Process by
        Mandating the Revocation of Drivers' Licenses for
        Failure to Pay Court Debt Without Notice or an
        Ability-to-Pay Determination .......................................... 21

II.    THE 2017 AMENDMENT DOES NOT CURE THE
    CONSTITUTIONAL INFIRMITIES OF THE STATUTE ....................... 26

**III.** **THE MOTION TO DISMISS SHOULD BE DENIED** ............................................. 29

    A.    Revocation of Driver's Licenses Under the Statute Is a
            Debt Collection Measure, Not Part of the Criminal
            Punishment ............................................................................. 29

    B.    The Commissioner Applies the Wrong Legal Standard ......................... 30

    C.    The Statute Violates Procedural Due Process by
            Mandating Revocation Without Notice or an
            Opportunity To Be Heard on Ability To Pay ....................................... 32

**CONCLUSION** ...................................................................................................... 34

Case 3:17-cv-00005   Document 38   Filed 08/18/17   Page 3 of 41 PageID #: 149

*Page*

**Cases**

*Adkins v. E.I. DuPont de Nemours*, 335 U.S. 331 (1948) ................................. 18

*Alexander v. Johnson*, 742 F.2d 117 (4th Cir. 1984) ........................................ 19, 21, 28

*Alkire v. Irving*, 330 F.3d 802 (6th Cir. 2003) ................................................ 12, 22

*Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242 (1986) ................................... 10

*Augustin v. City of Philadelphia*, 171 F. Supp. 3d 404 (E.D. Pa. 2016) ................................................................................................ 28

*Baldwin v. Hale*, 68 U.S. (1 Wall.) 223 (1863) .............................................. 22

*Bearden v. Georgia*, 461 U.S. 660 (1983). ..................................................... *passim*

*Bell v. Burson*, 402 U.S. 535, 539 (1971) ....................................................... *passim*

*Boddie v. Connecticut*, 401 U.S. 371 (1971) .................................................. 14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................. 10

*Coleman v. Watt*, 40 F.3d 255 (8th Cir. 1994) ............................................... 10

*Delaware v. Prouse*, 440 U.S. 648 (1979). ..................................................... 2

*Dixon v. Love*, 431 U.S. 105 (1977) ............................................................... 11, 33

*Douglas v. California*, 372 U.S. 353 (1963) ................................................... 13

*Fitch v. Belshaw*, 581 F. Supp. 273 (D. Or. 1984) ......................................... 25

*Fuentes v. Shevin*, 407 U.S. 67 (1972) ........................................................... 22

*Fuller v. Oregon*, 417 U.S. 40 (1974) ............................................................ 12, 13, 19, 28

*Griffin v. Illinois*, 351 U.S. 12 (1956) ........................................................... 13, 14

*James v. Strange*, 407 U.S. 128 (1972) ........................................................... *passim*

*Johnson v. Bredesen*, 624 F.3d 742 (6th Cir. 2010) ....................................... 32

*Kratt v. Garvey*, 342 F.3d 475 (6th Cir. 2003) ............................................... 21

*Lee v. Rhode Island*, 942 F. Supp. 750 (D.R.I. 1996) ..................................... 14, 25

*Little v. Streater*, 452 U.S. 1 (1981) ............................................................... 14

*M.L.B. v. S.L.J.*, 519 U.S. 102 (1996) ............................................................ 13

*Mayer v. Chicago*, 404 U.S. 189 (1971) ......................................................... 13

*Med. Corp. v. City of Lima*, 296 F.3d 404 (6th Cir. 2002) ............................. 21

*Miller v. Reed*, 176 F.3d 1202 (9th Cir. 1999) ............................................... 30, 31

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ................................................................................................ 21, 22

Case 3:17-cv-00005   Document 38   Filed 08/18/17   Page 4 of 41 PageID #: 150

| | Page |
|---|---|
| *Olson v. James*, 603 F.2d 150 (10th Cir. 1979) ................................ | 19 |
| *Padberg v. McGrath-McKechnie*, 203 F. Supp. 2d 261 (E.D.N.Y. 2002) ................................ | 14, 25 |
| *Raper v. Lucey*, 488 F.2d 748 (1st Cir. 1973) ................................ | 15 |
| *Rodriguez v. Providence Cmty. Corr. Inc.*, 155 F. Supp. 3d 758 (M.D. Tenn. 2015) ................................ | 12 |
| *Schroeder v. Ryan*, 1995 U.S. Dist. LEXIS 13322 (N.D. Ill. Sept. 6, 1995) ................................ | 25 |
| *Schuman v. State of California*, 584 F.2d 868 (9th Cir. 1978) ................................ | 14 |
| *State v. Black*, 897 S.W.2d 680 (Tenn. 1995) ................................ | 24, 27 |
| *State v. Lafever*, 2004 Tenn. Crim. App. LEXIS 71 (Jan. 30, 2004) ................................ | 24 |
| *State v. Ryan*, 2014 Tenn. Crim. App. LEXIS 719 (July 22, 2014) ................................ | 24, 27 |
| *Stypmann v. San Francisco*, 557 F.2d 1338 (9th Cir. 1977) ................................ | 10 |
| *Tate v. Short*, 401 U.S. 395 (1971) ................................ | 11-16 |
| *Turner v. Rogers*, 564 U.S. 431 (2011) ................................ | 28 |
| *Turner v. Turner*, 919 S.W.2d 340 (Tenn. Ct. App. 1995) ................................ | 20 |
| *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185 (6th Cir 1997) ................................ | 10 |
| *United States v. Bracewell*, 569 F.2d 1194 (2d Cir. 1978) ................................ | 19 |
| *United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993) ................................ | 21 |
| *United States v. Wilson*, 597 F.3d 353 (6th Cir. 2010) ................................ | 28 |
| *Washington v. McQuiggin*, 2011 U.S. Dist. LEXIS 68072 (W.D. Mich. Jun 23, 2011) ................................ | 28 |
| *Williams v. Illinois*, 399 U.S. 235 (1970) ................................ | 11-14 |
| *Wooley v. Maynard*, 430 U.S. 705 (1977). ................................ | 1, 10 |

**Statutes**

| | |
|---|---|
| 15 U.S.C. § 1673 ................................ | 18 |
| 2017 Tenn. Session Laws, Pub. C.412 ................................ | 4, 7, 8, 26-28 |
| Tenn. Code Ann. §§ 26-2-101 *et seq.* ................................ | 18 |

iv

|                                         | **Page**   |
|-----------------------------------------|------------|
| Tenn. Code Ann. § 26-2-106              | 18         |
| Tenn. Code Ann. § 36-5-703              | 20         |
| Tenn. Code Ann. § 36-5-704              | 20         |
| Tenn. Code Ann. § 40-24-101             | 7, 7n, 26  |
| Tenn. Code Ann. § 40-24-104(a)          | 7, 7n, 26  |
| Tenn. Code Ann. § 40-24-105(a)          | 16         |
| Tenn. Code Ann. § 40-24-105(b)          | *passim*   |
| Tenn. Code Ann. § 40-24-105(b)(3)       | 7          |
| Tenn. Code Ann. § 40-24-105(b)(4)       | 7          |
| Tenn. Code Ann. § 40-25-129(a)(2)       | 7n, 26     |
| Tenn. Code Ann. § 40-35-104             | 29n        |
| Tenn. Code Ann. § 55-10-104             | 29n        |
| Tenn. Code Ann. § 55-10-407             | 31n        |
| Tenn. Code Ann. §§ 67-1-1401 *et seq.*  | 20         |
| Tenn. Code Ann. § 71-1-123(a)(6)        | 20         |
| Tenn. Stat. Ann §§ 20-01-01 *et seq*    | 16         |

**Constitutional Provisions**

| U.S. Const. Amend. XIV                  | *passim*   |

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

-------------------------------------------------------X

JAMES THOMAS and DAVID HIXSON, on
behalf of themselves and all others similarly
situated,

               Plaintiffs,

     v.

DAVID W. PURKEY, Commissioner of the
Tennessee Department of Safety and Home-
land Security,

               Defendant.

-------------------------------------------------------X

No. 3:17-cv-00005

## PLANTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

     Plaintiffs, and the putative class they seek to represent,[1] respectfully submit this Memorandum of Law (a) in support of their motion for summary judgment and (b) in opposition to Defendant's motion to dismiss.[2] Submitted herewith are a Statement Pursuant to Local Rule 56.01 ("S56.01") and the Declarations of David Hixson, James Thomas, and Edward P. Krugman.

