**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

------------------------------------------------------X

JAMES THOMAS and DAVID HIXSON, on
behalf of themselves and all others similarly
situated,

                         Plaintiffs,

       v.

DAVID W. PURKEY, Commissioner of the
Tennessee Department of Safety and Home-
land Security,

                        Defendant.

------------------------------------------------------X

No. 3:17-cv-00005
JUDGE TRAUGER

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER**
**SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

*Page*

Table of Authorities ................................................................................................... i

ARGUMENT

I. THE COMMISSIONER'S ATTACKS ON PLAINTIFFS'
EVIDENCE ARE UNFOUNDED ................................................................... 2

   A. The Census Data Is Admissible, and the Brookings
   Report Is Properly Submitted in Support of Plaintiffs'
   Request for Judicial Notice .............................................................. 2

   B. Large Portions of the Commissioner's Response to
   Plaintiffs' Rule 56.01 Statement Are Improper .................................... 8

II. THE COMMISSIONER HAS IGNORED *STATE V. BLACK* AND
ITS PROGENY, WHICH DEMONSTRATE THAT THE
POTENTIAL AVAILABILITY OF WHOLLY DISCRETIONARY
RELIEF FROM THE SENTENCING COURT DOES NOT CURE
THE UNCONSTITUTIONALITY OF THE STATUTE ...................................... 11

III. THE STATUTE VIOLATES EQUAL PROTECTION UNDER
*JAMES V. STRANGE* BECAUSE THE STATE GRANTS ITSELF
DEBT COLLECTION PRACTICES IT FORBIDS TO PRIVATE
CREDITORS ............................................................................................ 12

IV. THE STATUTE VIOLATES PROCEDURAL DUE PROCESS
BECAUSE IT MANDATES REVOCATIONS WITHOUT NOTICE
AND WITHOUT AN OPPORTUNITY TO BE HEARD ON
ABILITY TO PAY COURT DEBT .............................................................. 19

V. INCORPORATION BY REFERENCE ......................................................... 24

CONCLUSION .......................................................................................... 24

GLOSSARY .............................................................................................. 25

*Page*

*Adkins v. E.I. DuPont de Nemours,* ............................................................................. 13
    335 U.S. 331 (1948)

*Alexander v. Johnson,* .................................................................................................. 14
    742 F.2d 117 (4th Cir. 1984)

*Bearden v. Georgia,* ................................................................................................... 2, 9
    461 U.S. 660 (1983)

*Bell v. Burson,* ............................................................................................ 16, 20, 21, 23
    402 U.S. 535 (1971)

*Bennis v. Michigan,* ....................................................................................................... 23
    516 U.S. 442 (1996)

*Bd. of Regents v. Roth* ................................................................................................... 20
    408 U.S. 564 (1972)

*Boddie v. Connecticut,* ............................................................................................ 20, 23
    401 U.S. 371 (1971)

*Canadian St. Regis Band of Mohawk Indians v. New York,* ............................................ 4
    2013 U.S.Dist. LEXIS 112860 (N.D.N.Y. July 23, 2013)

*Coe v. Armour Fertilizer Works,* .................................................................................... 19
    237 U.S. 413 (1915)

*Dixon v. Love,* ........................................................................................................ 19- 22
    431 U.S. 105 (1977)

*Duncan v. Carpenter,* ...................................................................................................... 4
    2015 U.S.Dist. LEXIS 28009 (M.D.Tenn. Mar. 4, 2015)

*EEOC v. E.I. Dupont de Nemours & Co.,* .......................................................................... 4
    2004 U.S.Dist. LEXIS 20753 (E.D.La. Oct. 18, 2004)

*Evans v. Rhodes,* ............................................................................................................ 22
    2016 U.S.Dist. LEXIS 126677 (Feb. 29, 2016)

*Fair Hous. Ctr. v. Hunt,* .................................................................................................. 4
    2011 U.S.Dist. LEXIS 17739 (W.D.Mich. Feb. 23, 2011)

Case 3:17-cv-00005   Document 82   Filed 12/18/17   Page 3 of 32 PageID #: 697

*Fell v. Armour,* ................................................................................................................ 19
    355 F.Supp. 1319 (M.D.Tenn. 1972)

*Fitch v. Belshaw,* ................................................................................................ 19, 21, 22
    581 F.Supp. 273 (D.Or. 1984)

*Fuentes v. Shevin,* ............................................................................................................ 19
    407 U.S. 67 (1972)

*Goss v. Lopez,* .................................................................................................................. 19
    419 U.S. 565 (1975)

*Gregg v. Ohio Dep't of Youth Servs.,* ............................................................................... 4
    661 F.Supp.2d 842 (S.D.Ohio 2009)

*James v. Strange,* ....................................................................................................... *passim*
    407 U.S. 128 (1972)

*Johnson v. Bredesen,* .................................................................................................. 15, 16
    624 F.3d 742 (6th Cir. 2010)

*Laudermilk v. Fordice,* ........................................................................................... 7, 19, 22
    948 F.Supp. 596 (D.Miss. 1996)

*Lee v. Rhode Island,* ....................................................................................................... 22
    942 F.Supp. 750 (D.R.I. 1996)

*Mackey v. Montrym,* ................................................................................. 16, 19, 20, 21, 22
    443 U.S. 1 (1979)

*Mathews v. Eldridge,* ................................................................................................. 19, 22
    424 U.S. 319 (1976)

*McLaughlin v. Florida,* .................................................................................................... 15
    379 U.S. 184 (1964)

*Moore v. Weinstein Co.,* ..................................................................................................... 9
    2012 U.S.Dist. LEXIS 72929 (M.D.Tenn. May 23, 2012)

*Olson v. James,* ........................................................................................................... 14, 16
    603 F.2d 150 (10th Cir. 1979)

*Page*

*Padberg v. McGrath-McKechnie,* .................................................................................. 22
    203 F.Supp.2d 261 (E.D.N.Y. 2002)

*Red Strokes Entm't, Inc. v. Sanderson,* ........................................................................... 3
    977 F.Supp.2d 837 (M.D.Tenn. 2013)

*Rinaldi v. Yeager,* ........................................................................................................ 15
    384 U.S. 305 (1966)

*Robinson v. Purkey,* ......................................................................................... 2, 8, 16, 18
    No. 3:17-cv-01263 (M.D.Tenn. Oct. 5, 2017)

*Rodriguez v. Providence Cmty. Corr., Inc.,* .................................................................... 17
    191 F.Supp.3d 758 (M.D.Tenn. 2016)

*Schroeder v. Ryan,* ....................................................................................................... 22
    1995 U.S.Dist. LEXIS 13322 (N.D.Ill. Sep. 6, 1995)

*Smith Corona Corp. v. Pelikan, Inc.,* ............................................................................... 3
    784 F.Supp.2d 452 (M.D.Tenn. 1992)

*Southerland v. St. Croix Taxicab Ass'n,* ............................................................................ 7
    315 F.2d 364 (3d Cir. 1963)

*State v. Black,* ............................................................................................................... 11
    897 S.W.2d 680 (1995)

