# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| JAMES THOMAS and DAVID HIXSON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:17-0005 |
| | ) | |
| BILL HASLAM, Governor of Tennessee, in | ) | Judge Trauger |
| his official capacity; DAVID W. PURKEY, | ) | |
| Commissioner for the Department of Safety | ) | |
| and Homeland Security, in his official | ) | |
| capacity; and HERBERT SLATERY, III, | ) | |
| Attorney General and Reporter, in his | ) | |
| official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## COMMISSIONER DAVID W. PURKEY'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

David W. Purkey, the Commissioner for the Department of Safety and Homeland Security ("the Commissioner"), respectfully requests that the Court grant summary judgment in his favor on each of Plaintiffs' claims for the following reasons: (1) pursuant to the *Rooker-Feldman* doctrine, this Court lacks subject matter jurisdiction; and (2) Plaintiffs cannot prevail in a claim brought under 42 U.S.C. § 1983 because Tenn. Code Ann. § 40-24-105(b) does not violate Plaintiffs' constitutional rights.

## INTRODUCTION

### A. Factual Background

As set forth in their Complaint (D.E. 1) and their sworn Declarations to the Court (D.E. 6-1, 6-2, 41, and 42), Plaintiffs James Thomas and David Hixson assert that they are indigent Tennessee citizens, currently residing in Nashville. Pursuant to Tenn. Code Ann. § 40-24-105(b), both Plaintiffs have had their driver's licenses revoked by the Department of Safety and Homeland

Security ("the Department"), due to their failure to pay certain monetary judgments rendered against them in state court criminal proceedings.

### 1. Plaintiff Thomas

Specifically, Plaintiff Thomas avers that, in September 2013, he was arrested for criminal trespass in Nashville, because he was homeless and taking shelter under a bridge. *See* Thomas Declaration (D.E. 42) at ¶ 6. Plaintiff Thomas further avers that, on October 14, 2013, he represented himself in court and was found guilty of the charge. *Id*. at ¶ 7. As a consequence of the finding of guilt, the court gave Plaintiff Thomas "a thirty day suspended sentence and assessed court costs, but no fines." *Id*.[1] Plaintiff Thomas avers that the assessed court costs are in the amount of $289.70, which he has been, and continues to be, unable to pay. *Id*. at ¶ 12. Because he has not paid these court costs, the Department of Safety revoked his driver's license. *Id*. at ¶ 5. Further, Plaintiff Thomas avers that, in order to get his license reinstated, he must pay the outstanding court costs plus a $65 reinstatement fee, which he states he also is unable to pay. *Id*. at ¶¶ 11, 12, and 14.

Plaintiff Thomas states that, without a driver's license, he needs to take a bus to and from his "many" medical appointments, which "can take hours and is often painful . . . ." Thomas Declaration (D.E. 42) at ¶ 4. *See also id*. at ¶ 13 (also needing a driver's license to "access . . . potentially less costly shopping opportunities").

### 2. Plaintiff Hixson

In a similar fashion, Plaintiff Hixson avers that he was convicted of a crime in Washington

---

[1]     The General Sessions Disposition, signed by Judge Aaron Holt, specifically reflects that —upon Mr. Thomas' plea of guilty and "having heard the evidence produced by the State and Defendant"—the court "hereby orders and adjudges the defendant pay . . . all the costs of this cause . . . ." *See* General Sessions Disposition (*Defendant's Exh. A*).

County.  *See* Hixson Declaration (D.E. 41) at ¶ 4.  He also avers that, "[a]ccording to the Washington County Clerk, I need to pay . . . $2,583.80 before I will be eligible for reinstatement of my license."  *Id*. at ¶ 7.  Because he has failed to pay that court-assessed obligation, the Department revoked his driver's license.  *Id*. at ¶¶ 4, 8.

Yet, Plaintiff Hixson is somewhat circumspect as to the exact nature of this Washington County crime, as well as the specific components of the "$2,583.80 in Court Debt" that he owes.  Apparently, the conviction which Mr. Hixson references was entered on September 3, 2013.  *See* Defendant's Statement of Undisputed Facts at ¶ 10, and *Defendant's Exh. B*.  On that date, Plaintiff Hixson pled guilty to two counts of violating community supervision for life by (a) testing positive for cocaine and (b) failing to participate in a court-ordered "sexual offense treatment" program.  *Id*.  As reflected in the Washington County Criminal Court Order, signed by Criminal Court Judge Robert Cupp, the Court sentenced Plaintiff Hixson to incarceration in the county jail for concurrent sentences of 11 months and 29 days, and ordered him to pay a fine of only $50.00 ($25.00 for each count) and court costs.  *See* Defendant's Statement of Undisputed Facts at ¶¶ 11-12.

With a fine of only $50, Plaintiff seems to suggest that the court costs for this offense amounted to over $2,500.

However, this is not Plaintiff Hixson's only Washington County conviction.  Indeed, while not disclosed by Mr. Hixson, he also was convicted on November 10, 2015, again for "violation of CSL [i.e., community supervision for life]."  *See id*. at ¶ 13, and *Defendant's Exh. C*.  As a consequence of that second Washington County conviction, Criminal Court Judge Lisa Nidiffer Rice ordered Mr. Hixson to serve another 11 months and 29 days of incarceration in the county jail, and pay another fine of $25.00 and court costs.  *Id*. at ¶¶ 14-15.  With regard to the court-ordered monetary assessment, Judge Rice entered the notation: "Defendant to pay $30.00 per

3

month beginning 60 days after release." *Id*. at ¶ 15.

Still, with Washington County court fines amounting to only $75, aggregated court costs for these misdemeanor convictions in the residual amount of $2,508.80 simply does not make sense. The answer to this mathematical conundrum lies in the fact that Plaintiff Hixson has another, far more serious conviction, which he has not disclosed.

On September 8, 2003, Plaintiff Hixson was convicted, in *Sullivan* County Circuit Court, of "ATTEMPT TO COMMIT AGGRAVATED SEXUAL BATTERY" on a minor. *Id*. at ¶ 25, and *Defendant's Exh. F*. As a consequence of that conviction, Mr. Hixson was given a 5-year probationary sentence. *Id*. at ¶ 26. In addition, Judge Phyllis Miller ordered Plaintiff Hixson to pay

- a "$200 minimum mandatory fee as a sex offender,"

- $50.00 to the "Criminal Injuries Compensation Fund,"

- $402.50 in "Court Costs," and

- a $3,000 "fine" as a "Sex Offender Tax."

*Id*.

Accordingly, the "$2,583.80 in Court Debt" likely is *not* entirely attributable to the single Washington County conviction which Plaintiff Hixson chose to disclose. Instead, it probably is attributable (at least in part) to the $3,000 "sex offender tax" fine and other assorted fees and costs assessed against him by the Sullivan County Circuit Court.

Plaintiff Hixson contends that he is "trapped in a vicious cycle" in which he "cannot get a better job because [he] do[es] not have a driver's license," but cannot recover his driver's license because he "do[es] not have enough money" to pay the $2,583.80 assessed against him. *See* Hixson Declaration (D.E. 41) at ¶ 9. *See also id*. at ¶¶ 10-12.

4

Plaintiff Hixson, however, has another (and more acute) impediment to finding a "better job." As a consequence of his 2003 conviction in Sullivan County, Plaintiff Hixson is a registered violent sex offender. *See* Defendant's Statement of Undisputed Facts at ¶ 21. He is classified as "VIOLENT AGAINST CHILDREN," and is registered as an "OFFENDER AGAINST CHILDREN." *Id.* at ¶ 22 (*Defendant's Exh. E* at 1). This public information, if noted by a prospective employer, likely could compromise Mr. Hixson's ability to obtain a "better job."[2]

## B. Statutory Overview

Plaintiffs challenge, on due process and equal protection grounds, the constitutionality of Tenn. Code Ann. § 40-24-105(b). *See* Complaint (D.E. 1) at ¶¶ 100-02. Their challenge focuses on subsection (1) of section 105(b), which provides:

> A license issued under title 55 for any operator or chauffeur shall be revoked by the commissioner of safety if the licensee has not paid all litigation taxes, court costs, and fines assessed as a result of disposition of any offense under the criminal laws of this state within one (1) year of the date of disposition of the offense. The license shall remain revoked until such time as the person whose license has been revoked provides proof to the commissioner of safety that all litigation taxes, court costs, and fines have been paid.

Plaintiffs contend that this statute is constitutionally infirm because (a) revocations occur "without any inquiry into their ability to pay," Complaint at ¶ 100, (b) revocations occur "without providing [drivers] notice and an opportunity to show" their inability to pay, *id.* at ¶ 101, and (c) such mandatory revocations as related to "indigent" drivers violate the Equal Protection Clause. *Id.* at ¶ 102.

Specifically, both Plaintiffs make the following identical assertion: "I never had the opportunity to seek a hearing in connection with the revocation of my driver's license. I would

---

[2] Plaintiff Hixson's Sex Offender Registration also discloses that he currently is employed. *Id.* at ¶ 23; *Defendant's Exh. E* at 2. The address of his employer is 3494 Dickerson Pike in Nashville. *Id.* This is the address for a Metro Nashville vehicle inspection site. *Id.* at ¶ 24.

5

have argued that my driver's license should not be revoked because I do not have the money to pay." *See* Hixson Declaration (D.E. 41) at ¶ 6; Thomas Declaration (D.E. 42) at ¶ 11. Accordingly, the gravamen of Plaintiffs' Complaint focuses on the license revocations as a consequence of plaintiffs' inability to pay debts "assessed" for "crimes" without the benefit of "inquiry," "notice," or "opportunity" to demonstrate their lack of "ability to pay" such assessments. Complaint (D.E. 1) at ¶¶ 1, 100-101.

