# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **JAMES THOMAS and DAVID HIXSON,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:17-cv-00005** |
| | ) | **Judge Aleta A. Trauger** |
| **BILL HASLAM, Governor of Tennessee,** | ) | |
| **in his official capacity; DAVID W.** | ) | |
| **PURKEY, Commissioner for the** | ) | |
| **Department of Safety and Homeland** | ) | |
| **Security, in his official capacity; and** | ) | |
| **HERBERY SLATERY, III, Attorney** | ) | |
| **General and Reporter, in his official** | ) | |
| **capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the court are a Motion to Dismiss (Docket No. 23) and Motion for Summary Judgment (Docket No. 61) filed by the sole remaining defendant in this matter, David W. Purkey, the Commissioner of the Tennessee Department of Safety and Homeland Security ("TDSHS"), as well as a Renewed Motion for Class Certification (Docket No. 36) and a Motion for Summary Judgment (Docket No. 37) filed by the plaintiffs, James Thomas and David Hixson. For the reasons set forth herein, the Motion to Dismiss will be denied and the Motion for Class Certification will be granted. The Motions for Summary Judgment will be held in abeyance pending supplemental briefing, as directed in the accompanying order.

## I. BACKGROUND AND PROCEDURAL HISTORY

Thomas and Hixson are among the thousands of Tennesseans who owe fines, costs, or litigation taxes related to their passage through the state's criminal justice system. (*See* Docket No. 40 ¶ 43.) By statute, TDSHS revokes the driver's license of any person who, like Thomas

and Hixson, has failed to pay those fines, costs, or litigation taxes for a year or more, unless that person is granted a form of discretionary relief by a court. *See* Tenn. Code Ann. § 40-24-105(b). Thomas and Hixson sue on behalf of themselves and a not fully known number of similarly situated Tennesseans who, they argue, have had their right to drive taken away solely based on the fact that they are indigent and therefore cannot pay the fines, costs, and litigation taxes imposed on them.

## A. "Court Debt"

Thomas and Hixson characterize this case as about "court debt," a somewhat opaque term that does not itself appear in any of the statutes at issue. Although Purkey takes particular issue with the term, the specific terminology that one uses to discuss the issue is of fairly little importance. A person who passes through the criminal justice system may incur a number of different payment obligations, assessed in different amounts for different reasons, and "court debt" is merely a shorthand for the particular payment obligations at issue here. For the purposes of this opinion, "court debt" will refer to fines, costs, and litigation taxes assessed against a defendant who either (1) pleads guilty to a misdemeanor or felony, (2) is convicted of a misdemeanor or felony following trial, or (3) agrees to incur liability for fines, costs and/or litigation taxes based on an agreement with a prosecutor for the charges brought against the defendant to be dismissed "on costs." (*See* Docket No. 64 ¶ 9.)

### *1. Fines*

A person convicted of a felony or misdemeanor in Tennessee may be sentenced to "[p]ayment of a fine either alone or in addition to any other sentence authorized by" the penal laws of the state. Tenn. Code Ann. § 40-35-104(c)(1). "[T]he defendant's ability to pay the fine is a factor in the establishment of the fine," but "it is not a controlling factor." *State v. Butler*,

2

108 S.W.3d 845, 854 (Tenn. 2003) (citing Tenn. Code Ann. § 40-35-207(a)(7)). The court imposing a fine is permitted to choose from a number of options regarding the timeline for payment:

> When any court of this state . . . imposes a fine upon an individual, the court may direct as follows:
>
> (1)    That the defendant pay the entire amount at the time sentence is pronounced;
>
> (2)    That the defendant pay the entire amount at some later date;
>
> (3)    That the defendant pay the fine in specified portions or installments at designated periodic intervals and that the portions be remitted to a designated official, who shall report to the court in the event of any failure to comply with the order; or
>
> (4)    Where the defendant is sentenced to a period of probation as well as a fine, that payment of the fine be a condition of the sentence.

Tenn. Code Ann. § 40-24-101(a). A court that imposes a fine retains jurisdiction and is empowered to release the fine, in whole or in part, "for good cause." Tenn. Code Ann. § 40-24-102; *see also* Tenn. Code Ann. § 40-24-104(a) (permitting court to waive all or portion of fine or revise payment schedule based on defendant's inability to pay). Purkey admits that, depending on the case, fines "can range from $50 to multiple thousands of dollars." (Docket No. 64 ¶ 12; *see also* Docket No. 40 ¶ 11 (stipulating same).)

## *2. Court Costs*

Tennessee requires that, generally speaking, "[a] defendant convicted of a criminal offense shall pay all the costs that have accrued in the cause." Tenn. Code Ann. § 40-25-123(a). "Costs" are defined to include "all costs accruing under existing laws on behalf of the state or county, as the case may be, for the faithful prosecution and safekeeping of the defendant, including the cost of boarding juries and that of the jailer," Tenn. Code Ann. § 40-25-133, as

3

well as "all costs incident to the arrest and safekeeping of the defendant, before and after conviction, due and incident to the prosecution and conviction, and incident to the carrying of the judgment or sentence of the court into effect," Tenn. Code Ann. § 40-25-104.

The procedures related to court costs vary, depending on the court in which a verdict is entered. Some, but not all, misdemeanor prosecutions are resolved in general sessions court. *See* Tenn. Code Ann. § 40-1-109 (explaining general sessions jurisdiction over certain misdemeanor matters). "[T]he presiding judge of a court of general sessions may suspend the court costs . . . for any indigent criminal defendant, as in the presiding judge's opinion the equities of the case require." Tenn. Code Ann. § 40-25-123. The Tennessee Supreme Court has held that, even after a finding of indigency, "the decision of whether to grant a waiver of costs still rests within the court's discretion." *State v. Black*, 897 S.W.2d 680, 684 (Tenn. 1995); *see also Waters v. Ray*, No. M2008-02086-COA-R3-CV, 2009 WL 5173718, at *5 (Tenn. Ct. App. Dec. 29, 2009) (endorsing holding of *Black*).

Felonies, as well as the misdemeanors not resolved in general sessions, are tried or otherwise resolved in criminal courts or circuit courts. *See* Tenn. Code Ann. §§ 40-1-108, 16-10-102. The statutory terms pursuant to which a person in criminal or circuit court may seek relief from costs have been recently amended, with the amendments having gone into effect on January 1, 2018. *See* 2017 Tenn. Pub. Acts, ch. 412 (S.B. 802). A person who is "unable to pay all of the assessed litigation taxes, court costs, and fines but is able to pay some of them" may apply to the court of his conviction for a payment plan that would expressly shield him from the revocation of his driver's license:

> A person who is unable to pay all of the assessed litigation taxes, court costs, and fines but is able to pay some of them may apply to the court having original jurisdiction over the offense for an order setting up a payment plan for such taxes, costs, and fines. If the person and court agree to such a payment plan, the court

4

shall so order and such order shall have the effect of staying the revocation of the license pursuant to this subsection (b). The order staying the revocation of license shall remain in effect for as long as the person is current and in compliance with the payment plan.

Tenn. Code Ann. § 40-24-105(b)(4)(A). If the person is granted a payment plan and fails to make payments thereunder "for three (3) consecutive months without good cause, the court may revoke the order and notify the clerk." *Id.* A version of that payment plan provision existed prior to the January 1, 2018 amendment. *See* Tenn. Code Ann. § 40-24-105(b)(4) (2017).

The 2018 amendment added an additional subsection providing that a person who is indigent "may . . . apply for the waiver of any outstanding court costs and fines." Tenn. Code Ann. § 40-24-105(b)(4)(B). A person seeking a waiver must provide an affidavit of indigency and pay a $50 fee, "subject to the discretion of the court after consideration of the person's ability to pay." Tenn. Code Ann. § 40-24-105(b)(4)(B)(i)–(ii). "After consideration of the affidavit of indigency and the payment of any fee that may be required . . . , the court may waive any outstanding court costs and fines." Tenn. Code Ann. § 40-24-105(b)(4)(C). Because this provision is fairly new, it has not been widely construed. The court notes, however, that its waiver provision appears to be permissive in nature, using "may" instead of "shall" or similar language. In response to the plaintiffs' assertion that the statute, as amended, makes the decision to offer relief entirely discretionary for the court, Purkey admits that "the text of Tenn. Code Ann. § 40-24-105(b) . . . speaks for itself." (Docket No. 64 ¶ 51.)

### *3. Litigation Tax*

Tennessee's constitution grants the General Assembly a number of specific powers of taxation, including the "power to tax . . . privileges." Tenn. Const. art. II, § 28. Pursuant to that power, the state levies "privilege tax[es] on litigation" in various amounts, depending on the type of case at issue. Tenn. Code Ann. § 67-4-602. For example, "[t]here is levied a privilege tax on

5

litigation of seventeen dollars and seventy-five cents ($17.75) in all civil cases in this state in general sessions court, when not exercising state court jurisdiction," and a "a privilege tax on litigation of thirteen dollars and seventy-five cents ($13.75) in all civil cases in this state in the court of appeals or the supreme court." Tenn. Code Ann. § 67-4-602(c), (d). In criminal cases, "[t]here is levied a privilege tax on litigation instituted in this state, of twenty-nine dollars and fifty cents ($29.50) on all criminal charges, upon conviction or by order." Tenn. Code Ann. § 67-4-602(a).

Just as the amount of the tax varies between different types of cases, so too does the issue of when the litigation tax becomes due. *See, e.g.*, Tenn. Code Ann. § 67-4-603(a)(1) (directing the clerk to collect tax "[u]pon the commencement of an original civil action, from the plaintiff, except when such action is brought pursuant to a pauper's oath"); (a)(3) (directing the clerk to collect tax "[u]pon the filing in any civil action of an appeal, or of an appeal in the nature of a writ of error or certiorari, from one court to another, from the appellant, except when such appeal is brought pursuant to a pauper's oath"). In a criminal case, the tax is due "[u]pon a finding of guilt, plea of guilty, or submission to fine in a criminal action from the defendant." Tenn. Code Ann. § 67-4-603(a)(2).

The collection of litigation taxes is delegated to "[t]he clerks of the various courts" in which litigation takes place. Tenn. Code Ann. § 67-4-603(a). The clerk then has an obligation to remit the state litigation tax to Tennessee's department of revenue. If the clerk fails to transmit the tax collected, the amount improperly withheld "shall be a debt of the clerk." Tenn. Code Ann. § 67-4-605(a)(1).

Counties and municipalities are also given authority to levy certain "local litigation tax[es]" devoted to specific, statutorily defined purposes, including building or upgrading the

jails and workhouses, Tenn. Code Ann. § 67-4-601(b)(1); purchasing and maintaining hardware and software related to record keeping, Tenn. Code Ann. § 67-4-601(b)(7)(B); providing security to courthouses, Tenn. Code Ann. § 67-4-601(b)(6); and "substance abuse prevention purposes," Tenn. Code Ann. § 67-4-601(h).

Tennessee's statutory scheme contemplates that, in some instances, a court may grant a litigant some manner of relief from litigation taxes. The precise circumstances of when that relief should or will be granted, however, are not set forth in the relevant statute:

> If the judge of any court suspends, releases, waives, remits or orders the clerk of the court not to collect any privilege tax on litigation, or in any other manner releases any party from liability for any privilege tax on litigation, the clerk of the court shall immediately report such suspension, release, waiver, remission, or order to not collect such tax, to the department in such manner as shall be prescribed by the department, and the commissioner or the commissioner's delegate shall immediately, upon receipt of such a report from any clerk of a court, present such information to the board of judicial conduct, which court shall take appropriate action pursuant to title 17, chapter 5. The commissioner or the commissioner's delegate shall also report such information to the council on pensions and insurance.

Tenn. Code Ann. § 67-4-605(c). Purkey admits that, depending on the case, "litigation taxes and court costs can range from about $200 at the low end to more than $10,000." (Docket No. 64 ¶ 11; *see also* Docket No. 40 ¶ 11 (stipulating same).)

**B. Mechanisms for Collecting Court Debt**

If an individual fails to pay fines, court costs, or litigation taxes, the court and state have a number of options. First, the state or court can resort to the ordinary tools of collection available to other litigants in the state's courts. "[A] fine may be collected in the same manner as a judgment in a civil action." Tenn. Code Ann. § 40-24-105(a). The same is true for costs and litigation taxes: "The district attorney general or the county or municipal attorney, as applicable, may, in that person's discretion, and shall, upon order of the court, institute proceedings to

7

collect the fine, costs and litigation taxes as a civil judgment." Tenn. Code Ann. § 40-24-105(c).

The collection tools related to civil judgments remain available for all three types of court debt

after the defendant's sentence is complete and the sentencing court loses its original jurisdiction:

> If any fine, costs or litigation taxes assessed against the defendant in a criminal case remain in default when the defendant is released from the sentence imposed, the sentence expires or the criminal court otherwise loses jurisdiction over the defendant, the sentencing judge, clerk or district attorney general may have the amount remaining in default converted to a civil judgment pursuant to the Tennessee Rules of Civil Procedure. The judgment may be enforced as is provided in this section or in any other manner authorized by law for a civil judgment.

Tenn. Code Ann. § 40-24-105(f). Tennessee affords a number of tools to judgment creditors in

civil actions, namely garnishment of wages or other sources of income, Tenn. R. Civ. P. 69.05,

execution on realty, Tenn. R. Civ. P. 69.07, and execution on personalty, Tenn. R. Civ. P. 69.06.

*See also* Tenn. Op. Att'y Gen. No. 06-135 (Aug. 21, 2006) (discussing application of Rule 69

collection mechanisms in criminal cases).

Neither the court nor the state, moreover, is forced to rely purely on its own personnel or

attention to effect collection. "After a fine, costs, or litigation taxes have been in default for at

least six (6) months, the district attorney general or criminal or general sessions court clerk may

retain an agent to collect, or institute proceedings to collect, or establish an in-house collection

procedure to collect, fines, costs and litigation taxes." Tenn. Code Ann. § 40-24-105(d)(1).

Similarly, "[t]he governing body of any municipality may by ordinance authorize the

employment of a collection agency to collect fines and costs assessed by the municipal court

where the fines and costs have not been collected within sixty (60) days after they were due."

Tenn. Code Ann. § 40-24-105(e)(1).

If traditional collection methods are insufficient, more coercive options are available, in

particular with regard to fines. Prior to 2007, Tennessee statutes did not expressly contemplate

8

that a person could be held in contempt for failure to pay a fine. (Docket No. 64 ¶¶ 18–19.) That

year, the General Assembly adopted a provision stating that the court that imposes a fine also has

the option of holding a person who has failed to pay in "contempt upon a finding by the court

that the defendant has the present ability to pay the fine and willfully refuses to pay." Tenn. Code

Ann. § 40-24-105.

## C. Revocation of Drivers' Licenses for Nonpayment of Court Debt

At issue in this case, however, is one particular consequence of the failure to pay court

debt: the revocation of the debtor's driver's license. The State of Tennessee generally prohibits

drivers from using its highways without a license. Tenn. Code Ann. § 55-50-301(a)(1). That

licensure scheme is administered by the TDSHS pursuant to Tennessee's Uniform Classified and

Commercial Driver License Act, Tenn. Code Ann. § 55-50-201 *et seq*. An applicant for a

Tennessee driver's license must furnish certain required information confirming his eligibility

and submit to an examination, including "an actual demonstration of ability to exercise ordinary

and reasonable control in the operation of a motor vehicle." Tenn. Code Ann. §§ 55-50-321, 55-

50-322(a)(1)(A). In certain statutorily prescribed situations, however, an individual who has

previously obtained a valid driver's license may have the associated privileges rescinded,

through revocation, suspension, or cancellation of the license. *See, e.g.*, Tenn. Code Ann. §§ 55-

50-501, 55-50-502(a) & (b).

Prior to 2011, a person's failure to pay fines, costs, and litigation taxes had no bearing on

the possible revocation of a Tennessee driver's license. (Docket No. 64 ¶¶ 14, 16–17.) That year,

the Tennessee General Assembly enacted the provision that is now codified as Tenn. Code Ann.

§ 40-24-105(b)(1):

> A license issued under title 55 for any operator or chauffeur shall be revoked by
> the commissioner of safety if the licensee has not paid all litigation taxes, court

9

costs, and fines assessed as a result of disposition of any offense under the criminal laws of this state within one (1) year of the date of disposition of the offense. The license shall remain revoked until such time as the person whose license has been revoked provides proof to the commissioner of safety that all litigation taxes, court costs, and fines have been paid.

Tenn. Code Ann. § 40-24-105(b)(1). Purkey admits that, from July 1, 2012, to June 1, 2016, TDSHS revoked 146,211 driver's licenses for failure to pay fines, costs and/or litigation taxes. (Docket No. 64 ¶ 107.) Over the same period, only 10,750 people whose licenses were revoked for non-payment of fines, costs, or litigation taxes pursuant to section 40-24-105(b)—about 7% of the total number—had their licenses reinstated. (*Id.* ¶ 108; *see also* Docket No. 40 ¶¶ 43–44 (stipulating to statistics).)

