# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **JAMES THOMAS and DAVID HIXSON,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:17-cv-00005** |
| | ) | **Judge Aleta A. Trauger** |
| **JEFF LONG, Commissioner for the** | ) | |
| **Department of Safety and Homeland** | ) | |
| **Security, in his official capacity,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

James Thomas and David Hixson have filed a Motion for Attorney's Fees and Costs (Doc. No. 142), to which the Tennessee Department of Safety and Homeland Security Commissioner Jeff Long ("Commissioner"[1]) has filed a Response (Doc. No. 148), and the plaintiffs have filed a Reply (Doc. No. 152). For the reasons set out herein, the motion will be granted as modified.

## I. BACKGROUND

On January 4, 2017, Thomas and Hixson filed a putative class action Complaint challenging the State of Tennessee's practice of revoking the driver's licenses of individuals convicted of criminal offenses who were unable to pay fines, costs, and litigation taxes related to their criminal cases—also known as "court debt"—for a year or more. (Doc. No. 1.) Such

---

[1] The individual holding the office of the Commissioner of the Tennessee Department of Safety and Homeland Security has changed over the course of this litigation. Because the plaintiffs' claims are directed at the Commissioner in his official capacity, successive officeholders have been "automatically substituted as a party" pursuant to Fed. R. Civ. P. 25(d). The court will refer to each such commissioner, at the relevant time, as "the Commissioner."

revocations were carried out pursuant to Tenn. Code Ann. § 40-24-105(b), which stated, at the time, that an individual's driver's license

> shall be revoked by the commissioner of safety if the licensee has not paid all litigation taxes, court costs, and fines assessed as a result of disposition of any offense under the criminal laws of this state within one (1) year of the date of disposition of the offense. The license shall remain revoked until such time as the person whose license has been revoked provides proof to the commissioner of safety that all litigation taxes, court costs, and fines have been paid.

Tenn. Code Ann. § 40-24-105(b)(1) (2017). The statute contained a provision allowing a driver to seek a one-time, 180-day stay of revocation based on "extreme hardship" related to the need to drive to employment or to deal with serious illness. After that stay, however, the license would be revoked. Tenn. Code Ann. § 40-24-105(b)(3).

On January 5, 2017, the plaintiffs filed a motion asking the court to certify a class defined as follows:

> All persons whose Tennessee driver's licenses have been or will be revoked pursuant to Tenn. Code Ann. § 40-24-105(b), and who, at the time of the revocation, cannot or could not pay Court Debt due to their financial circumstances.

(Doc. No. 6 at 2.) The court granted that motion on March 26, 2018.(Doc. No. 94.) The certified class challenged the constitutionality of Tennessee's court debt-based revocation scheme pursuant to 42 U.S.C. § 1983 on three grounds: first, for violation of criminal defendants' due process and equal protection rights by the "mandatory revocation of people's driver's licenses because they are too poor to pay Court Debt without any inquiry into their ability to pay" (Doc. No. 1 ¶ 100); second, for violation of their due process right to notice and a hearing on whether they can pay their court debt (*Id.* ¶ 101); and, third, for violation of equal protection based on Tennessee's policy of revoking the licenses of court debtors and not other similarly situated debtors (*Id.* ¶ 102).

The Commissioner filed a Motion to Dismiss (Doc. No. 23) and a Motion for Summary Judgment (Doc. No. 61), arguing that (1) the court was barred from considering the plaintiffs' claims under the *Rooker-Feldman* doctrine and (2) the Commissioner was entitled to summary judgment on the merits. The plaintiffs also filed a Motion for Summary Judgment. (Doc. No. 37.) The court denied the Motion to Dismiss, resolved most of the legal issues underlying the Motions for Summary Judgment, and ordered supplemental briefing on a few outstanding evidentiary matters. (Doc. Nos. 93 & 94.)

On July 2, 2018, the court entered a Memorandum and Order granting summary judgment to the plaintiffs and denying it to the Commissioner. (Doc. Nos. 113 & 114.) Specifically, the court held that:

> Under a long and well-established line of Supreme Court precedents, a statute that penalizes or withholds relief from a defendant in a criminal case, based solely on his nonpayment of a particular sum of money and without providing for an exception if he is willing but unable to pay, is the constitutional equivalent of a statute that specifically imposes a harsher sanction on indigent defendants than on non-indigent defendants. *See Griffin v. Illinois*, 351 U.S. 12 (1956); *Douglas v. California*, 372 U.S. 353 (1963); *Roberts v. LaVallee*, 389 U.S. 40 (1967); *Williams v. Illinois*, 399 U.S. 235 (1970); *Tate v. Short*, 401 U.S. 395 (1971); *Mayer v. City of Chicago*, 404 U.S. 189 (1971); *Bearden v. Georgia*, 461 U.S. 660 (1983).

(Doc. No. 113 at 6.) Under those precedents, the court held, Tennessee was required, at a minimum, to articulate a rational basis for imposing harsher sanctions on indigent defendants than on non-indigent defendants, with respect to the state's system of licensing drivers. The court held that the state's policy failed that test. (*Id.* at 27.) The court also held that the policy failed to provide individuals the minimum required due process, in light of the rights involved, because it provided no opportunity for a pre-revocation hearing. (*Id.* at 30.) The court therefore enjoined the application of Tenn. Code Ann. § 40-24-105(b), in its then-present form, going forward, and ordered the Commissioner to take various steps to allow relief to members of the class whose

3

licenses had been improperly revoked, including developing a plan to restore all improperly revoked licenses. (Doc. No. 114.)

In its Memorandum, however, the court acknowledged that the General Assembly could (and quite possibly would) amend Tennessee's statutes to continue to revoke many individuals' driver's licenses for nonpayment of court debt, as long as the state made substantive and procedural accommodations consistent with the court's holding:

> As the Supreme Court has observed, when a state's existing procedures are held to violate due process, the state's "alternative methods of compliance are several" and its "area of choice is wide." Tennessee's scheme currently requires revocation with no consideration of indigence and, therefore, violates the Constitution and will continue to do so unless altered or supplemented by additional procedures. The state, of course, is under no obligation to replace its current scheme if the relevant decision makers conclude that other mechanisms for debt collection are preferable. Insofar as the state may wish to pursue a modified system of revocation, however, the court will not unduly restrict the options available. The court can require the state to comply with the Constitution, but it cannot, at least at this stage, force it to choose one mechanism for doing so over another. Nor will the court venture into pre-judging the constitutionality of processes that do not yet exist.