### PRELIMINARY STATEMENT

     As the Supreme Court held forty years ago this April, "driving an automobile [is] a virtual necessity for most Americans." *Wooley v. Maynard*, 430 U.S. 705, 715 (1977). It is "a

---

[1]   Simultaneously with the filing of this memorandum, Plaintiffs are renewing their previous-ly-filed motion for class certification, which was stayed on the filing of Defendant's mo-tion to dismiss. Plaintiffs believe that efficiency will best be served if the Court considers all three pending motions together, and the Court granted the parties' joint request to pro-ceed on this basis on August 8 (ECF #33).

[2]   The original Defendants included Governor Haslem and Attorney General Slatery (both in their official capacities) as well as Commissioner Purkey. By agreement between the par-ties, however, the Governor and the Attorney General have been dismissed without preju-dice, and the action is proceeding solely against Commissioner Purkey.

basic and often necessary mode of transportation to and from one's home, workplace, and leisure activities." *Delaware v. Prouse*, 440 U.S. 648, 662 (1979). Without driving, it is virtually impossible to look for and maintain a job, to access medical care, to see friends and family, to go to the grocery store, or to participate in social and civic life. More than 93% of Tennesseans get to work by car (S56.01 ¶¶ 97-105). Even in the major metropolitan areas of the state, which do have some functioning public transportation, more than 70% of jobs are not reasonably accessible by public transportation (S56.01 ¶ 95).

Yet more than 100,000 people in Tennessee cannot legally drive because they do not have enough money to satisfy their Court Debt—fines, fees, court costs, and litigation taxes arising from criminal proceedings against them. (S56.01 ¶¶ 107, 108) Exercising powers it gives to no private creditor, the State of Tennessee as sovereign has revoked Court Debtors' driver's licenses because they have failed to pay the State of Tennessee as creditor. It has done so simply because these Court Debtors are too poor to pay, and it has done so without giving them notice and an opportunity to be heard on their ability to pay.

Plaintiffs and putative class members rely on their driver's licenses for the most fundamental aspects of their daily lives. They need their driver's licenses to secure and maintain employment, to access medical care and food, and to care for family members. The Court can take judicial notice of the isolating effect of the geographical barriers in many parts of this State. The revocations trap Plaintiffs and class members in a vicious cycle: They do not have a driver's license because they cannot pay their Court Debt; they cannot pay their Court Debt because they do not have enough money; and they cannot earn enough money because they do not have a driver's license.

2

It need not be this way. Prior to 2011, it was not this way. Until 2011, fines, court costs, and litigation taxes in Tennessee were collected "in the same manner as a judgment in a civil action" (S56.01 ¶ 14). Until 2011, Court Debtors accordingly had the benefit of protections and exemptions "designed primarily to benefit debtors of low and marginal incomes," *James v. Strange*, 407 U.S. 128, 139 (1972); *see* S56.01 ¶ 113.

In 2011, however, the General Assembly enacted Tenn. Code Ann. § 40-24-105(b) (the "Statute"), which provides (emphasis added):

> A license issued under title 55 for any operator or chauffeur **shall be revoked** by the commissioner of safety if the licensee has not paid all litigation taxes, court costs, and fines assessed as a result of disposition of any offense under the criminal laws of this state within one (1) year of the date of disposition of the offense. The license **shall remain revoked** until such time as the person whose license has been revoked provides proof to the commissioner of safety that all litigation taxes, court costs, and fines have been paid.

The Statute mandates that the Commissioner revoke the driver's licenses of people who do not pay Court Debt within one year of its imposition—even if they are indigent and unable to pay. Court Debt can amount to hundreds, or even thousands, of dollars. The Statute is not a public safety measure; as the House sponsor of the bill that became the Statute candidly acknowledged, the Statute "is just a way to collect revenue that is owed the tax payers of this State." (S56.01 ¶ 22)

As set forth in detail below, the Statute violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution of the United States. Accordingly, Plaintiffs and the putative class seek summary judgment (a) declaring the Statute unconstitutional, (b) directing the reinstatement (without fees) of the driver's licenses of those who have been unconstitutionally deprived of them, and (c) enjoining the Commissioner from revoking driver's licenses pursuant to the Statute without a prior determination that failure to pay is not due to indigency but rather is "willful" within the meaning of *Bearden v. Georgia*, 461 U.S. 660 (1983).

Recognizing the constitutional infirmities of the Statute and the irrationality of trying to get blood from a stone, the General Assembly amended the Statute in 2017 (the "2017 Amendment"). 2017 Tenn. Session Laws, Pub. C.412. The sponsor of the 2017 Amendment explained his bill as follows:

> Most of the people who are not paying the fees and fines and what have you are people who simply don't have the means.
>
> . . . When the bill was passed originally, the one that this is sort of updating, it was thought, well, if we hold their driver's license back it will give them a carrot to encourage them to pay. Really what it does is it puts them even further behind the eight ball. Now they don't have a driver's license, and if they drive to work they may be subject to be stopped for driving without a license or they may simply not go to work. (S56.01 ¶¶ 41, 42)

The 2017 Amendment has the potential to ameliorate some of the effects of the Statute, but it does not cure the Statute's fundamental unconstitutionality. Even under the amended Statute, the State of Tennessee will continue automatically to revoke licenses without notice, from people too poor to pay, without considering ability to pay. The Statute remains a violation of both Due Process and Equal Protection.

This is Plaintiffs' combined Memorandum of Law in support of their Motion for Summary Judgment and in opposition to Defendant's Motion to Dismiss. The Memorandum is in three parts. Part I lays out the basic constitutional framework and contains Plaintiffs' affirmative showing of entitlement to relief with respect to the Statute as originally enacted. There are more than 100,000 currently revoked licenses; more will be added before the January 1, 2018 effective date of the 2017 Amendment, and the original Statute is a live issue as to this very large group of individuals. Part II then demonstrates that the Statute remains unconstitutional after the 2017 Amendment. Finally, Part III disposes of the Commissioner's arguments on his Motion to Dismiss to the extent they have not already been addressed in Parts I and II. For the reasons set forth

4

below, the Motion to Dismiss should be denied and summary judgment should be entered in favor of Plaintiffs and the (to be certified) class.

STATEMENT OF FACTS

The facts relevant to this case have largely been stipulated, and the remainder are not reasonably subject to dispute. In particular, it is stipulated that Commissioner Purkey takes away the driver's licenses of those who do not pay litigation taxes, fines, restitution, or court costs within a year of imposition, that he does so automatically, and that he does so without providing either notice to the debtor or an opportunity to demonstrate that the failure to pay was not willful but rather due to lack of means. (Stipulation of Fact ¶¶ 26, 29-32) In a very real sense, that is all the Court needs to know to decide this case.

***Operation of the Statute***

Prior to enactment of the Statute, Tennessee collected Court Debt in the same manner as all other civil judgments (S56.01 ¶¶ 14, 16), and court debtors thus had the same protections and exemptions as civil judgment debtors (S56.01 ¶ 15). These included a $10,000 holdback from execution, limitations on the amount of garnishments, and the prevention of *any* garnishment of exempt funds such as pensions, Social Security, or disability payments (S56.01 ¶ 113). Upon the enactment of the Statute, however, all this changed. On pain of losing their driver's licenses, Court Debtors were required to pay *even if* their only assets would be exempt from execution and *even if* their only income would be exempt from garnishment.

Under the Statute, court clerks are required to notify Defendant Purkey when Court Debt remains unpaid after one year from imposition (S56.01 ¶ 25), and the Commissioner must then revoke that person's license (S56.01 ¶ 26). The license is revoked immediately and without notice to the driver (S56.01 ¶ 28), and it must remain revoked until all outstanding Court Debt is paid *and* a reinstatement fee is paid (S5.01 ¶¶ 27, 29).

5

With the Statute in place, people stood to lose—and did in fact lose—their driver's licenses **even if they had no assets or income at all.** As Senator Dickerson said, "Most of the people who are not paying the fees and fines and what have you are people who simply don't have the means." The Statute provided that people might avoid revocation by entering into and maintaining a payment plan, or by applying for a very limited, one-time, six-month stay of revocation on the ground of "extreme hardship," but the payment plan was of no use for people like Plaintiffs and class members, who are too poor to make any payment at all, and the hardship exemption was so narrow that most people, including the named Plaintiffs (*see* S56.01 §§ 72, 73, 87), did not qualify for it even though they were indigent and unable to pay.