*Toth v. Grand Trunk R.R.,* ............................................................................................ 10
    306 F.3d 335 (6th Cir. 2002)

*United States v. Bracewell,* ........................................................................................... 14
    569 F.2d 1194 (2d Cir. 1978)

*United States v. Bray,* ................................................................................................. 5, 6
    139 F.3d 1104 (6th Cir. 1998)

*United States v. Cunningham,* ....................................................................................... 17
    866 F.Supp.2d 1050 (S.D.Iowa 2012)

*United States v. Iverson,* ................................................................................................. 4
    818 F.3d 1015 (10th Cir. 2016)

iv

*Page*

*United States v. Lopez,* ........................................................................................................ 7
     2007 U.S.Dist. LEXIS 26170 (E.D.Pa. Mar. 26, 2007)

*Wells v. Malloy,* ................................................................................................................... 7
     402 F.Supp. 856 (D.Vt. 1975)

*United States v. James Daniel Good Real Prop.* ................................................... 20
     510 U.S. 43 (1993)

*United States v. Woodard,* .............................................................................................. 17
     2016 WL 9406086 (W.D.Mich. June 24, 2016)

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

--------------------------------------------------------X

JAMES THOMAS and DAVID HIXSON, on
behalf of themselves and all others similarly
situated,

                  Plaintiffs,

      v.

DAVID W. PURKEY, Commissioner of the
Tennessee Department of Safety and Home-
land Security,

                  Defendant.

No. 3:17-cv-00005

JUDGE TRAUGER

--------------------------------------------------------X

### PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

It is stipulated in this action that:

- Tenn. Code Ann. § 40-24-105(b) (the "Statute") does not require the Commissioner of Safety to send pre-revocation notices to people whose driver's licenses will be revoked for failure to pay their litigation taxes, fines, and/or court costs (SF ¶ 28[1]).

- The Commissioner of Safety does not in fact send pre-revocation notices to the people whose licenses will be revoked for failure to pay their litigation taxes, fines, and/or court costs (SF ¶ 29).

- The Statute does not provide for a hearing at which a person may challenge the revocation on the basis that he or she is unable to pay the litigation taxes, fines, and/or court debts involved (SF ¶ 30), but instead requires automatic and mandatory revocation without consideration of ability to pay and does not permit the Commissioner to consider ability to pay before revoking (SF ¶ 31).

It is further an undisputed fact for purposes of this motion that both named Plaintiffs are too poor

to pay the amounts required to obtain restoration of their licenses (DOpp 56.01 ¶¶ 71, 89, 91).

On the basis of these undisputed facts, the Statute violates Due Process and Equal Protec-

tion. The threat of license revocation under the Statute is an unduly harsh and coercive measure

---

[1]    "SF" refers to the Factual Stipulations Between the Parties (ECF #40). A Glossary of all abbreviations used to reference papers filed on the pending motions is appended hereto.

of debt collection that the State of Tennessee as sovereign gives to itself as creditor, *without* giving the same tool to private creditors. And as this Court held in *Robinson v. Purkey*, No. 3:17-cv-01263, slip op. at 17 (M.D.Tenn. Oct. 5, 2017), and Plaintiffs discuss in their brief in opposition to Defendants' Motion for Summary Judgment, a statute that purports to collect debts by stripping debtors of their means of livelihood fails rational basis review, let alone the more stringent *Bearden* balancing test that Plaintiffs submit applies. Because all of this happens without notice prior to revocation and without the opportunity for Court Debtors to keep their licenses by demonstrating their inability to pay, the Statute violates procedural due process as well.

For all these reasons, and as discussed further below and in Plaintiffs' moving brief, summary judgment should be entered for Plaintiffs.[2]

ARGUMENT

**I.    THE COMMISSIONER'S ATTACKS ON PLAINTIFFS' EVIDENCE ARE UNFOUNDED**

> **A.    The Census Data Is Admissible, and the Brookings Report Is Properly Submitted in Support of Plaintiffs' Request for Judicial Notice**

The Declaration of Edward P. Krugman, one of Plaintiffs' counsel in this action, does four things: (a) It authenticates Tennessee Attorney General Opinion No. 06-135; (b) it authenticates a Brookings Institution Report; (c) it authenticates certain data obtained from the United States Census Bureau; and (d) it summarizes certain of the Census data, all in support of paragraphs 92-104 of Plaintiffs' Rule 56.01 Statement. Those paragraphs and the materials supporting them are plainly relevant: They relate to the importance of being able to drive in Tennessee,

---

[2]    Plaintiffs are simultaneously filing separate papers in opposition to Defendant's Motion for Summary Judgment (ECF #61). There is substantial overlap between the two motions, and Plaintiffs have tried where possible to cross-reference between this brief and their Opposition Brief to avoid duplication. This Reply Brief responds to arguments made by the Commissioner that are specific to Plaintiffs' motion. Beyond that, *Rooker-Feldman*, *Bearden*, and "rational basis" are addressed in the Opposition brief, whereas *James v. Strange* and procedural due process are addressed in this Reply Brief.

2

which in turn bears both on the four-factor *Bearden* balancing test and on the coercive effect of the Statute under *James v. Strange*. And in focusing specifically on the need to drive to get to work, paragraphs 92-104 relate as well to the irrationality of seeking to collect debts by taking away the debtors' ability to earn a living.

Commissioner Purkey, however, asserts that the Krugman Declaration and the materials it authenticates are inadmissible. Commissioner Purkey is wrong.

Neither Rule 3.7 of the Rules of Professional Conduct nor the caselaw contains an absolute bar on evidentiary submissions from lawyers; indeed, they support admissibility in this context. In particular, Rule 3.7(a)(2) permits an advocate to submit testimony on an uncontested issue, and that is exactly what the Krugman Declaration does. There can be no reasonable dispute that the Attorney General Opinion, the Brookings Report, or the Census Data are what they purport to be, and the principal evidentiary content of the Krugman Declaration is to say that they are. It is common for lawyers to authenticate documents received from the other side in discovery. *E.g.*, *Red Strokes Entm't, Inc. v. Sanderson*, 977 F.Supp.2d 837, 843 n.3 (M.D.Tenn. 2013) (affidavit of lawyer attaches excerpts of discovery materials in support of motion for summary judgment). There is no reason why they cannot do the same for publicly available materials whose source cannot reasonably be questioned.

*Smith Corona Corp. v. Pelikan, Inc.*, 784 F.Supp.2d 452, 472 (M.D.Tenn. 1992), *aff'd mem.*, 1 F.3d 1252 (Fed. Cir. 1993), which the Commissioner cites eight times in his papers, has nothing to do with this case. At issue in *Pelikan* was a memorandum of non-infringement written by an intern in trial counsel's law office, which was being relied on to negate willful infringement. The document had been withheld in discovery, and no witness had been deposed on it, but defendants proposed to testify that they relied on it in believing that they were not infringing. *Id.*

3

at 471-74. The Court excluded the document, and any testimony based on it, because it had been withheld and because any current use would necessarily involve trial counsel's vouching for his intern's work. That scenario is entirely removed from the purely formal authentication of publicly available documents in this case, and likewise from the mechanical extraction of data from documents that are themselves exhibits.