However, Plaintiffs' challenge is premised on the assumption that the Department should provide a forum in which they (and others similarly situated) could demonstrate their indigency. *See*, *e.g.*, Complaint at ¶ 32. Yet, the monetary assessments which Plaintiffs contend they "do not have the money to pay" were ordered by the sentencing court,[3] and not the Department. In this respect, Section 105(b) functions within a broader statutory framework, and—contrary to their assertions—Plaintiffs (and those whom they seek to represent) did (and do) have an "opportunity" to demonstrate their lack of "ability to pay" whatever fines, restitution, court costs, and/or litigation taxes were (and are) assessed against them by the sentencing court. *See*, *e.g.*, Tenn. Code Ann. §§ 40-24-102, 40-24-104(a), 40-25-123(b), 40-25-129(a)(2), 40-35-304(f), and 67-4-605(c). Those

---

[3]     Throughout their Complaint, Plaintiffs use the term "Court Debt" as a catch-all term for "litigation taxes, court costs, and fines." *See* Complaint at ¶ 1. In their summary judgment Memorandum, Plaintiffs also include "restitution" as being a part of so-called "Court Debt." *See* Plaintiff Summary Judgment Memorandum (D.E. 38) at 5; *see also id*. at 24.

     This nomenclature is both inaccurate and inappropriate. Fines, restitution, court costs, and/or litigation tax serve distinct purposes (which are discussed below), and it is undisputed that fines, restitution, court costs, and/or litigation tax all are assessed *by a court* as part of a criminal sentence and judgment. *See*, *e.g.*, Plaintiffs' Statement of Undisputed Facts (D.E. 39) at ¶ 4.

     Moreover, a failure to pay "restitution" is not a basis for revocation of a driver's license under Tenn. Code. Ann. § 40-24-105(b)(1). However, because Plaintiffs include restitution within their global "Court Debt" terminology, it is addressed here.

6

opportunities are appropriately before the sentencing court, not the Department.

## 1. Fines

A "fine" is penal; its purpose is to punish. *State v. Blevins*, 968 S.W.2d 888, 895 (Tenn. Crim. App. 1997); s*ee also* Tenn. Code Ann. § 40-35-104(c)(1) (identifying a fine as an appropriate "sentencing alternative" for a felony or misdemeanor); Plaintiffs' Statement of Undisputed Facts (D.E. 39) at ¶ 5. When imposing a fine, a sentencing court is required to take into account certain "factors," including "prior history, potential for rehabilitation, financial means, and mitigating and enhancing factors, that are relevant to an appropriate, total sentence." *Blevins*, 968 S.W.2d at 895 (emphasis added).[4]

Although intended as a form of punishment, a criminal defendant has recourse to obtain a release from a fine (either in part or completely). In fact, the sentencing trial court *retains* jurisdiction—even after entry of final judgment—to revisit an individual's ability to pay an assessment. *Id.* at 895 n.1 ("The trial court retains jurisdiction, even after final judgment, to modify the payment schedule or to reduce or remit entirely the amount of fines for which the defendant may be obligated."). Tenn. Code Ann. § 40-24-102 states:

> The several courts in which a cause is finally adjudged are authorized, *either before or after final judgment, for good cause*, to release the defendants, or any one (1) or more of them, from the whole or any part of fines or forfeitures accruing to the county or state.

*Id.* (emphasis added). In turn, Tenn. Code Ann. § 40-24-104(a) states:

> If the defendant fails to pay the fine as directed, or is unable to pay the fine and so represents upon application to the court, the court, after inquiring into and making further investigation, if any, which it may deem necessary with regard to the defendant's financial . . . situation . . ., *including whether the nonpayment was . . .*

---

[4] Indeed, as demonstrated by his 2015 (and heretofore undisclosed) conviction in Washington County, Judge Rice clearly took Plaintiff Hixson's "financial means" into account, by permitting him to pay his fines and court costs in installments. *See* Defendant's Statement of Undisputed Facts at ¶ 15.

*due to indigency*, may enter any order that it could have entered under § 40-24-101, or may reduce the fine to an amount that the defendant is able to pay . . . .

*Id.* (emphasis added). Section 40-24-101(a) allows a court imposing a fine to direct the defendant to pay the entire amount at the time of sentencing, pay the entire amount at a later date, or pay the fine in installments. *Id.* at 40-24-101(a)(1)-(a)(3).

### 2. Restitution

Restitution is also penal. *See* Plaintiffs' Statement of Undisputed Facts at ¶ 5. *See also* Tenn. Code Ann. § 40-35-104(c)(2) (identifying restitution as an appropriate "sentencing alternative" for a felony or misdemeanor). Indeed, "[t]he purpose of restitution is not only to compensate the victim but also to punish and rehabilitate the guilty." *State v. Johnson*, 968 S.W.2d 883, 885 (Tenn. Crim. App. 1997). It is a judicial method "to promote accountability of offenders to their communities . . . ." *Id.* However, while "[t]here is no formula or method for determining restitution," *id.* at 886, a court is required to "consider the *financial resources* and *future ability* of the defendant *to pay* or perform" such restitution. Tenn. Code Ann. § 40-35-304(d) (emphasis added).

In a manner similar to release from a fine, "[a] defendant . . . *at any time* may petition the sentencing court to adjust or otherwise waive payment or performance of any ordered restitution or any unpaid or unperformed portion of the restitution." Tenn. Code Ann. § 40-35-304(f) (emphasis added).

Finally, a failure to pay restitution is not a basis for revocation of a driver's license under Tenn Code. Ann. § 40-24-105(b)(1) (stating that a license "shall be revoked if the licensee has not paid all litigation taxes, court costs, and fines assessed [by the court]").

### 3. Court Costs

"Court costs" are comprised of "all costs accruing . . . for the faithful prosecution and

safekeeping of the defendant, including the cost of boarding juries and that of the jailer. . . ." Tenn. Code Ann. § 40-25-133. Court costs also include "all costs incident to the arrest and safekeeping of the defendant, before and after conviction, due and incident to the prosecution and conviction, and incident to carrying of the judgment or sentence of the court into effect." Tenn. Code Ann. § 40-25-104.

While the amount of costs may be calculated by the court clerk, costs themselves are "adjudged." *Id.* They are, in other words, assessed by the trial court judge, and are part of the court's order. *See* Plaintiffs' Statement of Undisputed Facts (D.E. 39) at ¶ 4 ("In Tennessee, the sentence of a person convicted of a crime may include . . . an obligation to pay restitution, fines, litigation taxes, and/or court costs."); *see also Defendant's Exh. A-C* and *F* (court orders assessing costs).

While the applicable statutes require the defendant to pay court costs upon conviction, *see* Tenn. Code Ann. § 40-25-123(a), the sentencing court nevertheless has the authority and discretion to waive the payment of court costs as circumstances of the defendant may require, both at the time the costs are adjudged *and* at any time thereafter. The presiding judge of the general sessions court, which has jurisdiction over misdemeanor cases, Tenn. Code Ann. § 40-1-109, "may suspend the court costs and litigation tax . . . *for any indigent criminal defendant*, as in the presiding judge's opinion the equities of the case require." Tenn. Code Ann. § 40-25-123(b) (emphasis added). This statute is not restricted to the time of sentencing. In other words, the presiding judge of the Court of General Sessions may "suspend" such assessments *at any time*.

Criminal and Circuit Court judges have jurisdiction over both misdemeanor and felony cases. *See* Tenn. Code Ann. §§ 40-1-108; 16-10-102. In those courts, the sentencing judge— following a conviction—may require the state and/or county to pay the court costs and may relieve

the defendant of all "costs or fees," if the court "has made *a finding at an evidentiary hearing that the defendant is indigent* and remains indigent at the time of conviction . . . ." Tenn. Code Ann. § 40-25-129(a)(2) (emphasis added).

In addition, under Tenn. Code Ann. § 40-24-105(b)(4) (as currently in effect), "[a] person who is unable to pay all of the assessed litigation taxes, court costs, and fines but is able to pay some of them on a monthly or weekly basis may apply to the court having original jurisdiction over the offense for an order setting up a payment plan" for such assessments. "If the person and court agree to such a weekly or monthly payment plan, the court shall so order and such order shall have the effect of staying the revocation of [a driver's] license" for as long as the defendant adheres to the payment plan. *Id.* There is nothing in section 105(b)(4) which precludes a defendant from seeking relief at a later time under Tenn. Code Ann. §§ 40-24-102, Tenn. Code Ann. § 40-24-104(a) or 40-25-123(b) (discussed above).

Further, an amended version of section 105(b)(4) will go into effect on January 1, 2018. *See* 2017 Tenn. Pub. Ch. 412, Section 2. When effective, "a person who is indigent . . . may *also* apply for the waiver of *any* outstanding court costs and fines" by submitting an affidavit of indigency and paying a fee "of up to" $50.00, which itself may be waived "subject to the discretion of the court . . . ." Tenn. Code Ann. § 40-24-105(b)(4)(B) (eff. 1/1/18). Upon receipt and consideration of such submissions, the court "may waive any outstanding court costs and fines." Tenn. Code Ann. § 40-24-105(b)(4)(C) (eff. 1/1/18). This remedy also does not preclude a defendant from utilizing the mechanisms of Tenn. Code Ann. §§ 40-24-102, 40-24-104(a) or 40-25-123(b).

### 4. Litigation Tax

A state litigation tax in the amount of $29.50 is "levied . . . on all criminal charges,

upon conviction or by order." Tenn. Code Ann. § 67-4-602(a). In addition, "counties and municipalities . . . have authority to levy a local litigation tax . . .," Tenn. Code Ann. § 67-4-601(a), which, if adopted, "shall not exceed ten dollars ($10.00) per case" and "shall be used exclusively for the purposes of jail or workhouse construction, reconstruction or upgrading, or to retire debt, including principal and interest and related expenses, on such construction, reconstruction or upgrading or for courthouse renovation." Tenn. Code Ann. § 67-4-601(b)(1). Finally, pursuant to Tenn. Code Ann. §§ 67-4-601(b)(5) and/or (b)(6), a county legislative body may adopt "a privilege tax on litigation in . . . criminal cases" which "may be levied in an amount not to exceed twenty-five dollars ($25.00) per case," and that such privilege tax "may . . . use those funds . . . for the purpose of obtaining and maintaining software and hardware associated with collecting, receiving and maintaining records for law enforcement agencies, including county sheriff offices . . . ." Tenn. Code Ann. § 67-4-601(b)(7)(B)(i).