A driver facing the revocation of his license pursuant to Tenn. Code Ann. 40-24-105(b)(1) may seek a single, 180-day stay of the revocation from the court having original jurisdiction over the underlying offense. Tenn. Code Ann. § 40-24-105(b)(3)(A). The statute characterizes this time-limited stay as a "hardship exception." Tenn. Code Ann. § 40-24-105(b)(3)(B). Pursuant to the statute:

Grounds for finding of hardship are limited to travel necessary for: (i) Employment; (ii) School; (iii) Religious worship; (iv) Participation in a recovery court, which includes drug courts under the Drug Court Treatment Act of 2003, compiled in title 16, chapter 22; DUI courts; mental health courts; and veterans treatment courts; (v) Serious illness of the person or an immediate family member; or (vi) Other reasons or destinations as determined by the court.

Tenn. Code Ann. § 40-24-105(b)(3)(A). The amendments going into effect in January 2018 also added a subsection permitting a person whose license was revoked for nonpayment of court debt to apply to the trial court for the issuance of a restricted license for the purposes of engaging in the types of driving identified in the hardship exception, with the license issued under the new subsection not being limited to 180 days. Tenn. Code Ann. § 40-24-105(h). The issuance of a restricted license under the new provision, however, is within the "authority and discretion" of

the court. *Id.* (*See also* Docket No. 40 ¶ 38 (stipulating that relief under § 40-24-105(h) is discretionary).) A driver who obtains an order permitting him to receive a restricted license pursuant to section 40-24-105(h) must pay a $65 fee to TDSHS to obtain the license. A section 40-24-105(h) license is valid for one year, after which the driver may seek renewal. In contrast, an ordinary driver's license is issued for eight years and costs $28. (Docket No. 64 ¶¶ 55–57.)

Because litigation taxes, court costs, and fines are assessed at the local level, but drivers are licensed at the state level, the administration of section 40-24-105(b) requires coordination between the respective units of government. Pursuant to section 40-24-105(b)(2), "[t]he clerk of the court ordering disposition of an offense shall notify the commissioner of safety when an offender has litigation taxes, court costs, and fines that remain unpaid after one (1) year from the disposition of the offense," at which point the commissioner is required by statute to revoke the license. An individual may be treated as having a revoked license, even if he was not licensed to drive by the State of Tennessee as an initial matter; TDSHS simply assigns such a person a driver's license number and classifies the corresponding "license" as revoked. (Docket No. 64 ¶ 31.)

Purkey admits that, when his office receives notification from a clerk of court that an individual qualifies for revocation of his license, "the Department revokes a person's driver's license on the same day that it receives notification of non-payment from the court." (Docket No. 64 ¶ 28.) However, he draws a distinction between when a license is "effective" and when the "status" of the debtor's license is changed: "[W]hile revocation is effective as of the date that notification is [sent][1] to the driver by the Department, the Department does not change the status of the driver's license for a period of 10 days in order to allow the driver to receive notification

---

[1] Purkey uses the word "set" here, but the court presumes that this is a typographical error.

from the Department." (*Id.*; *see also* Docket No. 62-4 (Declaration of Randi Cortazar) ¶ 2 ("While revocations are effective as of the date the notification is [sent] to the driver, the Department does not change the status of the driver's license for a period of 10 days in order to allow the driver to receive notification from the Department").) Purkey admits that TDSHS "does not send pre-revocation notices to the people whose licenses will be revoked pursuant to Tenn. Code. Ann. § 40-24-105(b) for failure to pay their restitution, litigation taxes, fines, and/or court costs" but maintains that TDSHS "sends out proposed notices[2] of suspension or revocation the day information is received from the court." (Docket No. 64 ¶ 34 (quoting Docket No. 39-2 (E-mail from Jenny C. Taylor to Joshua Van Kirk).)

A driver whose license has been revoked is required to pay "[a] sixty-five-dollar restoration fee . . . , unless otherwise specified by law, for each and every offense committed that provides for the revocation . . . of driving privileges." Tenn. Code Ann. § 55-12-129(b). TDSHS is permitted to adopt payment plans for restoration fees in excess of a certain amount set by Purkey. Tenn. Code Ann. § 55-12-129(g)(1). TDSHS currently permits payment plans only for drivers "whose reinstatement fee totals more than two hundred dollars ($200)." Tenn. Comp. R. & Regs. 1340-02-05-.02.

For the first offense, driving on a revoked license is a Class B Misdemeanor, punishable by up to six months in jail, a fine of up to $500, or both. Tenn. Code Ann. §§ 40-35-111(e)(2), 55-50-504(a)(1). For second and subsequent offenses, driving on a revoked license is a Class A Misdemeanor, punishable by up to 11 months and 29 days in jail, a fine of up to $2,500, or both. Tenn. Code Ann. §§ 40-35-111(e)(1), 55-50-504(a)(2). Purkey concedes that a person's conviction for driving on a revoked license may lead to the imposition of additional fines, costs, and litigation taxes. (Docket No. 64 ¶ 111.)

---

[2] It is not entirely clear what Purkey means by this "proposed notice."

**D. Circumstances of the Plaintiffs' Revocations**

*1. Thomas*

James Thomas is a 48-year-old resident of Nashville. He has multiple serious disabilities and his only income consists of Supplemental Security Income ("SSI") and Supplemental Nutrition Assistance Program ("SNAP") benefits. (Docket No. 64 ¶ 60.) In 2013, Thomas was charged with criminal trespass in Davidson County after taking shelter under a bridge during the rain while homeless. (*Id.* ¶ 64.) Thomas represented himself *pro se*, pled guilty, and was given a thirty-day suspended sentence and assessed $289.70 in court costs. Purkey concedes, for the purposes of summary judgment, that, on the day of his guilty plea, Thomas went to the clerk's office and advised the clerk that he was unable to pay the court costs because he was homeless and had no money. (*Id.* ¶ 66.)

For the three years following his guilty plea, Thomas did not hear anything further about his court debt. (Docket No. 64 ¶ 67.) The Financial Responsibility Section of TDSHS had issued a letter, dated December 2, 2014, to Thomas at a Nashville address informing him:

> Pursuant to [Tenn. Code Ann.] § 40-24-105, your motor vehicle driver license, driving privileges, and privilege to obtain a license in the state of Tennessee are revoked for failure to pay litigation taxes, court costs, and fines assessed by the court in DAVIDSON COUNTY. You are to mail your Tennessee Driver License to the address given at the end of this notice, or surrender it at any office of the Tennessee Highway Patrol or Driver Services Center in Tennessee.

(Docket No. 62-5.) For purposes of summary judgment, however, Purkey concedes that Thomas never received written notice of his revocation. (Docket No. 89 ¶ 11.) In October 2016, Thomas sought to apply for a Tennessee driver's license, only to learn that he was prevented from doing so by a license revocation related to his unpaid costs. (*Id.* ¶ 61.) Purkey admits, for summary judgment purposes, that Thomas "currently survives on very limited subsistence income for people who are totally and permanently disabled" and "cannot afford to pay the $289.70 in Court

Debt, the $65 reinstatement fee, and the additional application fee necessary to regain his driving privileges." (*Id.* ¶ 71.)

### *2. Hixson*

David Hixson is a 50-year-old resident of Nashville. When he filed this case, he was living in a homeless shelter. Thereafter, Hixson moved into private housing, but he was unable to make his rental payments and, as of the time he filed his statement of undisputed material facts, was living in a tent. (*Id.* ¶¶ 74–76.) His driver's license was revoked in 2014 for failure to pay court debt related, at least in part, to a criminal conviction in Washington County.[3] Purkey admits, for summary judgment purposes, that, when Hixson accrued the court debt, he was incarcerated and unable to pay. (*Id.* ¶ 77.) TDSHS revocation notice letters appear to have been generated and issued for Hixson on two occasions (Docket Nos. 62-6 & -7), although Purkey concedes, for purposes of summary judgment, that Hixson never received those letters (Docket No. 89 ¶ 10).

Hixson now works part-time as a vehicle emissions inspector, but he struggles to afford basic necessities. (Docket No. 64 ¶ 81.) Hixson claims that he is generally qualified to work as a motorcycle mechanic, but he cannot do so due to his lack of a driver's license. (*Id.* ¶¶ 82–85.) He identifies a total of $2,583.80 of court debt, for which he remains liable, in addition to the fees he would be required to pay to have his license reinstated. (*Id.* ¶ 88.)

### E. Procedural History

Thomas and Hixson filed their Complaint in this matter on January 4, 2017, naming Purkey, as well as Tennessee's Governor and Attorney General, as defendants in their official

---

[3] The parties devote a substantial amount of time and effort to arguing over the details of Hixson's criminal record and the circumstances in which he accrued his court debt and faced a revocation. None of those disagreements, however, negates the fundamental allegations of his claim, namely that he is indigent and that his license was revoked for nonpayment of court debt. The court, accordingly, will not pass further judgment on any of those contested background facts here.

14

capacities. (Docket No. 1.) Thomas and Hixson seek to represent a class defined as "[a]ll persons whose Tennessee driver's licenses have been or will be revoked pursuant to the Statute [Tenn. Code Ann. § 40-24-105(b)] and who, at the time of the revocation, cannot or could not pay Court Debt due to their financial circumstances." (*Id.* ¶ 93.) They plead three causes of action under 42 U.S.C. § 1983: first, for violation of due process and equal protection rights by the "mandatory revocation of people's driver's licenses because they are too poor to pay Court Debt without any inquiry into their ability to pay" (*Id.* ¶ 100); second, for violation of their due process right to notice and a hearing on whether they can pay their court debt (*Id.* ¶ 101); and third, for violation of equal protection based on Tennessee's policy of revoking the licenses of court debtors and not other debtors (*Id.* ¶ 102).

Purkey filed a Motion to Dismiss and Defer Issues Related to Class Certification on March 3, 2017. (Docket No. 23.) Thomas and Hixson filed a Renewed Motion for Class Certification (Docket No. 36) and a Motion for Summary Judgment (Docket No. 37) on August 18, 2017. On October 10, 2016, the named defendants other than Purkey were dismissed without prejudice upon the agreement of the parties. (Docket No. 55.) Purkey filed a Motion for Summary Judgment on November 6, 2017 (Docket No. 61), which repeats and adds to the arguments raised in his motion to dismiss.

## II. LEGAL STANDARD

### A. Motion to Dismiss

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487

F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## B. Motion for Summary Judgment

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*,

578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## C. Motion to Certify Class

The principal purpose of class actions is to achieve efficiency and economy of litigation, both with respect to the parties and the courts. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 159, (1982). The Supreme Court has observed that, as an exception to the usual rule that litigation is conducted by and on behalf of individual named parties, "[c]lass relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'" *Id.* at 155 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979)). The Court directs that, before certifying a class, district courts must conduct a "rigorous analysis" of the prerequisites of Rule 23 of the Federal Rules of Civil Procedure. *Falcon*, 457 U.S. at 161. The Sixth Circuit has stated that district courts have broad discretion in deciding whether to certify a class, but that courts must exercise that

17

discretion within the framework of Rule 23. *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).

Although a court considering class certification may not inquire into the merits of the underlying claim, a class action may not be certified merely on the basis of its designation as such in the pleadings. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974); *In re Am. Med. Sys., Inc.*, 75 F.3d at 1079. In evaluating whether class certification is appropriate, "it may be necessary for the court to probe behind the pleadings," as the issues concerning whether it is appropriate to certify a class are often "enmeshed" within the legal and factual considerations raised by the litigation. *Falcon*, 457 U.S. at 160; *see also In re Am. Med. Sys., Inc.*, 75 F.3d at 1079; *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974). Moreover, the party seeking class certification bears the burden of establishing that the requisites are met. *See Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003); *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 522 (6th Cir. 1976).

### III. ANALYSIS

#### A. *Rooker-Feldman*

Purkey argues first that, pursuant to the *Rooker-Feldman* doctrine, this court lacks subject matter jurisdiction over the claims in this case. He argues that Thomas and Hixson are basically seeking relief from the underlying state court judgments against them, which amounts to an impermissible intrusion on the state court process. Thomas and Hixson counter that they do not challenge any state court judgment, but rather TDSHS's revocation of their driver's licenses alone. Thomas and Hixson contend that they do not seek to set their court debt aside or challenge any aspect of their convictions. Rather, they are challenging only a specific statutory

18

consequence of their continuing inability to pay the amounts assessed against them, as administered by TDSHS.

The *Rooker-Feldman* doctrine is derived from two Supreme Court cases, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). *Rooker-Feldman*, as a principle, stands for the proposition that a federal district court lacks subject matter jurisdiction to conduct an appellate review of a state court decision. *Pittman v. Cuyahoga Cty. Dep't of Children and Family Servs.*, 241 F. App'x 285, 287 (6th Cir. 2007). By the same token, a federal court cannot issue injunctive relief that would, as a practical matter, amount to an exercise of the interjurisdictional appellate function that *Rooker-Feldman* forbids. *See Lawrence v. Welch*, 531 F.3d 364, 371–72 (6th Cir. 2008) ("[C]laims seeking injunctive relief are barred by *Rooker-Feldman* if they necessarily require the federal court to determine that a state court judgment was erroneously entered.").

However, the *Rooker-Feldman* doctrine is "not a panacea to be applied whenever state court decisions and federal court decisions potentially or actually overlap." *McCormick v. Braverman*, 451 F.3d 382, 395 (6th Cir. 2006); *see also Givens v. Homecomings Fin.*, 278 F. App'x 607, 609 (6th Cir. 2008) (referring to the "narrow range of cases" implicated by *Rooker-Feldman*). The Supreme Court has stated that *Rooker-Feldman* "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). The Sixth Circuit, accordingly, has "distinguished between plaintiffs who bring an impermissible attack on a state court judgment— situations in which *Rooker-Feldman* applies—and plaintiffs who assert independent claims

before the district court—situations in which *Rooker-Feldman* does not apply." *Pittman*, 241 F. App'x at 287.

In making this distinction, the court must look to "the source of the injury the plaintiff alleges in the federal complaint. If the source of the injury is the state court decision," then the *Rooker-Feldman* doctrine prevents the federal court from deciding the case. *McCormick*, 451 F.3d at 393. "If," however, "there is some other source of injury, such as a third party's actions, then the plaintiff asserts an independent claim." *Id.* The court must decide whether it is being called on to consider whether the state court judgment "in and of [itself] violate[s] the federal Constitution or federal law," or whether the complaining party bases its argument on some unlawful action or policy outside the four corners of that judgment. *Id.* at 392. "The appropriate inquiry is not whether the district court would be required to 'overrule' in some technical way the state court judgment, but is instead whether the constitutional claim presented by the plaintiff is so intertwined with the state court proceedings that a federal court review of the claim would necessarily constitute a review of the state court's decision, such that a federal court decision in the plaintiff's favor would call the state court decision into question." *Pancake v. McCowan*, 64 F. App'x 464, 466 (6th Cir. 2003).

Under *Rooker-Feldman*, this court cannot penetrate the closed circle between the litigants and the court in a state case. But "sometimes a state-court judgment gives rise to a new problem . . . and that . . . new problem can get federal review without impermissible examination of the initial state-court decision." *Market. v. City of Garden City, Kan.*, No. 16-3293, 2017 WL 6388812, at *3 (10th Cir. Dec. 14, 2017). The reality of our legally complex, multi-jurisdictional system is that the judgment of a court may be the catalyst of a complex and far-reaching array of events and consequences that go well beyond what the court itself decided. A court entering a

money judgment in one jurisdiction may be creating the basis for collection proceedings a thousand miles away, involving assets, rules, obligations, and interests that appear nowhere in the court's reasoning or judgment. *See Condaire, Inc. v. Allied Piping, Inc.*, 286 F.3d 353, 356 (6th Cir. 2002) (discussing procedures for collecting judgment entered in one federal district against property in another federal district pursuant to 28 U.S.C. § 1963). A judgment of guilt in a criminal trial may give rise to collateral consequences that neither the defendant nor the court foresaw because the statutory basis for those consequences had not even been enacted at the time of the conviction. *See Doe v. Bredesen*, 507 F.3d 998, 1007 (6th Cir. 2007) (upholding retroactive application of Tennessee's sexual offender registration requirements). Court A's criminal verdict may play a role in Court B's parental rights case or Agency C's decision on whether to grant a license. *See, e.g.*, Tenn. Code Ann. § 36-1-113(g)(6) (establishing basis for termination of parental rights based on incarceration under a sentence of ten or more years); Tenn. Code Ann. § 68-140-311(a)(1)(E) (providing for denial of emergency medical services licensure based on conviction of a crime of moral turpitude). In other words, a judgment may echo throughout the life of a litigant, in ways foreseeable or unforeseeable, far beyond the facial terms of the judgment itself. *Rooker-Feldman* protects the judgment, but not necessarily its far-reaching consequences.