(Doc. No. 113 at 30 (citations omitted).)

On July 25, 2018, the Commissioner filed a Notice of Appeal. (Doc. No.121.) On July 26, 2018, the Commissioner filed a Motion asking the court to stay its injunctive relief pending the resolution of the appeal. (Doc. No. 123.) On July 30, 2018, however, the parties filed a Proposed Order reflecting that they had conferred and reached an agreement regarding the Commissioner's actions during the pendency of the appeal. According to the Proposed Order, the parties had agreed that the Motion to Stay should be granted with the caveats that:

1. Defendant will continue his cessation of driver's license revocations for nonpayment of court debt pursuant to Tenn. Code Ann. § 40-24-105(b);

2. Defendant will continue to administratively lift all revocations for nonpayment of court debt pursuant to Section 105(b);

3. Defendant will continue to not withhold reinstatement of the driver's licenses for those drivers whose only barrier to the reinstatement of their driver's license was a Section 105(b) revocation; and

4. Defendant will continue to not withhold reinstatement of driver's licenses for drivers who also address all remaining barriers to their licensure . . . .

(Doc. No. 128 at 1.) In other words, the agreement allowed the members of the plaintiff class to enjoy most of the relief they had been granted, but, while the Commissioner was still required to administratively lift revocations, he was relieved of the burden of immediately formulating a plan for large-scale restoration and reissuance of revoked licenses for individuals who did not affirmatively seek reinstatement. The court entered the proposed Order. (Doc. No. 129.)

During the pendency of this litigation, the Tennessee General Assembly amended the provisions governing driver's license revocations multiple times. The first few amendments involved relatively limited changes, mostly to the details of the provision allowing for a time-limited hardship exception. *See* 2017 Tenn. Pub. Acts, ch. 149, § 1 (expanding the hardship exception to include hardship related to the need to participate in recovery court activities); 2017 Tenn. Pub. Acts, ch. 412, §§ 1–4 (removing requirement that hardship be "extreme," expanding grounds for finding hardship, and allowing courts to offer payment plans); 2018 Tenn. Pub. Acts, ch. 538, § 1 (giving recovery court judges power to set time for hardship exception stay of payment beyond 180 days, if recovery court-related hardship was the basis of the exception); 2018 Tenn. Pub. Acts, ch. 579, § 1 (exempting one type of fees from sums that must be paid to avoid revocation).

On April 30, 2019, however, while the appeal was pending in the Sixth Circuit, the Tennessee General Assembly enacted 2018 Tenn. Pub. Acts, ch. 438, §§ 5–6 ("Chapter 438"), which rewrote Tenn. Code Ann. § 40-24-105(b) in its entirety. During the General Assembly's consideration of Chapter 438, House Majority Leader William Lamberth stated explicitly that the

bill "deals specifically with" this court's ruling in this case. Consideration of H.B. 0839 before the Tenn. House Finance, Ways, & Means Comm., 111th Gen. Assemb., (April 9, 2019 [5:58-6:04]).[2] He explained that the bill would "take parts of that ruling and put[] it into law." *Id.*

The version of Tenn. Code Ann. § 40-24-105(b) set forth in Chapter 438 differs from the provisions originally challenged by the plaintiffs in several ways relevant to their constitutional arguments. Tenn. Code Ann. § 40-24-105(b)(1), which had previously called for automatic revocation after one year of nonpayment, now provides that a person

> who has not paid all litigation taxes, court costs, and fines assessed as a result of disposition of any offense under the criminal laws of this state within one (1) year of the date of the completion of the sentence shall enter into an installment payment plan with the clerk of the court ordering disposition of the offense to make payments on the taxes, costs, and fines owed.

Only if the individual fails to comply with the payment plan is the process for revocation initiated. Tenn. Code Ann. § 40-24-105(b)(3)(B).

Perhaps most importantly to the plaintiffs' substantive challenges, "[u]pon proof of a person's financial inability to pay, the court shall suspend the person's taxes, fines, and costs. No additional fines or costs accrue against the original taxes, fines, and costs as a result of or during the suspension of the person's taxes, fines, and costs." Tenn. Code Ann. § 40-24-105(b)(6)(B). In addition, Chapter 438 codified a policy of allowing indigent drivers whose licenses were revoked under the old system to obtain reinstatement. Tenn. Code Ann. § 40-24-105(b)(9) provides that, "[i]f otherwise eligible for a driver license, any person whose driver license was revoked under this section, prior to July 1, 2019, for nonpayment of litigation taxes, court costs, and fines assessed may apply to the court having original jurisdiction over the offense for an order

---

[2] Available at
http://tnga.granicus.com/MediaPlayer.php?view_id=414&clip_id=17128&meta_id=403009.

reinstating the person's license upon entering into an installment payment plan . . . or the submittal of proof" of indigence.

Chapter 438 also eliminated the defect central to the plaintiffs' procedural claim, the practice of revoking a person's license before he is given notice and the opportunity for a hearing in which to challenge the revocation:

> (i) Upon notice of the person's failure to comply with the payment plan, the department shall notify the person in writing of the pending revocation of the person's restricted license[3] and instruct the person to contact the appropriate court clerk within the time period described in this subdivision (b)(5)(B).
>
> (ii) A person has thirty (30) days from the date the department sends the notice described in subdivision (b)(5)(B)(i) to reestablish compliance with the payment plan or petition the court clerk or court and demonstrate that the person has, in fact, complied with the court clerk's payment plan.
>
> (iii) If the person reestablishes compliance with the payment plan or demonstrates to the court clerk or court that the person complied with the court clerk's payment plan, then the court clerk shall issue a receipt or other documentation to the person. If the person presents the receipt or other documentation to the department prior to the expiration of the thirty-day period described in subdivision (b)(5)(B)(ii), then the department shall not revoke the person's restricted license.

Tenn. Code Ann. § 40-24-105(b)(5)(B).