Even if Court Debt is paid, reinstatement of driving privileges requires an additional fee (S56.01 ¶ 29), which can amount to hundreds of dollars or more. The Tennessee Department of Safety offers payment plans for people who owe more than $200 in reinstatement fees, but the required initial and quarterly payments (S56.01 ¶ 30) are so high as to make the payment plans themselves unaffordable for indigent Tennesseans. *See* Thomas Dec. ¶ 12; Hixson Dec. ¶¶ 8, 9. Only after the reinstatement fee is paid may a person apply for a new driver's license, which necessitates payment of additional fees. Thus, for indigent Tennesseans, reinstatement fees provide yet another barrier to regaining legal driving privileges.

From July 1, 2012 to June 1, 2016, the Tennessee Department of Safety revoked 146,211 driver's licenses from people who did not pay their Court Debt. (S56.01 ¶ 107) Only 10,750 people (7%) whose licenses were revoked pursuant to the Statute had their licenses reinstated. (S56.01 ¶ 108) Accordingly, 93% of people whose licenses were revoked since June 1, 2012, have been unable to recover their licenses.

6

*The 2017 Amendment*

The 2017 Amendment made three changes to the Statute. First, it amended Section 40-24-105(b)(3)(A) by expanding the grounds for a stay of revocation on the grounds of hardship, adding travel necessary for school, religious worship, participation in a recovery court, and "other reasons or destinations as determined by the court" to the former exclusive employment and serious illness. (S56.01 ¶ 45) It also deleted a reference in subsection (b)(3)(A) to applying to the Court "one time" for the hardship stay, but the provision of subsection (b)(3)(B) that the Court may only enter "a one-time stay for a period of not longer than one hundred eighty (180) days" remains in effect, and the hardship stays are thus, at best, one-time, non-renewable events. (S56.01 ¶ 47)

Second, it deleted the phrase "weekly or monthly" from the payment plan provision of subsection (b)(4), renamed that subsection (b)(4)(A), and added new subsections (b)(4)(B) and (b)(4)(C), which authorize indigent defendants to apply for a waiver of court costs and fines (but not litigation taxes). (*See* Exhibit 1 to the Stipulation of Fact) New subsection (b)(4)(C) makes it clear that the waiver is wholly discretionary with the trial court, so subsection (b)(4)(B) adds nothing to the waiver authority that already existed under Sections 40-24-101 and 40-24-104.[3]

Finally, the 2017 Amendment added a new subsection (h) to Section 40-24-105, which permits issuance of restricted licenses at the discretion of the court in any of the circum-

---

[3]    Tenn. Code Ann. § 40-24-101 provides, *inter alia*, for payment of fines in installments if the Court so orders, and Tenn. Code Ann. § 40-24-104(a) provides:

> If the defendant fails to pay the fine as directed, or is unable to pay the fine and so represents upon application to the court, the court, after inquiring into and making further investigation, if any, which it may deem necessary with regard to the defendant's financial and family situation and the reasons for nonpayment of the fine, including whether the nonpayment was contumacious or was due to indigency, may enter any order that it could have entered under § 40-24-101, or may reduce the fine to an amount that the defendant is able to pay . . . .

As the Commissioner has pointed out (Comm. Mem. at 5, 17), Tenn. Code Ann. § 40-25-129(a)(2) makes it clear that similar discretionary authority exists with respect to costs.

7

stances identified in the hardship section. (S56.01 ¶ 55) In contrast with a regular license, which costs $28 for an eight-year term and can be used to drive anywhere, the restricted license costs $65, must be renewed annually, and can only be used to drive to certain places designated by court order. (S56.01 ¶¶ 56-58 & Exhibit 1 to the Stipulation of Fact).

***The Named Plaintiffs***

The circumstances of the named Plaintiffs[4] demonstrate the fundamental unfairness and lack of basic due process afforded to indigent people who owe Court Debt.

Plaintiff James Thomas is a 49-year-old veteran who has multiple serious disabilities and relies on Supplemental Security Income (SSI) and SNAP (food stamps) for his only income. In October 2016, Mr. Thomas applied for a Tennessee driver's license but was denied because his license had already been revoked pursuant to the Statute. In 2013, Mr. Thomas was homeless and taking shelter under a bridge on a rainy night when he was arrested and prosecuted for criminal trespass, incurring $289.70 in Court Debt that he could not pay. At the time Mr. Thomas had no income other than SNAP benefits, which can only be used to purchase food. Mr. Thomas advised the Court Clerk of his dire financial circumstances, but that did not prevent the Commissioner from revoking his driver's license without notice or consideration of his ability to pay. Mr. Thomas needs his driver's license to attend medical appointments. He has been taking the bus to those appointments, but the journey back and forth takes hours and causes him pain. Mr. Thomas cannot afford to pay his Court Debt or the reinstatement fee necessary to regain driving privileges. He was not eligible for the hardship stay under the original Statute, and the expanded hardship provisions would not benefit him either, both because his license has already been revoked (making the hardship provisions inapplicable on their face) and because he would have no more prospect of clearing his Court Debt after a six-month stay than he does now.

---

[4]     *See* S56.01 ¶¶ 60-73 (Plaintiff Thomas), 74-91 (Plaintiff Hixson).

8

Plaintiff David Hixson is 50 years old and at the time of suit resided in a homeless shelter in Nashville. He then moved into private housing, which cost him approximately half his take-home pay, but he was unable to keep up his rent payments and is now living in a tent. In 2013, he was convicted of a crime and incarcerated. The Commissioner revoked Mr. Hixson's license without notice or consideration of his ability to pay while he was incarcerated. Mr. Hixson learned of the revocation after the fact, when in preparation for his release the Tennessee Department of Corrections provided him with a non-driver's identification card instead of a driver's license. Mr. Hixson currently owes $2,583.80 in Court Debt and a reinstatement fee in the amount of $140. The Washington County Clerk maintains that he must pay this entire amount before he can regain his driver's license.

Mr. Hixson did not qualify for the hardship stay under the original Statute and, like Mr. Thomas, he cannot benefit from the expanded hardship provisions in the 2017 Amendment because his license is already revoked. He cannot afford to pay $2,583.80, or any amount. He works as a vehicle emissions inspector and does not earn enough even to cover basic living expenses. He has a car that is fully paid for, but he cannot use it because he has no driver's license. If Mr. Hixson had a valid driver's license, he could seek a job as a motorcycle mechanic, which would enable him to earn enough money to pay his Court Debt. But he cannot work as a motorcycle mechanic without a valid driver's license. In short, Mr. Hixson is trapped in a vicious cycle. His license has been revoked for failure to pay Court Debt. He cannot pay his Court Debt because he does not earn enough money. And he cannot obtain a better job because he does not have a driver's license. The Statute indeed "put him further behind the eight ball," just as Senator Dickerson described.

To obtain summary judgment, Plaintiffs must demonstrate the absence of a genuine issue of material fact and their entitlement to judgment as a matter of law. *E.g.*, *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1188 (6th Cir 1997). Not every asserted factual dispute can defeat summary judgment: the dispute must be "genuine" (*i.e.*, there must be a real, evidence-based reason for believing that the trier of fact could go either way on the issue), and the disputed fact must be "material" (*i.e.*, Plaintiffs' entitlement to judgment must turn on whether the fact is true). *E.g.*, *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 247-48 (1986). A party moving for summary judgment need not prove a negative but may state that there is no evidence to support a proposition as to which the non-moving party bears the burden, and it then falls to the non-moving party to show, if it can, that evidence does in fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

Here, as set forth above, the basic facts concerning the operation and effects of the Statute have been largely stipulated and are in any event indisputable. The Commissioner's Motion to Dismiss should be denied, and Plaintiffs are entitled to judgment as a matter of law.

## I. THE STATUTE AS ORIGINALLY ENACTED VIOLATES THE DUE PROCESS AND EQUAL PROTECTION CLAUSES OF THE FOURTEENTH AMENDMENT

Driver's licenses involve "important" property interests that are protected by the Constitution. *Bell v. Burson*, 402 U.S. 535, 539 (1971). Courts have repeatedly recognized the central importance of the ability to drive in modern American life. *See, e.g.*, *Wooley v. Maynard*, *supra*, 430 U.S. at 715; *Coleman v. Watt*, 40 F.3d 255, 260–61 (8th Cir. 1994) ("Automobiles occupy a central place in the lives of most Americans, providing access to jobs, schools, and recreation as well as to the daily necessities of life."); *Stypmann v. San Francisco*, 557 F.2d 1338, 1343 (9th Cir. 1977) ("A person's ability to make a living and his access to both the necessities

10

and amenities of life may depend upon the availability of an automobile . . . ."). Revocation of a driver's license is a complete deprivation within the meaning of the due process clause, *see Dixon v. Love*, 431 U.S. 105, 112 (1977), and it is well-established that driver's licenses "are not to be taken away without that procedural due process required by the Fourteenth Amendment." *Bell*, 402 U.S. at 539.