*The Census Data* (Exhibit 4). Commissioner Purkey acknowledges that Exhibit 1, the Attorney General Opinion, is self-authenticating (Opp. at 5), but the same is true of the Census Report (Exhibit 4). Fed. R. Evid. 902(5); *e.g.*, *Fair Hous. Ctr. v. Hunt*, 2011 U.S.Dist. LEXIS 17739, at *8-*9 (W.D.Mich. Feb. 23, 2011); *EEOC v. E.I. Dupont de Nemours & Co.*, 2004 U.S. Dist. LEXIS 20753, at *3-*4 (E.D.La. Oct. 18, 2004).[3] Exhibit 4 is taken from an official Census Bureau publication that lays out how people get to work in the United States; the Krugman Declaration says nothing more than that it is what it appears to be, *i.e.,* the Tennessee rows from the dataset the Census Bureau posted on its website.

But Exhibit 4 is not merely authentic; it is admissible. The Commissioner's hearsay objection is not well taken, because as both *EEOC v. Dupont* and *Fair Hous. Ctr. v. Hunt* held, census data are the paradigmatic "public records" for purposes of the Rule 803(8) hearsay exception. *Accord*, *e.g.*, *United States v. Iverson*, 818 F.3d 1015, 1021 (10th Cir. 2016) (agreeing that "government websites fall within the exception for public records"). Indeed, census data is subject to judicial notice as well. *Duncan v. Carpenter*, 2015 U.S.Dist. LEXIS 28009, at *58 & n.7 (M.D. Tenn. Mar. 4, 2015); *accord*, *e.g.*, *Canadian St. Regis Band of Mohawk Indians v. New York*, 2013 U.S.Dist. LEXIS 112860, at *43-*46 (N.D.N.Y. July 23, 2013) (collecting cases). Accordingly, Exhibit 4 is properly before the Court.

---

[3]     As a public record downloaded from a government website, it is also authentic under Rule 901(b)(7). *Gregg v. Ohio Dep't of Youth Servs.*, 661 F.Supp.2d 842, 852 (S.D.Ohio 2009).

4

***The Pivot Table*** (Exhibit 5). Because Exhibit 4 is properly before the Court, so is Exhibit 5.[4] Exhibit 5 is an Excel "pivot table" — in effect, a cross-tab — that shows, for Tennessee as a whole and for several metropolitan areas within Tennessee, how Tennessee residents who work in those areas get to work. ***It is a purely mechanical tabulation of data that are in the record***, and it provides the paragraph-by-paragraph support for the factual assertions in paragraphs 97-104 of Plaintiffs' Rule 56.01 Statement. For two separate reasons, paragraphs 97-104 are properly supported by the evidence of record.

First, the underlying data are admissible and before the Court, so paragraphs 97-104 are directly supported by the data themselves. It may be a tedious operation to manually add up the various rows and do the percentages, but the data are there and the work can be done. Crucially, nowhere does Commissioner Purkey say that the percentages in paragraphs 97-104 are wrong, miscalculated, or in any other way not supported by the data.

Second, Exhibit 5 itself is properly before the Court as a summary exhibit under Fed. R. Evid. 1006. Rule 1006 provides:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

In *United States v. Bray*, 139 F.3d 1104, 1112 (6th Cir. 1998), the Sixth Circuit said "there are three kinds of summaries," which it characterized as primary-evidence summaries, pedagogical-

---

[4]    Paragraphs 9 and 10 of the Krugman Declaration are not independent evidence. They simply set forth, for convenience, numbers that are taken directly from Exhibit 5.

5

device summaries, and secondary-evidence summaries. In this case, Exhibit 5 can be regarded either as a pedagogical device[5] or as a secondary-evidence summary.

As a pedagogical device, Exhibit 5 would not itself be admitted but merely exhibits the calculations (which, as described above, would otherwise have to be done manually) on the data, and the data *are* admissible. The evidence, in other words, is Exhibit 4; Exhibit 5 simply walks through how to get from Exhibit 4 to the relevant paragraphs of the Rule 56.01 Statement.

Exhibit 5 is also directly admissible as a "secondary evidence" summary. As the Sixth Circuit explained in *Bray*, 139 F.3d at 1112, a "primary evidence" summary is admitted by itself, without the underlying data. The data have to be made available for checking, but they are not directly admitted; the only evidence is the summary. In the case of a "secondary evidence" summary, however, *both* the data and the summary are admitted, if the trial court concludes the summary is accurate and would be helpful to the finder of fact. *Id*. Secondary evidence summaries do require sponsoring witnesses, but for the same reason Exhibit 5 is a valid pedagogical device, the portion of the Krugman Declaration describing how the summary was prepared is well within the formal, uncontested matters permitted by Rule 3.7. It bears repeating that the Commissioner has not challenged the substantive validity of either the data (Exhibit 4) or the tabulations (Exhibit 5), and he obviously has no basis on which to do so. For this reason too, therefore, paragraphs 97-104 of the Rule 56.01 Statement are properly supported by the evidence of record.

***The Brookings Report*** (Exhibit 3). The Brookings Report is a formal report of a nationally recognized research and policy organization that, as set forth in the Krugman Declaration, was downloaded from the organization's website. Both for that reason and because it bears numerous

---

[5] "Pedagogical device," of course, is just another name for "demonstrative exhibit." Demonstrative exhibits are routinely prepared and presented by lawyers, without the need for a sponsoring witness.

6

internal indicia that it is exactly what it purports to be, *see* Fed. R. Evid. 901(b)(4), it has been properly authenticated.

That does not mean it is admissible, however, and Plaintiffs acknowledge that the report is hearsay. Nevertheless, because it is the Brookings Institution, and because insofar as it discusses public transportation in Tennessee it relates to matters that are "generally known within the trial court's territorial jurisdiction," Fed. R. Evid. 201(b)(1), it is properly submitted as support for the request for judicial notice in paragraph 92 of the Rule 56.01 Statement. The Commissioner stipulated that for "many" adult residents of Tennessee, the ability to drive is an important aspect of daily life (SF ¶ 41), but he chose not to stipulate to "most." That is Defendant's right, of course, but "most" is both obviously true[6] and well within this Court's judicially noticeable knowledge of conditions in the State in which it sits. As stated in *Laudermilk v. Fordice,* 948 F.Supp. 596, 601 (D.Miss. 1996), in finding due process violation in a county's deprivation of car tags of residents who failed to pay their garbage collection fees:

> Were this matter to come to trial, the undersigned could take judicial notice of the fact that Oktibbeha County, like almost every county in the state of Mississippi, has no public transportation system which would adequately meet the needs of the plaintiffs in this case. As such, as the parties have stipulated, the plaintiffs rely upon their own motor vehicles to obtain the necessities of life.