While "[t]he clerks of the various courts" are charged with "collect[ion]" of litigation taxes, the "judge of any court" may "suspend[], release[], waive[], remit[] or order[] the clerk of the court not to collect" such taxes. Tenn. Code Ann. § 67-4-605(c). Litigation taxes also may be subject to "payment plan" options as set forth in Tenn. Code Ann. § 40-24-105(b)(4) (in effect and as amended). Finally, and like court costs, litigation taxes may be waived by the trial court for good cause, including a showing of indigency. *See* Tenn. Code Ann. §§ 40-25-123(b), 40-25-129(a)(2).

### C. Procedural History

Plaintiffs filed the Complaint in this matter on January 4, 2017. (D.E. 1.) The Commissioner filed a motion to dismiss on March 3, 2017. (D.E. 23.) On August 18, 2017, Plaintiffs filed a renewed motion for class certification (D.E. 36), a motion for summary judgment/ opposition to the Commissioner's motion to dismiss (D.E. 37), and factual stipulations between

11

the parties (D.E. 40).

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 403 (6th Cir. 1992). After the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of material facts in dispute. An opposing party may not simply rely on its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). When the moving party has carried this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009). In evaluating a motion for summary judgment, the Court must draw all inferences in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment); *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995). Moreover, in order to be considered at the summary judgment stage, all evidence must be admissible. *See*

12

*Bowman v. Skyview Apartments*, 2008 WL 4449922 at \*3 (M.D. Tenn. 2008) (citing *Weberg v. Franks*, 229 F.3d 514, 526 n. 13 (6th Cir. 2000)); *see also Sperle v. Mich. Dept. of Corr.*, 297 F.3d 483, 495 (6th Cir. 2002).

Here, the parties have filed cross-motions for summary judgment. In reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

## ARGUMENT

This Court should enter judgment in the Commissioner's favor on each of Plaintiffs' claims because (1) the Court lacks subject matter jurisdiction on the basis of *Rooker-Feldman* doctrine; and (2) even if the Court had subject matter jurisdiction and Plaintiffs' claims were not barred by the statute of limitations, Plaintiffs' due process and equal protection claims fail as a matter of law.

**I.      The Court Lacks Subject Matter Jurisdiction on the Basis of *Rooker-Feldman* Doctrine.**

This Court lacks subject matter jurisdiction under the *Rooker-Feldman* doctrine—a doctrine based on two United States Supreme Court decisions, *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), and *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). This doctrine "provides that district courts lack subject-matter jurisdiction of 'cases brought by state court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Davis v. Wells Fargo, NA*, No. 3:12-CV-1181, 2013 WL 392616, at \*3 (M.D. Tenn. Jan. 31, 2013) (Trauger, J.) (quoting *Lawrence v. Welch*, 531 F.3d 364, 368 (6th Cir. 2008)). *See*

13

*also Exxon Mobil Corp. v. Saudi Basic Ins. Corp*., 544 U.S. 280, 284 (2005). Its fundamental purpose is to "prohibit end runs around state court judgments" via civil rights challenges in federal court. *Kovacic v. Cuyahoga County Department of Children and Family Services*, 606 F.3d 301, 308 (6th Cir. 2010).

*Rooker-Feldman* applies not only to issues that actually were raised before the state court, but also to claims that are "inextricably intertwined" with state court determinations. *Feldman*, 460 U.S. at 482 n.16*; accord Exxon*, 544 U.S. at 286 n.1. As the Sixth Circuit explained,

> *The inquiry* then *is the source of the injury* the plaintiff alleges in the federal complaint. If the source of the injury is the state court decision, then the *Rooker-Feldman* doctrine would prevent the district court from asserting jurisdiction. If there is some other source of injury, such as a third party's actions, then the plaintiff asserts an independent claim.

*McCormick v. Braverman*, 451 F.3d 382, 393 (6th Cir. 2006) (emphasis added); *see also id.* at 395 ("[T]he phrase 'inextricably intertwined' only describes the conclusion that a claim asserts an injury whose source is the state court judgment, a claim that is thus barred by *Rooker–Feldman*."); *Davis*, 2013 WL 392616, at \*3. Furthermore, the Supreme Court has warned that "a petitioner's failure to raise his constitutional claims in state court does not mean that a United States district court should have jurisdiction over the claims." *Feldman*, 460 U.S. at 482 n.16.

A review of Plaintiffs' Complaint, as well as other materials which they have submitted, demonstrates that the "source" of their "injury" is not "independent" from the underlying state court proceedings. *McCormick*, 451 F.3d at 393. To the contrary, the "injury" of which Plaintiffs complain (i.e., revocation of their licenses) is predicated directly upon the underlying criminal court judgments rendered against them. In short, Plaintiffs claim they were injured *because* they were subject to court-ordered assessments which they contend they cannot pay. Again, Plaintiffs assert that the statute violates their due process and equal protection rights because (a) such revocations occur "without any inquiry into their ability to pay," Complaint at ¶ 100, (b) such

revocations occur "without providing [drivers] notice and an opportunity to show" their inability to pay, *id*. at ¶ 101, and (c) such mandatory revocations as related to "indigent" drivers violate the Equal Protection Clause. *Id*. at ¶ 102.

Plaintiffs, however, concede that the underlying "litigation taxes, court costs, and fines" were "assessed" against them and members of their putative class as part of state court proceedings. *See* Complaint at ¶ 1. Plaintiffs further concede that they and members of their putative class are "*ordered*" to pay such litigation taxes, court costs, and fines. *Id*. at ¶ 16 (emphasis added). Indeed, while the term inaccurately lumps fines, court costs and taxes under one global term, Plaintiffs refer to these assessments as "*Court* Debt." *Id*. at ¶ 1 (emphasis added). Finally, Plaintiffs admit that "[i]n Tennessee, *the sentence* of a person convicted of a crime *may include* . . . an obligation to pay *restitution, fines, litigation taxes, and/or court costs*." *See* Plaintiffs' Statement of Undisputed Facts (D.E. 39) at ¶ 4 (emphasis added). Put simply, and as demonstrated by the statutory provisions cited above, Plaintiffs admit that each and every component of what they define as "Court Debt" is "ordered," "assessed," and "imposed" by the sentencing court as part of its judgment. *See* Factual Stipulations Between the Parties (D.E. 4) at ## 4, 8, 9, and 13. *See also* Tenn. Code Ann. §§ 40-35-104(c)(1) (fines set by the court), 40-35-104(c)(2) (restitution set by the court), 40-25-104 (court costs "adjudged"), 67-4-605(c) (litigation tax may be "suspend[ed]," "releas[ed]," or "waiv[ed]" by the court).

Moreover, the "inquiry into their ability to pay" such monetary assessments, and the "opportunity to show that they are unable to pay" such assessments, *see* Complaint at ¶¶ 100-01, was available to them (and is presumed to have occurred) in court and at the time of their

15

sentencing.[5]  If a fine is imposed, a court must take into account, among other things, "financial means" (i.e., the ability to pay) before pronouncing a sentence.  *Blevins*, 968 S.W.2d at 895 (emphasis added).  Similarly, before imposing restitution, a court is required to "consider the financial resources and future ability of the defendant to pay or perform" such restitution.  Tenn. Code Ann. § 40-35-304(d) (emphasis added).  Payment of court costs and litigation taxes also may be waived at the discretion of the court upon a proper showing by the defendant.  *See* Tenn. Code Ann. §§ 40-25-123(b), 40-25-129(a)(2), and 67-4-605(c).  Finally, Plaintiffs and every member of their putative class have the ability *right now* to go back to court, and seek relief from monetary assessments that they cannot pay.  *See* Tenn. Code Ann. §§ 40-24-102 (relief from fines and forfeitures), 40-24-104(a) (relief from fines), 40-25-123(b) (relief from court costs and litigation tax), and 67-4-605(c) (relief from litigation tax).[6]

---

[5]     Plaintiff Thomas, for instance, avers that after the court found him guilty of criminal trespass and "assessed court costs" against him, he "went to the clerk's office to advise the clerk that [he] could not pay" the assessment.  *See* Thomas Declaration (D.E. 42) at ¶¶ 7-8.  His declaration is silent as to what the clerk advised him.  However, with regard to judgments, the clerk only is vested with the authority to "perform all clerical functions of the court."  *See* Tenn. Code Ann. § 18-1-101.  In that respect, the clerk must "[r]eceive the amount of any judgment or decree rendered by the court," *see* Tenn. Code Ann. § 18-1-108(a)(5), and "[k]eep an execution docket," containing (among other things) "all judgments or decrees . . . [with] the amount of the recovery and the amount of costs . . . ."  Tenn. Code Ann. § 18-1-105(a)(4).  But, the clerk cannot alter a judgment.  *See generally* Tenn. Code Ann. §§ 18-1-105 ("Duties") and 18-1-108 ("Authority").  Accordingly, Plaintiff Thomas' plea of indigency should have been made to the sentencing judge.  Further, under the statutory authority cited above, Plaintiff Thomas still has the ability to do so.  *See* Tenn. Code Ann. § 40-25-123(b).

Plaintiff Hixson, on the other hand, did precisely that and was permitted to participate in a $30/month payment plan relating to his 2015 criminal judgment.  *See* Defendant's Statement of Undisputed Facts at ¶ 15.

[6]     Further, Plaintiffs may not argue that they had no notice of these protections.  As the Supreme Court has held, when state-law remedies are established and published in state statutes and case law, individualized notice of those remedies is not required. *City of W. Covina v. Perkins*, 525 U.S. 234, 241 (1999).  In other words, the State is not constitutionally required to provide

Plaintiff likely will argue that they do not challenge the terms and conditions of their respective state court judgments, but instead challenge the "independent" actions of the Commissioner in revoking their licenses. But such an argument belies their own allegations. Plaintiffs contend that the injuries relating to their license revocations occurred *because* they did not receive "notice," *because* they had no "opportunity" to be heard with regard to their indigency, and *because* no "inquiry" was made as to their ability to pay "restitution, fines, litigation taxes, and/or court costs" that are assessed by the court as part of a "sentence." Complaint at ¶¶ 100-01; Plaintiffs' Statement of Undisputed Facts (D.E. 39) at ¶ 5. These contentions essentially challenge the merits and substance of the underlying criminal court judgments. Again, Plaintiffs argue that they were ordered by the court to pay something that they were incapable of paying,[7] and that they should not be deprived of their licenses as a means of enforcing criminal court orders which they cannot comply with.