Several courts have considered *Rooker-Feldman* in the context of judgment collection mechanisms and have generally held that the doctrine poses no obstacle to federal jurisdiction, as long as the plaintiff raises "a challenge to the *manner* of collecting on the state-court judgment," rather than a "claim . . . contingent upon the invalidity of the underlying debt." *Moore v. Idealease of Wilmington*, 465 F. Supp. 2d 484, 490 (E.D.N.C. 2006) (emphasis added) (citing *Todd v. Weltman, Weinberg & Reis Co., L.P.A.*, 434 F.3d 432, 437 (6th Cir. 2006); *Senftle v.*

*Landau*, 390 F. Supp. 2d 463, 469 (D. Md. 2005); *Wyles v. Excalibur I, LLC*, No. 05-2798JRTJJG, 2006 WL 2583200, at *2 (D. Minn. Sept. 7, 2006)); *see also Hageman v. Barton*, 817 F.3d 611, 614–16 (8th Cir. 2016) ("Through his federal complaint, [plaintiff] seeks relief from neither the Missouri judgment nor the Illinois garnishment order. Rather, he alleges statutory violations seeking statutory penalties based on [defendant's] actions in the process of obtaining the judgment and order. [Therefore,] *Rooker-Feldman* does not apply, and we may exercise jurisdiction over [plaintiff's] federal claims."); *Moran v. Greene & Cooper Attorneys LLP*, 43 F. Supp. 3d 907, 911–12 (S.D. Ind. 2014) ("Plaintiff does not challenge the validity of the state court judgment against him—neither its amount nor the methods used by the creditor to obtain it. . . . [W]e could find that Defendant violated the statute without 'reviewing' the state court judgment, and [the] *Rooker-Feldman* doctrine therefore presents no impediment to our exercise of jurisdiction."); *Ness v. Gurstel Chargo, P.A.*, 933 F. Supp. 2d 1156, 1162–63 (D. Minn. 2013) ("These allegations appear to attack Defendants' debt-collection practices rather than the state-court judgments, so for the purposes of deciding this motion, the Court determines that *Rooker-Feldman* does not bar these . . . claims."); *Meyer v. Debt Recovery Sols. of Ohio, Inc.*, No. 1:10CV363, 2010 WL 3515663, at *4 (N.D. Ohio Sept. 2, 2010) (holding that *Rooker-Feldman* did not apply "[b]ecause the plaintiffs challenged the manner of collection rather than the underlying debt").

The Sixth Circuit addressed the issue in *Todd v. Weltman, Weinberg & Reis Co.*, in which a judgment debtor filed suit under the Fair Debt Collection Practices Act based on the judgment creditor's filing of an allegedly false affidavit under Ohio's garnishment statute. 434 F.2d at 437. The Sixth Circuit concluded that *Rooker-Feldman* did not bar jurisdiction, because the plaintiff "d[id] not complain of injuries caused by this state court judgment, as the plaintiffs did in *Rooker*

and *Feldman*," but rather raised "an independent federal claim that Plaintiff was injured by" the defendant's collection activities. *Id.* at 437. The same principle would apply to permit jurisdiction here. Fundamental to *Rooker-Feldman* is the question of whether the federal courts are being asked, either actually or practically, to exercise an appellate function. "Where federal relief can only be predicated upon a conviction that the state court was wrong, it is difficult to conceive the federal proceeding as, in substance, anything other than a prohibited appeal of the state-court judgment." *Catz v. Chalker*, 142 F.3d 279, 293 (6th Cir. 1998) (quoting *Keene Corp. v. Cass*, 908 F.2d 293, 296–97 (8th Cir. 1990)). Neither Thomas nor Hixson argues that Tennessee state courts committed error either in entering their convictions or in assessing fines, costs, or litigation taxes against them. Nor do Thomas and Hixson challenge the relevant courts' or prosecutors' rights to enforce that debt against them through the various ordinary collection mechanisms that the law makes available to creditors. Thomas and Hixson seek only one thing: that the state not take away their lawful ability to drive based on the fact that they cannot currently pay the amounts they owe. Their challenge is to one inherently post-judgment coercive tool used in the state's collection regime—not to any judgment itself.[4]

To bolster his *Rooker-Feldman* argument, Purkey points to the various statutory bases pursuant to which an individual facing court debt can ask a relevant court, within its discretion,

---

[4] Purkey urges the court to follow the lead of two district courts that applied *Rooker-Feldman* to bar *pro se* plaintiffs' claims challenging their driver's license revocations or suspensions. *King v. Creed*, No. 1:14-CV-0165, 2016 WL 204492, at *2–3 (N.D.N.Y. Jan. 15, 2016); *Normandeau v. City of Phoenix*, 516 F. Supp. 2d 1054, 1064 (D. Ariz. 2005). Purkey cites these cases for the proposition that *Rooker-Feldman* bars suits challenging revocations that have a "causal relationship" to state-court judgments. (Docket No. 88 at 7 (quoting *McKithen v. Brown*, 481 F.3d 89, 98 (2d Cir. 2007)).) Insofar as those cases are based on such a rule, it is plainly incompatible with the Sixth Circuit's recognition, in *Todd*, that suits based on a judgment creditor's collection efforts are permissible as long as they do not challenge the original judgment. 434 F.2d at 437. The Supreme Court, moreover, has stated unambiguously that a causal connection is a necessary, but not sufficient, condition for applying *Rooker-Feldman*, writing that the doctrine reaches "cases [1] brought by state-court losers [2] complaining of injuries caused by state-court judgments [3] rendered before the district court proceedings commenced *and* [4] inviting district court review and rejection of those judgments." *Exxon*, 544 U.S. at 284 (emphasis added).

for some form of relief from his debt or some consideration of his indigency. *See* Tenn. Code Ann. §§ 40, 24-102, 40-25-123(b), 40-24-102, 40-24-105(h), 67-4-605(c). Because such avenues are available, Purkey argues, the plaintiffs' claims are the equivalent of a direct challenge to the state courts' failure to grant the relevant relief. *Rooker-Feldman*, however, insulates actual state court judgments, not hypothetical ones. *See Exxon*, 544 U.S. at 284 (noting that *Rooker-Feldman* applies only to judgments actually "rendered before the district court proceedings commenced"). Thomas and Hixson are not challenging any judgment made pursuant to the cited statutes, nor are they even arguing that they are entitled to have fines, costs, or litigation taxes waived. Thomas and Hixson seek relief from one specific statutory consequence of their failure to pay— the revocation of their licenses—that took effect long after the fines, costs, or litigation taxes were imposed, based on a fact—their nonpayment after one year—that was not, nor could have been, adjudicated in the original criminal proceedings.

Purkey argues, in essence, that as long as Tennessee state law permits the plaintiffs to raise the issue of their indigence to a court in some form, pursuant to some standard, then *Rooker-Feldman* wholly shields state and local agencies from any federal suit based on those agencies' actions related to nonpayment. The narrow protections of *Rooker-Feldman* require no such result. What Thomas and Hixson have raised is clearly a challenge to the operation of a supplemental statutory mechanism for seeking to coerce or encourage the payment of their debts—not any actual feature of the judgments against them or the debts in and of themselves. The court, accordingly, will not grant summary judgment or dismissal based on the *Rooker-Feldman* doctrine.

**B. Constitutionality of Applying Tenn. Code Ann. § 40-24-105(b) to Indigent Debtors**

To prevail on a claim under § 1983, a plaintiff must prove two elements: (1) that he was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of law. *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014). In both his motion to dismiss and his motion for summary judgment, Purkey argues that Thomas and Hixson cannot prevail, because they cannot establish any constitutional violation related to the section 40-24-105(b) revocation scheme. In response and in support of their own motion for summary judgment, Thomas and Hixson argue that section 40-24-105(b) is unconstitutional under a straightforward application of a number of Supreme Court cases, starting with *Griffin v. Illinois*, 351 U.S. 12 (1956). *See also Williams v. Illinois*, 399 U.S. 235 (1970); *Tate v. Short*, 401 U.S. 395 (1971); *Mayer v. City of Chicago*, 404 U.S. 189 (1971); *James v. Strange*, 407 U.S. 128 (1972); *Bearden v. Georgia*, 461 U.S. 660 (1983). Purkey argues that the state's scheme is subject only to rational basis review, which it survives. *See Midkiff v. Adams Cty. Reg'l Water Dist.*, 409 F.3d 758, 770 (6th Cir. 2005) ("Under rational basis review, the governmental policy at issue will be afforded a strong presumption of validity and must be upheld as long as there is a rational relationship between the disparity of treatment and some legitimate government purpose." (citations & internal quotation marks omitted)).

*1. Count I*

*a. The* Griffin *Cases*

Starting with *Griffin*, and continuing through several cases decided over the ensuing decades, the Supreme Court set forth certain core protections due to indigent persons—primarily criminal defendants—under the constitutional guarantees of due process and equal protection. In *Griffin*, the Supreme Court, through divided opinions, held that the State of Illinois had violated

25

both the Due Process and Equal Protection Clauses of the Fourteenth Amendment by failing to furnish trial transcripts to criminal defendants who needed the transcripts to obtain appellate review of their convictions but were unable to afford the required fees. Justice Black, writing the lead opinion, explained that, although Illinois' requirements, on their face, applied equally to all criminal appellants, their effect was "to deny adequate appellate review to the poor while granting such review to all others," which, the full majority agreed, was impermissible under the Constitution. *Griffin*, 351 U.S. at 13.

There are aspects of the analysis in *Griffin*—though not, necessarily, its holding—that seem to pose a challenge in terms of reconciling the case with the rules that govern constitutional cases today. Now, every law student is encouraged to learn the ordinary formula for considering a challenge under the Equal Protection Clause: "If a protected class or fundamental right is involved, [the court] must apply strict scrutiny, but where no suspect class or fundamental right is implicated, this Court must apply rational basis review." *Midkiff,* 409 F.3d at 770 (citing *Hadix v. Johnson*, 230 F.3d 840, 843 (6th Cir. 2000)). The *Griffin* Court, however, did not explain its holding in terms of either "rational basis" or "strict scrutiny," presumably because those rubrics had not yet taken the firm hold they now possess over so much constitutional litigation. *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2327 (2016) (Thomas, J., dissenting) (observing that "[o]nly in the 1960's did the Court begin in earnest to speak of 'strict scrutiny' versus reviewing legislation for mere rationality, and to develop the contours of these tests"). Rather, Justice Black explained the Court's holding as an extension of the basic principle, dating in its roots at least back to the Magna Carta, that "due process and equal protection both call for procedures in criminal trials which allow no invidious discriminations between persons and different groups of persons." *Griffin*, 351 U.S. at 16–17.

26

Justice Black stressed that Illinois' scheme offended the Constitution, even though the Constitution itself did not require Illinois to provide any appellate courts at all. *Id.* at 18 (citing *McKane v. Durston*, 153 U.S. 684, 687–88 (1894)). Justice Frankfurter's opinion completing the majority echoed Justice Black in the relevant respects, observing that "[l]aw addresses itself to actualities," and "[i]t does not face actuality to suggest that Illinois affords every convicted person, financially competent or not, the opportunity to take an appeal," if indigent persons do not have a mechanism to receive an adequate transcript. *Id.* at 22 (Frankfurter, J., concurring in judgment). Accordingly, "when a State deems it wise and just that convictions be susceptible to review by an appellate court, it cannot by force of its exactions draw a line which precludes convicted indigent persons . . . from securing such a review merely by disabling them from bringing" an effective notice of appeal. *Id.* at 23.

In the years following *Griffin*, the Supreme Court decided several cases expanding that case's principle to secure additional rights to indigents working their way through the criminal justice system. *See, e.g.*, *Douglas v. California*, 372 U.S. 353, 357–58 (1963) (holding that indigent defendants are entitled to counsel on their first direct appeal); *Roberts v. LaVallee*, 389 U.S. 40, 42 (1967) (holding that indigent defendants are entitled to a free transcript of the preliminary hearing for use at trial). In *Williams v. Illinois*, the Court extended the logic of *Griffin* to hold that a court could not increase an indigent defendant's imprisonment past his maximum sentence, based solely on his inability to pay fines arising out of his conviction. 399 U.S. at 242. In so doing, the Court stressed that a statute's lack of an exception for indigent persons was the equivalent of improperly imposing a greater punishment based solely on an individual's inability to pay:

> Since only a convicted person with access to funds can avoid the increased imprisonment, the Illinois statute in operative effect exposes only indigents to the

27

risk of imprisonment beyond the statutory maximum. By making the maximum confinement contingent upon one's ability to pay, the State has visited different consequences on two categories of persons since the result is to make incarceration in excess of the statutory maximum applicable only to those without the requisite resources to satisfy the money portion of the judgment.

*Id.* The Court stressed that its holding did not render the state "powerless to enforce judgments against those financially unable to pay a fine," but rather merely required it to avail itself of the "numerous alternatives" on which it could rely to enforce the convicted person's debts without unconstitutionally imposing a greater maximum sentence on the indigent than the non-indigent. *Id.* at 244. The purpose of *Griffin*, the *Williams* Court explained, was not to eliminate costs and fees, but to "to alleviate discrimination against those who are unable to meet the costs of litigation in the administration of criminal justice." *Id.* at 241.

In *Tate v. Short*, the Court considered whether the rule set out in *Williams* applied to a debtor who, unable to pay the fines he had accumulated for traffic offenses, had been committed by a court to service at a municipal farm where he would work "to satisfy the fines at the rate of five dollars for each day." 401 U.S. at 397. The court ordering him to the farm had original jurisdiction over only offenses for which there was no possibility of confinement, but it had been granted the authority to order confinement based on failure to pay fines. *Id.* at 396 n.2. The Supreme Court concluded that, "[a]lthough the instant case involves offenses punishable by fines only, petitioner's imprisonment for nonpayment constitutes precisely the same unconstitutional discrimination [as in *Williams*] since, like Williams, petitioner was subjected to imprisonment solely because of his indigency." *Id.* at 397–98. Again, the Court emphasized that the constitutional defect was not in the act of imposing a consequence on nonpayment, but in the fact that applying that consequence to a truly indigent person had the practical effect of imposing greater punishment based on the economic status of the violator. *Id.* at 401 ("We emphasize that

28

our holding today does not suggest any constitutional infirmity in imprisonment of a defendant with the means to pay a fine who refuses or neglects to do so.").

In *Mayer v. City of Chicago*, the Court considered whether the *Griffin* right to an adequate appellate record applied in cases where the defendant faced only the threat of a fine, rather than imprisonment. The defendant in *Mayer* "urge[d]" the Court to adopt a "distinction to set this case apart from *Griffin* and its progeny": namely, "that the defendants in all the transcript cases previously decided . . . were sentenced to some term of confinement," whereas the accused in *Mayer* was "not subject to imprisonment, but only a fine." 404 U.S. at 196. The Court rejected any suggestion that the rights set forth in *Griffin* and subsequent cases were at all contingent on a person's facing the threat of incarceration:

> This argument misconceives the principle of *Griffin* . . . . [I]ts principle is a flat prohibition against pricing indigent defendants out of as effective an appeal as would be available to others able to pay their own way. The invidiousness of the discrimination that exists when criminal procedures are made available only to those who can pay is not erased by any differences in the sentences that may be imposed.

404 U.S. at 196–97. The Court explained that the basis for its holdings since *Griffin* was that refusing to allow an exception for the indigent was, as a constitutional matter, no different from adopting an "unreasoned distinction" punishing indigents more severely than non-indigents for reasons unrelated to their guilt or culpability. *Id.* at 193 (quoting *Rinaldi v. Yeager*, 384 U.S. 305, 310 (1966)). "The size of the defendant's pocketbook," the Court wrote, "bears no . . . relationship to his guilt or innocence"—and therefore could not form the basis for denying the right to appeal. *Id.* at 196.

Finally, in *Bearden v. Georgia*, the Court held that Georgia could not revoke an individual's probation for failure to pay a fine or make restitution without first finding that the probationer was responsible for that failure or that alternative forms of punishment were

29

inadequate. 461 U.S. at 672–73. The Court explained that "depriv[ing] the probationer of his conditional freedom simply because, through no fault of his own, he [could not] pay the fine" was "contrary to the fundamental fairness required by the Fourteenth Amendment." *Id.* The *Bearden* Court took the opportunity to consider the *Williams* line of cases in the context of developments in the law emphasizing the now-commonplace tiered system of judicial review of state actions, noting that "[t]he parties, following the framework of *Williams* and *Tate*, have argued the question primarily in terms of equal protection, and debate vigorously whether strict scrutiny or rational basis is the appropriate standard of review." *Id.* at 665. The Court, however, noted that the considerations at issue occupied a place in the Court's constitutional case law where "[d]ue process and equal protection principles converge" and required a more searching analysis:

> Whether analyzed in terms of equal protection or due process, the issue cannot be resolved by resort to easy slogans or pigeonhole analysis, but rather requires a careful inquiry into such factors as "the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose . . . ."

*Id.* at 666–67 (quoting *Williams*, 399 U.S. at 260 (Harlan, J., concurring)).