After Chapter 438 was enacted, the plaintiffs filed a Suggestion of Impending Mootness[4] with the Sixth Circuit. (Doc. No. 148-1.) The Sixth Circuit requested briefing from the parties regarding whether the appeal was moot, as well as whether intervening legal developments after

---

[3] When an individual first fails to comply with his payment plan, he receives notice of a pending suspension—not revocation—of his license. Tenn. Code Ann. § 40-24-105(b)(3)(C). If he does not address the issue underlying the pending suspension with the appropriate court within 30 days, his license is suspended. A driver with a suspended license, however, may obtain a restricted license for limited purposes, such as driving to and from work. Tenn. Code Ann. § 40-24-105(b)(3)(C)(iv), (4)(A). It is only when an individual with an already restricted license again fails to comply with the payment plan that he faces "revocation." Tenn. Code Ann. § 40-24-105(b)(5). For both suspensions and revocations, however, the individual receives notice and the opportunity to contest the matter in the relevant court.

[4] Mootness was "impending" because Chapter 438 had not yet gone into effect.

the filing of the Suggestion affected the case. After briefing, the Sixth Circuit issued an opinion agreeing with the plaintiffs that their claims had been rendered moot. Regarding this court's judgment, the court wrote that, "[w]hen a claim is rendered moot while awaiting review by this Court, the judgment below should be vacated with directions to the District Court to dismiss the relevant portion of the complaint [with prejudice]." *Thomas v. Lee*, 776 F. App'x 910, 911 (6th Cir. 2019) (quoting *Deakins v. Monaghan*, 484 U.S. 193, 200 (1988)). Accordingly, the Sixth Circuit vacated this court's judgment and remanded the case "with instructions to dismiss the underlying litigation as moot." *Id.* at 911. On September 30, 2019, this court entered an Order dismissing the claims as moot. (Doc. No. 138.)

On October 30, 2019, the plaintiffs filed a Motion for Attorney's Fees and Costs. (Doc. No. 142.) They requested a total of $1,114,074.50 in fees and $3,563.41 in costs, dividing among the various law firms engaged in the plaintiffs' representation—specifically, two national public interest firms, the National Center for Law and Economic Justice ("NCLEJ") and the Civil Rights Corps ("CRC"); one Tennessee-based public interest firm, Just City; and one Tennessee-based full-service law firm, Baker, Donelson, Bearman, Caldwell, & Berkowitz ("Baker Donelson"). The majority of the requested funds are attributable to fees to NCLEJ. (*Id.* at 2.) The fees claimed for the individual attorneys range from $600 per hour for the most experienced and senior members of the team to $215 for one young Baker Donelson associate. (*See* Doc. No.143 at 11.) The most hours worked appear to have been by two seasoned civil rights litigators, NCLEJ's Edward P. Krugman (536.6 hours at $600/hour) and Claudia Wilner (476 hours at $550/hour). (Doc. No. 149-1 at 2.)

The Commissioner opposes the award of an attorney's fees on the ground that the plaintiffs did not prevail in the underlying litigation. In the alternative, the Commissioner argues

that various aspects of the plaintiffs' requested fees are insufficiently documented and/or unreasonable. The Commissioner argues that, given the large number of alleged defects in the request and the voluminous billing involved, the most appropriate mechanism for reducing the attorney's fees is through a flat reduction of the lodestar amount by percentage—specifically, by 50%.

## II. LEGAL STANDARD

"Our legal system generally requires each party to bear his own litigation expenses, including attorney's fees, regardless whether he wins or loses." *Fox v. Vice*, 563 U.S. 826, 832, (2011). Thus, courts do not award "fees to a prevailing party absent explicit statutory authority." *Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 602 (2001) (citation omitted). In 42 U.S.C. § 1988(b), Congress "explicitly empowered the courts to grant fees to parties who win § 1983 actions." *Id.* Under § 1988(b), the "prevailing party" in an action to enforce civil rights under § 1983 may recover "a reasonable attorney's fee as part of the costs" of litigation. *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 552 (6th Cir. 2014). To be considered a prevailing party, a litigant must have "receive[d] at least some relief on the merits of his claim" amounting to "a court-ordered change in the legal relationship between the plaintiff and the defendant." *Buckhannon Bd. & Care Home*, 532 U.S. at 603–04 (internal quotation marks and alterations in original omitted).

A civil rights plaintiff need not succeed on every claim in order to recover attorney's fees. Success on a single claim is sufficient to render him a prevailing party. *McQueary v. Conway*, 614 F.3d 591, 603 (6th Cir. 2010). However, if a plaintiff's unmeritorious claims are "based on different facts and different legal theories" than his meritorious claims, then the court must treat them "as if they had been raised in separate lawsuits, and therefore no fee may be

awarded for services on the unsuccessful claim[s]." *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 789 (1989) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983)). On the other hand, if both the meritorious and unmeritorious claims "arise out of a common core of facts, and involve related legal theories," a court should not exempt from its fee award the hours spent on the claims that did not succeed. *Id.* at 789. Instead, the court should consider "the degree of success obtained." *Id.* (quoting *Hensley*, 461 U.S. at 436).

An attorney who achieves "excellent results" is entitled to a full fee, regardless of whether she succeeds on every related claim raised. *Waldo v. Consumers Energy, Co.*, 726 F.3d 802, 822 (6th Cir. 2013). However, when the plaintiff's success is "limited," the court may "exercise [its] equitable discretion . . . to arrive at a reasonable fee award" in light of the hours expended. *Tex. State Teachers Ass'n*, 489 U.S. at 789. In no case should a court reduce a full fee award "simply by using a ratio of successful claims to claims raised." *Waldo*, 726 F.3d at 822.

### III. ANALYSIS

#### A. Prevailing Party Status

The Commissioner argues that the plaintiffs were not prevailing parties in this case, because (1) the judgment they obtained was vacated, (2) the Commissioner would have succeeded on his appeal if the claims had not been rendered moot, and (3) the plaintiffs were responsible for the claims becoming moot because they strategically conceded mootness to avoid reversal. The Commissioner focuses in particular on the Sixth Circuit's holding in *Fowler v. Benson*, 924 F.3d 247 (6th Cir. 2019), in which the court rejected similar challenges to a Michigan driver's license suspension scheme. The plaintiffs respond that it was the State of Tennessee's amendment of its laws that rendered their claims moot, not the plaintiffs' actions, and that the plaintiffs prevailed by obtaining injunctive relief that granted them their sought-after

10

rights until the state's laws were changed to make that injunctive relief unnecessary. The plaintiffs also point out that any suggestion that they strategically conceded mootness in light of *Fowler* is belied by the fact that *Fowler* was initially decided on May 8, 2019, a bit under a week *after* the plaintiffs filed their Suggestion of Impending Mootness. (*See* Doc. No. 148-1.)