As set forth in more detail in Part III below, revocation of driver's licenses has nothing to do with punishment for the underlying offenses: it is purely a collection measure. The Plaintiffs and the class here consist of people from whom there is nothing to collect. By depriving such Court Debtors of their driver's licenses simply because they are too poor to pay, and by doing so entirely without notice and without an opportunity to demonstrate their inability to pay, the original Statute violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment. And as shown in Part II below, the 2017 Amendment does not cure these deficiencies.

### A. The Statute Deprives Plaintiffs of Substantive Due Process and Violates Equal Protection by Revoking Their Driver's Licenses Without Considering Whether They Have the Ability to Pay Court Debt

#### 1. The *Bearden* Standard

The Statute is unconstitutional because it violates the equal-protection and due-process principles enshrined in *Tate v. Short*, 401 U.S. 395 (1971), *Williams v. Illinois*, 399 U.S. 235 (1970), and *Bearden v. Georgia*, 461 U.S. 660 (1983). The standard to be applied in this case is the four-part balancing test of *Bearden*, under which the court takes account of (1) the nature of the individual interest affected; (2) the extent to which it is affected; (3) the rationality of the connection between legislative means and purpose; and (4) the existence of alternative means for effectuating the purpose. 461 U.S. at 666-67. Here, the interest in being able to drive is extremely strong, it is totally deprived by the Statute, there is no rational connection between

11

means of the Statute and the General Assembly's desire to collect Court Debt (indeed, the Statute is actually at odds with its stated purpose), and there are ample, longstanding means of fairly collecting debts available to the State.

As discussed in more detail in Part III below, the Commissioner incorrectly seeks to apply a pure "rational basis" test to the Statute here. In doing so, he fails to cite, much less address, either *Bearden* or any of the other long-standing Supreme Court precedents that control this case. In each of *Tate*, *Williams*, and *Bearden*, the Supreme Court held that jailing someone because he is unable to pay a sum of money violates equal protection and due process principles. *Bearden*, 461 U.S. at 668; *Tate*, 401 U.S. at 399; *Williams*, 399 U.S. at 241-42; *see also Alkire v. Irving*, 330 F.3d 802, 816 (6th Cir. 2003) ("'[F]undamental fairness' requires that a court inquire into an individual's reasons for failing to pay a fine or court costs."); *Rodriguez v. Providence Cmty. Corr. Inc.*, 155 F. Supp. 3d 758, 770 (M.D. Tenn. 2015) (Fourteenth Amendment requires indigency determination before detaining probationers on secured money bonds or jailing them on the basis of nonpayment); *cf. Fuller v. Oregon*, 417 U.S. 40, 46 (1974) (state recoupment statute found constitutional because it is directed only at people who have the ability to pay). In *Tate*, the Supreme Court considered a state statutory scheme governing traffic offenses in which the maximum possible penalty was a fine. But anyone who could not pay the fine was ordered to serve out the debt in the local jail at the rate of $5 per day. 401 U.S. at 397. In striking down this statutory scheme, the Court held that a "statutory ceiling cannot, consistently with the Equal Protection Clause, limit the punishment to payment of the fine if one is able to pay it, yet convert the fine into a prison term for an indigent defendant without the means to pay his fine." *Id.* at 399. In *Williams*, the statute at issue permitted the state to hold a prisoner in confinement past the maximum term of his sentence solely because he could not afford to pay the fine imposed as part

12

of his punishment. 399 U.S. at 237. The Court recognized that "a law nondiscriminatory on its face may be grossly discriminatory in its operation." *Id.* at 242 (quoting *Griffin v. Illinois*, 351 U.S. 12, 17 n.11 (1956)). Although the statute appeared to offer all criminal defendants an equal opportunity to avoid excess imprisonment by paying their fines, this was "an illusory choice" for "any indigent who, by definition, is without funds." *Id.* at 242. For that reason, the statute worked "an impermissible discrimination that rests on ability to pay." *Id.* at 241; *cf. Griffin*, 351 U.S. at 16 ("Providing equal justice for poor and rich, weak and powerful alike is an age-old problem. People have never ceased to hope and strive to move closer to that goal."); *Douglas v. California*, 372 U.S. 353, 355 (1963) (condemning the "evil" of "discrimination against the indigent").

The constitutional principles of *Griffin*, *Williams*, *Tate*, and *Bearden* are not limited to imprisonment. *M.L.B. v. S.L.J.*, 519 U.S. 102, 111 (1996) ("*Griffin*'s principle has not been confined to cases in which imprisonment is at stake."). Rather, those principles prohibit imposing adverse consequences because of an individual's inability to pay, whether in the form of jailing, barriers to court procedures, or some other burden. For instance, in *Mayer v. Chicago*, 404 U.S. 189, 197 (1971), the Supreme Court noted the "invidiousness of the discrimination that exists when criminal procedures are made available only to those who can pay." Thus, it held that even an indigent person convicted of non-felony offenses resulting in mere fines, not incarceration, could not be denied an appellate record based on ability to pay.

The Supreme Court has made clear that the principle against imposing wealth-based consequences extends outside of the strictly criminal context as well. *See, e.g.*, *M.L.B.*, 519 U.S. at 124 (statutes conditioning appeal of decision terminating parental rights on ability to pay court costs violated equal protection and due process clauses of Fourteenth Amendment); *Little v.*

*Streater*, 452 U.S. 1, 10 (1981) (statute requiring that blood grouping tests in paternity actions be borne by requesting party violated due process when applied to deny such tests to an indigent defendant); *Boddie v. Connecticut*, 401 U.S. 371, 382-83 (1971) (due process prohibits a state from denying, solely because of inability to pay court fees and costs, access to its courts to indigent couples who seek divorce). The principles derived from the *Griffin*, *Williams*, *Tate*, and *Bearden* line of cases apply here.

 2. **Application of the *Bearden* Test**

The four-part test of *Bearden* considers: (1) the nature of the individual interest affected; (2) the extent to which it is affected; (3) the rationality of the connection between legislative means and purpose; and (4) the existence of alternative means for effectuating the purpose. The Statute fails this test.

 **a. The Nature of the Individual Interest Affected Is Significant, As Is the Extent to Which It Is Affected**

The nature of the individual interest affected in this case—a driver's license—is significant. A driver's license is, of course, a property interest, as the Commissioner effectively concedes (Comm. Mem. at 15-17), but in our society it is much more than that.  It is "essential in the pursuit of a livelihood," *Bell*, 402 U.S. at 539, and thus is directly tied to basic subsistence. *Accord Padberg v. McGrath-McKechnie*, 203 F. Supp. 2d 261, 277 (E.D.N.Y. 2002) ("Suspending their licenses does far more than inconvenience drivers; it deprives them of their very livelihood."); *Lee v. Rhode Island*, 942 F. Supp. 750, 755 (D.R.I. 1996) ("Depriving a person of the use of her own motor vehicle impacts on her property—on her ability to earn a livelihood"). Deprivation of a driver's license also impacts fundamental liberty interests—the ability to get from place to place—that are necessary to maintain health, to care for children and other family members and, in general, to live rather than merely exist. *See Schuman v. State of California*,

14

584 F.2d 868, 870 (9th Cir. 1978) (recognizing liberty interest in use of automobile); *Raper v. Lucey*, 488 F.2d 748, 752 (1st Cir. 1973) (same). In many areas of Tennessee, the lack of meaningful public transportation means that the loss of a drivers' license is a threat to a person's ability to meet the most basic necessities of life. An individual's interest in maintaining his or her driver's license is profound. And the Statute completely deprives Plaintiffs of that interest.