*See also Southerland v. St. Croix Taxicab Ass'n*, 315 F.2d 364, 367 (3d Cir. 1963) (taking judicial notice of area not served by public transportation); *United States v. Lopez*, 2007 U.S.Dist. LEXIS 26170, at *14 n.14 (E.D.Pa. Mar. 26, 2007) (taking judicial notice of area "generally inaccessible without a car"). In this case, the Commissioner has not objected to the request for judicial notice in paragraph 92 of the Rule 56.01 Statement, merely asserting that the statement is

---

[6]    *Wells v. Malloy*, 402 F.Supp. 856 (D.Vt. 1975), *aff'd mem.*, 538 F.2d 317 (2d Cir. 1976), a forty-year-old district court opinion from Vermont, cannot possibly provide factual support for the Commissioner's denial of "most."

7

one of opinion, not fact[7] and that some of the cited materials contain hearsay. But if something is "generally known" in the district, the fact that somebody said it out of court does not make it any less judicially noticeable.

As this Court said in *Robinson v. Purkey* (slip op. at 17), "one needs only to observe the details of ordinary life to understand that an individual who cannot drive is at an extraordinary disadvantage in both earning and maintaining material resources." Whether or not the Court takes judicial notice of the specific percentages from the Brookings report set forth in paragraphs 94-96 of the Rule 56.01 Statement, the report reinforces what this Court knows as a decades-long Tennessean: "For most adult residents of Tennessee, the ability to drive is an important aspect of daily life, such as for accessing food, shelter, work, education, medical treatment, and family."

**B.    Large Portions of the Commissioner's Response to Plaintiffs' Rule 56.01 Statement Are Improper**

Local Rule 56.01(c) provides three options for the non-movant in responding to a given paragraph of the statement of the material facts as to which the moving party contends there is no genuine issue for trial:

> Any party opposing the motion for summary judgment must respond to each fact set forth by the movant by either (i) agreeing that the fact is undisputed; (ii) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (iii) demonstrating that the fact is disputed. Each disputed fact must be supported by specific citation to the record.

In numerous instances, the Commissioner does none of these three things but responds outside the permissible confines of the Rule, including regarding facts to which the Commissioner himself previously stipulated.

---

[7]    It is not. Whether something is an "important" aspect of daily life is a fact, as the Commissioner necessarily recognized in agreeing to paragraph 41 of the parties' "factual stipulations." Whether the ability to drive is such an important aspect of daily life for "most" adults in Tennessee, as Plaintiffs contend, as opposed to "many," as the Commissioner was willing to stipulate, is likewise a fact. Indeed, "most" has ***more*** objective content (it means more than half) than does "many."

8

***Evidentiary Objections***. Virtually every paragraph of the Commissioner's response contains an evidentiary objection of some sort. The proper vehicle for objecting to evidence submitted in support of a motion for summary judgment is an exclusionary motion or a motion to strike, so that the issues can be briefed and decided by the Court and the motions for summary judgment decided on a clear record. *See Moore v. Weinstein Co.*, 2012 U.S.Dist. LEXIS 72929, at *8-*9 (M.D.Tenn. May 23, 2012) ("the court must resolve the pending Motions to Exclude and Motions to Strike before considering the Motion for Summary Judgment").[8] The same applies to objections to the individual factual assertions in the Rule 56.01 Statement itself: If the Commissioner believes a statement is wrong, he may dispute it; if he believes it is irrelevant, he may argue that in his brief. It is inappropriate to object as "compound" to statements to which the Commissioner himself stipulated in the Factual Stipulations of the Parties. *See* DOpp 56.01 ¶¶ 3, 8, 9, 13-16, 19, 20.

***Failure to Admit, or to Admit or Deny.*** The Commissioner likewise frequently refuses to admit statements to which he has stipulated. We do not dispute the Commissioner's right to object to the use of the defined term "Court Debt," but his refusals go far beyond that. *See, e.g.*, DOpp 56.01 ¶¶ 30, 32, 33, 35, 47.

***The Objection for Assertion of "Matters of Law."*** In the ordinary case, matters of law should not be included in a Rule 56.01 Statement. Nevertheless, where—as is the case here—the matters at issue include how state statutes translate into day-to-day operation, the lines between fact and law become blurred. Here, the "law" is, in a very real sense, the factual substrate of the

---

[8]     Thus, the Commissioner's extended argument—in his 56.01 Opposition (DOpp56.01 ¶¶ 21, 21, 41, 42, 43), not in his brief and not in a separate motion to strike—about the "hearsay" nature of the legislative history Plaintiffs have cited is improper. It is also wrong: statements of legislators are routinely considered in equal protection analysis of state statutes. *See, e.g., Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7 (1981) (citing "a review of the legislative history" to determine "the principal purposes" of state statute being challenged on equal protection grounds).

9

constitutional issues being adjudicated. *See Toth v. Grand Trunk R.R.*, 306 F.3d 335, 349 (6th Cir. 2002) ("A legal rule may be a proper fact for judicial notice if it is offered to establish the factual context of the case, as opposed to stating the governing law.").

It was for this reason that Plaintiffs asked for—*and the Commissioner agreed to*— "Factual Stipulations" on matters such as whether the restricted license provisions of the 2017 Amendment are discretionary (they are: SF ¶ 38) or whether, prior to 2011, Court Debt "could only be collected 'in the same manner as a judgment in a civil action'" (it could: SF ¶ 14). Whether or not these are "matters of law," the Commissioner agreed to them as "Factual Stipulations." *See also* SF56.01 ¶¶ 24-31. How he can now object to their appearing in the Rule 56.01 Statement is difficult to understand. And although he did not stipulate to the specific garnishment protections set forth at S56.01 ¶¶ 112, 113, or other statements about how the Statute operates and/or the effect of the 2017 Amendments (*e.g.*, S56.01 ¶¶ 44-47), those statements are functionally the same as those to which he did stipulate and, accordingly, would be fairly included in the Rule 56.01 Statement in the context of this case even if the issue were not already resolved by the Sixth Circuit's decision in *Toth*.

It is perhaps unlikely that the Commissioner's misuse of Local Rule 56.01 will have much effect on the decision of these motions. The record is clear, and the facts necessary to determine these motions are few. To the extent it matters, however, Plaintiffs submit that they are entitled to the benefit, as written, of all of the statements set forth in their Rule 56.01 Statement, all of which are properly supported and fairly before the Court.