Yet, the processes and mechanisms to address all of these injuries were available (and still are available) in the state court system. Fines, restitution, court costs, and litigation tax all are imposed by the state court—and all may be waived and/or suspended by the state court—based upon the facts and evidence (including the defendant's ability to pay, if raised) in each case. Thus, for the purposes of *Rooker-Feldman*, Plaintiffs' asserted injuries were "caused by the state-court judgments," *Davis*, 2013 WL 392616 at *3, even though the judgments themselves may not specifically order the revocation of driver's licenses.

---

Plaintiffs with "information about available remedies outlined in the Tennessee Code. *Sherman v. State of Tenn.*, No. 16-02625, 2017 WL 2589410, at *17 (W.D. Tenn. June 14, 2017).

[7]     This clearly is a difficult argument for Plaintiff Hixson, who was permitted by Judge Rice to pay his fines and court costs at a rate of $30/month. *See* Defendant's Statement of Undisputed Facts at ¶ 15.

Indeed, by asserting that the Department of Safety should conduct "a hearing at which a person may challenge the revocation[] on the basis that he or she is unable to pay the Court Debt,"[8] Plaintiffs essentially propose that the Commissioner (or a designated hearing officer) should substitute his own judgment for that of the sentencing court. In concrete terms, Plaintiffs suggest that the Commissioner should evaluate whether Plaintiff Hixson is capable of paying the $3,000 "sex offender tax" and "$200 minimum mandatory fee as [a] sex offender" previously assessed against him by Sullivan County Judge Phyllis Miller. *See* Defendant's Statement of Undisputed Facts at ¶ 26. Such a contemplated procedure would trespass on the separation of powers construct of the state government. *See* Tenn. Const. art. II, § 2 ("No person or persons belonging to one of these [three] departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted.").

A similar situation was addressed by the District Court for the Northern District of New York in *King v. Creed*, No. 1:14-CV-0165 LEK/TWD, 2015 WL 893573, at *1 (N.D.N.Y. Mar. 2, 2015), *reconsideration denied*, No. 1:14-CV-0165 LEK/TWD, 2016 WL 204492 (N.D.N.Y. Jan. 15, 2016). In *King*, a court found the plaintiff guilty of speeding and assessed a fine against him. *Id.*, 2015 WL 893573 at *1. After one year, with the fine unpaid, the court clerk (defendant Creed) sent a letter to plaintiff "detailing the fine Plaintiff owed." *Id.* Several months after that, Creed sent plaintiff another letter advising that "his driver's license was suspended" for failure to pay the fine. *Id.* Plaintiff King never received a notice of suspension from the New York Department of Motor Vehicles. *Id.*

In his federal civil rights case, plaintiff King challenged (among other things) the court clerk's and DMV Commissioner's attempt to "enforce" the judgment by "unlawfully suspend[ing]

_____

[8]       Complaint (D.E. 1) at ¶ 32.

[his] driver's license . . . ." *Id*. at *2. Plaintiff further alleged that defendant Barbara Fiala, the Commissioner of the state DMV, "lacked authority to require Plaintiff to pay the assessment in violation of [his] due process and equal protection rights." *Id*.

Defendants Creed and Fiala argued that the plaintiff's claims were barred by *Rooker-Feldman*, and the district court agreed:

> "*Rooker-Feldman* bars a losing party in state court from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights." Plaintiff's claims against [clerk] Creed fall squarely within this scenario and thus are not properly before the court.

*Id*. at *3 (quoting *Exxon*, 544 U.S. at 287); *see also id*. at *7 (dismissing the claims against Commissioner Fiala pursuant to *Rooker-Feldman* as well).

In his motion for reconsideration, Plaintiff argued that *Rooker-Feldman* did not apply because he had asserted an "independent claim" against Creed and Fiala, which was distinct from the state court judgment itself. *King v. Creed*, 2016 WL 204492, at *2–3 (N.D.N.Y. Jan. 15, 2016). The district court disagreed:

> [A] federal suit does not raise an independent claim where it "alleg[es] that actions taken pursuant to a court order violate [the plaintiff's] rights." *Because Creed and Fiala acted to enforce the state court order*, the Court found that Plaintiff's allegations against them were essentially challenges to the underlying state court judgment. The Court is not persuaded by Plaintiff's argument that Creed and Fiala's actions to enforce the state court judgment were "voluntary" or "discretionary" acts.

*Id*. at *3 (emphasis added) (quoting *Hoblock v. Albany City Bd. Of Elections*, 422 F.3d 77, 88 (2d Cir. 2005) (emphasis in original) (record citations omitted).

Here, Plaintiffs' claims against the Commissioner are identical to those raised in *King*. Plaintiffs specifically allege that "the Commissioner of Safety 'shall' revoke [a] person's license" after "receiving notification from the Court Clerk that [such] person has outstanding Court Debt." *See* Complaint at ¶ 28 (emphasis added). Moreover, the license "'shall' remain revoked until such

19

time as the person provides proof to the Commissioner of Safety that he or she has paid all outstanding Court Debt." *Id*. at ¶ 29. Accordingly, Plaintiffs recognize that a license revocation is a means to enforce the underlying court judgment. For this reason, Plaintiffs' claims regarding revocation are "inextricably intertwined" with the state court judgments. *Feldman*, 460 U.S. at 482 n.16.

This conclusion also was reached by the District Court of Arizona in *Normandeau v. City of Phoenix*, 516 F. Supp. 2d 1054 (D. Ariz. 2005). In *Normandeau*, the plaintiff initially was convicted of driving on an expired registration and without proof of insurance, and fined $420. *Id.* at 1059. Although he was given a payment plan for the fine, plaintiff failed to make any payments in accordance with it—even after the city court gave him a 30-day grace period to pay the fine. *Id*. In the interim, the plaintiff received four additional citations for the same offenses. *Id*. After failing to appear for these additional citations, the city court fined plaintiff an additional $3,040. *Id*. After the court entered default judgments, it notified plaintiff that "if he did not remit the entire $3,468.00 he then owed, the Motor Vehicle Division of the Arizona Department of Transportation ("MVD") would be *asked* to suspend Plaintiff's driver's license pursuant to [state statute]." *Id*. (emphasis added). Plaintiff refused to pay, and the Arizona MVD suspended his license. *Id*. Among his federal civil rights claims, plaintiff Normandeau asserted that the Arizona suspension statute was "unconstitutional on its face and as applied to him," *id*. at 1060, and he sought a preliminary injunction against MVD Division Director, Stacey Stanton, from suspending his driver's license. *Id*.

As in the *King* case, Director Stanton argued that, in order "to entertain Plaintiff's claims against the State defendants, this Court could not avoid reviewing the city court decisions convicting plaintiff . . . ." *Id*. at 1062. The district court agreed. Applying *Rooker-Feldman*, the

court stated that "'the fundamental and appropriate question to ask is whether the injury alleged by the federal plaintiff *resulted* from the state court judgment itself, or is distinct from that judgment.'" *Id.* at 1063 (emphasis added) (quoting *Garry v. Geils*, 82 F.3d 1362, 1365 (7th Cir. 1996)).[9]  The district court explained: "The court 'cannot simply compare the *issues* involved in the state-court proceeding to those raised in the federal-court plaintiff's complaint.  Rather, '[it] must pay close attention to the *relief* sought by the federal-court plaintiff.'" *Id.* at 1063 (emphasis and alteration in original) (quoting *Bianchi v. Rylaarsdam*, 334 F.3d 895, 900 (9th Cir. 2003)); *accord Kenmen Eng'g v. City of Union*, 314 F.3d 468, 476 (10th Cir. 2002) (same)).  Accordingly, the district court held that the *Rooker-Feldman* doctrine precluded the relief the plaintiff requested: "Most obviously, because Plaintiff asks this Court to find a specific Arizona statute unconstitutional as state courts have applied it to him, to comply with Plaintiff's request would require this Court to find that the state courts erred." *Id.* at 1064.  Thus, even though the state court judgments only assessed fines against the plaintiff, and the suspension of his license was a statutory enforcement mechanism to compel payment of those fines, the district court found that *Rooker-Feldman* required dismissal of plaintiff's claims related to the unconstitutionality of the statute. *Id.*[10]

The relief sought by Plaintiffs here (i.e., a declaration of a violation of the Fourteenth Amendment for failure to provide notice, and an opportunity to be heard, and to conduct an inquiry regarding a person's ability to pay court-assessed fines, costs and litigation taxes) is directly and

---

[9]     *Accord Exxon*, 544 U.S. at 284 (*Rooker-Feldman* applies to "cases brought by state-court losers complaining of injuries *caused* by state-court judgments"; emphasis added).

[10]    The district court held that one of plaintiff's claims survived *Rooker-Feldman* scrutiny, because it was "based on events subsequent to Plaintiff's license suspension" and therefore independent of the underlying state court proceedings.  *Id.*  That remaining claim, however, was dismissed on statute of limitations grounds.  *Id.* at 1064 n.3.

inextricably connected to the underlying state court judgments. For this reason, *Rooker-Feldman* bars Plaintiffs' causes of action.

## II. Plaintiffs Cannot Prevail on Their Claims Because They Have Not Proven the Statute Violates their Constitutional Rights.

To prevail on a claim brought under 42 U.S.C. § 1983, a plaintiff must prove that (1) he or she was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was caused by a person acting under color of law. *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014). Here, Plaintiffs cannot show that they were deprived of a right secured by the Constitution. Section 105(b) neither implicates a fundamental right nor targets a suspect class. Accordingly, Plaintiffs' equal protection claim is subject to—and comfortably satisfies—rational basis review, especially under *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010).

Plaintiffs' procedural due process claim fails because they received adequate process in the underlying criminal court proceedings that led to the imposition of fines, restitution, court costs, and litigation taxes. Under *Dixon v. Love*, 431 U.S. 105, 112 (1977), the Due Process Clause does not require a pre-revocation hearing in such a circumstance.

Plaintiffs' substantive due process claim fails, because there is no authority for the proposition that the Department must consider a licensee's ability to pay a criminal court judgment before revoking a driver's license for failure to pay. The *Griffin/Bearden* line of Supreme Court cases to which Plaintiffs cite for this requirement do not apply in this context.