### *b.* Johnson v. Bredesen

The Sixth Circuit gave substantial consideration to the *Griffin* line of cases in *Johnson v. Bredesen*, in which the court held that Tennessee's law requiring felons to pay child support and restitution before having their voting rights restored did not offend constitutional principles, despite lacking an indigence exception. 624 F.3d 742, 750 (6th Cir. 2010). The majority opinion in *Johnson* faulted *Griffin* and *Williams* for "fail[ing] to articulate a precise standard of review," but ultimately concluded that the *Griffin* line of cases was inapposite because those cases "concerned fundamental interests"—namely, physical liberty and access to the courts—that

30

made the laws at issue "subject to heightened scrutiny." *Id.* at 749. Because the *Johnson* court considered the felons' re-enfranchisement interests non-fundamental and because "a class of less wealthy individuals is not a suspect class," *Molina-Crespo v. U.S. Merit Sys. Prot. Bd.*, 547 F.3d 651, 660 (6th Cir. 2008) (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 29 (1973)), the court applied only rational basis review.

*Johnson v. Bredesen* is the law of this circuit, and the court will apply it here. The court pauses to note, however, that the simple tiers-of-scrutiny analysis that the Sixth Circuit considered adequate in *Johnson* cannot simply be substituted for a consideration of the full line of *Griffin* cases without losing quite a bit in the translation. As the court will explain, one must be careful not to read *Johnson* in a way that (1) directly contradicts *Bearden*, (2) misstates the basis of the rights set forth in the earlier *Griffin* cases, or (3) loses a level of nuance that, as even the *Johnson* majority itself acknowledged, applies in cases where the statute at issue not only affects indigents but threatens to exacerbate their indigency. The court's application of *Johnson* then, will be one that strives to read its holding in harmony with, rather than as a repudiation of, the Supreme Court cases that preceded it.

The parties in *Bearden* "debate[d] vigorously whether strict scrutiny or rational basis [was] the appropriate standard of review," but the Court rejected those arguments on the ground that such "easy slogans" and "pigeonhole analysis" were insufficient to the "careful analysis" required by the overlap of the due process and equal protection interests at issue under *Griffin*. *Bearden*, 461 U.S. at 665–66. Fitting the principles underlying *Griffin* into the simple categories sufficient for an ordinary equal protection case, the Court wrote, was a task "too Procrustean to be rationally accomplished." *Id.* at 667 n.8 (quoting *North Carolina v. Pearce*, 395 U.S. 711, 723 (1969)). The Sixth Circuit, in *Johnson*, acknowledges these statements but nevertheless applies

its own gloss on *Bearden*, assuring the reader that, whatever the Supreme Court said, what it meant was that the Court was applying heightened scrutiny because the fundamental right to physical liberty was at issue. 624 F.3d at 749. It is difficult for this court to see how *Bearden* supports such a reading. In any event, it is sufficient to say that the Sixth Circuit's conclusion was that the nature of the rights at issue in *Bearden* and *Johnson* justified the differing analyses, but that *Bearden* remained and remains good law.[5]

Moreover, the *Johnson* majority's contention that the puzzle of the *Griffin* cases can be solved by noting that those cases involved "fundamental interests"— freedom from confinement and access to courts—seems, at first, to be difficult to square with the precedents themselves. In *Mayer v. City of Chicago*, the Supreme Court, considering a scheme involving fines only, expressly considered and rejected the argument that the rule of *Griffin* was premised on a threat to the defendant's physical liberty. 404 U.S. at 196–97. To the contrary, the Court explained that its holdings arose from the premise that imposing a harsher punishment on a person due to his indigence amounted to relying on an "'unreasoned distinction' proscribed by the Fourteenth Amendment." 404 U.S. at 193, 196 (quoting *Rinaldi*, 384 U.S. at 310); *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 111 (1996) ("*Griffin*'s principle has not been confined to cases in which imprisonment is at stake."). On the other end of the spectrum, the possibility that the *Griffin* cases are about freedom from physical restraint and access to the courts is belied by the fact that the Supreme Court has expressly *declined* to apply them in some cases where those interests

---

[5] Purkey seems to suggest that the reasoning set forth, in *Griffin* through *Bearden*, was rendered obsolete by the Supreme Court's brief analysis of those cases in *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996). In *M.L.B.*, the Supreme Court considered the constitutionality of a Mississippi scheme that premised a parent's appeal of the termination of her parental rights on her payment of over $2,000 in record preparation fees. *Id.* at 106. In striking down Mississippi's scheme, the Court did indeed use the language of "fundamental interest[s]." *Id.* at 113. The analysis in *M.L.B.*, however, was expressly premised on the fact that the proceeding at issue, unlike those in the *Griffin* cases and here, was neither criminal nor quasi-criminal in nature. *Id.* at 112–13. The Court stressed that it "has not extended *Griffin* to the broad array of civil cases," *id.* at 116, which Thomas and Hixson do not dispute.

32

were implicated. *See United States v. MacCollum*, 426 U.S. 317, 328–29 (1976) (holding that *Griffin* does not apply in cases involving an indigent person's right to obtain a transcript to assist him in obtaining collateral relief); *Ross v. Moffitt*, 417 U.S. 600, 618 (1974) (holding that *Griffin* does not grant a right to appointed counsel in a discretionary appeal). Whatever principle is at work in *Griffin*, then, it is clearly less simple than determining whether access to courts or a risk of confinement is directly implicated, even if that distinction was sufficient to resolve the issue presented by *Johnson*.

Ultimately, even the *Johnson* majority opinion concedes that more is going on in its talk of "fundamental interests" than a binary question of whether the statute at issue impinges on something that the courts have identified as a "fundamental right" under the Constitution. At one point, the *Johnson* court is called on to distinguish *James v. Strange*, 407 U.S. 128, which the court will discuss in more detail with regard to Count III below. The law at issue in that case, like this one, involved the collection of court-related debt from people who had faced criminal charges. The Court invalidated the *Strange* scheme under what appeared to be rational basis review, although the *Johnson* court construed the *Strange* opinion as having set a higher bar than was required for Tennessee's re-enfranchisement statute. The *Johnson* court, rather, concluded that the analysis in *Strange* did not apply to *Johnson* because *Strange* involved a scheme that, by further impoverishing already-indigent debtors, endangered "the hopes of indigents for self-sufficiency and self-respect," whereas *Johnson* involved a "mere 'statutory benefit.'" *Johnson*, 624 F.3d at 749 (quoting *Strange*, 407 U.S. at 135; *Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010).). But self-sufficiency and self-respect have never been recognized by the Sixth Circuit or the Supreme Court as fundamental rights in a constitutional sense. *Cf. Cutshall v. Sundquist*, 193 F.3d 466, 479 (6th Cir. 1999) (recognizing the lack of cases recognizing a

33

constitutional "general right to private employment"). Under *Johnson* then, an at least somewhat elevated version of rational basis review would seem to be required in a case where a scheme was alleged to discriminatorily endanger an indigent person's basic subsistence and capacity for self-sufficiency.

The tiered system of scrutinies has its advantages and, for a large portion of constitutional cases, is sufficient to resolve the questions at hand. The problem is that this is one area of law where the Supreme Court has said, in no uncertain terms, that a different set of tools is called for. Ignoring those holdings in favor of a two-sizes-fit-all approach does not afford the Supreme Court's cases the precedential weight to which they are entitled. As much as Purkey may argue that the standard, tiered framework is inescapable and unbending, the reality is that the jurisprudence of the Supreme Court says otherwise. In *Bearden* and elsewhere, the Supreme Court has recognized that, in select areas, "more is involved . . . than the abstract question whether [the challenged law] discriminates against a suspect class, or whether [the matter at issue] is a fundamental right." *Plyler v. Doe*, 457 U.S. 202, 223 (1982). While this court has no appetite for inventing new areas for departure from the standard framework, it also sees no ground for ignoring the exceptions that the Supreme Court has already established.

### c. Section 40-24-105(b)'s Lack of an Indigence Exception

Those caveats aside, Purkey is correct that *Johnson* calls on us to consider whether section 40-24-105(b) bears on a fundamental interest and apply rational basis review if it does not. The Sixth Circuit has held that "there is no fundamental right to drive a motor vehicle" under the Constitution. *Duncan v. Cone*, No. 00-5705, 2000 WL 1828089, at *2 (6th Cir. Dec. 7, 2000). The use of a motor vehicle is, however, closely tied to the exercise of rights that have been found to give rise to heightened constitutional protection. It is well settled that "the

34

Supreme Court has recognized a protected right to interstate travel." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 534 (6th Cir. 2007) (citing *Saenz v. Roe*, 526 U.S. 489, 500 (1999)). The Sixth Circuit, moreover, has gone a step further and "has recognized a protected right to intrastate travel, i.e., 'a right to travel locally through public spaces and roadways.'" *Id.* (quoting *Johnson v. City of Cincinnati*, 310 F.3d 484, 494–98 (6th Cir. 2002)); *see also Fowler v. Johnson*, No. CV 17-11441, 2017 WL 6379676, at *8 (E.D. Mich. Dec. 14, 2017). That right, as recognized in this circuit, does not generally prohibit the state from denying "a single mode of transportation," such as driving, to an individual. *Fowler*, 2017 WL 6379676, at *8 (collecting cases.) A law may "implicate[] the right to travel," however, "when it actually deters travel, when impeding travel is its primary objective, or when it uses a classification that serves to penalize the exercise of the right." *League of United Latin Am. Citizens*, 500 F.3d at 535 (citing *Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 (1986)). The Sixth Circuit has demonstrated a willingness to consider laws governing the right to drive under that rubric, to determine whether "[s]omething more than a negligible or minimal impact on the right to travel" exists, thereby potentially triggering a heightened level of scrutiny. *Id.* (citing *State of Kansas v. United States*, 16 F.3d 436, 442 (D.C. Cir. 1994)). Attention to modes of transport would seem to be particularly important where, as here, the legal matter at issue, by definition, involves people with especially limited resources. A right to intrastate travel that assumes that a homeless person who cannot afford to pay court costs can simply hop into a cab or summon an Uber or a Lyft on a regular basis[6] would not seem to be a right that recognizes the specific solicitude afforded to indigent persons in the criminal justice system under *Griffin*, *Williams*, *Tate*, *Mayer*, and *Bearden*.

---

[6] Nor can we assume that an adequate system of public transportation exists and is available. Indeed, Purkey concedes that there are parts of Tennessee that public transportation fails to reach altogether. (Docket No. 40 ¶ 42.)

35

Consistently with the Sixth Circuit's prior decisions, the court will not consider the state's license revocation system as subject to heightened scrutiny merely because it bears, in some way, on a person's ability to use the roads. At the same time, however, the court notes that, as the degree of the burden imposed increases, a scheme that hinges on taking away one's right to drive gets closer and closer to the rights to which the Constitution affords special protection. Moreover, as the court will discuss below, the right at issue here bears substantially on the debtor's interest in self-sufficiency, which the Sixth Circuit recognized, in *Johnson*, to justify an at least somewhat more searching standard of review. Purkey's contention that *Johnson* mandates the application of ordinary rational basis review here, therefore, is questionable.

Nevertheless, even if only the lowest standard of judicial review applies, this court cannot conclude, categorically, that section 40-24-105(b) passes constitutional muster. "Under rational basis review, a law is upheld so long as it is rationally related to a legitimate government purpose. There is a strong presumption of constitutionality and the regulation will be upheld so long as its goal is permissible and the means by which it is designed to achieve that goal are rational." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 694 (6th Cir. 2014) (citing *Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1050 (9th Cir. 2000)). Thomas and Hixson do not dispute that collecting fees, costs, and taxes from those who can actually pay them is, generally speaking, a legitimate government purpose.[7] *See Sickles v. Campbell Cty., Ky.*, 501 F.3d 726, 731 (6th Cir. 2007) ("[T]he government's interests—sharing the costs of incarceration and furthering offender accountability—are

---

[7] Purkey identifies a total of seven legitimate purposes related to the state's scheme, one of which is inapplicable to this analysis because it involves only restitution, which, both parties now agree, is not a basis for revocation of a driver's license. Each of the six remaining interests is, in one way or another, simply a reformulation or component of the state's interest in assessing and enforcing fines, costs, and litigation taxes. (*See* Docket No. 63-1 at 24–25.) Because the legitimacy of the state's interest is conceded, there is no need to dwell on the many ways that that interest can be restated, subdivided, and characterized.

36

substantial . . . .”). Moreover, if Tennessee's revocation scheme applied only to those debtors capable of paying but unwilling to do so, one could imagine the rational relationship that might exist between the threat of license revocation and the legitimate interest of collecting court debt. That connection, though, falls apart where indigent debtors are concerned. Visiting a harsh consequence on "someone who through no fault of his own is unable to make" the payment sought "will not make [payment] suddenly forthcoming." *Bearden*, 461 U.S. at 670. No person can be threatened or coerced into paying money that he does not have and cannot get.

As the *Griffin* cases demonstrate, before the court applies any level of scrutiny, it must take the preliminary analytic step of defining precisely what "the law" that is being challenged is. Under *Griffin* and its progeny, the answer is clear: this court is bound to consider Tenn. Code Ann. § 40-24-105(b) as the equivalent of a statute that imposes a harsher sanction on indigent debtors than their non-indigent peers. *See Griffin*, 351 U.S. at 13 ("There is no meaningful distinction between a rule which would deny the poor the right to defend themselves in a trial court and one which effectively denies the poor an adequate appellate review accorded to all who have money enough to pay the costs in advance. "); *Williams*, 399 U.S. at 242 ("Since only a convicted person with access to funds can avoid the increased imprisonment, the Illinois statute in operative effect exposes only indigents to the risk of imprisonment beyond the statutory maximum. By making the maximum confinement contingent upon one's ability to pay, the State has visited different consequences on two categories of persons since the result is to make incarceration in excess of the statutory maximum applicable only to those without the requisite resources to satisfy the money portion of the judgment."); *Mayer* , 404 U.S. at 193 (reaffirming that *Griffin* established a prohibition on laws that, in practical effect, created an "unreasoned distinction[]" between the indigent and non-indigent).

In other words, if the scheme at issue affords no adequate exception based on indigence, *Griffin* and the cases applying it instruct this court to consider that scheme as the constitutional equivalent of the state's "us[ing,] as the sole justification for" its action, "the poverty of" the defendant. *Bearden*, 461 U.S. at 671. The court must "address[] itself to actualities," *Griffin*, 351 U.S. at 22, and treat section 40-24-105(b) as what it, as a practical matter, is: a law that guarantees that an indigent person will lose his license while giving a non-indigent person the opportunity not to. That the law is "nondiscriminatory on its face" does not negate the fact that imposing a payment obligation on the indigent "may be grossly discriminatory in its operation."[8] *Williams*, 399 U.S. at 242 (quoting *Griffin*, 351 U.S. at 17 n.11). Such a distinction poses constitutional problems, the Supreme Court has stressed, not merely because it might, in some instances, bear on a fundamental right, but because the distinction itself is "unreasoned." *Mayer*, 404 U.S. at 193 (quoting *Rinaldi* , 384 U.S. at 310).

The *Johnson* court grappled with this question and concluded that the differential treatment of indigent prospective voters was permissible in relation to the state's goal of ensuring payment of child support and restitution generally. The court wrote that "[t]he legislature may have been concerned, for instance, that a specific exemption for indigent felons would provide an incentive to conceal assets and would result in the state being unable to compel payments from some non-indigent felons." 624 F.3d at 748. The *Johnson* majority reasoned that, although the lack of an indigence exception rendered the statute arguably overbroad, that overbreadth was not fatal due to the low level of scrutiny that applied. "That the state used a shotgun instead of a rifle to accomplish its legitimate end," the court wrote, "is of no moment under rational basis review." *Id.*

---

[8] The court notes, however, that the issue of facial neutrality regarding indigence is something of a red herring here. If a statute imposes a sanction on a person for not paying a sum of money, the statute is not, in any meaningful way, neutral on the question of how much money the person has.

38

A far different calculus prevails, however, when the privilege lost is the ability to operate a car on the state's roadways. Unlike the power to vote, the ability to drive is crucial to the debtor's ability to actually establish the economic self-sufficiency that is necessary to be able to pay the relevant debt. It does not require reams of expert testimony to understand that an individual who cannot drive is at an extraordinary disadvantage in both earning and maintaining material resources. "[D]riving an automobile" is "a virtual necessity for most Americans." *Wooley v. Maynard*, 430 U.S. 705, 715 (1977). Thomas and Hixson have previewed substantial evidence to that effect, much of which Purkey has objected to on evidentiary, rather than factual, grounds. Even solely on the basis of the undisputed facts and the basic features of life of which the court can take judicial notice, however, the substantial economic disadvantages associated with being unable lawfully to drive are apparent.[9]

Most obviously, being unable to drive in Tennessee limits the jobs available to a person and makes holding a job difficult once the person has it. "Automobile travel . . . is a basic, pervasive, and often necessary mode of transportation to and from one's home [and] workplace." *Delaware v. Prouse*, 440 U.S. 648, 662 (1979). Some jobs require a person to drive as part of his duties, and even those jobs that do not themselves involve driving generally require the employee to be somewhere, reliably, on time.