"A plaintiff crosses the threshold to 'prevailing party' status by succeeding on a single claim, even if he loses on several others and even if that limited success does not grant him the 'primary relief' he sought." *McQueary*, 614 F.3d at 603 (6th Cir.2010) (quoting *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 790–91 (1989)). In order to be said to have succeeded on the claim, a plaintiff typically must obtain a "material alteration of the legal relationship between the parties," by which the plaintiff is "entitled to enforce a judgment, consent decree, or settlement against the defendant." *Farrar v. Hobby*, 506 U.S. 103, 113 (1992). "[A] judicial pronouncement that the defendant has violated the Constitution, unaccompanied by an enforceable judgment on the merits, does not render the plaintiff a prevailing party." *Id.*

The Sixth Circuit addressed the issue of how a party's prevailing party status is affected by an amendment of the challenged statute while his appeal was pending in *Green Party of Tennessee v. Hargett*, 767 F.3d 533 (6th Cir. 2014) ("*Green Party II*"). The plaintiff in that case had challenged two aspects of Tennessee's election laws, respectively referred to as the state's "ballot-access" and "ballot-ordering" laws. The plaintiff initially prevailed on its challenges by obtaining summary judgment in the district court. Then, "[i]n the spring of 2012, while the defendants' appeal was pending, Tennessee amended its ballot-access statutes." *Id.* at 541. The Sixth Circuit concluded that, in light of the change in law, "the district court should be given the opportunity" to consider the claim anew, given that the underlying laws had "fundamentally changed since the district court decided the case." *Green Party of Tennessee v. Hargett*, 700 F.3d

11

816, 824 (6th Cir. 2012) ("*Green Party I*"). The Sixth Circuit accordingly "REVERSE[D] the judgment of the district court and REMAND[ED] the case for further proceedings consistent with" its opinion. *Id.* at 829.

On remand, the court again granted summary judgment to the plaintiff. The court also awarded the plaintiff attorney's fees—including fees related to the already-reversed challenge to the original version of the ballot-access provisions. The defendants appealed, and, in *Green Party II*, the Sixth Circuit again reversed the award of summary judgment to the plaintiff. *Green Party II*, 767 F.3d at 549. The court, however, upheld the award of attorney's fees with regard to the original challenge, despite the fact that the court had technically reversed that holding:

> We conclude that the plaintiffs qualify as prevailing parties because the district court initially ruled that Tennessee's then-current ballot-access scheme . . . was unconstitutional, and the court ordered declaratory and injunctive relief to remedy the violation. The plaintiffs have not been stripped of their prevailing party status by the legislature's decision to amend the relevant statutes two months after the district court issued its order but before the defendants' appeal was heard. Moreover, this court never reached the merits of Tennessee's old ballot-access scheme and has done nothing to disturb the original judgment of the district court.

*Id.* at 553 (citations omitted).

. This case differs from *Green Party II* procedurally in a few ways that are arguably relevant. First, *Green Party II* did not involve a holding that the plaintiff's claim itself was moot; rather, the Sixth Circuit held, in *Green Party I*, that the claim survived but merely needed to be litigated again, targeting the new law rather than the old law. In this case, therefore, unlike in the *Green Party* cases, there is no longer any live, substantive claim over which the court has jurisdiction. The Supreme Court has held that a plaintiff's "interest in attorney's fees is . . . insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990) (citing *Diamond v.*

*Charles*, 476 U.S. 54, 70–71 (1986)). It could be argued, then, that this court would exceed its jurisdiction to award attorney's fees now.

The plaintiffs, however, are not arguing that they have a standalone claim for attorney's fees, nor are they seeking to rely on attorney's fees to manufacture jurisdiction that would prolong the case. They are merely seeking attorney's fees related to their actions taken in a case over which both this court and the Sixth Circuit *did*, for an extended period of time, have jurisdiction—jurisdiction that the courts exercised and based on which the plaintiffs expended considerable resources. The Sixth Circuit has recognized that a court may, if statutorily authorized, have the power to award attorney's fees even if it has determined that it lacks jurisdiction over the case in every other respect—for example, after or concurrently with its remand of a case that was improperly removed. *See Stallworth v. Greater Cleveland Reg'l Transit Auth.*, 105 F.3d 252, 256 (6th Cir. 1997); *see also* 28 U.S.C.§ 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."). It therefore cannot be the case that the court would be constitutionally barred from awarding attorney's fees here, at least under current Sixth Circuit law.

Indeed, even the Commissioner concedes that "there is support for the proposition that when an intervening event renders a case moot on appeal, plaintiffs may remain 'prevailing parties' for the purpose of attorney's fees in the district-court litigation." (Doc. No. 148 at 6.) In order for that proposition to hold true, it must at least be constitutionally permissible, if statutorily authorized, for the court to retain jurisdiction to award attorney's fees even after the claim becomes moot. Such a holding is consistent with the principle that the court has limited

13

ancillary jurisdiction "to protect its proceedings and vindicate its authority" related to the proceedings over which it has primary jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380 (1994). It would be inconsistent with both the integrity of this court's proceedings and the purposes of § 1988 to allow the State of Tennessee to evade attorney's fees by way of total legislative capitulation on the challenged aspects of Tennessee's laws.[5] The eventual mootness of the underlying claims in this case therefore does not necessarily preclude this court from awarding attorney's fees, if those fees are authorized by § 1988—in other words, if the plaintiffs are prevailing parties.

In applying the interpretation of § 1988 set forth in *Green Party II* to this case, it bears noting that the reason that that the plaintiffs' claims were held to be moot in this case but not in *Green Party I* is that the plaintiffs were, if anything, substantially *more* successful than the *Green Party* plaintiff was at obtaining the relief they sought. Although the General Assembly amended the state's ballot-access laws, it did not fully remedy the issues that the Green Party plaintiff had raised. In contrast, Chapter 438 gave the plaintiffs here at least some version of everything that the plaintiffs asked for. They asked for the state to stop revoking licenses of individuals who could show that their nonpayment of court debt was due to their indigence; the state has done so. They asked for the state to stop revoking driver's licenses before a chance for a hearing; the state has done so. They asked for the state to create a way for indigent drivers whose licenses were revoked to have them restored; that path is now available. To hold that the *Green Party I* plaintiffs prevailed but these plaintiffs did not would be punishing these plaintiffs for being too successful at nudging Tennessee's policy in their preferred direction.