### b. The Purported Connection Between Legislative Means and Purpose Lacks Rationality

As a method of debt collection it makes no more sense to deprive indigent people of their driver's licenses than it does to deprive them of their liberty. Here, as in *Bearden*, "[r]evoking the [driver's license] of someone who through no fault of his own is unable to make [payments] will not make [payments] suddenly forthcoming."  461 U.S. at 670; *see also Tate v. Short*, 401 U.S. 395, 399 (1971) (observing that imprisoning indigent criminal defendants for failing to pay their fines does not increase collections). Rather, such practices are "little more than punishing a person for his poverty." *Bearden*, 461 U.S. at 671

License revocation is actually counter-productive when applied to the indigent Plaintiffs and class members in this case. As the Senate sponsor of the 2017 Amendment pointed out, the Statute actually *decreased* collections.[5] The situation of Plaintiff Hixson described above, demonstrates the Statute's senselessness. Mr. Hixson's driver's license was revoked for failure to pay Court Debt. He works as an emissions inspector but does not earn enough to make payments on his Court Debt. If he had a driver's license, he would be able to seek a higher-paying job as a motorcycle mechanic, which would allow him to start paying his Court Debt and regain his license, but he cannot secure that work because he does not have a valid license. For thousands of

---

[5]    "In the aggregate, I think the court clerks throughout the state, and there may be exceptions county by county or jurisdiction by jurisdiction, what they've seen is actually a decrease in some of these fees . . . ." (S56.01 ¶ 43)

15

others like Mr. Hixson, the automatic revocations trap them in a cycle of debt and poverty because without a license they cannot get a job to earn money to repay their debts. Many are forced to drive to meet the basic necessities of life and then incur more tickets for driving without a valid license, further increasing their Court Debt and making it even harder to get their license back.

As the Supreme Court observed in *James v. Strange*, 407 U.S. at 139, "A criminal conviction usually limits employment opportunities." A person with a criminal conviction and no valid driver's license is *even less likely* to secure employment, and therefore less likely to be able to pay outstanding court costs. "It is in the interest of society and the State" that former criminal defendants "be afforded a reasonable opportunity of employment, rehabilitation, and return to useful citizenship." *Id*. at 139. Depriving people of their driver's licenses "discourages the search for self-sufficiency which might make of the criminally accused a contributing citizen." *Id*. The Statute creates a scenario similar to the one described in *Tate v. Short*, in which the Court observed: "It is imposed to augment the State's revenues but obviously does not serve that purpose; the defendant cannot pay because he is indigent and his imprisonment, rather than aiding in the collection of the revenue, saddles the State with" additional costs. 401 U.S. at 399.

### c.     The State Has Ample Means for Effectuating Its Purpose

The State has ample alternative means for collecting Court Debt. Tennessee law allows for the State to collect court debt in the same manner as other civil debt, which includes the ability to garnish wages and bank accounts and place liens on real and personal property. Tenn. Stat. Ann §§ 20-01-01 *et seq*. (execution of judgments); 40-24-105(a). These collection methods, unlike the driver's license revocation at issue in this lawsuit, incorporate constitutional safeguards like notice and are tailored to obtain payment only from people who have the ability to pay.

16

Plaintiffs have strong property and liberty interests in maintaining their driver's licenses and using them for employment and to care for themselves and family members—and, eventually, to repay their debts. The State of Tennessee, on the other hand, has no rational reason to deprive indigent people of their driver's licenses, and it has reliable alternative methods of collecting outstanding Court Debt from people who have the ability to pay. Under these circumstances, as in *Bearden*, the driver's license revocation scheme at issue here is "contrary to the fundamental fairness required by the Fourteenth Amendment." 461 U.S. at 673.

**B.  The Statute Violates Equal Protection Because the State Grants Itself Debt Collection Practices It Forbids to Private Creditors**

The Statute violates long-established Supreme Court precedent that the government cannot take advantage of its position as a creditor to impose unduly harsh debt collection methods against indigent Court Debtors that are unavailable as against other debtors.

In *James v. Strange*, *supra,* the Supreme Court confronted Kansas's attempt to collect fees and costs from defendants in criminal cases. Kansas law authorized the state to use harsh collection techniques for these court fees and costs, including depriving the indigent defendants of the standard protections available under state law for judgment debtors. For example, although Kansas limited the percentage of a private judgment-debtor's wages that could be subject to garnishment for private judgments, indigent defendants who owed certain court costs to the state could lose their entire paycheck. 407 U.S. at 135. The Court struck down Kansas's scheme because Kansas was taking advantage of its status as the government to impose debt-collection methods that private creditors could not. *Id*. at 139. The State may not "impose unduly harsh or discriminatory terms merely because the obligation is to the public treasury rather than to a private creditor." *Id*. at 138.

17

The Statute violates this longstanding principle by using the State's unrelated and unique power over the allocation of driver's licenses to coerce payment from those who fail within a year to pay Court Debt—even when they cannot pay because of their poverty. No private creditor could revoke a judgment debtor's driving privileges because a debt had not been paid; only the State can. The revocations effected by the Statute are both "unduly harsh" and "discriminatory." Notwithstanding Senator Dickerson's euphemistic reference to the Statute as a "carrot" to "encourage" Court Debtors to pay (S56.01 ¶ 42), there is no question that the Statute is coercive. It is a classic "or else": It threatens to take something away—something very important, a driver's license—if the Court Debtor does not pay up. It is, accordingly, very much the stick and not the carrot.

Tennessee, like Kansas and other states, provides important protections for judgment debtors. For example, under Tennessee and federal law, when a court orders garnishment, it cannot garnish more than 25% of a person's wages. Tenn. Code Ann. § 26-2-106; *see also* 15 U.S.C. § 1673. Tennessee also exempts social security, unemployment, veteran's benefits, and all other forms of public assistance benefits from garnishment, and exempts a wide range of other sources of income and property up to certain monetary thresholds. *See generally* Tenn. Code Ann. §§ 26-2-101 *et seq*. These protections recognize the principle of fundamental fairness embodied in Tennessee law and Supreme Court precedent that the State cannot force a person to pay a debt when he or she cannot afford both to pay and to meet the basic necessities of life. *See Adkins v. E.I. DuPont de Nemours*, 335 U.S. 331, 339 (1948) (holding that statute cannot be interpreted to require that a person pay "the last dollar they have or can get, and thus make themselves and their dependents wholly destitute.").

18

*James v. Strange* bars the Commissioner from collecting Court Debt from the Plaintiffs in a manner so wildly out of line with how state law mandates other judgments be collected from other debtors. The Equal Protection Clause requires "more even treatment of indigent criminal defendants with other classes of debtors." 407 U.S. at 141. As the Supreme Court concluded:

> State recoupment laws, notwithstanding the state interests they may serve, need not blight in such discriminatory fashion the hopes of indigents for self-sufficiency and self-respect. The statute before us embodies elements of punitiveness and discrimination which violate the rights of citizens to equal treatment under the law.

*Id.* at 141–42; *see also, e.g.*, *Fuller v. Oregon*, 417 U.S. 40, 47 (1974) (upholding Oregon scheme when "[t]he convicted person from whom recoupment is sought thus retains all the exemptions accorded other judgment debtors, in addition to the opportunity to show at any time that recovery of the costs of his legal defense will impose 'manifest hardship'"); *Olson v. James*, 603 F.2d 150, 154 (10th Cir. 1979) ("[T]he Court held that indigent defendants were entitled to evenhanded treatment in relationship to other classes of debtors."); *United States v. Bracewell*, 569 F.2d 1194, 1198-1200 (2d Cir. 1978) (discussing the need for individualized consideration of repayment so as not to require repayment that creates hardship in violation of *James v. Strange* and *Fuller*); *Alexander v. Johnson*, 742 F.2d 117, 124 (4th Cir. 1984) (upholding scheme of payments for appointed counsel costs as long as the indigent defendant is not "exposed to more severe collection practices than the ordinary civil debtor").

The essential inequality at the heart of the statutory scheme is evident when one considers what might happen if a person took out a private loan to pay off Court Debt. If the person subsequently could not repay that loan, the private creditor could not fundamentally alter the debtor's life by prohibiting that person from driving. But Tennessee has taken it upon itself to

19

impose those harsh debt collection practices because the debt is to the "public treasury." *James v. Strange*, 407 U.S. at 138.

Likewise, the Statute singles out people who owe Court Debt for unduly harsh treatment—revocation of their driver's licenses—not imposed on people who owe other debts to the State. For example, Tennessee may not revoke driver's licenses to recoup welfare overpayments, *see* Tenn. Code Ann. § 71-1-123(a)(6), or to collect income tax debts. *See id.* §§ 67-1-1401 *et seq*. People who have failed to pay court-ordered child support could be subject to revocation of their driver's licenses, but only after the court has provided notice and an opportunity for a hearing. At the hearing, an indigent person has the opportunity to argue that such a sanction should not be imposed because the order of support is beyond the person's means. *Compare* Tenn. Code Ann. § 36-5-704 *with Turner v. Turner*, 919 S.W.2d 340, 344 (Tenn. Ct. App. 1995) (discussing necessity of determining income when setting or modifying order); *see also* Tenn. Code Ann. § 36-5-703.