10

## II. THE COMMISSIONER HAS IGNORED *STATE V. BLACK* AND ITS PROGENY, WHICH DEMONSTRATE THAT THE POTENTIAL AVAILABILITY OF WHOLLY DISCRETIONARY RELIEF FROM THE SENTENCING COURT DOES NOT CURE THE UNCONSTITUTIONALITY OF THE STATUTE

As set forth throughout Plaintiffs' moving papers and these response and reply papers, Due Process and Equal Protection prohibit revocation of driver's licenses for nonpayment of Court Debt without a determination that the Court Debtor had the ability to pay but willfully chose not to do so. A recurring theme of the Commissioner's papers, both on his own motion and in opposition to Plaintiffs', is that because various provisions of the Tennessee Code give criminal defendants the right to seek relief from judgments, including reduction or waiver of fines, costs, and litigation taxes, there is simply no constitutional problem to be remedied. (DMSJ at 6-11, 16, 38, 41; DOpp. at 6, 7, 16)

The Commissioner made similar arguments in his now-abandoned Motion to Dismiss (ECF #24 at 4-5, 17-18). As Plaintiffs pointed out in their moving brief, however (PMSJ at 24), a sentencing court's decision to waive or reduce Court Debt is an entirely separate matter from the Commissioner's decision to revoke, without notice and inquiry into ability to pay, the driver's license of a Court Debtor who has not paid within one year. The sentencing court's decision invokes different state and individual interests, different court inquiries, different constitutional requirements, and different legal standards. In particular, under the Tennessee Supreme Court's decision in *State v. Black*, 897 S.W.2d 680, 683 (1995), and its progeny, the waiver provisions are wholly discretionary with the sentencing court, and it is not an abuse of discretion under Tennessee law to refuse to waive or reduce even if the defendant is indigent and cannot make any payments at all. Discretionary hardship, reduction, or waiver provisions based on wholly different legal standards and state interests in calibrating punishment are simply not substitutes for constitutionally required pre-revocation procedures.

11

*The Commissioner has made no response whatsoever to this point.* Nowhere—in either of his briefs, in nearly 70 pages of briefing—does Commissioner Purkey mention *State v. Black* or any of the other Tennessee cases Plaintiffs cited, nor does he discuss the clear rule of Tennessee law they establish. That rule of law guts the Commissioner's argument.

Not having one's driver's license taken away for non-payment of Court Debt without a determination of ability to pay is a matter of constitutional right, not an appeal to judicial grace. When the State is creditor, preventing its collection of debts by means of coercive tools at its sole disposal is similarly a matter of constitutional right. The wholly discretionary waiver and reduction provisions cited by the Commissioner do not begin to be adequate protection for the constitutional rights at stake here.[9]

### III. THE STATUTE VIOLATES EQUAL PROTECTION UNDER *JAMES V. STRANGE* BECAUSE THE STATE GRANTS ITSELF DEBT COLLECTION PRACTICES IT FORBIDS TO PRIVATE CREDITORS

The Statute violates equal protection because it treats Court Debtors differently from other classes of debtors in Tennessee. *James v. Strange*, 407 U.S. 128, 138 (1972), provides the controlling analysis. In *Strange*, the Court held that government officials could not use "unduly harsh or discriminatory terms" to collect court costs owed from a criminal case, "merely because the obligation is to the public treasury rather than to a private creditor." The Court struck down a Kansas recoupment statute that expressly denied indigent defendants the basic wage garnishment exemptions available to judgment debtors in civil cases. *Id.* at 135, 141. It recognized that "state recoupment statutes" embody "legitimate state interests," but reasoned that those interests "are not thwarted by requiring more even treatment of indigent criminal defendants with other classes

---

[9] As Plaintiffs pointed out in their moving brief (PMSJ at 26-27), the discretionary nature of the 2017 Amendment's provisions for waivers and issuance of a restricted license means that the 2017 Amendment has not cured the constitutional deficiencies of the Statute. Here, too, the Commissioner is silent.

12

of debtors." *Id.* at 141. "For Kansas to deny [the basic wage exemptions at issue] is to risk deny-ing [a debtor] the means needed to keep himself and his family afloat." *Id.* at 136. The result was to "blight" in "discriminatory fashion the hopes of indigents for self-sufficiency and self-respect." *Id.* at 141-42. For these reasons, the Court struck down Kansas's "unduly harsh" debt-collection scheme.

As Plaintiffs have pointed out (PMSJ at 20), the Commissioner himself acknowledges the coercive effect of indefinite license revocation as a collection tool.[10] That coercive tool did not exist before the Statute was enacted in 2011,[11] and it exists today solely for the benefit of the State. The government, however, cannot force a person to pay a debt owed to the state when s/he cannot afford both to pay and to meet the basic necessities of life. *Adkins v. E.I. DuPont de Nemours*, 335 U.S. 331, 339 (1948) (statute cannot be interpreted to require that a person pay "the last dollar they have or can get, and thus make themselves and their dependents wholly des-titute"). For the vast majority of Tennesseans, the ability to drive is essential to get to work, to make a living, and to support themselves and their families. In depriving indigent Court Debtors of their means to do that, the Statute here blights not merely the hope but any practical possibility of their obtaining self-sufficiency and maintaining self-respect.

The cases following *Strange* established that a mechanism for determining ability to pay is a crucial element in the constitutionality of a coercive State collections scheme. Thus *Fuller v. Oregon*, 417 U.S. 40, 54 (1974):

---

[10]   In his brief in support of his now-abandoned motion to dismiss (ECF #24 at 11), the Com-missioner said that because "driver licenses play an important role in the everyday lives of most people, . . . [i]t is therefore reasonable to expect that most people will *take whatever action as may be necessary* to retain that license."

[11]   It is stipulated that prior to 2011, fines, courts costs, and litigation taxes in Tennessee could *only* be collected "in the same manner as a judgment in a civil action" (SF ¶ 14).

13

Oregon's legislation is tailored to impose an obligation only upon those with a foreseeable ability to meet it, and to enforce that obligation only against those who actually become able to meet it without hardship.

*Accord Olson v. James*, 603 F.2d 150, 154 (10th Cir. 1979) ("such a statute must not indiscriminately pursue the indigent as well as those who have acquired the means of repaying"); *United States v. Bracewell*, 569 F.2d 1194, 1198-1200 (2d Cir. 1978) (discussing the need for individualized consideration of repayment so as not to require repayment that creates hardship in violation of *James* and *Fuller*). As set forth in *Alexander v. Johnson*, 742 F.2d 117, 124 (4th Cir. 1984):

[The State] must take cognizance of the individual's resources, the other demands on his own and family's finances, and the hardships he or his family will endure if repayment is required. The purpose of this requirement is to assure repayment is not required as long as he remains indigent.

As Plaintiffs have argued, the Statute constitutes a unique discrimination by utilizing a coercive debt collection method not available in other debt collection contexts. Not only does the Statute give the State a debt collection method unheard of for private creditors (PMSJ at 19), but Tennesseans owing welfare overpayments or income tax debts *to the State* cannot have their license revoked, and people who have failed to pay court-ordered child support can have their license revoked only after notice and an opportunity for a hearing, during which indigency is considered if raised (PMSJ at 20). Here, as in *Strange*, 407 U.S. at 136-37, the "indigent's predicament" under the Statute "comes into sharper focus when compared with that of one who has" taken out a private loan to pay off Court Debt. "Should the latter prove unable to pay," the private creditor could not fundamentally alter the debtor's life by prohibiting that person from driving. This Statute violates *Strange*.