Lastly, Plaintiffs' equal protection claim that the Statute impermissibly allows the State to engage in unfair collection practices is without merit, as the case they rely on, *James v. Strange*, 407 U.S. 128 (1972), is also inapposite.

There is no genuine dispute of material fact in this case. Plaintiffs' claims fail as a matter of law. Accordingly, even if the Court were not deprived of subject matter jurisdiction pursuant

to the *Rooker-Feldman* doctrine, the Commissioner is entitled to judgment on each of Plaintiffs' claims because they are without legal merit.

### A. The Statute Does Not Violate the Equal Protection Clause.

Plaintiffs argue that the Statute violates the Equal Protection Clause of the Fourteenth Amendment because it makes no allowance for inability to pay and thus unfairly disadvantages indigent people who owe court-imposed fines, restitution, and court costs arising from their criminal proceedings. To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff disparately, as compared to similarly situated persons, and that such disparate treatment either (1) burdens a fundamental right, (2) targets a suspect class, or (3) has no rational basis. *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.,* 470 F.3d 286, 299 (6th Cir. 2006).

The Commissioner's revocations of drivers' licenses neither burden a fundamental right nor target a suspect class. "[T]here is no fundamental right to drive a motor vehicle." *Duncan v. Cone*, No. 00-5705, 2000 WL 1828089, at *2 (6th Cir. Dec. 7, 2000) (citing *Miller v. Reed,* 176 F.3d 1202, 1205-06 (9th Cir. 1999); *accord Roberts v. State,* 229 F.3d 1164, 2000 WL 1275606, at *2 (10th Cir. 2000) (table) (same). Further, while Plaintiffs attempt to plead the existence of a suspect class by asserting that Section 105(b) is "fundamentally unfair because it deprives Plaintiffs of the right to drive solely because of their poverty,"[11] the Sixth Circuit has held that "wealth-based classifications do not discriminate against a suspect class." *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010) (citing *Papasan v. Allain*, 478 U.S. 265, 283-84 (1986); *Maher v. Roe*, 432 U.S. 464, 470-71 (1977)). Thus, because Section 105(b) does not implicate a fundamental right or target a suspect class, it is subject to rational basis review.

---

[11]    Complaint (D.E. 1) at ¶ 95(a).

"To survive rational basis scrutiny, the statute need only be rationally related to legitimate government interests." *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010). Under this standard, the statute "'*must* be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id.* (emphasis added) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). "The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Hooper v. California*, 155 U.S. 648, 657 (1985); *accord Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (same). Under rational basis review, courts "will not strike down a statute on equal protection grounds 'unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the legislature's actions were irrational.'" *Johnson*, 624 F.3d at 747 (quoting *Vance v. Bradley*, 440 U.S. 93, 97 (1979)). "A plaintiff may demonstrate that the government action lacks a rational basis either by negativing every conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will." *Id.* (internal quotation marks, punctuation, and citations omitted). Finally, the existence of better methods for achieving governmental ends is irrelevant under rational basis review. *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 77 (2001); *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 316 (1976) (per curiam) ("[T]he State perhaps has not chosen the best means to accomplish this purpose. But where rationality is the test, a State 'does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect' " (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970))).

Here, the Statute is rationally related to the State's legitimate interests in (1) ensuring

compliance with court orders; (2) ensuring that victims of crime are made whole by receiving payment of restitution from the criminal defendant who caused them financial harm;[12] (3) requiring criminals to fulfill their sentences; (4) furthering offender accountability; (5) shifting some of the costs of enforcing the state penal code from taxpayers as a whole to the particular individuals who engage in criminal conduct; (6) having a cost-effective method of collecting criminal judgment assessments; and (7) increasing the likelihood of collecting criminal judgment assessments.

Courts have found each of these to be a legitimate state interest. In *Johnson v. Bredesen*, the Sixth Circuit held that Tennessee's voter re-enfranchisement statute, which conditioned restoration of felons' statutory voting rights upon payment of court-ordered victim restitution and child support obligations, did not violate the equal protection rights of felons whose indigency precludes them from making the necessary payments:

> We find that the state's interests of encouraging payment of child support and compliance with court orders, and requiring felons to complete their entire sentences, including paying victim restitution, supply a rational basis for the challenged statutory provisions sufficient to pass constitutional muster. Certainly, Tennessee possesses valid interests in promoting payment of child support, requiring criminals to fulfill their sentences, and encouraging compliance with court orders.

*Johnson*, 624 F.3d at 747 (citing *Jones v. Helms*, 452 U.S. 412, 423 (1981) ("There can be no question about the legitimacy of the purpose to cause parents to support their children."); *Blackhawk Mining Co. v. Andrus*, 711 F.2d 753, 757–58 (6th Cir. 1983) (upholding statute requiring prepayment of proposed penalty assessments against due process challenge where government had legitimate interest in preventing collection problems and ensuring compliance with the law); *Carter v. Lynch*, 429 F.2d 154, 157–58 (4th Cir. 1970) (upholding state civil arrest

---

[12]    "The purpose of restitution is not only to compensate the victim but also to punish and rehabilitate the guilty." *State v. Johnson*, 968 S.W.2d 883, 885 (Tenn. Crim. App. 1997).

and release statutes as legitimate legislative functions "well within the State's power to secure enforcement of the judgments of its courts")).

The State also has a legitimate interest in requiring those who have violated the criminal law to bear some portion of the costs of their criminal conduct, which is accomplished through the imposition of court costs and litigation taxes. This cost-shifting measure both reduces the tax burden on law-abiding Tennesseans and also serves to hold individuals who have violated the law accountable for some of the financial costs incurred by their actions. In rejecting a due process challenge to a jail's withholding a portion of an inmate's canteen-account funds to cover the costs of booking and room and board, the Sixth Circuit concluded "the government's interests—sharing the costs of incarceration and furthering offender accountability—are substantial, and indeed plaintiffs do not challenge them." *Sickles v. Campbell Cty., Kentucky*, 501 F.3d 726, 731 (6th Cir. 2007).[13] Similarly, the requirement that those who have violated the criminal law pay the statutory fines and victim restitution imposed by a criminal court clearly serves the State's legitimate interest

---

[13] *See also Mickelson v. Cty. of Ramsey*, 823 F.3d 918, 921 (8th Cir. 2016), *cert. denied sub nom. Mickelson v. Cty. of Ramsey, Minn.*, 137 S. Ct. 1578 (2017) (agreeing with Sixth Circuit's conclusion in *Sickles* that collecting booking fees is a substantial interest that "allows the county to manage the costs of serving and policing the community and 'further[s] offender accountability'") (quoting *Sickles*, 501 F.3d at 731); *Slade v. Hampton Roads Reg'l Jail*, 407 F.3d 243, 253 (4th Cir. 2005) (upholding jail's practice of automatically charging pretrial detainees one dollar per day in part because the jail had a "legitimate interest in attempting to defray the costs of a prisoner's keep and a legitimate interest in the collection of the fee"); *Broussard v. Parish of Orleans*, 318 F.3d 644, 656-57 (5th Cir. 2003) (rejecting due process challenge to a Louisiana statutory scheme that required inmates to pay a fee as a prerequisite to release on bail because the policy furthered "the government's interest in conserving scarce resources" and in "maintaining cost-effective procedures"); *Tillman v. Lebanon Cty. Corr. Facility*, 221 F.3d 410, 423 (3d Cir. 2000) (rejecting equal protection challenge of former prisoner who was assessed a daily fee for his incarceration because it is rationally related to the legitimate state interests in "teach[ing] fiscal responsibility to inmates" and "reimburse[ing] the state for the expenses of incarceration"); *Waters v. Bass*, 304 F. Supp. 2d 802, 806 (E.D. Va. 2004) (noting that federal law and many state statutes allow a fee assessment to cover the costs of incarceration).

in requiring offenders to complete their criminal sentences and in holding individuals accountable for their criminal conduct. *Johnson*, 624 F.3d at 747.

The State also has a legitimate interests in having a cost-effective method of collecting criminal judgment assessments. In *Mickelson v. City. of Ramsey*, the Eighth Circuit noted that a county's collection of a booking fee from a detained arrestee's cash upon booking involved "little or no discernable collection costs," while post-conviction attempts to collect the fee would "inevitably incur costs . . . [that] would frustrate the purpose of collecting the fee as a means to defray the expenses associated with booking." 823 F.3d 918, 925 (8th Cir. 2016); *cf. Mathews v. Eldridge*, 424 U.S. 319, 347 (1976) (noting that convenience, efficiency, and administrative cost are appropriate considerations in determining what kind of hearing is necessary in context of procedural due process challenge). The cost to the State of collecting criminal judgment assessments as a civil debt can be greater than the amount the offender owes. Revoking the driver's license of an offender who has not paid a court-imposed assessment in full or, alternatively, entered into a payment plan, is a substantially more cost effective way to secure the offender's cooperation with his obligations.

Lastly, the State's method of collecting court-ordered assessments—revoking a driver's license for non-payment—increases the likelihood of offenders paying those assessment precisely because of the importance of driver's licenses. This issue was addressed directly in *Wells v. Malloy*, 402 F. Supp. 856, 859 (D. Vt. 1975), *aff'd*, 538 F.2d 317 (2d Cir. 1976), wherein the district court rejected an equal protection challenge to a Vermont statute that allowed the suspension of a driver's license for failure to pay a four percent state vehicle purchase tax. Similar to the allegations here, the plaintiffs alleged that the statute violated their equal protection rights because they were unable to pay the tax as a result of their indigency. *Id.* at 857. Applying the

27

rational basis test (because there was no suspect class and no fundamental right involved[14]), the court concluded: "The rational basis is readily apparent because the [tax] is a revenue collecting measure and [the statute] is clearly designed to aid in the collection of the tax. Since losing one's right to drive is a great inconvenience, the potential loss operates as an incentive to make prompt payment." *Id.* at 859. The court further held that "[a] state may place restrictions on a citizen's right to use his car on public highways for reasons which are not directly related to health, safety, and welfare of society," and rejected the plaintiffs' argument that the statute was not effective: "To the contrary, the fact that [plaintiff] Wells brought this lawsuit indicates that he believes the State's strategy is too effective to ignore." *Id.* at 860.