The damage that the lack of a driver's license does to one's employment prospects is just the beginning. Being unable to drive is the equivalent of a recurring tax or penalty on engaging in the wholly lawful ordinary activities of life—a tax or penalty that someone who was convicted of the same offense, but was able to pay his initial court debt, would never be obligated to pay. When the State of Tennessee takes away a person's right to drive, that person does not, suddenly

---

[9] Again, Tennessee is not New York City or Chicago, where public transportation is so ubiquitous that many people do not own cars and some never even learn to drive.

and conveniently, stop having to go to medical appointments, stop having to report to court dates, or stop having to venture into the world to obtain food and necessities. Maybe public transportation will work for some of those activities some of the time, and maybe it will not. Purkey has offered nothing that would permit the court to conclude that public transportation can adequately fill the void left by the loss of a license, and indeed he stipulates, at a minimum, that "[p]ublic transportation is not available in some parts of Tennessee."(Docket No. 40 ¶ 42.) Similarly, while some individuals with revoked licenses may be able to rely on family or charitable assistance for some purposes, there is no reason to conclude that such options will be available or adequate in most cases. What, then, is a person on a revoked license to do? The lawful options are simple: he can simply forgo the life activities, no matter how important, for which he cannot obtain adequate transportation, or he can incur additional transportation expenses—making himself that much less likely ever to satisfy his court debt.

Of course, an indigent person with a revoked license has another option, besides accepting the practical limitations that the state has placed on him: he can, faced with the need to navigate the world and no feasible, affordable, and legal option for doing so, break the law and drive. The court very deliberately uses "can" here, not "may" or "should," but it would simply be willful blindness to ignore the fact that some debtors with revoked licenses will be tempted to disregard the revocation, at least for pressing needs. By defying his license revocation, however, the indigent debtor puts himself at the risk of incurring more fines, more court costs, and more litigation taxes that will be likely to render the restoration of his rights an even more improbable proposition. *See* Tenn. Code Ann. §§ 40-35-111(e), 55-50-504(a) (criminalizing and imposing fines on driving on a revoked license). If the purpose of such a scheme were simply to lock indigent defendants into an endless cycle of greater and greater debt, it could be said to serve that

40

purpose well. But Purkey, to his credit, does not assert that the State of Tennessee or his Department has any legitimate interest in building inescapable debt traps for indigent Tennesseans. Purkey, rather, claims that his Department's policies are in furtherance of debt collection. Toward that end, it is hard to say the policies are rationally calculated.

Purkey may respond that rational basis review permits even arguably counterproductive policies a presumption of constitutionality. Nothing about the case law, however, suggests that the Constitution's tolerance for legislative or administrative self-sabotage is limitless. *Cf. Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 653 (1974) (Powell, J., concurring in the result) (arguing that policy would fail rational basis review because it is "either counterproductive or irrationally overinclusive"). The Supreme Court has made clear that, "even in the ordinary equal protection case calling for the most deferential of standards," a law may be struck down if its substance is "so discontinuous with the reasons offered for it" that any pretense of rationality cannot be sustained. *Romer*, 517 U.S. at 632. That review includes considering whether, "in practical effect, the challenged classification simply does not operate so as rationally to further the" legitimate purpose professed. *U. S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 537 (1973). There is reason to believe that taking away a driver's license is not merely out of proportion to the underlying purpose of ensuring payment, but affirmatively destructive of that end—so much so that whether section 40-24-105(b) can lay any claim to rationality is open to serious question.

The court finds itself returning to the Sixth Circuit's reminder that, under rational basis review, a state is free to "use[] a shotgun instead of a rifle to accomplish its legitimate end." 624 F.3d at 748. The Sixth Circuit invoked that colorful aphorism to demonstrate that the state is free to resort to policies that are imprecise and overbroad. But the question unavoidably arises: Is it

actually always rational to reach for the metaphorical shotgun, no matter the task at hand? This court previously suggested that taking a person's driver's license away to try to make him more likely to pay a fine is more like using a shotgun to treat a broken arm. Maybe it is more like using the shotgun to shoot oneself in the foot. However one wants to think about it, the aspect of the Sixth Circuit's metaphor that is easy to miss is that, while the state is not required to use the best tool for the job, it still has to use *a* tool for the job. There is substantial reason to doubt that applying section 40-24-105(b) to indigent debtors makes any sense at all as a tool for collecting court debt.

Section 40-24-105(b), moreover, presents more than a garden variety case of overbreadth. *Johnson*, unlike this case, involved a sanction, disenfranchisement, that was initially imposed on all convicted felons, with no option to buy one's way into an exception. *See* 624 F.3d at 745 (citing Tenn. Code Ann. § 40-29-202(b)–(c)). When a disenfranchised felon completed his sentence, he had the right to apply for re-enfranchisement, a process that again applied generally to the entire eligible population. *Id.* Two of the requirements for re-enfranchisement, however, were payment of restitution and child support obligations. *Id.* The scheme at issue in *Johnson*, then, was one that truly was targeted at all qualifying felons with outstanding payment obligations, and it sanctioned those who failed to pay only by forestalling their relief from a preexisting sanction that they had suffered. *See Johnson*, 624 F.3d at 751 ("First, and most fundamentally, the re-enfranchisement law at issue does not deny or abridge any rights; it only restores them.").

Section 40-24-105(b), on the other hand, imposes a wholly new sanction and is exclusively targeted at defendants who have failed to pay their court debt for an entire year—that is to say, a group particularly likely to consist, in substantial part, of defendants who, like

42

Thomas and Hixson, have suffered from a longstanding, persistent inability to pay. And the undisputed facts suggest that that longstanding, persistent inability usually continues after revocation. Purkey admits that, from July 1, 2012, to June 1, 2016, his agency revoked over 146,000 driver's licenses for failure to pay fines, costs and/or litigation taxes. It restored fewer than 11,000. (Docket No. 64 ¶¶ 107–08.) In other words, well over 92% of the people whose driver's licenses were revoked turned out not, in fact, to be people who could be coerced into payment. Can it really be said, then, that section 40-24-105(b) is a collection mechanism that, through its overbreadth, sweeps in some indigent people? The numbers would suggest that, to the contrary, taking away the driver's licenses of indigent people is the core of what the statute does.[10]

Admittedly, the General Assembly has taken some recent steps to allow courts, in their discretion, to afford relief to defendants facing greater court debt than they can pay. Absent some actually articulated standard explaining when—if ever—a defendant is entitled to that relief, those mechanisms are inadequate for vindicating the constitutional interests here. The *Griffin* line of cases does not simply guarantee indigent defendants, in the relevant situations, the opportunity to appeal generally to the broad discretion of their sentencing court to alleviate their burden. Rather, the Court set forth certain situations in which a qualifying indigent is, as a matter of law, entitled to an exception from bearing a certain negative consequence that he could and would avoid if he were able to pay.[11] *See, e.g.*, *Mayer*, 404 U.S. at 198 ("We conclude that

---

[10] Purkey would presumably respond that the success of section 40-24-105(b) is shown not by the small number of people who paid their debt after revocation, but by the people who, out of fear of losing their licenses, paid before a year was up. But those people, by definition, were capable of paying, unlike the debtors at issue here. They could just as easily be coerced by a mechanism with an exception for indigent debtors like Thomas and Hixson.

[11] Indeed, it appears that the complaining parties in at least some of the post-*Griffin* cases may have already been denied just that kind of discretionary relief. *See Williams*, 399 U.S. at 237 (noting that

43

appellant *cannot be denied* a 'record of sufficient completeness' to permit proper consideration of his claims." (emphasis added)). The only statute that offers anything comparable to that type of definite relief is the provision regarding the 180-day hardship exception. *See* Tenn. Code Ann. § 40-24-105(b)(3)(A) ("An order to stay the revocation of the license *shall be granted* if the court finds that the person would experience hardship from the revocation of the license and that other means of transportation are not readily available to the person.") & -105(b)(3)(B) ("The court may enter a one-time stay for a period of not longer than one hundred and eighty (180) days."). That provision, however, is expressly time-limited and not primarily focused on addressing indigence.

Every other opportunity for relief is left entirely to the discretion of the court. *See* Tenn. Code Ann. § 40-24-102 ("The several courts in which a cause is finally adjudged are *authorized*, either before or after final judgment, *for good cause*, to release the defendants, or any one (1) or more of them, from the whole or any part of fines or forfeitures accruing to the county or state."); Tenn. Code Ann. § 40-24-104(a) ("If the defendant . . . is unable to pay the fine . . . the court . . . *may* enter any order that it could have entered under § 40-24-101, *or may* reduce the fine to an amount that the defendant is able to pay . . . ."); Tenn. Code Ann. § 40-24-105(h) ("The court is vested with the *authority and discretion* to order the issuance of a restricted driver license for the purposes specified in subdivision (b)(3)(A)."); Tenn. Code Ann. § 40-25-123(b) ("[T]he

---

Williams "petitioned the sentencing judge to vacate that portion of the order requiring that he remain imprisoned upon expiration of his one year sentence because of nonpayment of the fine and court costs" and quoting a portion of the sentencing court's decision including discussion of prudential concerns), *reversing People v. Williams*, 41 Ill. 2d 511, 513 (1969) (noting, in case below, that the relevant sentencing statute provided that "the court *may* further order that upon non-payment of such fine, the offender *may* be imprisoned until the fine is paid" (emphasis added)); *Bearden*, 461 U.S. at 663, 673–74 (discussing parole hearing afforded in *Bearden* case), *reversing Bearden v. State*, 288 S.E.2d 662, 663 (1982) (explaining that a trial court's revocation decision was reviewable, under Georgia law, only for abuse of discretion).

presiding judge of a court of general sessions *may* suspend the court costs and the litigation tax . . . , for any indigent criminal defendant, *as in the presiding judge's opinion the equities of the case require*.").[12] Most of those mechanisms, moreover, are not targeted at the specific issue of driver's license revocations, but rather deal with the general assessment of fines, costs, and litigation taxes. Accordingly, a court's exercise of its discretion may, and may well, be guided by factors wholly apart from the debtor's indigence or his need to drive.

Tennessee courts have made clear that, when a court is, by statute, given discretion to grant a debtor relief from a particular type of court debt, that discretion includes the authority to deny relief, despite the debtor's indigence. *See Black*, 897 S.W.2d at 683 (upholding denial of waiver of costs for indigent defendant); *State v. Lafever*, No. M2003-00506-CCA-R3CD, 2004 WL 193060, at *7 (Tenn. Crim. App. Jan. 30, 2004) (applying *Black* to discretion to waive fines). For example, the state courts have upheld the denial of a waiver of fines to a person who was earlier found to be indigent, based purely on the speculative possibility that, "[b]y the time [he was] required to begin paying the fines, his financial circumstances may have altered significantly, for instance, through an inheritance." *Lafever*, 2004 WL 193060, at *7; *see also State v. Ryan*, No. E2013-02135-CCA-R3CD, 2014 WL 3611508, at *7 (Tenn. Crim. App. July 22, 2014) (affirming assessment of court costs against defendant who was found, twice, to be indigent, as within the court's discretion). Thomas and Hixson do not seek to deprive Tennessee courts of their discretion regarding what a defendant should owe. They simply argue that, when it comes to one particularly harsh consequence of nonpayment, they are entitled to a more definite right to protection based on their indigence. Because Tennessee's discretionary relief statutes provide no definite right to relief from revocation based on inability to pay, they are no

---

[12] Emphasis added throughout.

substitute for the type of protection required by the *Griffin* cases. The state cannot replace a right to relief with an opportunity merely to throw oneself upon the mercy of the court.

If the General Assembly concluded that the state should revoke the driver's license of every person convicted of a felony or misdemeanor, then the *Griffin* line of cases would provide no obstacle. However, because Tennessee has "deem[ed] it wise and just that" some convicted persons be permitted to retain their licenses, "it cannot by force of its exactions draw a line" that imposes a greater sanction on a convicted person based solely on his indigence. *Griffin*, 351 U.S. at 23 (Frankfurter, J., concurring in judgment). *Griffin* and the cases applying it have "made clear that," at least in criminal and quasi-criminal settings, "differences in access to the instruments needed to vindicate legal rights, when based upon the financial situation of the defendant, are repugnant to the Constitution." *LaVallee*, 389 U.S at 42. Nothing about the rational basis framework or *Johnson* itself relieves Tennessee from the "basic command that justice be applied equally to all persons." *Williams*, 399 U.S. at 241. Accordingly, Purkey's Motion to Dismiss, which is premised on the argument that the plaintiffs' arguments fail as a matter of law, will be denied as to Count I.

### d. Evidentiary Basis for Granting Summary Judgment

Simply concluding that Purkey is not entitled to dismissal of the plaintiffs' claims as a matter of law leaves open the question of whether either party is entitled to summary judgment. Thomas and Hixson have set forth a sound theory of the constitutional protection to which they are entitled, based on longstanding Supreme Court precedents and well-recognized principles regarding the solicitude owed to indigent people in the criminal justice system. Whether that theory justifies the holding they seek, however, depends on the facts. Purkey reminds the court repeatedly—and correctly—that constitutional case law has recognized no fundamental right to

drive a motor vehicle. Conceding as much, the plaintiffs have not framed their challenge as about the right to drive in the abstract, but about the practical effect of losing that right on other, sometimes profoundly important interests. Specifically, the plaintiffs argue that, in Tennessee, losing one's license has substantial destructive effects on both (1) a person's ability to obtain basic self-sufficiency and (2) the government's ability to recoup its debts. The court, therefore, must survey the undisputed facts before it to determine if the plaintiffs have so conclusively established that premise—or Purkey so conclusively refuted it—that summary judgment would be proper.

   ***i. Judicial Notice of Importance of Driving in Tennessee.*** The plaintiffs first urge the court to take judicial notice, generally, of the centrality of motor vehicle travel to life in Tennessee. As the court has already discussed, taking at least some judicial notice to that effect is proper. Rule 201 of the Federal Rules of Evidence permits a court, either by motion of a party or on its own motion, to "judicially notice a fact that is not subject to reasonable dispute because it" either "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Judicial notice permits a court to acknowledge certain indisputable foundational facts about life in a jurisdiction, such as the region's geography, *see Tucker v. Outwater*, 118 F.3d 930, 935 (2d Cir. 1997), its recurring weather conditions, *see Stephan v. Transp. Ins. Co.*, 140 F. App'x 340, 341 (3d Cir. 2005), or widely known demographic facts about its workforce, *see Caulfield v. Bd. of Educ. of City of N.Y.*, 486 F. Supp. 862, 885 (E.D.N.Y. 1979), *aff'd*, 632 F.2d 999 (2d Cir. 1980). Where appropriate, judicial notice may extend to indisputable realities of an area's economic life—for example, that a state or region lacks a certain industry, *see United States v. Ramirez*, 910 F.2d 1069, 1071 (2d Cir. 1990), or that a particular consumer good

is widely available, *see United States v. Various Articles of Obscene Merch., Schedule No. 2102*, 709 F.2d 132, 137 (2d Cir. 1983).

By the same principle, a court is permitted to take judicial notice of commonly known and indisputable facts about a city or region's transportation infrastructure. *See, e.g., Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366, 1370 (11th Cir. 1998) (taking judicial notice that "Atlanta is home to Hartsfield Atlanta International Airport, one of the busiest airports in the country"). Indeed, as Thomas and Hixson point out, courts have, where appropriate, specifically taken judicial notice of the necessity of motor vehicle travel for certain work or life activities. *See Southerland v. St. Croix Taxicab Ass'n*, 315 F.2d 364, 367 (3d Cir. 1963) ("The District Court was entitled to take judicial notice of the fact, as do we, that the Alexander Hamilton Airport is located in a rural part of St. Croix, some miles from the hotels and towns of the island and that it is served by no regular public transportation facilities."); *United States v. Lopez*, No. 05-CR-593, 2007 U.S. Dist. LEXIS 26170, at *13 n.14 (E.D. Pa. Mar. 26, 2007) ("The Court takes judicial notice that the motel in question is in King of Prussia, Pennsylvania, approximately 20 miles outside of Philadelphia, in an area that is not readily served by public transportation and is otherwise generally inaccessible without a car."); *cf. Susman v. N. Star Tr. Co.*, 30 N.E.3d 622, 628 (Ill. App. Ct. 2015) ("This court, which is located in Chicago, Cook County, may take judicial notice of the fact that Lake County is adjacent to Cook County and that many people commute every day from Lake County to work in Chicago."). Of particular relevance to this case, the Supreme Court itself appears to have had little hesitation in observing that "[a]utomobile travel . . . is a basic, pervasive, and often necessary mode of transportation," *Prouse*, 440 U.S. at 662, or in referring to driving as "a virtual necessity for most Americans." *Wooley*, 430 U.S. at 715.