---

[5] Indeed, it bears noting that, if the court accepted the premise that mootness rendered it incapable of awarding attorney's fees, then the state could evade those fees in a case by amending its laws at any time prior to the entry of the award or at least before the judgment became final—the state could even amend its laws to create mootness the day after receiving an unfavorable ruling on the merits in the United States Supreme Court itself, before the district court had the chance to enter a judgment on remand.

The Commissioner, however, protests that mootness in this case was not the result of Chapter 438, but rather the plaintiffs' litigation decision to argue, at the Court of Appeals level, that their claims were moot. It is true that the Sixth Circuit cited the plaintiffs' position in making its mootness finding. Nothing about the Sixth Circuit's ruling, however, leads this court to believe that the court would have accepted the plaintiffs' position if there had not been an underlying change in the law rendering their claim of mootness at least plausible. In any event, insofar as the Sixth Circuit left some room for ambiguity regarding whether Chapter 438 independently rendered the plaintiffs' claims moot, that issue is, therefore, undecided in this litigation and this court can address it, in the first instance, as part of the prevailing party analysis. The court finds that, as the plaintiffs urge, their claims are actually moot by virtue of the amendments in Chapter 438, and plaintiffs' concession of that fact in the Sixth Circuit has no bearing on the court's analysis. It would be pointless—and contrary to the principle of candor to the tribunal—to require the plaintiffs to pretend that their claims are not moot just to establish prevailing party status.[6]

The other salient procedural difference between this case and *Green Party II* that is arguably relevant is that the Sixth Circuit, in this case, expressly vacated the judgment that the plaintiffs obtained. It may be that, in some cases, vacating the judgment obtained will be categorically inconsistent with the plaintiff's being granted prevailing party status, because, without the judgment or a settlement agreement, there is no basis for finding a "material alteration of the legal relationship between the parties." *Farrar*, 506 U.S. at 113. The material alteration in the relationship between the parties brought on by this litigation, however, is

---

[6] It is, moreover, irrelevant that, in light of the Sixth Circuit's intervening decision in *Fowler,* there is a high likelihood that the defendants would have initially prevailed on their appeal at the circuit panel stage. In that regard, Tennessee's predicament is no different from that of a defendant who settles the claims against him, only to later see caselaw develop in his favor. The plaintiffs did not force Tennessee to change its statutes in response to this litigation; the state chose to do so, and it must bear the results.

undeniable. First, the relationship was altered by this court through its injunctive relief. That injunctive relief remained substantially in effect for as long as it was needed—that is, until Chapter 438 changed the law in the plaintiffs' favor. Moreover, many of the plaintiffs already obtained the relief they sought, in the form of restored driver's licenses, between the court's entry of its injunction and the conclusion of the appeal. Finally, the plaintiffs have identified legislative history strongly supporting the conclusion that the General Assembly not only adopted Chapter 438 in direct response to this litigation but specifically viewed the enactment as a codification of aspects of the court's ruling. The changes put into effect by Chapter 438 are binding on the Commissioner and inure to the benefit of the plaintiffs. The court sees no reason why § 1988 would have the court turn its eyes from all of these changes in the parties' legal relationships based solely on the technical distinction of whether the circuit court issued an express vacatur of this court's judgment.

The plaintiffs prevailed in this court, after which they were, at least in large part, relieved of the burdens of the challenged statute for the entirety of that statute's remaining time on the books. Then, that statute was replaced with a new system that resolved each of the plaintiffs' objections in the plaintiffs' favor. The only way around the conclusion that the plaintiffs "prevailed," as that term is ordinarily used, would be to adhere to a highly technical view of what it means to "prevail" in litigation, requiring the entry of an actual judgment in the party's favor. That requirement, however, has already been rejected by the Sixth Circuit. *See McQueary*, 614 F.3d at 599 (holding that a plaintiff can attain prevailing party status if it obtained a preliminary injunction that caused it to "receive[] everything it asked for in the lawsuit," after which its claim was rendered moot by "court-ordered success and the passage of time").

16

Indeed, requiring a party to obtain judgment in order to "prevail" would make it virtually impossible for some types of plaintiffs—such as "protesters [who] seek an injunction to exercise their First Amendment rights at a specific time and place"—to ever count as prevailing parties, no matter how successful they were. *Id.* In such a case—or, for example, a case about the events of a particular upcoming election day—the plaintiff's receiving the protections he sought by preliminary injunction prior to the day in question may be all the success he needs or could reasonably hope to achieve. Such cases are, at least potentially, treated as successes under § 1988 by the Sixth Circuit, even though they may be rendered moot before a judgment is entered. *Id.*

The plaintiffs' situation turned out to be functionally similar to those hypothetical plaintiffs', although these plaintiffs did not know, when they first prevailed in this court, that they would only need injunctive relief for a limited period of time. The plaintiffs sought relief from Tennessee's system of revoking driver's licenses for unpaid court debt regardless of indigence. It turned out that that system would—seemingly due to the plaintiffs' efforts—remain in place for only a while longer, during which period the plaintiffs enjoyed the relief they had sought. Then, the effective date of Chapter 438 came and went, rendering the plaintiffs' claims moot and their injunctive relief unneeded. But when they did need the relief, they had it.

This court acknowledged, in its original opinion granting summary judgment to the plaintiffs, that Tennessee could and might, consistently with the court's rulings, amend its statutes to reinstate some form of driver's license revocations for nonpayment of court debts. Indeed, the court doubts that anyone involved in this case was particularly surprised that Tennessee chose to do so—the only surprise being, perhaps, that it acted so quickly, rather than waiting for a possible success on appeal. After the amendment and subsequent finding of mootness, the plaintiffs had obtained everything they would have received by prevailing wholly

17

through litigation, with the sole exception that they did not obtain a formal judgment that, at this point, would be functionally meaningless because the Commissioner is now statutorily required to comply with the injunctive relief that was granted.[7] The court therefore holds that the plaintiffs have established that they are prevailing parties and that the court is within its power and jurisdiction to award attorney's fees and costs. The court finds, moreover, that, in light of the plaintiffs' significant success and the scale of the relief they obtained, an award of fees is appropriate.