The Commissioner argues that because "driver licenses play an important role in the everyday lives of most people, . . . [i]t is therefore reasonable to expect that most people will *take whatever action as may be necessary* to retain that license." Comm. Mem. at 11 (emphasis added). But this approach to state debt collection is precisely what is unconstitutional under *James v. Strange*, because it uses license revocation as a harsh stick by which to extract payments from even the poorest debtors to the state, whatever the cost to the individuals' lives. By threatening and mandating such a fundamental deprivation—loss of a driver's license and thus the ability to meet essential daily needs—the Statute works an end run around well-established state and federal law for the collection of debts. This is exactly the kind of system that *James v. Strange* outlawed over 40 years ago.

Tennessee's use of its licensing power to coerce payment when it itself is the creditor is no different from Kansas's abrogation of important garnishment protections when that state was the creditor in *James v. Strange*. Tennessee is using its control over driving privileges to collect debt in a way that no private creditor ever could, and that even the State cannot in other comparable circumstances. By making the ability to get a job, to leave one's home, to visit relatives, to care for family, to go to church, and to participate meaningfully in basic social activities contingent on the payment of Court Debt, the Statute subjects people who owe court debt to uniquely and unduly harsh methods of collection. It is unconstitutional.

**C.** **The Statute Violates Procedural Due Process by Mandating the Revocation of Drivers' Licenses for Failure to Pay Court Debt Without Notice or an Ability-to-Pay Determination**

To establish a procedural due process violation, Plaintiffs must show: "(1) that they have a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment, (2) that they were deprived of this protected interest within the meaning of the Due Process Clause, and (3) that the state did not afford them adequate procedural rights prior to depriving them of their protected interest." *Med. Corp. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002) (internal alteration and citations omitted). As the State concedes, "once a license is issued, the holder has a right to notice and an opportunity to be heard before the license can be suspended or revoked." (Comm. Mem. at 15) (citing *Bell*¸ 402 U.S. at 539).

The Statute provides for none of the required procedural protections prior to revocation. At a minimum, the government must provide notice and an opportunity to be heard prior to revoking a license. *Kratt v. Garvey*, 342 F.3d 475, 483 (6th Cir. 2003) ("Notice and an evidentiary hearing . . . are the touchstones of procedural due process."); *see also United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993) ("The right to prior notice and a hearing is central to the Constitution's command of due process."); *Mullane v. Cent. Hanover Bank &*

21

*Trust Co.,* 339 U.S. 306, 313 (1950) (deprivation of property must "be preceded by notice and opportunity for hearing appropriate to the nature of the case"); *Alexander v. Johnson*, *supra*, 742 F.2d at 124 (holding that, in seeking recoupment of indigent defense fees, state must provide "notice of the *contemplated* action and a meaningful opportunity to be heard"; emphasis added). As the Supreme Court has explained, "For more than a century, the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right, they must first be notified.'" *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (quoting *Baldwin v. Hale*, 68 U.S. (1 Wall.) 223 (1863)); *see also Bell*, 402 U.S. at 542 (requiring pre-revocation hearing before revoking driver's license).

The Statute does not direct the Commissioner to send a notice before depriving people of their driver's licenses for failure to pay Court Debt. The Statute directs the clerk of the court to provide a thirty-day notice *to the Commissioner* that a license-holder has unpaid Court Debt, but there is no provision directing notice *to the license-holder*. Tenn. Stat. Ann. § 40-25-105(b). It is *stipulated* that the Commissioner revokes people's driver's licenses without providing any notice whatever. (Stipulation of Fact ¶¶ 28, 29) This absence of notice alone means the Statute cannot stand.

Moreover, the Statute fails to provide the person subject to deprivation with an opportunity for a hearing to challenge the deprivation. As the Court held in *Mullane*, a "fundamental requisite of due process of law is the opportunity to be heard." 339 U.S. at 314. Here, fundamental fairness requires a hearing on the topic of the license-holder's ability to pay outstanding Court Debt. *Alkire*, 330 F.3d at 816. Not only does the Statute not provide for such a hearing, it does not permit the Commissioner even to consider the license-holder's ability to pay. The Stat-

ute imposes a mandatory obligation on the Commissioner to revoke people's licenses without notice or the opportunity to be heard.

In lieu of providing a hearing, the original Statute set forth two very limited opportunities for a person to keep their license, but neither solves the fundamental constitutional problem, and neither meaningfully meets the needs of those who are too poor to pay outstanding Court Debt.

First, the right to request what the Statute calls a "hardship exemption" provides only limited protection for a single, six-month period and only to a narrow subset of the people whose licenses are automatically revoked because of their inability to pay Court Debt. Neither of the Named Plaintiffs in this action would have qualified for the hardship stay. The stay cannot be extended should the license-holder's financial circumstances fail to improve within the six-month time period. The availability of the stay rests entirely in the discretion of the sentencing court. Furthermore, the hardship stay is only available prior to revocation, but without receiving notice of the proposed revocation, a license holder would have no reason to apply for this relief.

Second, the Statute offers Court Debtors the opportunity to apply for a payment plan. But a payment plan, by definition, inures to the benefit of people who can pay *something*. Class members cannot pay *anything*. Moreover, the statutory scheme fails to provide any guidelines or framework governing payment plans. The Statute does not require that people even be notified of a payment plan option, fails to provide that payment plans be set with regard to ability to pay, does not include any procedures for how a Court Clerk administering the Statute determines the amount of payments, and requires no record or notification to the Commissioner that a payment plan has been offered and under what terms. The result is that the Commissioner automatically revokes licenses under the Statute without any assurance that even the most basic procedural pro-

23

tections required prior to such a deprivation are followed. No hearing opportunity is provided for persons for whom a payment plan or hardship exemption are either unavailable or ineffective.

The Commissioner's repeated citation of statutory provisions authorizing waiver or reduction of Court Debt on grounds of indigency (Comm. Mem. at 4-5, 17-18) is beside the point and misses a crucial distinction in Plaintiffs' constitutional challenge. A sentencing court's decision to waive or reduce Court Debt invokes different state and individual interests, different court inquiries, and different constitutional requirements from the entirely separate matter of the Commissioner's decision to revoke, without notice and inquiry into ability to pay, the driver's license of a Court Debtor who has not paid within one year. In particular, the waiver provisions, like the hardship stay, are *wholly discretionary* with the sentencing court, and it is *not* an abuse of discretion under Tennessee law to refuse to waive or reduce ***even if the defendant is indigent and cannot make any payments at all***. *E.g.*, *State v. Black*, 897 S.W.2d 680, 683 (1995) (expressly approving ruling that "there is no affirmative duty on [the sentencing court] to waive the costs, even if the defendant is found indigent"); *State v. Ryan*, 2014 Tenn. Crim. App. LEXIS 719, at 14-18 (July 22, 2014). A Tennessee judge may refuse to waive fines purely in hopes that the indigent defendant may one day secure a job or even an inheritance. *State v. Lafever*, 2004 Tenn. Crim. App. LEXIS 71 at 21-22 (Jan. 30, 2004). Discretionary hardship, reduction, or waiver provisions and procedures are simply not substitutes for constitutionally required pre-revocation procedures.

Regardless of whether a license-holder seeks or a court has denied waiver, the Fourteenth Amendment requires a determination of willfulness "in *revocation proceedings* for failure to pay a fine or restitution." *Bearden*, 461 U.S. at 672 (emphasis added). Here, as in *Bearden*, the issue is not whether the monetary penalty should be reduced but what procedures the state may

24

use to collect that money when the defendant does not pay. Under *Bearden* there must be a determination whether the nonpayment resulted from the defendant's purposeful choice. If it did not—if, as Senator Dickerson put it, and like the Plaintiffs and class members here, the defendant is one of those "people who simply don't have the means"—then as a matter of constitutional right there can be no revocation. Making the constitutionally-required ability-to-pay determination is an entirely separate legal inquiry from whether the defendant's Court Debt should be waived in the exercise of judicial discretion.

Procedural due process mandates that, in every case involving revocations for failure to pay Court Debt, the Commissioner must provide license-holders with pre-revocation notice and an opportunity for an ability-to-pay hearing. *See Bell*, 402 U.S. at 542 (since liability is an important element of revocation scheme, state must provide pre-revocation hearing on liability); *Lee*, 942 F. Supp. at 755–56 (since knowledge is important element of driver's-license-suspension scheme, state must provide pre-revocation hearing on knowledge); *Padberg*, 203 F. Supp. 2d at 281–82 (requiring pre-suspension hearing before revoking taxi license in service-refusal cases); *Schroeder v. Ryan*, 1995 U.S. Dist. LEXIS 13322, at *5 (N.D. Ill. Sept. 6, 1995) (requiring pre-deprivation hearing before revoking auto registration); *Fitch v. Belshaw*, 581 F. Supp. 273 (D. Or. 1984) (revoking driver's licenses without notice and ability to pay hearing violates Due Process Clause). Because the Statute provides for no notice or hearing in connection with the deprivation, it unconstitutionally deprives impoverished people of a protected right that is central to their ability to meet the basic necessities of life. Because the Statute lacks adequate procedural safeguards, the Commissioner routinely revokes driver's licenses without providing minimal due process and without any information with respect to whether nonpayment is due only to a person's poverty.