The Commissioner's arguments against the application of *Strange* are unavailing. His assertion that the Statute "does not strip indigent individuals from protections afforded to others,"

14

but rather "treats all criminal offenders who fail to pay their criminal court judgments in the same manner" (DMSJ at 40-41) applies incorrect Equal Protection analysis and misunderstands *Strange*. "The Equal Protection Clause requires more of a state law than nondiscriminatory application within the class it establishes. It also imposes a requirement of some rationality in the nature of the class singled out" by the statute. *Rinaldi v. Yeager*, 384 U.S. 305, 308–09 (1966) (citing *McLaughlin v. Florida*, 379 U.S. 184, 189-90 (1964)). The Kansas statute invalidated in *Strange* treated everyone to whom it applied the same, 407 U.S. at 140, but that was precisely the problem. The "unduly harsh" remedies the State gave to itself fell, in practical terms, only on poor people. It was *for a poor person* that denial of the basic wage exemptions risked "denying him the means necessary to keep himself and his family afloat." *Id.* at 136. Justice Frankfurter pointed out in his concurrence in *Griffin v. Illinois*, 351 U.S. 12, 23-24 (1956), that "[t]he State is not free to produce such a squalid discrimination":

> To sanction such a ruthless consequence, inevitably resulting from a money hurdle erected by a State, would justify a latter-day Anatole France to add one more item to his ironic comments on the "majestic equality" of the law. "The law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread."

It was for the same reason that the unanimous Court in *Strange* held that "to impose these harsh conditions on a class of debtors" created by the statute "is to practice . . . a discrimination which the Equal Protection Clause proscribes." *Id.* at 140-41.

The Commissioner's reliance on *Johnson v. Bredesen*, 624 F.3d 742 (6th Cir. 2010) (DMSJ at 41), is likewise misplaced. To be sure, the Sixth Circuit in *Johnson* described *Strange* as "concern[ing] fundamental interests subject to heightened scrutiny," *id.* at 749, but the interests to which *Johnson* said *Strange* applied are the very interests that Plaintiffs advance in this case. Quoting *Strange*, 407 U.S. at 135, and *Olson v. James*, 603 F.2d at 154, the *Johnson* Court said that *Strange* was centrally concerned with "'the hopes of indigents for self-sufficiency

15

and self-respect'" and the protection "of the wages 'with which a debtor supports himself and his family,'" so that "[i]t was the failure of the statute to protect he wages and intimate personal property of the defendant from seizure and its consequent discouraging of *independence and self-sufficiency* . . . that brought the Court to the conclusion that the provisions constituted a violation of the equal protection clause.'" 624 F.3d at 749.

*Johnson*'s description of interests that trigger heightened scrutiny maps directly onto the ability to drive in Tennessee. As this Court said in discussing *Johnson* in *Robinson v. Purkey* (slip op at 17):

> Unlike the power to vote, the ability to drive is crucial to the debtor's ability to actually establish he economic self-sufficiency that is necessary to be able to pay the relevant obligations.

The Supreme Court's own descriptions of the importance of being able to drive use very similar language. *E.g.*, *Bell v. Burson*, 402 U.S. 535, 539 (1971) ("Once licenses are issued, . . . their continued possession may become essential in the pursuit of a livelihood."); *Mackey v. Montrym*, 443 U.S. 1, 11 (1979) ("[T]he driver's interest . . . is [the] continued possession and use of his license . . . is a substantial one" because of the "personal inconvenience and economic hardship" he faces if his license is suspended.). The parallels are inescapable. Properly read, therefore, *Johnson* confirms that *Strange* applies here.

The Commissioner further argues that the debts involved in *Strange* "were civil in nature, whereas those at issue here are criminal judgments" (DOpp at 16). *Strange* itself does not limit its application according to the nature of the government debt owed, but rather on the statute's conferring "unduly harsh or discriminatory terms merely because the obligator is to the public treasury rather than to a private creditor." 407 U.S. at 138. The debts in *Strange*, moreover, were indigent defense costs arising from a criminal prosecution, which are functionally identical under the *Strange* analysis to the unpaid court costs, fees, and litigation taxes in criminal cases for

16

which the Commissioner revokes driver's licenses here. Indeed, in Tennessee, *indigent defense fees are part of costs in criminal cases* (SF ¶ 10) and so are subject to the Statute. It is a stipulated fact in this case that although fines and restitution are penal (SF ¶ 5), "litigation taxes and court costs are not considered part of the criminal penalty" (*id.* ¶ 7). The Statute authorizes the Commissioner to revoke licenses for unpaid costs or litigation tax alone, as well as for fines,[12] and the examples of Plaintiffs here show that the amount of costs and litigation taxes in a judgment frequently far outstrips the fine component.[13] There is no constitutional difference between the kind of debts at issue in *Strange* for appointed defense counsel fees and those at issue here.[14]

In *Rodriguez v. Providence Cmty. Corr., Inc.*, 191 F.Supp.3d 758, 775 (M.D.Tenn. 2016), Judge

---

[12] The Commissioner is correct that the Statute does not authorize revocation for unpaid restitution. Restitution is not at issue with respect to either of the named Plaintiffs here, even if the $50 due the "Criminal Injuries Compensation Fund" from Mr. Hixson's 2003 conviction is "restitution," because that conviction is not part of this case, as set forth above. Accordingly, *United States v. Cunningham*, 866 F.Supp.2d 1050 (S.D.Iowa 2012) (DMSJ at 41-42), would be beside the point even if its discussion of *Strange* were less conclusory than it is, because it involved collection of restitution. The analysis of *Cunningham*, such as it is, does not apply to fines. *United States v. Woodard*, 2016 WL 9406086, at *3 (W.D. Mich. Jun. 24, 2016).

[13] Mr. Hixson's fines totaled $75.00: $25.00 on each of two counts in 2013, and another $25.00 in 2015 (ECF ##62-2, -3). Over $2,500 of Mr. Hixson's Court Debt, therefore, was costs and litigation taxes. Mr. Thomas received no fine at all (ECF #62-1); his entire $289.70 in Court Debt consists of costs.

Moreover, this will most likely be true in a large number of cases, for the maximum fine in *any* criminal case in Tennessee is $50 unless a greater amount is established in a plea agreement or imposed by a jury. *See* Tenn. Const. art. VI, § 14; SF ¶ 12.

[14] For similar reasons, the Commissioner is wrong to assert that *Strange* does not apply because it and its progeny involve challenges to state efforts to recoup the specific costs of providing indigent legal defense. The Commissioner fails to explain the constitutional significance of this distinction, and none exists. The Court in *Strange* did not focus on the nature of the debt in the way the Commissioner suggests, and it made a point of saying that the unconstitutionality of the Kansas statute was *not* predicated on the disincentive on the indigent's right to seek appointed counsel. 407 U.S. at 134. Therefore, the nature of the fee in *Strange* was not determinative of the Court's equal protection analysis.

17

Sharp upheld the pleading of a *Strange* challenge to the collection of the same costs *and* fines at issue here.[15]

The Court in *Strange* proceeded in a manner sensitive to the "practical operation" of the Kansas statute, including the "unique[] disadvantage[s]" the statute visited upon criminal defendants, and the effect of the statute to "discourage" a criminal defendant's "search for self-sufficiency." 407 U.S. at 139. So too is the practical operation of the Statute here evident on its face. As this Court noted in *Robinson v. Purkey* (slip op. at 17), "one needs only to observe the details of ordinary life to understand that an individual who cannot drive is at an extraordinary disadvantage in both earning and maintaining material resources." If, as the Commissioner argues (DMSJ at 5), Mr. Hixson's record makes it more difficult to find employment,[16] that is itself a central point of *Strange*:

> A criminal conviction usually limits employment opportunities. This is especially true where a prison sentence has been served. It is in the interest of society and the State that such a defendant, upon satisfaction of the criminal penalties imposed, be afforded a reasonable opportunity of employment, rehabilitation and return to useful citizenship. 407 U.S. at 139.