The district court further noted that "[t]he fact that plaintiffs are unable to pay the tax does not make a coercive collection method unreasonable":

> [P]laintiffs' current financial straits may well be temporary, [and] Vermont has a legitimate interest in collecting the tax from assets which plaintiff may acquire in the future. Perhaps it would be more apt to suspend driving privileges at such time as plaintiffs may acquire the means to pay the tax, yet it is a practical impossibility, not to mention an invasion of privacy for Vermont to maintain so vigilant a surveillance of plaintiffs' finances. Rather than be a watch dog, Vermont has taken this tack to remind plaintiffs of their continuing obligation. Furthermore, this kind of indirect collection technique may well be the only method which is financially feasible. The cost of direct collection methods when added to the amount of tax due might exceed the value of plaintiffs' available property. Given the future orientation of [the statute] and the practical shortcomings of direct collection techniques, we cannot say that plaintiffs' present inability to pay makes a suspension of their driving privilege improper.

*Id.* at 861.

In the instant case, the considerations articulated in *Wells* are even more compelling. Here, the Statute at issue is intended to enforce criminal court judgments, which are intended to serve

---

[14]    *See Wells*, 402 F. Supp. at 858-59 (finding that "there is no fundamental right to drive" and that the statute does not "draw[] a suspect classification based on race, nationality, or alienage"). *See also id.* at 863 ("poverty alone does not create an unreasonable classification").

(a) as punishment from criminal infractions (fines), (b) as compensation for victims harmed by criminal activity (restitution), (c) as partial compensation for the cost of prosecuting a particular offender (costs), and (d) as partial compensation for the costs criminal conduct places on the criminal justice system (litigation taxes). The analysis in *Wells* (which merely construed the imposition of a civil tax) directly supports the conclusion that the Tennessee Statute is rationally related to the State's legitimate interest in having an effective mechanism for collecting criminal judgment assessments.

The Supreme Court has held, as a general matter, that "the power of the State to regulate the use of its highways is broad and pervasive." *Bibb v. Navajo Freight Lines Inc.,* 359 U.S. 520, 523 (1959). *See also Sullins v. Butler*, 175 Tenn. 468, 135 S.W.2d 930, 932 (1940) (legislature, through its police power, may prescribe conditions under which the "privilege" of operating automobiles on public highways may be exercised). Tennessee has chosen to use its regulatory power regarding the use of its highways in a manner that "remind[s]" criminal offenders of their "continuing obligation[s]" to pay their criminal fines, restitution to victims, court costs, and litigation taxes. *Wells*, 402 F. Supp. at 861. The challenged statute bears "a direct and rational relationship to the advancement" of numerous state interests and, accordingly, withstands rational basis scrutiny. *Johnson*, 624 F.3d at 747. Plaintiffs have not demonstrated that the government action lacks a rational basis, "either by negativing every conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will." *Id.* Nor is there any basis for the Court to "conclude that the legislature's actions were irrational." *Vance*, 440 U.S. at 97 (1979); *Johnson*, 624 F.3d at 747. To the contrary, this "collection strategy . . . is rationally related to [the State's] interest in collecting [fines, restitution, court costs, and/or litigation taxes] which the [court] has imposed." *Wells*, 402 F. Supp.

at 860.

Simply put, the fact that indigent offenders have difficulty paying their criminal judgment assessments does not render Tennessee's statute contrary to the Equal Protection Clause. *Id.* at 859 (upholding Vermont statute even though "suspending the right to drive causes [the plaintiffs] personal hardship"). As the Sixth Circuit has held, a "law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *E. Brooks Books, Inc. v. Shelby County, Tenn.*, 588 F.3d 360, 364 (6th Cir. 2009) (quoting *Romer v. Evans*, 517 U.S. 620, 632 (1996); *Johnson*, 624 F.3d at 748 (same); *see also City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)) ("When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes."); *James v. Strange*, 407 U.S. 128, 133 (1972) ("We do not inquire whether this statute is wise or desirable, or whether it is based on assumptions scientifically substantiated. Misguided laws may nonetheless be constitutional."). Regardless of the Plaintiffs' contention that the Statute is unwise, supported by a tenuous rationale, and works to the disadvantage of indigent offenders, such arguments are unavailing under the rational basis standard, and none of these rationales can serve as a basis for finding that the statute violates the Equal Protection Clause.

Indeed, in *Johnson*, dissenting Judge Moore opined that Tennessee's felon re-enfranchisement statute could not "survive constitutional scrutiny even under this highly deferential standard," because "'preconditioning suffrage on a payment that a person is unable to make is [not] in any rational way related to the government's interest in promoting that payment.'" 624 F.3d at 747-48 (quoting dissent at 756).

30

However, the *Johnson* majority specifically rejected that view, holding: "While the dissent would prefer that the state not discriminate on the basis of wealth when providing statutory benefits, this is an argument that must be resolved by the legislature, not this Court." *Id.* at 748. The court specifically explained that, "the statute is not aimed at encouraging the collection of payments from *indigent* felons, but from *all* felons," and that "the legislature may have been concerned that an exemption for indigent felons would provide an incentive to conceal assets and would result in the state being unable to compel payments from some non-indigent felons." 624 F.3d at 748 (emphasis in original). As the *Johnson* court colorfully phrased it, "That the state used a shotgun instead of a rifle to accomplish its legitimate end is of no moment under rational basis review." *Id.*

In an identical manner, the statute at issue here is aimed broadly at encouraging the collection of criminal judgment assessments from *all* offenders, not merely from *indigent* offenders. It is clear, under the binding authority of *Johnson*, that the statute at issue here survives rational basis review. *See also* W*ells*, 402 F. Supp. at 859. Accordingly, the Commissioner is entitled to judgment on the equal protection claim.

### B. The Statute Does Not Violate Plaintiffs' Right to Procedural Due Process.

Plaintiffs contend that their due process rights have been violated because they received no notice or opportunity to be heard on their ability to pay before the Commissioner suspended their licenses. "Procedural due process requires that the government, prior to depriving an individual of their property, provide that individual with notice of the proposed action and an opportunity to be heard." *Paterek v. Vill. of Armada, Mich.*, 801 F.3d 630, 649 (6th Cir. 2015) (citing *Morrison v. Warren*, 375 F.3d 468, 473 (6th Cir. 2004)). "To establish a procedural due process claim, a plaintiff must show (1) the existence of a protected property interest at issue, (2) a deprivation of

that protected property interest, and (3) that he or she was not afforded adequate procedures." *Id.* (citing *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014)).

The Supreme Court held that suspension of drivers' licenses implicates "important interests" (as opposed to property interests), but nonetheless held that "licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment." *Dixon v. Love*, 431 U.S. 105, 112 (1977) (quoting *Bell v. Burson,* 402 U.S. 535, 539 (1971)) (alterations in original). Courts "weigh several factors in deciding exactly how much process is due":

> [1] the private interest that will be affected by the official action; [2] the risk of an erroneous deprivation[;] . . . [3] the probable value, if any, of additional or substitute procedural safeguards; and [4] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Shoemaker v. City of Howell*, 795 F.3d 553, 559 (6th Cir. 2015) (alterations in original) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). The "requirements of due process are fluid and fact dependent." *Id.* (citing *Mathews*, 424 U.S. at 334). Courts also consider pre-and post-deprivation processes "together as a single package": "'[T]he sufficiency of predeprivation procedures must be considered in conjunction with the options for postdeprivation review; if elaborate procedures for postdeprivation review are in place, less elaborate predeprivation process may be required. In some cases, postdeprivation review may possibly be sufficient, and no predeprivation process is required.'" *Id.* (alteration in original) (quoting *Leary v. Daeschner*, 228 F.3d 729, 742-43 (6th Cir. 2000)). In addition to quoting its earlier opinion in *Leary*, the Sixth Circuit also relied on Supreme Court and Second Circuit precedent. *See id.* (citing *Mathews*, 424 U.S. at 349 (finding that "an evidentiary hearing is not required prior to the termination of disability benefits") and *Spinelli v. City of New York*, 579 F.3d 160, 171 (2d Cir. 2009) ("Under the circumstances, . . . the City was not required to provide Spinelli with pre-deprivation due process

32

before suspending her license and seizing her firearms.")).

In *Dixon v. Love*, the Supreme Court held that a state is not required to conduct a pre-decision administrative hearing before suspending a driver's license. 431 U.S. 105, 115 (1977). The Illinois statute at issue in *Dixon* provided for the summary revocation or suspension of drivers' licenses whenever a driver accumulated a set number of penalty points assessed for traffic offense convictions. *Id.* at 107-10. The Court held as to the first *Mathews* factor that "a driver's license may not be so vital and essential" as the social security payments at issue in *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970). *Dixon*, 431 U.S. at 113. Thus, the "nature of the private interest here is not so great as to require us 'to depart from the ordinary principle, established by our decisions, that something less than an evidentiary hearing is sufficient prior to adverse administrative action.'" *Id.* (quoting *Mathews*, 424 U.S. at 343). As to the second factor, the Court concluded that "the risk of an erroneous deprivation in the absence of a prior hearing is not great." *Id.* The Court noted that, although the suspension and revocation decisions "are largely automatic" under the applicable regulations, the licensee "had the opportunity for a full judicial hearing in connection with each of the traffic convictions" on which the suspension decision was made and had not "challenged the validity of those convictions or the adequacy of his procedural rights at the time they were determined." *Id.* For the third factor, the Court concluded that "requiring additional procedures would be unlikely to have significant value in reducing the number of erroneous deprivations." *Id.* at 114. In reaching that conclusion, the Court noted that the licensee "does not dispute the factual basis" for the suspension of his license, but "is really asserting the right to appear in person only to argue that the Secretary should show leniency and depart from his own regulations." *Id.* at 113. As to the fourth factor, the Court held that "the substantial public interest in administrative efficiency would be impeded by the availability of a pretermination

33

hearing in every case," as the opportunity to "automatically . . . obtain a delay in the . . . suspension or revocation" of a license "would encourage drivers routinely to request full administrative hearings." *Id.* at 114 (citing *Mathews*, 424 U.S. at 347).