48

"[C]aution must be used" in taking judicial notice under Rule 201, in part because judicial notice can have the effect of "depriv[ing] a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack" the assertion at issue. *Countrywide Home[] Loans, Inc. v. McDermott*, 426 B.R. 267, 273 (N.D. Ohio 2010) (quoting *Am. Prairie Constr. Co. v. Hoich*, 560 F.3d 780, 796 (8th Cir. 2009)). The court notes, however, that no such deprivation of the chance to refute a judicially noticed fact has taken place here. Indeed, Purkey has been given ample opportunity to dispute the importance of driving to life in Tennessee, and, while he has raised a number of evidentiary objections, he has offered little to nothing that would undermine the plaintiffs' factual premise. For example, in their Statement of Undisputed Material Facts, Thomas and Hixson, citing third-party research, posit that, "[i]n Memphis, Nashville, and Knoxville, 72% to 75% of jobs are not reasonably accessible by public transportation." (Docket No. 64 ¶ 95.) Purkey, in response, objects on the basis of hearsay but does not deny the fact asserted. (*Id.*) Thomas and Hixson add that, "[i]n Nashville, Knoxville, and Chattanooga, more than two thirds of working-age residents lack access to public transportation." (*Id.* ¶ 96.) Again, Purkey raises only a hearsay objection, with neither a denial of the plaintiffs' factual assertion nor any proffered reason to doubt its general accuracy. (*Id.*) Thomas and Hixson then claim that "93.4% of Tennessee residents drive to work." (*Id.* ¶ 97.) This time, Purkey raises two evidentiary objections—but again, he makes no quarrel with the facts. (*Id.*) This pattern continues for several pages, with Purkey objecting even to such undeniably common sense statements as "Many indigent people who owe Court Debt and whose licenses have been revoked under the Statute still need to drive in order to get to work, school, or medical appointments." (*Id.* ¶ 106; *see id.* ¶¶ 94–106.) Any factual basis for Purkey's resistance to the plaintiffs' positions, however, is conspicuously absent.

49

None of this is to give short shrift to Purkey's evidentiary objections—which the court will address in more detail below—but to note that, if Purkey has any ground on which he actually disputes the importance of driving in Tennessee, he has had ample opportunity to raise it. Therefore, while the court will exercise the level of caution appropriate under Rule 201, it will do so while noting that Purkey and his counsel have certainly not been blindsided by this issue, nor have they been deprived of chances to make a case to the contrary.

With the foregoing principles in mind, the court takes judicial notice of the following. First, the court judicially notices that the public transportation available in Tennessee is widely insufficient to provide an adequate substitute for access to private motor vehicle transportation. Second, the court judicially notices that the services, businesses, homes, and workplaces throughout Tennessee are so geographically diffuse that navigating life in the state wholly on foot is impracticable for all but perhaps a few Tennesseans. Third, the court judicially notices that a number of obstacles prevent non-motorized transportation, such as bicycles, from providing an adequate alternative to driving in Tennessee, including (1) the aforementioned geographically diffuse pattern of development; (2) the need to travel on interstates and highways; (3) safety concerns associated with using non-motorized travel in areas without paths dedicated to that purpose; (4) the lack of such dedicated paths on numerous important roads within the state; and (5) the fact that many Tennesseans face physical limitations that would not prevent them from driving but that would sharply limit their use of a bicycle or other human-powered mode of transportation.

Based on its judicial notice of these aforementioned facts, the court concludes that it is beyond dispute that, at least as a general proposition, the cities, towns, and communities of Tennessee are pervasively structured around the use of motor vehicles. Anyone who doubts that

50

premise is welcome to attempt to run a day's worth of errands in a rural Tennessee county with no car and very little money. The centrality of motor vehicle travel is, moreover, not solely a rural problem. Even the relatively dense city of Nashville, where the court sits, is deeply reliant on motor vehicle transport. If any city in this jurisdiction could be expected to be reasonably navigable without driving, it would be Nashville—and the court takes judicial notice that, to the contrary, Nashville is a city where motor vehicle travel is an essential part of ordinary life, particularly for anyone seeking to maintain or build economic self-sufficiency.

There are, of course, limits to what the court can judicially notice. The court cannot, for example, take judicial notice of the more specific statistical claims offered by Thomas and Hixson, nor can the court ascribe absolute universality to the general facts of which the court has taken judicial notice. There is no reason, however, for the court to engage in the preposterous fiction that the question of whether driving is central to life in Tennessee is shrouded in mystery. This is a state of roads, not footpaths—and those roads, for the most part, are filled with private and commercial vehicles, not bicycles and public buses. The court is permitted to acknowledge as much.

*ii. Stipulations.* Indeed, the parties' stipulations—though worded cautiously—support the court's conclusion. Purkey stipulates, for example, that, "[f]or many adult residents of Tennessee, the ability to drive is an important aspect of daily life." (Docket No. 40 ¶ 41.) He further stipulates that "[p]ublic transportation is not available in some parts of Tennessee." (*Id.* ¶ 42). Although those stipulations, in a vacuum, may be frustratingly vague and euphemistic, the court's permissible consideration of background facts about life in the state brings the agreed-upon premises more sharply into focus. No testimony is required for the court to understand that driving is "an important aspect of daily life," because it is how Tennesseans get to work, school,

51

supermarkets, doctors' offices, hospitals, religious services, job interviews, charitable organizations, polling places, and community activities, among other destinations. Nor is testimony required for the court to know that the "some parts of Tennessee" without public transportation include more than the bottom of the Cumberland River or the top of Mount Le Conte. The areas without public transportation, or with wholly inadequate public transportation, include the homes of many Tennesseans whose rights and desires to engage in the activities of life are no less than those of Tennesseans in the state's city centers. The parties' stipulations, accordingly, support a holding that the loss of one's driver's license works a substantial hardship on the former license holder's capacity for self-sufficiency, such that a license revocation would be counterproductive to fostering an indigent debtor's ability to pay his debts.

      ***iii. Census Data and Brookings Institution Report.*** The stipulations and judicial notice available provide a great deal of support for the general conclusion that driving is central to everyday life and personal self-sufficiency in Tennessee. General conclusions, however, can only take the court so far. Thomas and Hixson have offered a number of more detailed supporting facts, to which Purkey objects primarily, if not exclusively, on evidentiary grounds. The court, therefore, must consider the degree to which it can consider those supporting facts on the motions for summary judgment.

      Thomas and Hixson have offered the declaration of one of their attorneys, Edward Krugman, purporting to authenticate and summarize supporting evidence from (1) a 2011 Brookings Institution report entitled *Missed Opportunity: Transit and Jobs in Metropolitan America* ("Brookings Report")[13]; and (2) census data regarding the percentage of Tennessee

---

[13] Available at https://www.brookings.edu/research/missed-opportunity-transit-and-jobs-in-metropolitan-america/.

residents who commute to work.[14] (Docket No. 43.) Purkey objects to both sources on the grounds that Krugman, as an attorney for the plaintiffs, is not an appropriate authenticating witness and that the Brookings Report and the census figures are hearsay.

Purkey is correct that, insofar as there is a reasonable dispute about the authenticity or credibility of sources, a lawyer for one of the parties would not be an appropriate witness on the matter—at least if that lawyer also planned to appear at trial. *See* Tenn. Sup. Ct. R. 8, RPC 3.7 (forbidding an attorney to be both advocate and witness at trial unless pursuant to a particular exception); *see also* Local R. 83.01(e)(4) ("The standard of professional conduct of the members of the bar of this Court shall include the current Tennessee Code of Professional Responsibility, Tenn. Sup. Ct. R. 8."). That does not mean, however, that Krugman is forbidden from noting the *existence* of the census data and Brookings Report. The court is capable of taking judicial notice of the fact that "http://www.brookings.edu" and "http://www.census.gov" are the URLs of, respectively, the Brookings Institution and the U.S. Census Bureau, and the sources that Krugman has cited are available on those websites. Krugman's citation to those sources, therefore, is no different from merely mentioning them in a brief and poses no problem under the Rules of Professional Conduct.

The permissibility of Krugman's declaration, of course, does not resolve Purkey's hearsay objections, and, indeed, the plaintiffs concede that at least the Brookings Report is hearsay. Purkey is mistaken, however, that a hearsay objection is enough to categorically insulate him from addressing the facts at issue. Purkey relies on the Sixth Circuit's decision in *Sperle v. Michigan Department of Corrections* for the proposition that "[a] party opposing a motion for

---

[14] Available at U.S. Census Bureau, *Commuting (Journey to Work)*, https://www.census.gov/topics/employment/commuting/data.html. The court notes that the URL for accessing commuter data has apparently changed since these motions were originally briefed, but this URL appears, at least as of late March 2018, to contain the same or similar figures.

summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact." 297 F.3d 483, 495 (6th Cir. 2002) (citing *Weberg v. Franks*, 229 F.3d 514, 526 n.13 (6th Cir. 2000)). *Sperle*, however, was not decided under the current version of Rule 56. As the Sixth Circuit has more recently explained, the appropriate focus under Rule 56, as since amended, is on the admissibility of a fact at trial, not necessarily the admissibility of the fact in the specific form presented at the time of the summary judgment motion:

> As amended in 2010, Federal Rule of Civil Procedure 56 provides that parties asserting a genuinely disputed fact need only "cit[e] to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). It then permits a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Once an objection is properly made, the proponent must "show that the material is admissible as presented or . . . explain the admissible form that is anticipated."

*Mangum v. Repp*, 674 F. App'x 531, 536–37 (6th Cir. 2017) (quoting Fed. R. Civ. P. 56(c), advisory committee's note to 2010 amendment); *see also Mount Vernon Fire Ins. Co. v. Liem Constr., Inc.*, No. 3:16-CV-00689, 2017 WL 1489082, at *3 (M.D. Tenn. April 26, 2017) (Crenshaw, J.) (acknowledging that the court, on a summary judgment motion, may consider evidence presented in hearsay form if the evidence can be reduced to admissible form at trial); *Wilson v. Stein Mart, Inc.*, No. 3:15-CV-01271, 2016 WL 4680008, at *2 (M.D. Tenn. Sept. 7, 2016) (Nixon, S.J.) (same); Jeffrey W. Stempel *et al.*, 11-56 Moore's Federal Practice - Civil § 56.91 (2018) ("Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . , the material may be presented in a form that would not, in itself, be admissible at trial."); Charles Alan Wright & Arthur R. Miller *et al.*, 10A Fed. Prac. & Proc. Civ. § 2721 (4th ed.) ("The court and the parties have great flexibility with regard to the evidence that may be used in a Rule 56 proceeding."); *cf. Celotex*, 477 U.S. at

324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.").

Purkey's objections premised on the fact that the Brookings Report is hearsay are not objections that the facts therein "cannot be presented in a form that would be admissible in evidence," as required by Rule 56(c)(2).[15] The court notes, however, that lodging a simple hearsay objection is consistent with the ordinary practice of most litigants in this district. Addressing evidentiary objections on summary judgment through such a procedure is frequently sufficient, either because the ultimate evidentiary issue at trial is obvious or because reliance on the specific fact at issue is unnecessary for resolution of the relevant motion. The pending summary judgment motions, however, do not yield such an easy resolution. Accordingly, the court is inclined to hold those motions in abeyance with regard to Count I, pending either (1) a more cooperative effort between the parties at reaching reasonable, agreed-upon stipulations regarding the underlying facts or (2) the filing of supplemental briefs on whether the facts cited by the plaintiffs and found in the Brookings Report, or some rough equivalent or substitute, can be presented in a form that would be admissible at trial.

Thomas and Hixson do not, after all, ask the court to accept the entire Brookings Report, *in toto*, as indisputable. Rather, they identify a few simple aspects of the authors' conclusions—mostly straightforward statistical claims about Tennessee communities—that are relevant to this

---

[15] As Thomas and Hixson note, it is debatable whether Purkey's practice of lodging evidentiary objections alone, without addressing the facts asserted, follows the letter of the court's local rules. Under Rule 56.01(c), "[a]ny party opposing the motion for summary judgment *must respond* to each fact set forth by the movant by either (i) *agreeing that the fact is undisputed*; (ii) *agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only*; or (iii) *demonstrating that the fact is disputed*." Local R. 56.01(c) (emphasis added). Moreover, "[e]ach disputed fact must be supported by specific citation to the record." *Id.* Purkey, however, has not taken any position on whether he disputes the underlying facts, nor does he rely on specific citations to the record in his responses. In any event, because the court will order supplemental stipulations and briefing on this issue, it need not determine whether Purkey fully complied with Rule 56.01(c).

case. (*See* Docket No. 64 ¶¶ 94–96.) The Brookings Report, in turn, is fairly transparent about its methodology, and many of the sources on which it relies are publicly available, such as transit authorities' own route and schedule information. *See* Brookings Report at 5–6, 29–34. It is not difficult, then, to foresee how the facts cited by the plaintiffs—or comparable facts conveying similarly supportive background information about specific Tennessee communities—could be admissible at trial, either through an author of the Brookings Report, if available, or some other knowledgeable witness. Accordingly, if the parties truly are unable to agree upon the facts necessary for full consideration of the plaintiffs' claims, the court will permit Thomas and Hixson to file supplemental affidavits and statements of undisputed fact establishing how, if at all, they would anticipate introducing specific factual support regarding the necessity of driving to Tennesseans.

Further briefing may also be helpful on the census data as currently presented, if the parties are unable to agree on what that data says. With regard to the raw data itself, Purkey's hearsay objection is unavailing, because Rule 201 generally permits the court to take judicial notice of "public records and government documents available from reliable sources on the Internet." *U.S. ex rel. Dingle v. BioPort Corp.*, 270 F. Supp. 2d 968, 972 (W.D. Mich. 2003). Official publications of public authorities, moreover, are self-authenticating under Rule 902(5) of the Federal Rules of Evidence. *See Fair Hous. Ctr. of Sw. Mich. v. Hunt*, No. 1:09-CV-593, 2011 WL 710666, at *3 (W.D. Mich. Feb. 23, 2011) ("Publications of the U.S. Bureau of Census are self-authenticating . . . ."). Although parties might dispute the analysis of census figures or even the methodology by which a census was conducted, the court knows of no reasonable basis to dispute that the U.S. Census Bureau's published data is itself an accurate representation of the census or censuses taken.

56

Thomas and Hixson, however, do not rely solely on the data in its raw form, but also on their compilation and tabulation of figures from that data to represent the percentages of residents in a number of Tennessee metropolitan areas who drive to work. (Docket No. 43 ¶¶ 6–10.) The plaintiffs argue that their tabulations are admissible under Rule 1006 of the Federal Rules of Evidence, which permits a party to use "a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Alternatively, the plaintiffs suggest that their tabulations can be considered as a Rule 611(a) pedagogical device. *See United States v. Bray*, 139 F.3d 1104, 1111 (6th Cir. 1998). Given the voluminous nature of the census data, it seems to the court that a Rule 1006 summary would be appropriate. "[S]ummaries admitted as evidence under Rule 1006," however, "must fairly represent and be taken from underlying documentary proof." *Gomez v. Great Lakes Steel Div., Nat. Steel Corp.*, 803 F.2d 250, 257 (6th Cir. 1986). The court's consideration of this matter would therefore be aided by Purkey's setting aside his evidentiary gamesmanship and weighing in on whether the plaintiffs' summary is accurate. In other words, the court invites Purkey to check the plaintiffs' math rather than looking for ways to avoid it. If, then, the parties are truly unable to reach an agreement regarding the plaintiffs' numbers, the court will require additional briefing on the degree to which the numbers presented in paragraph 10 of Krugman's declaration are admissible as a Rule 1006 summary or, in the alternative, a Rule 611(a) pedagogical device. While Purkey is free to lodge or reiterate any evidentiary objections he likes, he will also be required to take an affirmative position on the accuracy of the plaintiffs' calculations, with an adequate and thorough explanation of any grounds for disputing those calculations, or risk the court's taking the plaintiffs' calculations as conceded. The plaintiffs, in

57

turn, will be ordered to make good faith efforts to assist Purkey's counsel in understanding the plaintiffs' tabulation methodology.

Counsel for the parties can, and presumably will, use their best litigation judgment regarding how to go about the stipulations and briefing ordered. The court notes, however, that it fails to see why any party would wish to draw these proceedings out by being intransigent or willfully obtuse about the basic fact that driving is a central part of ordinary life for most adult Tennesseans who are capable of operating a motor vehicle, particularly those who wish to be economically self-sufficient. The court has taken judicial notice of that fact generally, and it has little doubt that additional facts are discoverable and admissible that would provide more detailed support for the general proposition. It is difficult to imagine what would be gained by holding a trial solely for the purpose of hauling in witnesses to authenticate studies and confirm simple calculations, all to form an evidentiary record in support of a premise that any person who lives in Tennessee can see is true. It would seem to the court that resolving this case expeditiously would be better furthered by agreeing upon the basic, indisputable facts and focusing on the area of the parties' actual meaningful disagreement: the substance of the governing constitutional law. In any event, for the aforementioned reasons, the court will hold the parties' motions for summary judgment in abeyance regarding Count I, pending the requested supplemental stipulations and briefing, which the court will outline in greater detail in the accompanying order.