## B. Adequacy of Documentation

"The party requesting fees bears the burden to submit adequate documentation of the hours reasonably expended." *Plumbers & Pipefitters Local No. 396 Combined Fund v. State Line Plumbing & Heating, Inc.*, No. 4:10 CV 1936, 2011 WL 1769085, at *2 (N.D. Ohio May 9, 2011) (citing *Trustees of the Painters Union Deposit Fund v. Interior/Exterior Specialist, Co.*, 2011 WL 204750 (E D. Mich. January 21, 2011)). The plaintiffs provided lengthy billing records, as well a number of declarations from attorneys associated with the various firms that provided representation. The Commissioner, however, objected that some of the records lacked detail, including the fact that the timesheet for one attorney, Marc Cohan, wholly lacked descriptions of the work he performed. The Commissioner also took issue with the extensive redactions throughout some of the timesheets.

After the Commissioner filed his Response, the plaintiffs filed a Notice of Re-Filing (Doc. No. 149) seeking to file an updated version of their documentation to correct errors that they characterized as mechanical, including the omission of the task descriptions for Cohan.

---

[7] Admittedly, the plaintiffs did not receive the full extent of the precise relief they originally requested, in that they originally sought mass reinstatement of revoked licenses by the Commissioner, rather than a process by which individuals could seek reinstatement. The Commissioner has provided no basis for concluding that this difference alone would affect the plaintiffs' status as prevailing parties.

When the plaintiffs filed their Reply, they provided further additional records, removing some of the prior redactions. (Doc. Nos. 152-1 to -4.) The Commissioner filed Objections arguing that the court should not consider the new documents because they were not timely filed. (Doc. No. 153.)

The court will consider the supplemental documentation. Allowing a party to file supplemental documentation related to claimed attorneys' fees is commonplace and well within the court's ordinary powers in managing its consideration of motions. The Commissioner, moreover, has now had the chance to respond to the newly filed information.

The court also will not disregard any entries merely because they contain redactions. It is true that substantial redactions are not typically included in the documentation that the court receives in support of requests for attorney's fees. That, however, is because most task descriptions provided by attorneys are too general to implicate issues of privilege or work product. There is nothing inherently more suspect or problematic about using partial redactions, as opposed to simply rephrasing everything to be sufficiently vague. The court, therefore, will not disallow any entries based solely on the presence of redactions but, instead, will judge the entries based on the unredacted information that was included.

That said, the Commissioner is correct that many of the plaintiffs' entries provide less information than this court typically requires to justify an award of attorney's fees. For example, due to the redactions, a number of meetings and calls are billed for with no explanation of whom they were with or what they were about. The bar for documenting attorney hours with sufficient detail is not particularly high; it is difficult, however, to see how an entry such as "Meeting with [REDACTED]" (Doc. No. 152-3 at 2) can clear that bar without the bar becoming meaningless. The Commissioner's objection that a number of the plaintiffs' entries include insufficient detail, therefore, is supported.

The insufficiently documented entries are, however, considerably in the minority. The plaintiffs have adequately documented a wide range of reasonably necessary activities by the relevant attorneys, and the court will not deny the plaintiffs the fees to which they are entitled merely due to documentation issues elsewhere. The plaintiffs' errors of documentation, therefore, warrant only a reduction, but not a denial, of fees granted.

## C. Reasonableness of Fees

The Supreme Court has cautioned that a request for attorney's fees "should not result in a second major litigation." *Hensley*, 461 U.S. at 437. "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.* at 433. This two-step calculation, known as the lodestar amount, provides an "initial estimate of the value of a lawyer's services." *Id.* However, "[t]he product of reasonable hours times a reasonable rate does not end the inquiry." *Id.* at 434. After determining the lodestar amount, the court may adjust the fee upward or downward "to reflect relevant considerations peculiar to the subject litigation." *Adcock–Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000). However, "trial courts need not, and should not, become green-eyeshade accountants." *Fox*, 563 U.S. at 838. "The essential goal in shifting fees is to do rough justice, not to achieve auditing perfection." *Id.* Therefore, "trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Id.*

The Commissioner does not object to any of the fees charged or total hours expended as facially unreasonable. The court, based on its independent review, also finds the rates and total numbers of hours spent to fall within the range of reasonableness, if otherwise supported and proper. This case was complex and challenging, requiring the attorneys involved to develop a

20

deep understanding of a number of areas of law, including not only the Supreme Court and Sixth Circuit caselaw regarding wealth-based distinctions under the Constitution, but also the obscure ins and outs of Tennessee criminal procedure and administration, as well as the sometimes esoteric framework of protections that are implicated when federal court litigation veers close to the subject matter of independent state court proceedings, such as the *Rooker-Feldman* doctrine. Many of the plaintiffs' attorneys brought considerable experience and expertise to their representation, and the representation provided was, at least from the perspective of the court, of the highest quality. The court, accordingly, will take the plaintiffs' originally proposed lodestar calculation as its starting point and consider the specific objections raised by the Commissioner.

### 1. Fees for Work Performed on Appeal

The Commissioner argues that, even if the plaintiffs qualify as prevailing parties under § 1988, the court should not treat them as prevailing parties for the purposes of their appeal, because the appeal was never decided on the merits and their claims were dismissed as moot. *See Lewis*, 494 U.S. at 483 ("Since the judgment below is vacated on the basis of an event that mooted the controversy before the Court of Appeals' judgment issued, Continental was not, at that stage, a 'prevailing party' as it must be to recover fees under § 1988.")). The plaintiffs respond that they are not arguing that they separately "prevailed" on appeal, but that the work that their attorneys performed on appeal, at least before mootness became the determinative issue in the case, was necessary to defend the relief that they obtained in the district court and that those efforts should therefore be considered in the award of attorney's fees. The plaintiffs, however, have agreed to withdraw their fee requests related to work from May 7, 2019—the date when the Sixth Circuit canceled oral argument in the appeal in response to the Suggestion of Impending Mootness—until September 12, 2019, when the Sixth Circuit's mootness decision

21

was rendered. Accordingly, the plaintiffs now seek only fees related to the period during which they were defending this court's judgment on the merits.