25

## II. THE 2017 AMENDMENT DOES NOT CURE THE CONSTITUTIONAL INFIRMITIES OF THE STATUTE

For the reasons set forth above, the Statute as originally enacted is unconstitutional because it deprives Court Debtors of their ability to drive without notice, without an opportunity to be heard on the constitutionally central issue of ability to pay, and as a State debt collection measure available to no private creditor. The 2017 Amendment makes three changes to the Statute.

- The bases for the six-month, one-time-only hardship stay of revocation are expanded, although the stay remains available only pre-revocation and only for a single six-month period.

- The amendment adds a provision for discretionary waiver of the fines and fees that resulted in revocation.

- The amendment permits discretionary issuance of a restricted license to individuals unable to satisfy their Court Debt.

None of these changes cures the constitutional deficiencies of the original Statute. The Statute as amended violates both Due Process and Equal Protection.

First, the 2017 Amendment does not even address notice, so the Statute's violation of procedural due process remains exactly as it was before the Amendment. The Commissioner will continue to revoke people's driver's licenses automatically whenever his Department receives notice that Court Debt has remained unpaid for one year, and that revocation will continue to occur without notice and without consideration of the license-holder's ability to pay.

Second, the provision of possible indigency waivers adds nothing to existing law, because the power to reduce fines and fees for poor people has already existed for years under Tenn. Code Ann. §§ 40-24-101, -104; *see also id.* § 40-25-129(a). The problem is that, as set forth above, these waivers have been held to be *wholly discretionary*, and it is not an abuse of discretion to refuse to waive or reduce even if the defendant is indigent and cannot make any

26

payments at all. *State v. Black*, *supra*; *State v. Ryan*, *supra*. The 2017 Amendment expressly states that the waiver is discretionary, which means that it does not offer any new relief to Court Debtors.

Finally, although the expanded hardship provisions and the new restricted license provision may help some Court Debtors preserve or recover their licenses for a brief period, they do nothing to make constitutional the deprivations that plainly will continue to occur. Thus, the 2017 Amendment broadens the class of individuals to whom a hardship stay could potentially be available, but it does not change the limitation of the "hardship exemption" to a single, nonrenewable, six-month stay that is only applicable prior to revocation. Because the Commissioner provides no pre-revocation notice at all, let alone notice of the ability of a hardship stay, an indigent Court Debtor would have no reason even to apply for the stay until it is too late. And even if there were sufficient notice—which, again, is not addressed by the 2017 Amendment—a single, six-month stay of revocation will not suddenly make constitutional the deprivations of the licenses of those who are no more able to pay after the stay expires than they were originally.

As for the restricted license, it is completely discretionary, twenty times more expensive than a regular driver's license, sharply limited in scope, and is issued only *after* an unconstitutional deprivation has already taken place. The restricted license costs $65 and only lasts for one year, while a regular driver's license costs $28 and lasts for eight years. Indeed, the State expects these restricted licenses to generate nearly $65,000 in annual net revenue for the State treasury. (S56.01 ¶ 58). For many, and perhaps most, class members, the additional cost is substantial and merely compounds the deprivation of their license they never should have faced in the first place.

To the extent that the determination whether to issue a restricted license could be interpreted as a species of ability-to-pay hearing, it fails to meet minimal constitutional safeguards set forth in *Strange* and *Fuller*. As the Fourth Circuit explained in *Alexander*, to comply with the Fourteenth Amendment a Court Debt recoupment program must contain certain elements, including a *pre-deprivation* notice and ability-to-pay determination, protection for indigent debtors, and assurance that the Court Debtor is not "exposed to more severe collection practices than the ordinary civil debtor." 742 F.2d at 174; *see also United States v. Wilson*, 597 F.3d 353 (6th Cir. 2010) (noting that "thorough inquiry into the defendant's finances . . . should precede" any recoupment order). A post-revocation restricted license issued purely as an exercise of judicial discretion does not begin to meet this standard. It is simply not permissible *at all* to revoke licenses for non-payment without first making, in the words of *Turner v. Rogers*, 564 U.S. 431, 433 (2011), "an express finding by the court that the defendant has the ability to pay." *See also Augustin v. City of Philadelphia*, 171 F. Supp. 3d 404, 408 (E.D. Pa. 2016) ("the root requirement of the Due Process Clause" is that "an individual be given an opportunity for hearing *before* he is deprived of any significant property interest"); *Washington v. McQuiggin*, 2011 U.S. Dist. LEXIS 68072, at *10 (W.D. Mich. Jun 23, 2011) (approving Michigan recoupment statute specifically because it "requires an ability-to-pay hearing before enforcement of the fee begins"). Later giving back something less than was taken—for an additional fee—cannot cure the unconstitutionality of the original deprivation.

Last, the 2017 Amendment makes no strides in curing the *James v. Strange* constitutional defect, nor (as set forth in Part III below) did Defendant Purkey even name, much less discuss, this claim in his Motion to Dismiss. Based on the stipulated facts and statutory scheme alone, this Court can grant summary judgment on this claim for the Plaintiffs.

28

### III. THE MOTION TO DISMISS SHOULD BE DENIED

We have dealt with many of the Commissioner's arguments on his motion to dismiss in the course of the discussion above, which demonstrates that Plaintiffs have not merely stated a plausible claim for relief but have gone further and demonstrated an *entitlement* to relief. Here we address the Commissioner's remaining arguments. For all the reasons set forth above and in this section, the motion to dismiss should be denied and summary judgment should be entered for Plaintiffs.

#### A. Revocation of Driver's Licenses Under the Statute Is a Debt Collection Measure, Not Part of the Criminal Punishment

The Commissioner repeatedly treats the deprivation of driver's licenses as though it were part of the punishment for the underlying crimes. *E.g.*, Comm. Mem. at 4 ("revocation . . . is the last step in a chain of events that persons put in motion when they engage in conduct that leads to conviction of a criminal offense"); *id.* at 11 (statute "is . . . reasonably related to one of the overall objectives of the justice system, namely, rehabilitation of offenders"). But, of course, it is no such thing: Deprivation of a driver's license is *never mentioned* in the penalty provisions of most Tennessee statutes defining criminal offenses.[6] Where suspension or revocation of a driver's license *is* intended to be part of the punishment for the offense, the statute says so expressly,[7] and Plaintiffs do not challenge those statutes here. As the Statute on its face makes clear, and as the legislative history confirms, the Statute at issue here is not intended as punishment but rather as "just a way to collect revenue." (S56.01 ¶ 22)

Indeed the Commissioner's argument brings into sharp focus the fundamental injustice of the Statute. Tennesseans convicted of crimes who have the resources to pay their Court

---

[6]      The general sentencing provisions of Tenn. Code Ann. § 40-35-104(c) do not include license revocation except where such authority is separately "conferred by law," *see* § 40-35-104(d).

[7]      *See*, *e.g.*, Tenn. Code Ann. § 55-10-104 (mandatory suspension of license on DUI conviction).

Debts get to keep their driver's licenses; Tennesseans identical in every way except their lack of means do not. The Statute is not a punishment for the underlying offense at all; here, as in *Bearden*, 461 U.S. at 671, the Statute is punishment for being poor, and that is exactly why the Statute is unconstitutional.

### B. The Commissioner Applies the Wrong Legal Standard

Although the Complaint describes the impact of the Statute on African-Americans as part of its background allegations (Compl. ¶ 56), the Equal Protection claim in this case is not based on race but—as the Complaint expressly alleges—on the State's (a) taking away the driver's licenses only of poor Court Debtors, while allowing non-indigent Court Debtors to keep their licenses (Compl. ¶ 69), and (b) granting to itself unusual and harsh coercive collection powers it does not give to private creditors (*id*. ¶ 7). None of this was a secret; *James v. Strange*, the seminal Supreme Court case to address this issue, is expressly cited in paragraph 7 of the Complaint, yet the Commissioner never so much as mentions the case in his motion to dismiss.