Again, this Statute violates *Strange*.

## IV. THE STATUTE VIOLATES PROCEDURAL DUE PROCESS BECAUSE IT MANDATES REVOCATIONS WITHOUT NOTICE AND WITHOUT AN OPPORTUNITY TO BE HEARD ON ABILITY TO PAY COURT DEBT

It is now undisputed that the Statute mandates the revocation of driver's licenses with no notice and no opportunity to be heard at any time (DOpp56.01 ¶¶ 33, 35-36). As Plaintiffs have demonstrated (PMSJ at 32), the lack of a notice requirement in the Statute, standing alone, is fatal. For more than a century, it has been black letter law that "[i]t is not what notice, uncalled for

---

[15]   The coercive collection tool in *Rodriguez* was Rutherford County's use of supervised probation (with its ongoing fee burden) for defendants who did not pay their fines and costs in one lump sum.

[16]   With Mr. Hixson seeking work as a motorcycle mechanic, it is not at all clear how relevant the specifics of his record would be to prospective employers.

18

by the statute, the taxpayer may have received in a particular case that is material, but the question is, whether any notice is provided for by the statute." *Coe v. Armour Fertilizer Works*, 237 U.S. 413, 425 (1915). *Accord*, *e.g.*, *Goss v. Lopez*, 419 U.S. 565, 583-84 (1975); *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972); *Laudermilk v. Fordice*, 948 F.Supp. 596 (N.D.Miss. 1996)(striking statute permitting deprivation of auto tags without notice or opportunity to be heard); *Fitch v. Belshaw*, 581 F.Supp. 273, 277 (D.Or. 1984) (striking recoupment statute providing for revocation of driver's license without notice or opportunity to be heard); *Fell v. Armour*, 355 F.Supp. 1319, 1327-29 (M.D.Tenn. 1972)(striking forfeiture statute for lack of adequate notice provisions). Accordingly, the Commissioner's contention (DOpp at 19) that Plaintiffs have "failed to plead and prove the inadequacy of state or administrative process or remedies to redress their due process violations" is simply wrong. Because the Statute does not provide for notice, it is unconstitutional on its face and must be struck down.

The Commissioner argues that the court should consider pre- and post-deprivation procedures together (DOpp. at 18), implying that the Statute somehow provides for a post-deprivation review, but the Statute does not provide an opportunity to be heard at *any* stage. This aspect of Defendant's reliance on *Dixon v. Love*, 431 U.S. 105 (1977), is therefore misplaced. *Dixon* is primarily a timing case, in which the court applied *Mathews v. Eldridge*, 424 U.S. 319 (1976), to determine whether the driver in that case was entitled to a pre- or post-deprivation hearing. *Dixon*, 431 U.S. at 112; *see also Mackey v. Montrym*, 443 U.S. 1, 11 (1979). The statute at issue in *Dixon* provided for a post-revocation notice and a full evidentiary hearing upon request. 431 U.S. at 109; *see also Mackey*, 443 U.S. at 7 & n.5 (describing post-revocation hearing procedures). Here, of course, the Commissioner does not provide an opportunity for a hearing at any time.

19

Neither *Dixon* nor *Mackey* stands for the proposition that the State may revoke a driver's license without providing any hearing at all.

As Plaintiffs have argued, Due Process and Equal Protection prohibit the Commissioner from revoking driver's licenses for not paying Court Debt if the reason for nonpayment is indigence and not the driver's willful fault. For this reason, if the Commissioner wishes to suspend drivers' licenses for nonpayment of Court Debt, he must make a determination as to the drivers' ability to pay. The ability-to-pay determination is required by procedural due process because it is "an element essential to the decision whether licenses of the nature here involved shall be suspended." *Bell*, 402 U.S. at 542.

Moreover, the ability to pay determination must occur *prior* to revocation. "[I]t is fundamental that except in emergency situations (and this is not one) due process requires that when a State seeks to terminate an interest such as that here involved, it must afford 'notice and opportunity for hearing appropriate to the nature of the case' before the termination becomes effective." *Id.*; *see also United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993) ("Our precedents establish the general rule that individuals must receive notice and an opportunity to be heard before the Government deprives them of property."); *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) ("[A]n individual [must] be given an opportunity for a hearing before he is deprived of any significant property interest, except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event."). No emergency is present here, as the revocations of Plaintiffs' licenses have nothing to do with their conduct as drivers. In the absence of exigent circumstances, a pre-deprivation hearing is required. *E.g.*, *Bd. of Regents v. Roth*, 408 U.S. 564, 570 n.7 (1972) (it is "the rare and extraordi-

20

nary situation[] . . . that deprivation of a protected interest need not be preceded by opportunity for some kind of hearing").

The Commissioner does not address *Bell* in his brief, instead arguing that the Statute is lawful under *Dixon*. Here, too, however, Defendant's reliance on *Dixon* is misplaced. There was little risk of an erroneous deprivation in *Dixon*, because the revocation there was mandatory based on the driver's having had his license suspended three times within ten years. The driver had received full due process protections in connection with those suspensions, and he did not argue that they were unjustified. *Dixon*, 431 U.S. at 113, 118; *see also Mackey v. Montrym*, 443 U.S 1, 13 (1979)(little risk of erroneous deprivation when based on "objective facts either within the personal knowledge of an impartial government official or readily ascertainable by him."). Here, by contrast, the revocation does not follow from conviction of a criminal offense, but instead arises only as a consequence of Plaintiffs' nonpayment of Court Debt.[17] A key fact (indeed, *the* key fact) relevant to revocation is Plaintiffs' ability to pay, but that key fact is totally unknown to the Commissioner and is *never* adjudicated. In sharp contrast with *Dixon*, the risk of erroneous deprivation here is huge because, without making ability to pay determinations, the Commissioner has no way to know whether he is unconstitutionally revoking licenses from people who cannot pay Court Debt solely because of their poverty. *Fitch v. Belshaw*, 581 F.Supp. 272, 278 (D.D.C. 1984) ("The risk of an erroneous deprivation of an indigent defendant's [driver's license] and liberty is substantial in light of the statute's failure to provide notice and hearing.").

---

[17] As we have pointed out (PMSJ at 29-30), and as the Commissioner never refutes, license revocation forms no part of the punishment for the underlying offense. Tennesseans who have the means to pay their Court Debt keep their licenses; Tennesseans identical in every way except for lack of means do not.