The *Dixon* Court noted that the case demonstrated that "procedural due process in the administrative setting does not always require application of the judicial model":

> The decision to use objective rules in this case provides drivers with more precise notice of what conduct will be sanctioned and promotes equality of treatment among similarly situated drivers. The approach taken by the District Court would have the contrary result of reducing the fairness of the system, by requiring a necessarily subjective inquiry in each case as to a driver's "disrespect" or "lack of ability to exercise ordinary and reasonable care."

*Id.* at 115.

*Dixon* dictates the outcome of Plaintiffs' procedural due process challenge to Tennessee's statute. Pursuant to *Dixon*, it is clear that the nature of the private interest at stake does not require that the Department conduct an evidentiary hearing before suspending a driver's license for failure to pay criminal judgment assessments within one year of conviction. *See id.* at 113. Second, as in *Dixon*, the risk of an erroneous deprivation is small as Plaintiffs "had the opportunity for a full judicial hearing in connection with each of the [underlying] convictions." Third, as in *Dixon*, additional procedures would not "have significant value" in reducing the number of erroneous suspensions because Plaintiffs do not dispute the factual basis for their suspensions but instead seek leniency and departure from the statutes that bind the Department. *See id.* at 113-14. Fourth, as in *Dixon*, there is substantial public interest in administrative efficiency which would be impeded by the availability of a pre-termination hearing in every case. *Id.* at 114. Also, as in *Dixon*, Tenn. Code Ann. 40-24-105(b) provides "objective rules" which give drivers "precise notice of what conduct will be sanctioned and promotes equality of treatment among similarly situated drivers." *Dixon*, 431 U.S. at 115. Here, as in *Dixon*, it is "clear that a licensee . . .

34

eventually can obtain all the safeguards procedural due process could be thought to require before a discretionary suspension or revocation becomes final." *Id.* at 112.

A plaintiff "may not seek relief under Section 1983 without first pleading and proving the inadequacy of state or administrative processes or remedies to redress her due process violations." *See Jefferson v. Jefferson County Pub. Sch. Sys.,* 360 F.3d 583, 588 (6th Cir. 2004). Plaintiffs have failed to prove that state processes and remedies are inadequate to redress their rights under the Due Process Clause. Accordingly, the Commissioner is entitled to summary judgment on Plaintiffs' procedural due process claim.

### C. The Statute Does Not Violate Plaintiffs' Right to Substantive Due Process.

Plaintiffs not only assert a right to a pre-revocation hearing before the Department, but also, implicitly, they assert a substantive due process right to have the Department disregard criminal judgment assessments on the basis of indigency in that pre-revocation hearing. There is no authority that supports this claim.

In *Bennis v. Michigan*, 516 U.S. 442 (1996), the Supreme Court considered a claim by a woman who co-owned a car with her husband. Michigan authorities "abated" the car after the woman's husband, unbeknownst to her, engaged in an unlawful encounter with a prostitute in it. *Id.* at 444. Mrs. Bennis framed her claim as a procedural due process claim, but the Supreme Court concluded that she was actually claiming "she was entitled to contest the abatement by showing she did not know her husband would use it to violate Michigan's indecency law." *Id.* at 446. The *Bennis* Court declined to "import[] a culpability requirement" into Michigan's abatement scheme. *Id.* at 451-53. Relying on *Bennis*, another district court "decline[d] to rewrite" an ordinance that authorized the city of Chicago to dispose of cars whose owners had "repeatedly ignored lesser civil penalties" for parking infractions "by importing a requirement that the City ascertain, prior to

disposition, that the owner intends to abandon her impounded vehicle." *Robledo v. City of Chicago*, 778 F.Supp.2d 887, 896 (N.D. Ill. 2011). Here, Plaintiffs similarly seek to have this Court import an indigency defense to the enforcement of Section 105(b), but they have no authority to support such a holding.

Under *Dixon*, the Department is not constitutionally required to provide a hearing before revoking a driver's license for non-payment of criminal justice assessments. Logically, then, there can be no constitutional right to have the substantive issue of indigency considered at a hearing that the Department is not constitutionally required to hold.

Plaintiffs likely will cite to the Supreme Court's *Griffin/Bearden* line of cases for their position that the Department is constitutionally required to hold a hearing considering indigency before suspending or revoking a driver's license, but those cases are inapposite here.[15] Those cases, however, stand for the proposition that a state may not imprison individuals for inability to pay a fine or court costs. *Bearden v. Georgia*, 461 U.S. 660, 667 (1983) (holding unconstitutional a state's revocation of an individual's probation for failure to pay a fine or make restitution without first finding that the probationer was responsible for that failure or that alternative forms of punishment were inadequate); *Tate v. Short*, 401 U.S. 395, 399 (1971) (holding that a statute allowing imprisonment of an indigent person for failure to pay traffic fine violates the Equal Protection Clause); *Williams v. Illinois*, 399 U.S. 235, 242 (1970) (holding a statute allowing a court to impose a longer jail term on an indigent defendant who is unable to pay fines arising from his conviction violates the Equal Protection Clause); *Griffin v. Illinois*, 351 U.S. 12, 17-20 (1956) (holding unconstitutional a state's failure to provide trial transcripts (or devise an alternative

---

[15]    *See* Plaintiffs' Memorandum in Support of their Motion for Summary Judgment (D.E. 38) at 21-27 (applying the *Bearden* standard).

solution) to criminal defendants seeking appellate review).  The suspension of Plaintiffs' driver's licenses clearly do not implicate the liberty interest of incarceration that typically is at stake in this line of cases.  While Plaintiffs argue that this line of cases apply in the civil context as well, the Supreme Court clearly has held that the *Griffin/Bearden* analysis only applies in the civil context in the "narrow category" wherein a fundamental right is at stake.  *M.L.B. v. S.L.J.*, 519 U.S. 102, 113-16 (1996); *Johnson v. Bredesen*, 624 F.3d 742, 748-49 (6th Cir. 2010) (rejecting as inapposite the *Griffin/Bearden* line of cases to the civil context when no fundamental right triggers a heightened standard of review).[16]

In fact, there is no authority that creates a constitutional requirement for the criminal court that adjudicates a criminal charge to take indigency into consideration when imposing a fine, restitution, court costs, or litigation taxes.  To be sure, a state cannot imprison an individual for inability to pay fines or court costs.  *Bearden*, 461 U.S. at 667; *Tate*, 401 U.S. at 399; *Williams*, 399 U.S. at 242.  Thus, before an individual could be imprisoned for failure to pay a fine or court costs, a court would be constitutionally required to inquire into the reason the individual failed to pay.  *Alkire v. Irving*, 330 F.3d 802, 816–17 (6th Cir. 2003).[17]  But there is no constitutional requirement to consider ability to pay when a court merely imposes or assesses fines, restitution,

---

[16]     *See* Commissioner's Response to Plaintiff's Motion for Summary Judgment at 8-11 (expanding on the inapplicability of the *Griffin/Bearden* cases to the Commissioner's suspension and revocation of drivers' licenses).

[17]     If the nonpayment was willful or if the individual "'failed to make sufficient bona fide efforts legally to acquire the resources to pay,' imprisonment is justified.  On the other hand, if the individual was simply unable to pay, that is, he was indigent, the court is required to consider 'alternate measures of punishment.'" *Alkire*, 330 F.3d at 816–17 (quoting *Bearden*, 461 U.S. at 672); *see also id.* at 816 ("Of course, the Constitution does not 'preclude imprisonment for willful refusal to pay a fine or court costs.'") (quoting *Bearden*, 461 U.S. at 668)).

court costs, or litigation taxes.[18]

In their own summary judgment brief, Plaintiffs argue that, while "indigency determinations [may be] made at the time of arraignment or even sentencing," such determinations "do not answer the question [of] whether the defendant has the ability to pay . . . one year later." Plaintiffs' Summary Judgment Memorandum (D.E. 38) at 33-34. This argument, however, ignores the fact that a criminal defendant *always* has the ability to go back to the sentencing court and seek relief from whatever monetary assessment he or she has been ordered to pay. *See* Tenn. Code Ann. §§ 40-24-102, 40-24-104(a), 40-25-123(b), 40-25-129(a)(2), 40-35-304(f), and 67-4-605(c). Tennessee statutes and case law affirmatively require courts to consider ability to pay fines [19] and restitution[20] both before those assessments are imposed *and at any time thereafter by request of*

---

[18]    *See, e.g., State v. Ma*, 195 Wash. App. 1036 (2016) (table), 2016 WL 4248585 at *6 ("We reject the argument that imposition of mandatory [fines and court costs] on indigent defendants violates substantive due process because some of those defendants may be unable to pay them.").

[19]    *See State v. Blevins*, 968 S.W.2d 888, 895 (Tenn. Crim. App. 1997) (noting that the trial court's imposition of a fine must include consideration of several factors, including "financial means" (citing *State v. Bryant*, 805 S.W.2d 762, 766 (Tenn. 1991)); *Id.* at 895 n.1 ("The trial court retains jurisdiction, even after final judgment, to modify the payment schedule or to reduce or remit entirely the amount of fines for which the defendant may be obligated."); Tenn. Code Ann. § 40-24-102 (authorizing the "courts in which a cause is finally adjudged" to release a defendant from "the whole or any part of fines" "either before or after final judgment" "for good cause."); Tenn. Code Ann. § 40-24-104(a) (providing that, "upon application" by a defendant, a court may consider "the defendant's financial . . . situation," "including whether the nonpayment was . . . due to indigency" and reduce a fine "to an amount that the a defendant is able to pay," allow payment at a later date, or allow the fine to be paid in installments (citing § 40-24-101)).

[20]    "In determining the amount and method of payment or other restitution, the court shall consider the financial resources and future ability of the defendant to pay or perform." Tenn. Code Ann. § 40-35-304(d); *State v. Johnson*, 968 S.W.2d 883, 885 (Tenn. Crim. App. 1997) (reversing restitution order because "the trial court erred in failing to consider the defendant's financial resources and his future ability to pay or perform as required by Tenn. Code Ann. § 40–35–304(d)."). A defendant can petition the sentencing court at any time to adjust or waive payment of restitution, and the court must hold a hearing and give the victim and defendant an opportunity to be heard. Tenn. Code Ann. § 40-35-304(d). "If the court finds that the circumstances upon which it based the imposition or amount and method of payment or other restitution ordered no

*the defendant.* Courts may also consider ability to pay court costs, and litigation taxes *at any time after they are imposed* upon request by the defendant.[21] Thus, Tennessee law allows a sentencing court to consider one's ability to pay criminal justice assessments—both when setting the proper amount to impose as a fine and for restitution, and in considering requests from a defendant to waive or suspend the payment of fines, restitution, court costs, and litigation taxes on the basis of indigency.