### 2. Count III

#### a. James v. Strange

Because Count III, like Count I, involves the Equal Protection Clause, the court will turn to it next. Count III targets the same features of Tennessee's system as Count I, but from a

58

different angle. Relying largely on the Supreme Court's decision in *James v. Strange*, 407 U.S. 128, Thomas and Hixson argue that section 40-24-105(b) denies equal protection by subjecting people holding court debt to a significantly harsher collection and enforcement scheme than Tennessee allows with regard to people holding private debt. In other words, while Count I compares the difference between the law's treatment of indigent court debtors and non-indigent court debtors, Count III turns to the difference between the law's treatment of court debtors and its treatment of private debtors. Much of Purkey's argument follows the same path he took with Count I. He argues that this scheme is governed by rational basis review, which the state's laws should survive.

*Strange* involved a Kansas statutory scheme for recouping amounts expended by the state on counsel and legal services provided to indigent criminal defendants pursuant to the state's obligations under *Gideon v. Wainwright*, 372 U.S. 335 (1963). *Strange,* 407 U.S. at 128. Any time a sum was expended, it was promptly recorded as a debt of the defendant. That debt "bec[ame] a lien on the real estate of defendant" and could "be executed by garnishment or in any other manner provided by the Kansas Code of Civil Procedure." *Id.* at 131. The defendant debtor, however, was not "accorded any of the exemptions provided by [the Kansas Code of Civil Procedure] for other judgment debtors except the homestead exemption." *Id.*

The *Strange* court considered Kansas' scheme pursuant to a deferential standard, looking only to "whether [the law] is based on assumptions scientifically substantiated." *Id.* at 133 (quoting *Roth v. United States*, 354 U.S. 476, 501 (1957) (Harlan, J., concurring in the result)). Indeed, even the *Johnson* majority has conceded that *Strange*'s "text appeared to apply rational basis review." 624 F.3d at 749. Under that standard, the Court struck the scheme down, observing that the state may not "impose unduly harsh or discriminatory terms merely because

the obligation is to the public treasury rather than to a private creditor." *Id.* at 138. The Court

took particular issue with the fact that, by eliminating almost all exemptions, Kansas had

subjected criminal defendant debtors to a regime that struck at their core resources. The Court

explained that the protections that had been removed were ones intended to ensure that even

debtors facing an overwhelming civil judgment would not have their resources wholly wiped out

by debt collection efforts. For example:

> Of the [exemptions available to a civil judgment debtor], none is more important
> to a debtor than the exemption of his wages from unrestricted garnishment. . . .
> Kansas has . . . perceived the burden to a debtor and his family when wages may
> be subject to wholesale garnishment. Consequently, under its code of civil
> procedure, the maximum which can be garnished is the lesser of 25% of a
> debtor's weekly disposable earnings or the amount by which those earnings
> exceed 30 times the federal minimum hourly wage. No one creditor may issue
> more than one garnishment during any one month, and no employer may
> discharge an employee because his earnings have been garnished for a single
> indebtedness.

*Id.* at 135–36. The Court recognized that "deny[ing] protections such as these to the once

criminally accused is to risk denying him the means needed to keep himself and his family

afloat." *Id.* at 146.

    *Strange*, unlike *Griffin*, does not have a novella's worth of later Supreme Court opinions

explaining precisely what the lower courts should construe it to mean. The Court did revisit the

issue, however, in *Fuller v. Oregon*, 417 U.S. 40 (1974). Oregon, like Kansas and a number of

other states, had adopted a statutory scheme pursuant to which the state sought to recover the

costs of counsel from defendants—in Oregon's case, only convicted defendants—who had been

indigent at the time of their prosecutions and had relied on state-funded appointed counsel. Quite

unlike the Kansas scheme at issue in *Strange*, however, the Oregon recoupment statutes

categorically applied only to a person who "[was] or [would, in the future] be able to pay" the

amounts owed. 417 U.S. at 45 (quoting Or. Rev. Stat. § 161.665(3)). As interpreted by the

Oregon courts, "no requirement to repay [could] be imposed if it appear[ed] at the time of sentencing that 'there [was] no likelihood that a defendant's indigency [would] end." *Id.* (quoting *State v. Fuller*, 504 P.2d 1393, 1397 (1973)). The Oregon statute, therefore, was "quite clearly directed only at those convicted defendants who [were] indigent at the time of the criminal proceedings against them but who subsequently gain[ed] the ability to pay the expenses of legal representation." *Id.* at 46. As the Court put it:

> Defendants with no likelihood of having the means to repay are not put under even a conditional obligation to do so, and those upon whom a conditional obligation is imposed are not subjected to collection procedures until their indigency has ended and no 'manifest hardship' will result. The contrast with appointment-of-counsel procedures in States without recoupment requirements is thus relatively small: a lawyer is provided at the expense of the State to all defendants who are unable, even momentarily, to hire one, and the obligation to repay the State accrues only to those who later acquire the means to do so without hardship.

*Id.* (footnote omitted). The Court, applying *Strange*, upheld Oregon's statute. In so doing, the Court reiterated that what it had found objectionable about Kansas' scheme was that the "elimination of the exemptions normally available to judgment debtors 'embodie[d] elements of punitiveness and discrimination which violate the rights of citizens to equal treatment under the law.'" *Fuller*, 417 U.S at 47 (quoting *Strange*, 407 U.S. at 142.) Concurring in the judgment, Justice Douglas stressed that the reason the statute survived was that it had "been stringently narrowed." 417 U.S. at 59 (Douglas, J., concurring in the judgment).

### b. Section 40-24-105(b)'s Protection of Indigent Debtors

*Strange* does not require that all debt be recouped by the same mechanisms, or even by equally effective mechanisms. *See Strange*, 407 U.S. at 138 ("We recognize, of course, that the State's claim to reimbursement may take precedence, under appropriate circumstances, over the claims of private creditors and that enforcement procedures with respect to judgments need not

be identical."). What *Strange* does provide, however, is a firm command that a state's uniquely harsh treatment of a class of indigent debtors cannot be carried out in "such discriminatory fashion" that it "blight[s] . . . the hopes of indigents for self-sufficiency and self-respect." *Id.* at 142–43. The question, then, is whether that is the case here.

In Tennessee, fines, costs, and litigation taxes can be collected through the same basic mechanisms as a civil judgment. *See* Tenn. Code Ann. § 40-24-105(a), (c), (f). Kansas also took its system of ordinary civil collections as its baseline, but ran afoul of the Constitution by subtracting a number of protections that would have been uniquely necessary for the very indigent or recently indigent debtors to which its statute applied. Tennessee took a different route, albeit one that, Thomas and Hixson argue, took it to much the same destination. Whereas Kansas took away protections from its ordinary scheme, Tennessee heaped on additional tools of coercion—most notably, the loss of a driver's license. While the structure of the schemes is different, the effect is the same: one particular type of debtor is singled out for a regime uniquely capable of driving those debtors into, or further and more inextricably into, poverty.

Indeed, acknowledgment of the unique constitutional hazards of such a system can, as the court has noted, be found in the opinion of the *Johnson* Sixth Circuit majority. *Johnson* distinguished the Kansas debt scheme from Tennessee's re-enfranchisement scheme on the ground that *Johnson* involved a "mere 'statutory benefit,'" whereas *Strange* implicated the debtor's ability to "support[] himself and his family.'" *Johnson*, 624 F.3d at 749 (quoting *Harvey*, 605 F.3d at 1079; *Strange*, 407 U.S. at 135). That distinction, the *Johnson* majority explained, was why *Strange*, despite facially being a case of rational basis review, in fact applied a somewhat more demanding consideration of the factors involved.

Here, the statute at issue, like the one in *Johnson*, threatens serious financial harm to those who run afoul of it. The court does not need to repeat its lengthy discussion above to establish that taking a person's driver's license away is, like Kansas' scheme of unlimited garnishment, a threat to the debtor's basic subsistence. Ultimately, then, the formal differences between Count I and Count III give way to substantial practical overlap. Although the theories undergirding each differ, both hinge on just how severe a sanction the revocation of a license is and just how greatly it harms the debtor's basic subsistence or ability to build economic self-sufficiency. For that reason, the court will likewise deny Purkey's motion to dismiss with regard to Count III and hold the motions for summary judgment in abeyance pending the requested supplemental stipulations and briefing.

### *3. Count II*

In Count II, Thomas and Hixson challenge not the substance of the state's revocation scheme, but the way it is carried out—specifically, that a person facing revocation is not afforded notice and an opportunity to contest the facts underlying the TDSHS's revocation before that revocation goes into effect. Purkey does not dispute that the state's revocation of a person's driver's license requires it to afford the minimal protections of due process. Purkey argues, instead, that the state's procedural due process obligation is satisfied by a combination of (1) the original due process afforded at the time of the debtor's conviction, (2) the fact that TDSHS sends notices informing debtors of their revocations, and (3) that a debtor who believes that his license was revoked in error because he had, in fact, paid his court debt can seek a review of his records from TDSHS.

A driver's license, once issued, is "not to be taken away without that procedural due process required by the Fourteenth Amendment." *Bell v. Burson*, 402 U.S. 535, 539 (1971)

(citing *Sniadach v. Family Fin. Corp.*, 395 U.S. 337 (1969); *Goldberg v. Kelly*, 397 U.S. 254 (1970)). What due process requires, however, varies depending on the nature of the scheme at issue. Even in a case where all involved agree that a person was entitled to due process, there may still be disagreement about "how much process is due." *Shoemaker v. City of Howell*, 795 F.3d 553, 559 (6th Cir. 2015). Determining precisely what process a person is entitled to in a particular situation requires the consideration of a number of factors:

> [1] the private interest that will be affected by the official action; [2] the risk of an erroneous deprivation[;] . . . [3] the probable value, if any, of additional or substitute procedural safeguards; and [4] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 559 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

The Supreme Court's cases in this area establish that a driver facing suspension or revocation of his license is entitled to a pre-deprivation hearing in some—but not all—situations. In *Bell v. Burson*, the Supreme Court concluded that an adequate pre-deprivation hearing was required under a Georgia law pursuant to which "the motor vehicle registration and driver's license of an uninsured motorist involved in an accident" was "suspended unless he post[ed] security to cover the amount of damages claimed by aggrieved parties in reports of the accident." 402 U.S. at 535–36. The state allowed a motorist an administrative hearing prior to the suspension, but that hearing did not consider issues of liability or fault. *Id.* at 536. Accordingly, an uninsured driver who was wholly innocent in an accident could nevertheless have his license suspended for failing to post bond in the amount of the claimed damages of another party involved—indeed, possibly the party who was actually at fault—without ever having a hearing in which he could deny his liability. *Id.* The Court held that the statute deprived a driver of due process and that, although a driver was not entitled to a full determination of liability before

64

facing a requirement to post bond or face suspension, he was at least entitled to a "determination whether there [was] a reasonable possibility of judgments in the amounts claimed being rendered against" him. *Id.* at 540.

In *Dixon v. Illinois*, however, the Supreme Court made clear that a pre-suspension hearing is not required in all situations. 431 U.S. at 115. Under the scheme at issue in *Dixon*, Illinois had "established a comprehensive system of assigning 'points' for various kinds of traffic offenses, depending on severity, to provide an objective means of evaluating driving records." *Id.* at 107. Pursuant to the state's regulations, a driver faced suspension or revocation, without a pre-action hearing, if he amassed a qualifying number of points. *Id.* at 108. The state did, however, provide for notice concurrent with the revocation or suspension, followed by a right to a full evidentiary hearing on the state's decision. *Id.* at 109. Applying the aforementioned *Eldridge* factors, the Court concluded that no pre-deprivation hearing was required. The court explained that, in light of the fact that Illinois' scheme permitted exceptions based on hardship, the private interest at issue was "not so great as to require [the Court] 'to depart from the ordinary principle [that] something less than an evidentiary hearing is sufficient prior to adverse administrative action.'" *Id.* at 113 (quoting *Mathews*, 424 U.S. at 343). Moreover, although it was possible that a person might face an incorrect suspension due to a clerical error, the risk of an erroneous deprivation was ultimately "not great," because "revocation decisions [were] largely automatic." *Id.* Finally, the Court noted the "substantial public interest" in ensuring the administrative efficiency of a scheme dedicated to "safety on the roads and highways, and in the prompt removal of a safety hazard." *Id.* at 114. The Court concluded that it was this last factor, the presence of a public safety issue, that particularly distinguished the case from *Bell*. Illinois' denial of a pre-deprivation hearing was permissible, in part, because the statute at issue was

"designed to keep off the roads those drivers who are unable or unwilling to respect traffic rules and the safety of others." *Id.* at 115.

Purkey urges this court to treat *Dixon* as wholly determinative of TDSHS's obligations at issue in this case. That argument, however, ignores the fact that the factor that the Supreme Court appears to have considered most important in *Dixon* is entirely absent here. The scheme in *Dixon* was targeted at drivers who had amassed traffic offenses that could give rise to a reasonable inference that they were significantly more likely than the average driver to pose a risk to public safety if allowed on the road. In contrast, a person can find himself facing a section 40-24-105(b) revocation despite a spotless, or even exemplary, driving record. Despite Purkey's repeated attempts to ground Tennessee's revocation scheme in the state's power to police the safety of its highways, he has demonstrated no basis for concluding that a driver who cannot pay his court debt is any more of a risk to the drivers around him than a driver who can. Section 40-24-105(b) is not about safety; it is about payment. In that regard, it is more like the scheme at issue in *Bell*. Ultimately, though, Tennessee's policy of revoking driver's licenses based on court debt does not analogize perfectly to the laws at issue in either case. Whether a driver facing revocation is entitled to a pre-deprivation hearing must depend on a consideration of the particular rights, interests, and underlying evidentiary issues implicated here.

The facts and briefing currently before the court leave a certain amount of ambiguity with regard to how, exactly, TDSHS processes initial revocations for failure to pay court debt. In his Reply in support of his Motion for Summary Judgment, Purkey writes:

> Plaintiffs are incorrect that the State revokes driver's licenses "with no notice." Although Section 105(b) does not require pre-revocation notices, the Commissioner is required to send notice at the time of revocation. *See* Tenn. Code Ann. § 55-50-504(h). Further, such "revocation . . . shall not take effect until ten (10) days after notice has been sent to the last known address of the driver." *Id.*

66

(Docket No. 88 at 18–19.) This language, as far as the court can tell, states that, while section 40-25-105 does not *itself* require pre-revocation notice, another statute, section 55-50-504(h) does require notice, after which the revocation cannot "take effect" for ten days. Under that statute:

> Notwithstanding any other law to the contrary, revocation or suspension of a license shall not take effect until ten (10) days after notice has been sent to the last known address of the driver. The notice requirement in this subsection (h) shall not apply to a driver whose license has been revoked or suspended by a court of competent jurisdiction or who has surrendered the license to the court.

*Id.* The relevant section of Purkey's Reply, however, does not actually cite to any portion of either party's Undisputed Material Facts or Responses thereto in order to support the contention that TDSHS actually *does* wait ten days for its revocations to go into effect.

The crux of this discrepancy appears to be Purkey's distinction between when his agency changes a driver's "status" and when the revocation of the license is "effective." Purkey admits that "the Department revokes a person's driver's license on the same day that it receives notification of non-payment from the court." (Docket No. 64 ¶ 28.) However, Purkey also claims that, "while revocation is effective as of the date that notification is [sent] to the driver by the Department, the Department does not change the status of the driver's license for a period of 10 days in order to allow the driver to receive notification from the Department." (Docket No. 64 ¶ 28.) This distinction, though, does not appear to reflect what Purkey now admits he is bound to do pursuant to section 55-50-504(h), which makes no mention of the "status" of the driver's license, only when the revocation "shall . . . take effect."

In any event, the court need not dwell too long on this confusion, because Count II survives, for now, regardless. Whether TDSHS actually waits ten days for a revocation to take effect might become a key issue, if Thomas and Hixson ultimately fail to prevail on Counts I and III. If they do prevail on Counts I and III, however, the fact that they have not been afforded

67

procedural due process will be a foregone conclusion, because they will have been, as a matter of law, entitled to an opportunity for a hearing that they have not been afforded. Moreover, the question of what type of hearing might be necessary will inevitably hinge on the outcome of Counts I and III, because the substantive nature of the rights and facts at issue affects the application of the *Eldridge* factors. The court, accordingly, will deny Purkey's motion to dismiss with regard to Count II, and will add, to its requested briefing, that Purkey clarify TDSHS's practices regarding whether a driver's license is considered revoked for the ten days following the agency's sending a notice letter. The motions for summary judgment will be held in abeyance in full.