The Western District of Tennessee considered a similar issue in *Ford v. Tenn. Senate*, No. 2:06-CV-2031, 2008 WL 4724371 (W.D. Tenn. Oct. 24, 2008), which involved a request for attorney's fees that included fees incurred related to an appeal that was eventually dismissed as moot. The court ruled that the fees associated with the appeal were recoverable, because they were part and parcel of the plaintiff's overall success as the prevailing party with regard to the claims at issue. The court acknowledged that the "[d]efendants' actions mooted their appeal to the Sixth Circuit" but that the plaintiffs nevertheless had "still incurred attorney's fees in preparation for the appeal" and "ultimately prevailed" with regard to the claims at issue; accordingly, they were "entitled to an award of attorney's fees for the work performed regarding their appeal."[8] *Id.* at *4.

In light of the plaintiffs' withdrawal of the most questionable claimed fees, the court is persuaded that the Western District's framework should apply here. The plaintiffs did not choose to send this case to the Sixth Circuit; the Commissioner did. That appeal was part of prosecuting the claims for which, the court has held, the plaintiffs were the prevailing party. At the very least, it was plainly necessary for the plaintiffs, to ensure their prevailing status, to defend the appeal until Chapter 438 went into effect and rendered their claims moot and the relief they received unnecessary. Section 1988 allows for the granting of attorney's fees to the "prevailing party" in an "action or proceeding," and the appellate work performed by the plaintiffs' attorneys was an extension of the same "action" on which the plaintiffs prevailed.

---

[8] Admittedly, the Western District stated that it was "important" to its analysis that the Sixth Circuit did not grant vacatur in the dismissed appeal. *Ford*, 2008 WL 4724371 at *4. As this court has already held, however, the formal distinction of whether there was a vacatur is of limited importance in this instance.

22

That does not, however, mean that it is irrelevant that this court's ruling in the plaintiffs' favor was never affirmed. Although the plaintiffs have, as a practical matter, been successful, it is still true that it would have been a greater success for their judgment actually to have been upheld by the Sixth Circuit. The court, accordingly, will consider the lack of standalone appellate success on the merits as a factor weighing against the plaintiffs with regard to the final calculation of appropriate fees.

## 2. Fees for Client Selection

The Commissioner next objects that the plaintiffs have sought fees and costs related to their process of seeking out potential original plaintiffs for this litigation. The public interest firms in this case—like similar firms of all stripes—apparently identified legal challenges that they wished to raise and then engaged in a search for appropriate plaintiffs. The Commissioner does not take issue with such a practice as a general matter, nor could he. Indeed, deft client selection is an indispensable part of advocacy litigation. *See* Cynthia Godsoe, *Perfect Plaintiffs*, 125 Yale L.J. Forum 136 (2015). The Commissioner objects, however, that those efforts are not properly characterized as fees recoverable in this case.

The plaintiffs respond that appropriate vetting of potential plaintiffs was necessary to the ultimate success of this litigation. The court does not doubt that that is true; the fact that client selection was part of the plaintiffs' success does not, however, fully address the Commissioner's objection. Although attorney's fees under § 1988 are ultimately used to compensate attorneys, they are actually awarded to the "prevailing *party*." At least prior to the firms' recruitment of their first plaintiff, they did not represent anyone with any claim at issue in these proceedings. Moreover, if the court were to permit recovery for all work that was ultimately necessary to the plaintiffs' success, there would be very little by way of a limiting principle to stop that process

merely at the client selection and vetting process. Presumably, before they even sought out clients, the public interest firms involved in this case took time identifying Tennessee as an appropriate state in which to raise these issues, as well as time familiarizing themselves with both the constitutional and state-law landscapes involved. At some point, the organizations' preparatory efforts—no matter how indispensable to their ultimate success in court—must be attributed to the organizations' general advocacy missions, not to the litigation itself.

Both the plaintiffs and the Commissioner have identified cases in support of their respective positions, none of which is binding on this court. *See Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1251 (10th Cir. 1998) ("In some instances, such as when the litigation involves particularly difficult questions of standing, mootness, or ripeness, attorneys may be awarded time necessary to determine who should be the appropriate plaintiffs or whether the suit may even be brought. Pre-recruitment time also may be awarded where attorneys have done pre-recruitment work with an advocacy group representing a class."); *Kelly v. Corrigan*, 890 F. Supp. 2d 778, 786 (E.D. Mich. 2012) ("The subject matter of the work done prior to agreeing to represent an actual client may be relevant to the litigation ultimately initiated but . . . it is not something that should be included in the attorney fee award under § 1988."); *Gratz v. Bollinger*, 353 F. Supp. 2d 929, 944 (E.D. Mich. 2005) ("[T]he Court does not believe that § 1988 contemplates an award of fees related to an attorneys' search for clients who will serve as model plaintiffs."). There is, moreover, nothing in the text of § 1988 that directly addresses this question. Whether the plaintiffs' claimed fees related to client recruitment are appropriately included in a fee award must therefore be determined according to the general principles governing fee requests.

Ultimately, the court is persuaded that the plaintiffs have included fees for at least some entries related to the client selection process that fall outside the scope of reasonable fees under § 1988. The key to the amount of an award of attorney's fees is reasonableness, and reasonableness is determined against the backdrop of actual practice in the relevant jurisdiction. In this light, it makes little sense to reduce § 1988 fee amounts to categorical rules about what may or may not be included in a fee; what matters is what, as a factual matter, would reasonably be included in the fee, according to prevailing practices in the particular time and place in which the litigation took place. If the plaintiffs had produced any evidence that it is ordinary practice, in this district, for an attorney to require a plaintiff to pay for his own recruitment, then the fees would likely be recoverable. The plaintiffs, however, have provided no such evidence. To the contrary, the ordinary rule, as far as the court's experience reveals, is that, when a client retains an attorney at a particular rate, he is typically paying for all of that attorney's preexisting expertise, including his preparation to take on cases of the type at issue. The rate, in other words, captures the value of the work performed before the representation. There is no need to pay for that work twice. The court, accordingly, will consider the plaintiffs' overinclusive billing practices in it final fee calculation.

### 3. Excessive Staffing

The Commissioner objects next that the plaintiffs relied on an excessive number of attorneys in this case. *See Ky. Rest. Concepts Inc. v. City of Louisville*, 117 F. App'x 415, 419 (6th Cir. 2004) ("Plaintiffs are not entitled to have any number of well-qualified attorneys reimbursed for their efforts, when fewer attorneys could have accomplished the job."). As the Commissioner put it:

> At the time the Complaint was filed, Plaintiffs had engaged no less than 7 attorneys as counsel of record. Plaintiffs' billing records indicate that 14 attorneys

> had been engaged in this litigation prior to filing the Complaint. The Docket Report for this matter reflects that there were eventually 12 attorneys of record, and billing entries reflect that 16 attorneys and various support staff were engaged in this litigation.