The Commissioner's failure to address *James v. Strange* is a telling and perhaps dispositive comment on his argument that the standard for the Equal Protection claim here is not merely rational basis but the kind of rational basis review that is applied to business regulation, where the court looks for any conceivable basis for justifying the statute. *See* Comm. Mem. at 9 (citing *Miller v. Reed*, 176 F.3d 1202, 1206 (9th Cir. 1999)). Both *Bearden* and *James v. Strange* demonstrate the fallacy of the Commissioner's assertion.

For cases such as this one, dealing with ability-to-pay issues in connection with the State's collection of criminal justice debt, *Bearden* supplies a rule of decision that is very different from the "find some basis" rule urged by the Commissioner.[8] *Bearden* applies a specific,

---

[8] Indeed, even under the Commissioner's proposed rational basis standard, the Statute fails to pass muster. Because driver's licenses are necessary for most to commute to their livelihood, driver's li-

four-part balancing test involving (1) the nature of the individual interest affected; (2) the extent to which it is affected; (3) the rationality of the connection between legislative means and purpose; and (4) the existence of alternative means for effectuating the purpose. 461 U.S. at 666-667. As set forth above, the Statute here cannot possibly pass muster under that test. Even if, as the Ninth Circuit pointed out in *Miller*, the right to drive has not been formally categorized as "fundamental," it is nevertheless a very, very important part of the life and livelihood of nearly every adult in Tennessee. People have substantial property and liberty interests in their driver's licenses, and these interests may not be stripped away as lightly as the Commissioner suggests.

Likewise, in a case within the ambit of *James v. Strange*—as here—the possible existence of a legitimate state interest is not enough to save an "unduly harsh or discriminatory" statute. In *Strange* Justice Powell *agreed* that the State had a legitimate interest in the collection of the debts there at issue, 407 U.S. at 141, but that did *not* permit waiving for the State, and only for the State, the protections the State had granted to other judgment debtors:

> We recognize, of course, that the State's claim to reimbursement may take precedence, under appropriate circumstances, over the claims of private creditors, and that enforcement procedure with respect to judgments need not be identical. This does not mean, however, that a State may impose unduly harsh or discriminatory terms merely because the obligation is to the public treasury, rather than to a private creditor. The State itself in the statute before us analogizes the judgment lien against the indigent defendant to other "judgments under the code of civil procedure." But the statute then strips the indigent defendant of the very exemptions designed primarily to benefit debtors of low and marginal incomes.

---

cense revocation for the poor directly undermines the government's only stated interest of debt collection. People too poor to pay off the Court Debt at the time of revocation will be in an even worse off position to pay back their debts after losing what is likely their only practicable means of transportation to work. Second, the Statute thwarts public safety goals by diverting limited law enforcement and court resources to pursuing and processing drivers with licenses revoked for nonpayment, instead of focusing on drivers proven dangerous on the road. For comparison, the Commissioner can revoke licenses indefinitely for nonpayment of Court Debt, but he can revoke licenses for only five years if a driver is involved in an accident in which one or more persons are killed and the driver refuses to submit to an intoxication test. Tenn. Code Ann. § 55-10-407. Revoking the licenses of people too poor to pay court debt helps neither to repay Court Debt nor to ensure public safety.

407 U.S. at 138-39 (footnote omitted). At the end of the day, a unanimous Supreme Court found: "State recoupment laws, notwithstanding the interests they serve, may not blight in such discriminatory fashion the hopes if indigents for self-sufficiency and self-respect." *Id*. at 141. The same is true here.

The Sixth Circuit's decision in *Johnson v. Bredesen*, 624 F.3d 742 (6th Cir. 2010), is not to the contrary, since the Court of Appeals expressly conditioned its application of rational basis review on the fact that re-enfranchisement of convicted felons is a mere "statutory benefit . . . to which Plaintiffs have no legal claim," *Id*. at 749. In sharp contrast, the Statute here effects a complete deprivation of a concrete, existing property right. The felony disenfranchisement at issue in *Johnson*, moreover, is imposed as part of the punishment for the crime, *see* Tenn. Code Ann. § 2-19-143; here, as discussed above, the driver's license revocation is no part of the defendant's punishment. The context here, in other words, is completely different from that at issue in *Johnson v. Bredesen.* In *this* context, *Bearden* and *James v. Strange* are directly on point and controlling.

### C. The Statute Violates Procedural Due Process by Mandating Revocation Without Notice or an Opportunity To Be Heard on Ability To Pay

The Commissioner concedes that under the Due Process Clause, a license holder "has a right to notice and an opportunity to be heard before the license can be suspended or revoked." Comm. Mem. at 15. The Commissioner utterly fails to respond to Plaintiffs' allegations that, pursuant to the Statute, the Commissioner routinely revokes driver's licenses without notice. And, indeed, the Commissioner has no possible response; the lack of notice is apparent on the face of the Statute and has in any event been stipulated (Stipulation of Fact ¶¶ 28, 29). On this basis alone, Plaintiffs' Due Process Claims not only must go forward but must prevail.

32

*Dixon v. Love*, 431 U.S. 105 (1977), cited at Comm. Mem. at 16-17, does not control this case. In *Dixon*, a hearing prior to revoking a license for accumulated points (*i.e.*, multiple traffic violations) was held unnecessary for two reasons: it was important to get dangerous drivers off the road quickly, and the underlying driving offenses themselves, which had been fully adjudicated in accordance with due process standards, established the entire factual basis for the revocation. 431 U.S. at 335-36. Neither justification applies here: the revocations mandated by the Statute have nothing to do with the ability to drive safely, and the underlying criminal case does *not* adjudicate whether, at the time of the impending revocation, the defendant has the ability to pay Court Debt. In *Dixon*, there *had* been prior adjudication of the only facts that mattered; here, there has not.

As for the hearings, the Commissioner correctly notes that the required hearing, consistent with the flexible requirements of due process, need only be "appropriate to the nature of the case." Comm. Mem. at 15 (citing *Bell*, 402 U.S. at 542). The Commissioner skips over, however, the most important aspect of the holding in *Bell*: "[A] hearing which excludes consideration of an element essential to the decision whether licenses . . . shall be suspended does not meet" Due Process standards. 402 U.S. at 542.

Here, of course, the "element essential to the decision" whether to revoke a license for failure to pay Court Debt is whether that failure was willful—that is, whether the Court Debtor has the ability to pay. And the State simply does not consider this question at all at any point in the process. The prior criminal proceedings turn on whether the defendant committed the crime and, as the Commissioner notes, may include at various points a consideration of the defendant's financial circumstances. But indigency determinations made at the time of arraignment or even sentencing do not answer the question whether the defendant has the ability to pay Court

33

Debt one year later. For example, a person who is working when proceedings commence may have some financial resources at that time, but if that same person were then incarcerated for a year or longer, they would have earned nothing during all that time and thus would have no ability to pay.

## CONCLUSION

The motion to dismiss should be denied, and summary judgment should be entered for Plaintiffs.

| | |
|---|---|
| s/ Lori H. Patterson | s/ Claudia Wilner |
| Lori H. Patterson (TN #19848) | Claudia Wilner (NY #4264156) |
| Matthew G. White (TN #30857) | Petra T. Tasheff (NY #2593325) |
| BAKER, DONELSON, BEARMAN, | Edward P. Krugman (NY # 1665892)* |
| CALDWELL & BERKOWITZ, PC | NATIONAL CENTER FOR LAW AND |
| First Tennessee Bank Building | ECONOMIC JUSTICE |
| 165 Madison Avenue, Suite 2000 | 275 Seventh Avenue, Suite 1506 |
| Memphis, Tennessee 38103 | New York, NY 10001 |
| 901-577-8182 | 212-633-6967 |
| lpatterson@bakerdonelson.com | wilner@nclej.org |
| mwhite@bakerdonelson.com | tasheff@nclej.org |
| | krugman@nclej.org |
| | |
| s/ Premal Dharia | s/ Josh Spickler |
| Premal Dharia (DC #484091)* | Josh Spickler TN (TN #21019) |
| CIVIL RIGHTS CORPS | JUST CITY |
| 910 17th Street NW, Suite 500 | 902 South Cooper Street |
| Washington, DC 20006 | Memphis, TN 38104 |
| 202-670-4809 | 901-206-2226 |
| premal@civilrightscorps.org | josh@justcity.org |

August 18, 2017

\*  Pro Hac Vice Application
   Filed or Forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of August, 2017, a true and correct copy of the foregoing Plantiffs' Memorandum of Law in Support of Their Motion for Summary Judgment and in Opposition to Defendant's Motion to Dismiss was filed with the Court using the CM/ECF system which will send notice to counsel of record who are registered with the CM/ECF system.

/s/ Matthew G. White

_____