21

*Dixon* is different from this case in another important way. *Dixon* involved important public safety concerns, because the driver there was suspended precisely because of his dangerous driving record. *Dixon*, 431 U.S. at 114. The state thus had an important interest in "the prompt removal of a safety hazard." *Id.* A similar need "to protect people from drunken drivers" pending a "prompt postsuspension hearing" animated the decision in *Mackey*. 443 U.S at 15, 18. Nothing remotely resembling those safety concerns is present here; there is quite simply no connection whatsoever between failure to pay Court Debt and highway safety. *See Lee v. Rhode Island*, 942 F.Supp. 750, 756 (D.R.I. 1996) (emphases added):

> There are certain emergency situations when a state may terminate a driver's license without a predeprivation hearing. This is not one of them. The cases in which the third factor of the *Eldridge* analysis, the government's interest, was sufficient to overcome the risk of wrongly terminating a driver's license generally involved *some imminent risk to public safety* accompanied by *objectively reliable facts* which minimize the risk of erroneous deprivation.[18]

Where, as here, there is no public safety concern and key factors relevant to the suspension decision are based on subjective facts, notice and an opportunity to be heard must precede the deprivation. *Lee*, 942 F.Supp. at 755-56; *Padberg v. McGrath-McKechnie*, 203 F.Supp. 2d 261, 281-82 (E.D.N.Y. 2002); *Fitch*, 581 F.Supp. at 278; *cf. Schroeder v. Ryan*, 1995 U.S.Dist. LEXIS 13322, at *5 (N.D.Ill. Sept. 6, 1995) (auto registration); *Laudermilk*, 948 F.Supp. at 603-04 (auto tags). Accordingly, the Statute here violates due process for failure to provide notice and an opportunity to be heard on ability to pay.[19]

---

[18]    For the same reason, the Commissioner's appeal (DOpp at 19) to the "objective rules" discussed in *Dixon* does not apply here. The "precise notice of what conduct will be sanctioned" discussed in *Dixon* centered on the conduct of dangerous driving; thus all drivers were "similarly situated" because they had committed similar driving offenses. *Dixon*, 431 U.S. at 115. Here, by contrast, drivers are not "similarly situated" with respect to ability to pay, which implicates the crucial pre-deprivation question of whether the driver willfully refused to pay Court Debt.

[19]    *Evans v. Rhodes*, 2016 U.S. Dist. LEXIS 126677 (Feb. 29, 2016) (DOpp. at 39), actually supports Plaintiffs in this respect, because the Florida statute at issue there—unlike the

22

Nor does the theoretical ability to go back to the sentencing court to seek a waiver or reduction of the sentence cure the due process violation, because these waivers are entirely discretionary with the sentencing court even if the defendant is destitute and cannot make any payments at all. *See* Point II above. Indeed, without notice of an impending revocation, Plaintiffs would have no knowledge that they should seek such judicial review. Regardless of what happens (or does not happen) in the sentencing court, the Commissioner must make an independent ability-to-pay determination before revoking for nonpayment of Court Debt.[20]

The Commissioner's reliance on *Bennis v. Michigan*, 516 U.S. 442 (1996), is unavailing. The plaintiff in *Bennis*, unlike Plaintiffs and putative class members here, received notice and an opportunity to be heard in opposition to the taking of her vehicle. *Id.* at 446. Nor do Plaintiffs here seek to "have the Department disregard criminal judgment assessments" (DOpp at 35) as suggested by the Commissioner. As discussed in more detail in Point II of Plaintiffs' Opposition Brief, Plaintiffs do not seek to alter the judgments against them in any way. Plaintiffs do contend, however, that fundamental fairness and equal protection principles prohibit the Commissioner from revoking their driver's licenses for nonpayment of Court Debt when the only reason for nonpayment is Plaintiffs' indigence. The Commissioner has provided no meaningful response reflecting the existence of such due process, either pre-deprivation or post-deprivation. Accordingly, the Commissioner may not revoke Plaintiffs licenses unless he determines that they have

---

Statute challenged in this case—*did* provide for notice and *did* provide for consideration of the license holder's ability to pay. *Id.* at *8, *11-12. Unlike the Statute here, therefore, the Florida statute in *Evans* already provided process that was due.

[20] Due process is a flexible concept and may be satisfied by many different procedural mechanisms of varying levels of formality, as appropriate under the circumstances. *Boddie*, 401 U.S. at 379. There may be more than one possibility as to the precise nature of the hearing required, but there must be an opportunity for an ability-to-pay determination prior to license revocation. Both the Statute and the Commissioner's current practices, which revoke licenses without notice or hearing of any kind, violate Due Process and cannot stand. *See Bell*, 402 U.S. at 542-43.

23

the ability to pay, and he must provide them with an opportunity to be heard on that key question.

## V. INCORPORATION BY REFERENCE

Plaintiffs hereby incorporate by reference the *Bearden* and rational basis arguments from their opposition brief.

## CONCLUSION

Defendant's motion for summary judgment should be denied and Plaintiffs' motion should be granted.

s/ Matthew G. White
Matthew G. White (TN #30857)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
First Tennessee Bank Building
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
901-577-8182
mwhite@bakerdonelson.com

s/ Premal Dharia
Premal Dharia (DC #484091)
Jonas Wang (NY #5531769)*, **
CIVIL RIGHTS CORPS
910 17th Street NW, Suite 200
Washington, DC 20006
202-670-4809
premal@civilrightscorps.org
jonas@civilrightscorps.org


s/ Claudia Wilner
Claudia Wilner (NY #4264156)
Edward P. Krugman (NY # 1665892)
Theresa Lau (NY #5496526)*
NATIONAL CENTER FOR LAW AND ECONOMIC JUSTICE
275 Seventh Avenue, Suite 1506
New York, NY 10001
212-633-6967
wilner@nclej.org
krugman@nclej.org
lau@nclej.org

s/ Josh Spickler
Josh Spickler TN (TN #21019)
JUST CITY
902 South Cooper Street
Memphis, TN 38104
901-206-2226
josh@justcity.org

December 15, 2017

* *Pro hac vice* application submitted or forthcoming
** *Admitted to practice in New York; not admitted in the District of Columbia. Practice is limited pursuant to D.C. App. R. 49(c)(3).*

24

**GLOSSARY**

| | |
|---|---|
| PMSJ | Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment (ECF #37) |
| SF | Factual Stipulations Between the Parties (ECF #40) |
| S56.01 | Plaintiffs' Statement of Undisputed Facts submitted in support of Plaintiffs' Motion for Summary Judgment (ECF #39) |
| DOpp56.01 | Defendant's Response to Plaintiffs' Statement of Undisputed Facts (ECF #64) |
| D56.01 | Defendant's Statement of Undisputed Fact in Support of His Motion for Summary Judgment (ECF #62) |
| DMSJ | Defendant's Memorandum of Law in Support of His Motion for Summary Judgment (ECF #63-1) |
| DOpp | Defendant's Memorandum of Law In Opposition to Plaintiffs' Motion for Summary Judgment (ECF #65) |
| POpp56.01 | Plaintiffs' Response to Defendant's Statement of Undisputed Facts |
| POpp | Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment |

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of December, 2017, a true and correct copy of the foregoing Plantiffs' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment was filed with the Court using the CM/ECF system which will send notice to counsel of record who are registered with the CM/ECF system.

/s/ Matthew G. White

_____