Simply put, there is no authority for Plaintiffs' position that substantive due process requires the Department to hold a pre-suspension hearing before suspending a driver's license that takes into account a driver's ability to pay. At least one district court has explicitly rejected such an argument. *Evans v. Rhodes*, No. 3:14CV466/MCR/CJK, 2016 WL 5019202, at *7 (N.D. Fla. Feb. 29, 2016) ("The Department is not constitutionally required to provide Evans with a pre-suspension hearing to determine his ability to pay court costs before suspending his driver's license."), *report and recommendation adopted*, No. 3:14CV466/MCR/CJK, 2016 WL 5024202 (N.D. Fla. Sept. 16, 2016). Plaintiffs may dislike Tennessee's public policy of requiring that drivers pay their traffic citations and court costs to maintain the privilege of driving in the state. But as the Sixth Circuit held in *Johnson*, this policy preference must be taken up with the legislature, not the courts. 624 F.3d at 748. To the extent that Plaintiffs implicitly raise a substantive due process claim, the Commissioner is entitled to summary judgment on it.

---

longer exist or that it otherwise would be unjust to require payment or other restitution as imposed, the court may adjust or waive payment of the unpaid portion of the restitution or other restitution or modify the time or method of making restitution." *Id.*

[21] Courts have statutory authority to "suspend" waive costs and fees for indigent defendants. *See* Tenn. Code Ann. § 40-25-123(b) (providing presiding judge of the general session court authority to "suspend" court costs and litigation taxes "for any indigent criminal defendant"); Tenn. Code Ann. § 40-25-129(a)(2) (providing the state and county shall pay prosecution costs and fees when a "court of record" has made a finding that the defendant is indigent).

**D. The Statute Does Not Violate the Equal Protection Clause Under *James v. Strange*.**

Plaintiffs allege that Tenn. Code Ann. § 40-24-105(b) violates the Equal Protection Clause by subjecting individuals who fail to pay criminal court judgments to unduly harsh and discriminatory treatment as compared to other debtors, as prohibited by the Supreme Court in *James v. Strange*, 407 U.S. 128 (1972). Complaint, (D.E. 1) at ¶ 7. In *Strange*, the Supreme Court held that a Kansas statute intended to recoup from criminal defendants the cost of their court-appointed counsel violated the Equal Protection Clause because—by its very terms—it stripped indigent criminal defendants of statutory protections *specifically designed* to help indigent debtors. *Id.* at 141.

Two years later, in *Fuller v. Oregon*, 417 U.S. 40 (1974), the Supreme Court upheld an Oregon statute that required "a person convicted of a criminal offense to repay to the State the costs of providing him with effective representation of counsel, when he is indigent at the time of the criminal proceedings but subsequently acquires the means to bear the costs of his legal defense." *Id.* at 41. The Court concluded that the Oregon statute did not suffer from the "infirmity" that condemned the Kansas statute in *Strange* because the "convicted person from whom recoupment is sought [] retains all the exemptions accorded other judgment debtors," in addition to the statutory right to show at any time that recovery of the costs of his legal defense will impose 'manifest hardship.'" *Id.* at 47 (quoting the Ohio statute).

*Strange* and its progeny do not apply here. First, *Strange* related to a statute that "strip[ped] the indigent defendant of the very exemptions designed primarily to benefit debtors of low and marginal incomes." *Strange*, 407 U.S. at 139. Here, Section 105(b) does not strip indigent individuals from protections afforded to others. To the contrary, it treats all criminal offenders

40

who fail to pay their criminal court judgments in the same manner.[22]  Second, although *Strange*

"*appeared* to apply rational basis review," the Sixth Circuit concluded that the case actually

"concerned fundamental interests subject to heightened scrutiny."  *Johnson*, 624 F.3d at 749

(emphasis added).  Third, the debts involved in *Strange* were civil in nature, *Strange*, 407 U.S. at

128, whereas those at issue here are criminal judgments, as detailed above.  Fourth, virtually all of

the cases that apply *Strange* involve challenges to state efforts to recoup the specific costs of

providing indigent legal defense, which is not at issue here.[23]  In short, Plaintiffs cite no authority

(and the Commissioner can find none) which extends *Strange* to a statute such as Section 105(b).

Other district courts have rejected similar equal protection claims brought pursuant to

*James v. Strange*.  For example, in *United States v. Cunningham*, 866 F. Supp. 2d 1050 (S.D. Iowa

2012), the court distinguished *James v. Strange* in rejecting an equal protection challenge brought

by a federal criminal defendant challenging the government's garnishment of her state disability

retirement benefits to enforce the federal court's restitution judgment arising from her fraud

conviction:

> Although the statute in *James* dealt with indigent criminal defendants, the debts
> involved—and afforded disparate treatment—were all civil in nature.  Here, the
> nature of debts afforded disparate treatment are, in fact, different.  Restitution is
> part of a criminal sentence and is penal in nature.  Unlike the Government's interest
> in recouping debts from civil judgments debtors, the [Mandatory Victim Restitution
> Act] seeks primarily to assure that victims of a crime receive full restitution.
> Providing fewer exemptions to restitution debtors is rationally related to the
> legitimate twin interests of making crime victims whole and punishing criminals.
> Thus, discriminating against criminal judgment debtors by denying them state law
> exemptions does not violate the equal protection guarantee of the Fifth

---

[22]   For example, Section 105(b) does not deprive indigent drivers of any of the other remedies
and protections available to them under the Code.  *See*, *e.g.*, Tenn. Code Ann. §§ 40-24-102 (relief
from fines), 104(a) (relief from fines), 40-25-123(b) (relief from costs and litigation tax), 129(a)(2)
(relief from costs), and 40-35-304(f) (relief from restitution).

[23]   *See* Plaintiff's Memorandum in Support of Motion for Summary Judgment (D.E. 38) at 25
(citing *Strange* cases, each of which relate to recoupment of indigent counsel costs).

Amendment.

*Id.* at 1058 (internal quotation marks and citations omitted); *see id.* at 1058-59 (holding that prohibiting a criminal defendant owing restitution from invoking exemptions afforded civil judgment debtors did not violate equal protection).

Here, as in *Cunningham*, Plaintiffs cannot prove that the State has treated them differently than others who are similarly situated. The Equal Protection Clause requires that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). In opposing a motion for summary judgment, a plaintiff has the burden of demonstrating that they were treated differently than others "who were similarly situated in *all material respects*." *Loesel v. City of Frankenmuth*, 692 F.3d 452, 462 (6th Cir. 2012) (emphasis in original) (citation omitted); *accord Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."); *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cty., Ohio*, 430 F.3d 783, 790 (6th Cir. 2005) ("[D]isparate treatment of persons is reasonably justified if they are dissimilar in some material respect."). A district court may grant summary judgment "where it is clear that no reasonable jury could find that the similarly situated requirement has been met." *Fares Pawn, LLC v. Indiana Dep't of Fin. Insts.*, 755 F.3d 839, 846 (7th Cir. 2014); *accord Dixon v. Univ. of Toledo*, 702 F.3d 269, 279 (6th Cir. 2012) (affirming granting of summary judgment where a plaintiff fails to identify other similarly situated individuals); *EJS Props., L.L.C. v. City of Toledo*, 698 F.3d 845, 865–866 (6th Cir. 2012) (same); *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 987 (6th Cir. 2012) (same).

Thus, contrary to Plaintiffs' arguments, Section 105(b) plainly treats the Plaintiffs, and those indigent drivers whom they seek to represent, in exactly the same fashion as any other driver

42

who is required to pay court-ordered fines, restitution, costs and/or litigation tax. The statute does not single out the indigent; nor, does it deprive the indigent of the other previously-discussed statutory mechanisms which are designed to help indigent criminal defendants. As a result, the Commissioner is entitled to summary judgment on Plaintiffs' equal protection *James v. Strange* claim.

## CONCLUSION

For the foregoing reasons, the Commissioner respectfully requests that the Court grant his motion for summary judgment.

HERBERT H. SLATERY III
Attorney General and Reporter

/s/ Andrew B. Campbell
ANDREW B. CAMPBELL (14258)
Assistant Attorney General
Public Interest Division
Andrew.Campbell@ag.tn.gov (615) 532-0356

KATHERINE M. DIX (22778)
Special Counsel
Public Interest Division
Katherine.Dix@ag.tn.gov (615) 532-5817

SCOTT C. SUTHERLAND (29013)
Deputy Attorney General
Law Enforcement &
Special Prosecutions Division
P.O. Box 20207
Nashville, TN  37202
Scott.Sutherland@ag.tn.gov (615) 532-7688

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of November, 2017, a copy of the foregoing document was served via the Court's ECF system to:

| | |
|---|---|
| Lori H. Patterson, Esq.<br>Matthew G. White, Esq.<br>BAKER DONELSON, BEARMAN,<br>CALDWELL & BERKOWITZ<br>First Tennessee Bank Bldg., 165 Madison<br>Avenue, Suite 2000<br>Memphis, TN 38103 | Claudia Wilner, Esq.<br>Peter Tasheff, Esq.<br>Edward P. Krugman, Esq.<br>NATIONAL CENTER FOR LAW AND<br>ECONOMIC JUSTICE<br>275 Seventh Avenue, Suite 1506<br>New York, NY 10001 |
| Premal Dharia, Esq.<br>Jonas Wang, Esq.<br>CIVIL RIGHTS CORPS<br>910 17th Street, Suite 500<br>Washington, DC 20006 | Josh Spickler, Esq.<br>JUST CITY<br>902 South Cooper Street<br>Memphis, TN 38104 |

/s/ Andrew B. Campbell
ANDREW B. CAMPBELL
Assistant Attorney General