## C. Class Certification

Thomas and Hixson seek certification of a class defined as "[a]ll persons whose Tennessee driver's licenses have been or will be revoked pursuant to the Statute and who, at the time of the revocation, cannot or could not pay Court Debt due to their financial circumstances." (Docket No. 1 ¶ 93.) Purkey argues that Thomas and Hixson are not entitled to certification of their class for five reasons: (1) they have failed to produce appropriate evidence sufficient to meet their burden under Rule 23; (2) they cannot satisfy the numerosity requirement because they have not demonstrated what portion of people with revoked licenses are indigent; (3) they cannot satisfy the commonality requirement because the population of drivers with revoked licenses involves substantial variation in the issues and postures presented by each individual case; (4) they similarly cannot satisfy the typicality requirement because Thomas and Hixson proving their own right to relief would not necessarily establish the right to relief of others; and (5) they cannot satisfy Rule 23(b)(2) because they cannot identify a form of injunctive relief that would be applicable to the class as a whole.

68

### 1. Reliance on Statement of Claudia Wilner

Purkey objects to the plaintiffs' reliance, in their motion for class certification, on a 28 U.S.C. § 1746 declaration of Claudia Wilner, which addresses a number of foundational facts regarding their proposed class and Tennessee's scheme for revoking driver's licenses for court debt. (Docket No. 6-3.) Wilner is one of the plaintiffs' lawyers, and Purkey asks the court to strike her declaration on the ground that Wilner has inappropriately proffered herself as a fact witness in a case where she is also serving as counsel.

Under Tennessee's Rules of Professional Conduct, "[a] lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness unless" one of three enumerated exceptions applies. Tenn. Sup. Ct. R. 8, RPC 3.7(a); *see also* Local R. 83.01(e)(4) ("The standard of professional conduct of the members of the bar of this Court shall include the current Tennessee Code of Professional Responsibility, Tenn. Sup. Ct. R. 8."). As Thomas and Hixson point out, Rule 3.7(a), at least by its text, specifically applies to activity "at trial" and does not directly address preliminary stages such as a motion for class certification. Nevertheless, Rule 3.7(a) may be implicated by these earlier proceedings if an attorney's activities or statements are such that they would make her "likely to be a necessary witness" when the time for trial arrives.

Nothing in Wilner's statement raises such an issue here. For example, as the court has already noted, Rule 3.7(a) expressly permits an attorney to provide "testimony relat[ing] to an uncontested issue." Tenn. Sup. Ct. R. 8, RPC 3.7(a)(1). Several of the facts attested to by Wilner fall clearly within that exception. For example, Wilner attests that only 7% of the people whose licenses were revoked from July 1, 2012 through June 2, 2016, have had their licenses restored. (Docket No. 6-3 ¶¶ 11–13.) Purkey has since stipulated to that fact. (Docket No. 40 ¶ 44.) Other

69

of Wilner's claims are merely citations to materials put out by the State of Tennessee itself. For example, she cites the Tennessee Department of Correction's own figures regarding the number of people released by the state from jail or prison in Fiscal Year 2015–16 (13,987) and the average time served (4.57 years). (Docket No. 62 ¶ 14.) *See* Tenn. Dep't of Corr., Statistical Abstract: Fiscal Year 2016 30 (Oct. 2016).[16] "[P]ublic records and government documents available from reliable sources" are generally appropriate for judicial notice. *U.S. ex rel. Dingle*, 270 F. Supp. 2d at 972. Wilner's citation to those statistics is, therefore, little different than simply citing them in a brief. Still other of Wilner's statements bear on issues related to her representation of her client and fall within Rule 3.7(a)(2)'s exception for "testimony relat[ing] to the nature . . . of legal services rendered in the case." (*See, e.g.*, Docket No. 6-3 ¶¶ 1–2, 25.)

Wilner does draw the court's attention to a handful of third-party sources related to the prevalence of poverty among people with criminal records. (*Id.* ¶ 16 (citing Rebecca Vallas & Sharon Dietrich, *One Strike and You're Out: How We Can Eliminate Barriers to Economic Security and Mobility for People with Criminal Records* 9 (2014); The Pew Charitable Trusts, *Collateral Costs: Incarceration's Effect on Economic Mobility* (2010); Joan Petersilia, *When Prisoners Return to the Community: Political, Economic and Social Consequences*, Sentencing & Corrections, Nov. 2000, at 9.) If Wilner were planning to testify at trial regarding the credibility and contents of those reports, it would indeed likely pose a problem under Rule 3.7(a), as was discussed regarding the Brookings Report earlier. Unless Purkey disputes those reports' very existence, however, Wilner's merely informing the court that the reports have been published is not fact testimony on a contested issue. In any event, the court does not rely on those third-party reports for its certification decision.

---

[16] Available at https://www.tn.gov/content/dam/tn/correction/documents/StatisticalAbstract2016.pdf.

The few bits of Wilner's attestation that arguably bear on contestable factual issues merely involve Wilner's drawing simple inferences from the law and the uncontested facts presented. For example, Ms. Wilner speculates about the feasibility of a court debtor's repayment of court debt while he is still incarcerated. (Docket No. 6-3 ¶ 13.) Insofar as these few statements amount to factual assertions, the court finds them unnecessary to resolving the issue of class certification and finds that they do not establish that Wilner is likely to be a necessary witness at trial. Purkey's request that Wilner's statement be stricken is, therefore, denied.

### *2. Numerosity*

Purkey argues next that Thomas and Hixson cannot establish that their proposed class is sufficiently numerous to warrant certification under Rule 23. Purkey concedes that, from July 1, 2012, to June 1, 2016, TDSHS revoked 146,211 driver's licenses for failure to pay fines, costs and/or litigation taxes and restored only 10,750. (Docket No. 64 ¶ 107–08; *see also* Docket No. 40 ¶¶ 43–44 (stipulating to statistics)). He argues, however, that there is no way to know how many of those people were indigent. Thomas and Hixson, he argues, have therefore failed to demonstrate numerosity.

Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable. Although there is no strict numerical test, substantial numbers usually satisfy the numerosity requirement. *Gilbert v. Abercrombie & Fitch Co.*, No. 2:15-cv-2854, 2016 WL 4159682, at * 4 (S.D. Ohio Aug. 5, 2016) (citing *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006)). "There is no magic minimum number that will breathe life into a class." *Russo v. CVS Pharmacy, Inc.*, 201 F.R.D. 291, 294 (D. Conn. 2001) (quoting *Jones v. CCH-LIS Legal Info. Servs.*, 1998 WL 671446, *1 (S.D.N.Y. Sept.28, 1998)). Plaintiff must show some evidence of or reasonably estimate the number of class members, and, in assessing numerosity, the court

may make common sense assumptions without the need for precise quantification of the class. *Id.*

Purkey is correct that Thomas and Hixson have not put forth evidence that would allow the court to know precisely how many of the people whose driver's licenses were revoked are indigent. However, "the exact number of class members need not be pleaded or proved" for a class to be certified, as long as the class representatives can show that joinder would be impracticable. *Golden v. City of Columbus*, 404 F.3d 950, 965–66 (6th Cir. 2005) (quoting *McGee v. E. Ohio Gas Co.*, 200 F.R.D. 382, 389 (S.D. Ohio 2001)). Facts, common sense, and the basic features of the statutes at issue all dictate that there is little doubt that that is the case here. Tennessee's own Administrative Office of the Courts has written that it is "generally agreed that approximately 75% of those being prosecuted by the district attorney will be indigent" for the purpose of providing counsel. Tenn. Admin. Office of the Courts, *Tennessee's Indigent Defense Fund: A Report to the 107th Tennessee General Assembly* 19 (2011).[17] Although one can debate the degree to which that number would translate to indigence for the purpose of paying court debt, it establishes a reasonable baseline for considering the pervasiveness of indigence in the Tennessee criminal justice system. Moreover, the nature of Tennessee's scheme is that every person who cannot pay his court debt will face revocation unless he happens to receive some form of discretionary relief from a court. To deny that there are a substantial number of indigent debtors facing revocation, then, is essentially to deny that indigent debtors exist at all—or, at the very least, to assume, based on no evidence, that all or virtually all of those debtors have received relief that is, by its own terms, wholly discretionary. Such a possibility strikes the court as decidedly implausible.

---

[17] Available at http://www.tsc.state.tn.us/sites/default/files/docs/aoc_indigent_defense_fund_report.pdf.

Moreover, as Thomas and Hixson point out, their class would be sufficiently numerous, even if only a small percentage of the people whose licenses have been revoked turned out to be indigent. Indeed, if only one percent of the people whose licenses were revoked and never restored were indigent, then there would still be over 1,300 class members. Purkey's own speculation on this point tends actually to support the position of the plaintiffs. Purkey speculates that, although Thomas and Hixson suggest that most of the people whose licenses were revoked pursuant to section 40-24-105(b) were indigent, "[i]t is just as likely, based upon the proof before this Court at this stage, that a majority of those revocations involved individuals with the means to satisfy the outstanding sums." (Docket No. 67 at 7.) But even if a bare majority of those people are non-indigent, that still leaves a class of tens of thousands. Even in Purkey's counter-hypothetical intended to ward off certification, then, the plaintiffs' class is sufficiently numerous. The court will not deny certification for failure to satisfy Rule 23(a)(1).

### 3. Commonality and Typicality

Purkey's latter two objections under Rule 23(a) raise the same issue from different angles. Thomas and Hixson are two particular defendants, facing indigency for their own specific reasons, required to pay court debt in two particular counties. Tennessee, however, has numerous judicial districts, courts, and clerks' offices, which deal with a wide array of defendants. The practices for assessing and dealing with court debt may well vary substantially from county to county, from judge to judge, and from case to case. The questions then arise: (1) do all of the indigent people facing or living with revocations truly suffer a common injury; and (2) are the injuries of Thomas and Hixson truly typical of those injuries?

*a. Commonality*

Purkey is correct that Thomas and Hixson seek to assert claims for a diverse class of plaintiffs. The commonality requirement, however, does not simply call for the court to list all the traits that can be ascribed to the various class members and tally up the differences. "Commonality" refers to commonality with regard to the specific claims asserted. In order for the court to certify the class under Rule 23, the class members' claims must depend upon a common contention of such a nature that it is capable of class-wide resolution. *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 852 (6th Cir. 2013). Variation in the ancillary details of the class members' cases is insufficient to defeat certification, as long as "[i]t is unlikely that differences in the factual background of each claim will affect the outcome of the legal issue." *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 570 (6th Cir. 2004) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979)).

The claims of all the plaintiffs in this case share at least two central questions: (1) whether Tennessee can revoke a driver's license for failure to pay court debt without the opportunity to establish that the debtor is entitled to an exception based on his indigence; and (2) what minimum procedures the state must afford a debtor facing revocation. As the court has already discussed, those two questions implicate a number of legal and factual sub-issues, which will also be shared by the class. Moreover, while the individual cases of the different class members may vary substantially, those variations are immaterial to the categorical right that Thomas and Hixson have asserted. If Thomas and Hixson had cast their net more widely and sought to litigate the general fairness of Tennessee's system of court debt, Purkey might be correct that the substantial amount of local and case-by-case variation would make class certification impossible. Thomas and Hixson, however, are not asking the court to consider the

74

constitutionality of every debt assessment, collection effort, or clerk's office policy. They complain of a specific injury: the revocation of a person's driver's license for nonpayment of court debt without the opportunity to demonstrate that the person is entitled to an exception from revocation based on his indigence. That injury is common throughout the proposed class, as are the questions of law and fact underlying it.

Purkey argues next that Thomas and Hixson cannot establish commonality, because the various members of the class pose different safety risks if allowed on the road. Section 40-24-105(b), however, has nothing to do with safety risk. Tennessee has other provisions for the revocation of driver's licenses for reasons related to safety. *See, e.g.*, Tenn. Code Ann. § 55-50-501(a)(1) (calling for revocation based on conviction for vehicular homicide), (a)(2) (calling for revocation based on conviction for driving under the influence). The only reason anyone loses his license pursuant to section 40-24-105(b) is, by definition, that the person failed to pay court debt. The proposed class presumably includes both excellent drivers and mediocre drivers, just like the general population. This case, though, is concerned only with the impediment to their driving related solely to unpaid court debt. If a member of the class should qualify for revocation for some other reason, the proposed relief would pose no obstacle. With regard to the narrow claims raised in this case, Thomas and Hixson have established commonality.

### b. Typicality

Typicality is met if the class members' claims are fairly encompassed by the named plaintiffs' claims. This requirement ensures that the class representatives' interests are aligned with the interests of the represented class members so that, by pursuing his own interests, the class representative also advocates the interests of the class members. *Whirlpool*, 722 F.3d at 852–53. Thus, a plaintiff's claim is typical if it arises from the same event or practice or course

75

of conduct that gives rise to the claims of other class members and if his claims are based on the same legal theory. *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996). Commonality and typicality tend to merge because both of them serve as guideposts for determining whether, under the particular circumstances, maintenance of a class action is economical, and whether the plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 352, 542 (6th Cir. 2012).

In this instance, with commonality established, typicality readily follows. The underlying economic situations of Thomas and Hixson and the details of their convictions may be unique to them, but, with regard to the issues central to their claims, Thomas and Hixson are as typical as any member of the class. Because they have faced and received revocations for unpaid court debt under section 10-24-105 and they are indigent, they are typical.

### *4. Rule 23(b)*

Purkey's argument regarding Rule 23(b) mirrors his arguments on commonality and typicality and, ultimately, succumbs to the same flaws. After a plaintiff shows that he satisfies all of the requirements of Rule 23(a), he must establish that "the class he seeks to represent falls within one of the subcategories of Rule 23(b)." *Senter*, 532 F.2d at 522. Thomas and Hixson rely on Rule 23(b)(2), which covers situations in which "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(2) permits certification only for "those classes with homogenous interests" relative to the relief sought. *McDonald v. Franklin Cty., Ohio*, 306 F.R.D. 548, 558 (S.D. Ohio 2015) (quoting *Coleman*, 296 F.3d at 447).

Purkey again attempts to defeat class certification by pointing to the array of differing courts responsible for the putative class members' debts. Thomas and Hixson, however, are not asking this court to wade into every judicial district's procedures and solve the wide array of challenges facing every debtor. Rather, they are asking the court simply to enjoin TDSHS from enforcing the statute in its current form because TDSHS's process makes no allowance for indigence of the debtor. Rule 23(b)(2) is well suited to cases, such as this one, where class representatives allege an injury inherent to the administration of a generally applicable government policy. *See Daffin v. Ford Motor Co.*, No. C-1-00-458, 2004 WL 5705647, at *5 (S.D. Ohio July 15, 2004) ("Although not limited to civil rights suits, 23(b)(2) was plainly designed . . . to address them . . . ."), *aff'd*, 458 F.3d 549. It may be that the constitutional protections that Thomas and Hixson seek to vindicate can be satisfied while continuing to allow for a substantial amount of local variation regarding how the required safeguards are actually to be provided. That hypothetical potential for variation, however, does not negate the unitary nature of the relief sought. The plaintiffs' claims meet the requirements of Rule 23(b)(2).

### *5. Propriety of Certification*

Purkey identifies no other grounds for denying class certification here. Rule 23(a)(4) requires the court only to certify the class if "the representative parties will fairly and adequately protect the interests of the class." That requirement considers both general commonality of interests and whether the putative representative "will vigorously prosecute the interests of the class through qualified counsel." *Gonzales v. Cassidy*, 474 F.2d 67, 73 (6th Cir. 1973). The record provides ample basis for concluding that Thomas and Hixson have made such a showing. Thomas and Hixson have also satisfied Rule 23(a)(1), (2), and (3) by showing numerosity, commonality, and typicality, and they have demonstrated that their case falls within the

boundaries of Rule 23(b)(2). Rule 23(c)(1) directs this court to determine whether to certify a class "[a]t an early practicable time after a person sues or is sued as a class representative," and there appear to be no more substantive questions remaining regarding whether certification is appropriate here. The court, accordingly, will certify the proposed class.

One procedural issue, however, remains outstanding: appointment of class counsel. Rule 23(g) requires the court to appoint counsel to represent the class, chosen from among counsel involved in the litigation on behalf of individual members of the class. Hixson and Thomas have not identified whom, specifically, they are putting forward to serve as class counsel. Although the court notes that "the materials submitted in support of the motion for class certification may suffice to justify appointment [of class counsel] so long as the information described in paragraph (g)(1)(C) is included," Fed. R. Civ. P. 23(g)(2) advisory committee's note, the court will, rather than guessing at what Thomas and Hixson would propose, direct their counsel to designate which individual or individuals seek appointment as class counsel.

## IV. CONCLUSION

For the foregoing reasons, the Motion to Dismiss (Docket No. 23) will be denied and the Renewed Motion for Class Certification (Docket No. 36) will be granted. Purkey's Motion for Summary Judgment (Docket No. 61), as well as the plaintiffs' Motion for Summary Judgment (Docket No. 36), will be held in abeyance pending the completion of supplemental briefing and stipulations, as directed in the accompanying order. The court will further order plaintiffs' counsel to designate in writing which individual or individuals seek appointment as class counsel, in accordance with Federal Rule of Civil Procedure 23(g), by close of business on April 6, 2018.

An appropriate order will enter.

ENTER this 26th day of March 2018.

_____
ALETA A. TRAUGER
United States District Judge