(Doc. No. 148 at 11.) The Commissioner is no doubt correct that that represents an unusually large crew of attorneys, at least for this district. The court, moreover, is persuaded that the number of attorneys involved is relevant to the reasonableness of the hours billed. As anyone with experience working with a team of attorneys can attest, every new addition is another person who has to be brought up to speed, at least with regard to the portion of the litigation to which she is contributing. Moreover, a larger team, particularly one that involves multiple firms, means more time devoted to coordination. Large teams are sometimes necessary, but they also introduce an element of inefficiency to the process. *See Hutchinson ex rel. Julien v. Patrick*, 636 F.3d 1, 14 (1st Cir. 2011) (noting that, even "where the deployment of multiple attorneys on a single project is reasonable, that staffing pattern inevitably results in a need for some amount of coordination, including intramural conferencing").

That said, the number of attorneys involved—compared to the core lodestar issues of rate and hours—is not a matter of the utmost concern. Twenty attorneys' working one hour at a certain rate costs no more than one attorney's working twenty hours at that rate. Moreover, as the plaintiffs point out, merely counting up the attorneys involved can be somewhat misleading here. Although many attorneys appear to have contributed to the plaintiffs' representation, a significant majority of the work was performed by a core team of Wilner, Krugman, and a few others. At most, therefore, the court can infer that the number of lawyers employed by the plaintiffs is one limited indicium of inefficiency, to be considered in light of the reasonableness of the overall hours billed.

### 5. Billing for Allegedly Unnecessary Activities

Finally, the Commissioner argues that the plaintiffs frequently billed for activities that were not necessary to this litigation. Some of the Commissioner's complaints in this regard are duplicative of his objection to the plaintiffs' plaintiff-recruitment billing, and other objections appear to be to hours for which the plaintiffs are not, in fact, seeking reimbursement. The Commissioner also challenges hours spent attempting to intervene in *Fowler*—an effort that, the Commissioner plausibly suggests, was never likely to succeed.

The plaintiffs' questionably necessary entries represent a small number of hours, particularly compared to the larger problem of insufficient documentation for many entries. Based on the court's review of the challenged entries, the court finds any unnecessary tasks to have a minimal effect on the overall hours billed for lodestar purposes. The court's adjustments, therefore, will focus primarily on the larger issues of inadequate documentation, billing for client selection, failure to achieve appellate success on the merits, and potential overstaffing.

6. Method for Reduction of Fees Requested

The plaintiffs' billings are, to say the least, voluminous. That is to be expected. This was a complex, hard-fought case, presenting not only difficult constitutional questions, but difficult procedural and evidentiary issues as well. In light of this overwhelming documentation, the Commissioner has suggested that the court, rather than attempting to go through each billing with a fine-toothed comb to calculate a billable-minute-by-billable-minute reduction, instead impose an across-the-board reduction by percentage. Specifically, the Commissioner suggests that a reduction of 50% is called for.

"When confronted with a request for the award of attorney's fees in the face of inadequate billing records, courts in the Sixth Circuit often apply across-the-board fee reductions." *Potter v. Blue Cross Blue Shield of Mich.*, 10 F. Supp. 3d 737, 748 (E.D. Mich.

27

2014) (citing *Grant v. Shaw Envtl., Inc.*, No. 3:08-CV-350, 2013 WL 1305599, at *7 (E.D. Tenn. Jan. 30, 2013), report and recommendation adopted, No. 3:08-CV-350, 2013 WL 1305596 (E.D. Tenn. Mar. 28, 2013)); *see Heath v. Metro. Life Ins. Co.*, 2011 WL 4005409, at *10 (M.D. Tenn. Sept. 8, 2011); *Helfman v. GE Group Life Assurance Co.*, 2011 WL 1464678 (E.D. Mich. April 18, 2011)). Indeed, although the plaintiffs argue that an across-the-board reduction is unnecessary here, they premise that argument on the assertion that their attorney's fees were adequately documented and, therefore, "the court can readily determine what, if any, claimed time is not compensable." (Doc. No. 152 at 14.) To the contrary—a meaningful number of the plaintiffs' claimed hours have been documented too vaguely for this court to make any such determination. The court, accordingly, agrees that an across-the-board percentage reduction would be appropriate.

The court will reduce the claimed lodestar amount (minus the requests that have already been withdrawn) by 30%. The Commissioner's requested 50% reduction reflected a number of objections that, this court has held, did not have merit. The Commissioner, however, is correct that some of the plaintiffs' time entries fall short of sufficient documentation; that the plaintiffs have billed for some preparatory matters that would not be included in a reasonable fee; that the plaintiffs' success was of a lesser degree than it would have been if they had succeeded on the merits in the appellate courts; and that the large legal team used here is consistent with an inefficient structure of representation that likely inflated the billings at some beyond what was reasonably necessary. The court finds that a 30% reduction would reflect those cumulative flaws while still compensating the plaintiffs with a reasonable rate for the substantial work they performed and the excellent representation that they provided.

28

After their withdrawal of some of their claimed fees on appeal, the plaintiffs request the following:

| Firm | Fees | Costs | Total |
|---|---|---|---|
| NCLEJ | $695,355 | $1,495.25 | **$696,850.25** |
| CRC | $320,975 | $1,143.16 | **$322,118.16** |
| Baker Donelson | $48,419.50 | $925 | **$49,344.50** |
| Just City | $16,425 | | **$16,425** |
| **Total** | **$1,081,174.50** | **$3,563.41** | **$1,084,737.91** |

Seventy percent of $1,081,174.50 is $756,822.15. After the unaltered costs of $3,563.41 are added, that creates a sum of $760,385.56. The court will accordingly award attorney's fees and costs in that amount.

## IV. CONCLUSION

For the foregoing reasons, the plaintiffs' Motion for Attorney's Fees and Costs (Doc. No. 142) will be granted, as modified consistently with this opinion. The court will order the Commissioner to pay the plaintiffs attorney's fees and costs in the amount of $760,385.56.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

29